UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

-----------------------------------------------------

Brian J. Meuse
                              Plaintiff

v.

Susan Pane,
Rosalyn Stults,
Lt. Detective Daniel R. Moynihan, in his
        official and individual capacities,
Captain Donald Thompson, in his official
        and individual capacities,
City of Haverhill, Massachusetts,
Louis Freeh, in his official capacity,
Charles S. Prouty, in his official and
        individual capacities,
Charles P. Kelly, in his official and
        individual capacities,
FOX News Channel a/k/a FOX25News,
America's Most Wanted,
National Center for Missing and
        Exploited Children,
Wal-Mart Stores, Inc.
                              Defendants

-----------------------------------------------------

CIVIL ACTION:

# 04 cv 10255 EFH

MAGISTRATE JUDGE _____

RECEIPT # _53591_
AMOUNT $ _150_
SUMMONS ISSUED _✓_
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _2-6-04_

## VERIFIED COMPLAINT: JURY CLAIM AS TO ALL COUNTS

Brian J. Meuse ["Meuse"] of Massachusetts hereby asserts the following claims against the
defendants in the above-entitled action:

|       |                                                                          | **Paragraphs** |
|-------|--------------------------------------------------------------------------|----------------|
| **(1)**  | violation of 42 U.S.C. 1983: arrest                                    | 397-409        |
| **(2)**  | violation of 42 U.S.C. 1983: detention and confinement                | 410-411        |
| **(3)**  | violation of 42 U.S.C. 1983: conspiracy                               | 412-433        |
| **(4)**  | violation of 42 U.S.C. 1983: refusing or neglecting to prevent       | 434-440        |
| **(5)**  | malicious prosecution                                                  | 441-456        |
| **(6)**  | abuse of process                                                       | 457-464        |
| **(7)**  | violation of Mass. Civil Rights Act (M.G.L. c. 12, sec. 11I)          | 465-470        |
| **(8)**  | false arrest and imprisonment                                          | 471-478        |
| **(9)**  | assault                                                                | 479-483        |
| **(10)** | battery                                                                | 484-487        |
| **(11)** | conspiracy                                                             | 488-501        |
| **(12)** | defamation                                                             | 502-512        |
| **(13)** | intentional infliction of emotional distress                          | 513-521        |

1

**JURISDICTION**

1.      Jurisdiction of this court arises under 28 U.S.C. §§ 1331, 1337, 1343(a) (civil rights and elective franchise), and 1367(a) (supplemental jurisdiction); 42 U.S.C. §§.1983 (civil action for deprivation of rights), 1985(3) (conspiracy to interfere with civil rights), 1986, and 1988 (proceedings in vindication of civil rights); and 18 U.S.C. §§ 1341, 1511; 1961 (and statutes cited therein) through 1967.

2.      Jurisdiction of this court for the pendent claims is authorized by F.R.Civ.P. 18(a), and arises under the doctrine of pendent jurisdiction as set forth in <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715 (1966).

**PARTIES**

3.      Plaintiff Brian J. Meuse ["Meuse"] is a natural person residing at 115 Oxford Avenue, Haverhill, Essex County, Massachusetts, United States of America; was a resident of Massachusetts during all relevant times of this action, and was the significant other of Defendant Susan Pane, and father of Marissa Lyne Meuse, Pane and Meuse's child, born August 4, 1999.

4.      Defendant Susan Pane ["Susan"], who is a natural person, was residing at 291 Sagewood Drive, Port Orange, Volusia County, Florida 32127, United States of America, at all times relevant to this Complaint.

5.      Rosalyn Stults ["Stults"], who is an attorney, was a resident of Massachusetts, and represented Susan Pane at all relevant times in this Complaint [Trial, 5/20/02, at 65].

6.      Defendant Daniel R. Moynihan ["Moynihan"], who is a natural person and the named Complainant in the Criminal Complaint, Docket Number 0038-CR-2411 in the Haverhill Division of the District Court Department of the Commonwealth of Massachusetts, was a resident of Haverhill, Essex County, Massachusetts, United States of America, and a duly-appointed Detective in and Domestic Violence Officer for the Haverhill Police Department, 40 Bailey Place, Haverhill, MA, at all times relevant to this Complaint **[Trial, 5/20/02, at 164-165].**

7.      Defendant Donald Thompson ["Thompson"], who is a natural person, was a resident of Haverhill, Essex County, Massachusetts, United States of America, and a duly-appointed police officer, Captain, and Detective Commander in the Haverhill Police Department at all times relevant to this Complaint.  Detective Moynihan reports to Detective Commander Thompson.

8.      Defendant City of Haverhill ["Haverhill"] is a Municipal Corporation, organized under the laws of the Commonwealth of Massachusetts, and located at City Hall, Room 100, 4 Summer Street, Haverhill, MA 01830.  It is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby.  It was also the public employer of Defendants Moynihan, Thompson, and Barone at all times relevant to this Complaint.

9.      Louis Freeh was at all times relevant to this Complaint Director of the Federal Bureau of Investigation ["FBI"], whose headquarters is currently located in the J. Edgar Hoover Building, 935 Pennsylvania Avenue, NW, Washington, D.C. 20535-0001, and which is the investigative arm of the United States Department of Justice. The FBI's investigative authority can be

found in 28 U.S.C. §533 and 18 U.S.C. §351 (Congressional Assassination, Kidnapping, and Assault Act). The FBI Boston Field Office is located in Suite 600, at One Center Plaza, Boston, Massachusetts 02108 (boston.fbi.gov, 617-742-5533). He is sued in his official capacity.

10. Charles S. Prouty was appointed Special Agent in Charge of the Boston Division of the FBI on 26 April 2000 by Director Louis Freeh, and was appointed as Executive Assistant Director, Law Enforcement Services Division of the FBI on 7 November 2002 by Director Robert S. Mueller, III, who took the oath of office on 4 September 2001.

11. Charles P. Kelly is an FBI agent, who at the times relevant to this Complaint was assigned to the Boston office under Charles Prouty. Kelly is currently assigned to the New York office, 26 Federal Plaza, 23d floor, New York, New York 10278, 212-384-1000.

12. FOX News Channel a/k/a Fox25News, 15 Court Square, Suite 350, Boston, MA. 02108. Phones: New York: 212-301-3000, and Boston, 617-926-2986.

13. America's Most Wanted ["AMW"], a television show shown on ABC-TV stations nationwide, P.O. Box Crime-TV, Washington, D.C., 20016-9126; phone: 800-CRIME-TV (800-274-6388). NCMEC and AMW are Gold-Star partners [**Exh. HHH**].

14. National Center for Missing and Exploited Children, Wang International Children's Bldg., 699 Prince St., Alexandria, VA 22314-3175. NCMEC and Wal-Mart are partners.

15. Wal-Mart Stores, Inc., is a corporation with headquarters located in Bentonville, Arkansas. Its local agent is Corporation Service Company, at 84 State Street, 5th floor, Boston, MA 02109; phone: 617-227-9590 or 800-225-6244. Wal-Mart is a "Premiere Partner" of NCMEC. A "Premiere Partner contributes $100,000+ Per Year (In-Kind, Cash, Other)" [**Exh. EEE, a set of webpages**].

> **WAL★MART®**
>
> In 1996 Wal-Mart launched the Missing Children's Network, the most aggressive retailer program to date aimed at bringing missing children home. The Missing Children's Network includes bulletin board displays of missing children photographs in more than 2,400 stores, a Code Adam safety procedure to lock and search a store when there is lost child incident while a family is shopping at Wal-Mart, a television public service announcement, and provision of child safety information to 78 million homes in a weekly household flier. If you are interested in learning more about this partner, please click on the link below to visit their web site.

16. Plaintiff sues all public employees in their official and individual capacities.

17. At all times material to this Complaint, Defendants Moynihan and Thompson acted toward plaintiff under color of the statutes, ordinances, customs, and usage of the State of Massachusetts, City of Haverhill, and the Haverhill Police Department.

18. At all times material to this Complaint, Defendants Freeh, Prouty, and Kelly acted toward plaintiff under color of the statutes, ordinances, customs, and usage of the U.S.A.

**FACTS**

<u>NOTE</u>
**Because of the length of the FACTS section,**
**Plaintiff provides here for the convenience of the court,**
**a Table of Contents for the FACT section**

| | |
|---|---|
| The Beginning | 19-20 |
| Susan Pane's Work as a Prescription Drug Technician | 21-36 |
| The Birth of the Child, Marissa Lyne Meuse, and Pane's Inability to Cope with the Infant | 37-42 |
| Abduction of Child by Susan Pane, 10/1/99 | 43-64 |
| Child's Medical Condition As of June 2000 | 65-68 |
| Meuse Retains New Counsel and Begins Discovery | 69-72 |
| Moynihan Ignored Restraining Order Against Pane: Invidious Gender Discrimination | 73-86 |
| Moynihan's Non-Investigation Regarding Status of Case in Family Courts of Massachusetts and Florida | 87-94 |
| Information Supplied to and Gathered by the Haverhill Police Department | 95-115 |
| Moynihan's Non-Investigation Regarding the Drugs' List | 116-129 |
| Moynihan's Non-Investigation Regarding the Two Susans | 130-139 |
| Child's Medical Condition Between July 2000 and 1 October 2000 | 140-150 |
| Meuse's Legal Attempts to Take Marissa out of Harms Way | 151 |
| Faced with Court's Failure to Act, Meuse Must Act to Save Child | 152-172 |
| Moynihan's Understanding of the Law | 174-178 |
| Thompson Orders Moynihan to Stop Investigation and Later Lies to the Chief | 179-184 |
| Susan Pane Reports Child Taken from Florida | 185-193 |
| Moynihan's Investigation after Pane Reports Child Taken | 194-203 |
| What Thompson and Moynihan Knew Before They Sought Arrest Warrant | 204-214 |
| The Unlawful Warrant for Meuse's Arrest | 215-223 |
| What Thompson Knew about the Alleged FBI Unlawful Flight Warrant | 224-232 |
| What Thompson Did Not Investigate about the Baby's Health | 233-242 |
| What Thompson Knew about Moynihan's Investigation of the Baby's Health | 243-246 |
| Moynihan's Non-Investigation Regarding Pane's Care of the Child | 247-252 |
| Captain Thompson's General Police Knowledge | 253-267 |
| Thompson, Moynihan, the FBI, and FBI Agent Charles Kelly Coordinate Activities | 268-294 |
| Pane and Moynihan and the FBI Coordinate Poster Activities | 295-316 |
| The Warrant on America's Most Wanted Website | 317-324 |
| FOXNews Televised Broadcast | 325-326 |
| Moynihan's Communication with Pane and Stults | 327-334 |
| Stults' Working with the FBI and Maintaining the "Susan Pane Legal Defense Fund" | 335-337 |
| Probable Cause | 338-360 |
| Brian Meuse Never Intended to Remove Child Permanently from Mother | 361-376 |
| Meuse's Arrest and the Ensuing Criminal Process | 377-396 |

## THE BEGINNING

19. Defendant Susan Pane and Brian Meuse were living together in a home on Oxford Avenue in the Ward Hill area of Haverhill, Massachusetts. The home was owned by his parents.

20. Meuse was working full-time at Compaq, 40-50 hours a week, depending on overtime availability and working in his own machine shop that was about 20 feet from his house 25-30 hours a week at the same time [**Trial, 5/21/02, at 188**].

## SUSAN PANE'S WORK AS A PRESCRIPTION-DRUG TECHNICIAN

21. Pane began working in Andover, Massachusetts, as a level-one pharmaceutical technician at Merck-Medco, a mail-order pharmacy, where she dispensed prescription drugs [**Trial, 5/17/02, at 77**].

22. About a year later, when she became pregnant, she was promoted to the position of a level-two technician [**Trial, 5/17/02, at 132**].

23. According to Meuse, Pane was promoted to the level-two position because of the danger of exposure to the narcotics in the working environment. People were to wear face masks, protective suits and gloves, but Pane would not wear the gear that was offered, so they moved her into the level-two position [**Trial, 5/22/02, at 190**].

24. According to Pane, as a level-two technician at Merck-Medco, she deciphered the doctor's handwriting on a prescription and input her interpretation into Merck-Medco's computer system. The computer then generated a computerized prescription that went to the level-one technician [**Trial, 5/17/02, 125-126**].[1]/

25. Also according to Pane, the level-two technician, more specifically, "get[s] a bin with just a prescription in it. You read the prescription. . . . [T]he person's name, address should be on there; whatever other relative information, their phone number, their date of birth, their Social Security number. You read what the prescription says; for what drug it is, what milligrams, quantity, directions, and the doctor's name and the DEA number, if applicable, and you put all this information into the computer" [**Trial, 5/17/02, 131**].

26. A level-one technician's job begins with the prescription generated by the level-two technician's computer. The output prescription contains a UPC-type bar code, the person's name (but not the address and not the date), the name of the pill, the quantity and the milligrams, and "other jumbled numbers." The level-one technician holds the bar code under a laser light scanner. The computer counts the pills and sends them to the chute. The medication "comes through the chute, goes into the bottle, you put the label on, cap the bottle, that one's done" [**Trial, 5/17/02, at 124-129**]. The name of the person who gets the pills is not put on the prescription; it only appears on the label [**Trial, 5/17/02, at 126-127**].

---

[1]  Pane had access to the DEA numbers of all doctors nationwide and had the capability of entering any prescription she wanted into the system. So long as the DEA and the doctor's name matched on a prescription, the prescription could be filled by a level-one technician or by a pharmacy [**Trial, 5/22/02, at 181**].

27.    Pane technically worked at Merck-Medco until she left Haverhill. She phoned in her resignation. She had not been physically working there throughout the latter part of her pregnancy. She had not been out on maternity leave, but out on short-term disability. Eventually the short-term disability turned into a long-term disability, for when she was ready to go back to work she had, so she testified, pilonidal cysts on her tailbone, making her unable to sit as a level-two technician and input the information into the computer. "The only thing I could do if I wanted to remain working would be standing -- would be the level-one job. The doctor did not want me in the room, inhaling any types of the prescription medications. Therefore, keeping me out on my disability. . . . [Y]ou can get the scents of medication when you're working that closely with all these different medications. So, not to do any physical harm to myself or the baby, they kept me out of the pharmacy" [Trial, 5/17/02, at 132-133].

28.    Meuse complained that Pane was pill-dependent and Pane has denied being pill-dependent.

29.    Meuse requested on many occasions that Pane quit drinking, but her drinking continued and the drug addiction was getting increasingly worse and the pills were scattered all over the house. She never went for help. Instead, she started arguments, fights, and became volatile and very upset [Trial, 5/22/02, at 188].

30.    After Meuse burnt his hand, he had a 30-pill prescription for Percoset. He took one for the immediate pain of the first day. Pane took the other 29, even though he told her not to and tried to hide them from her [Trial, 5/22/02, at 187].

31.    Pane also took pills from his parents' freezer while visiting at their home [Trial, 5/22/02, at 187-188].

32.    Pane had a prescription plan with Merck-Medco Managed Care [Trial, 5/17/02, at 135; Trial Exh. KK and A].

33.    Merck-Medco Managed Care produced a claims history of the pills that Pane had received from diverse pharmacies [Trial Exh. KK and A]. There were approximately 140 prescriptions on that list [Trial, 5/22/02, at 40].

34.    Around 27 November 1998, while she was pregnant, Pane purchased amongst other pills, 360 Ultram pills.

35.    On Pane's Merck-Medco claims history list was one prescription allegedly ordered by Dr. Bruce Pastor and others by Dr. Barrie Paster. The latter was, indeed, Pane's doctor. The former was not. In response to a subpoena, Dr. Bruce Pastor wrote Meuse's counsel asserting that he did not have any records for Susan Pane, that he had never written a prescription for her, and that she had never been his patient [Trial, 5/22/02, at 183]. And Pane admitted Pastor was not her doctor [Trial, 5/17/02, at 151, 172; Trial Exhs. F, KK, SS].

36.    Pane was able to do this because at Merck-Medco she had access to the DEA numbers of all the doctors, and was able to create a prescription for herself on the Merck-Medco system [Trial, 5/17/02, at 130-131, 134; Trial, 5/22/02, at 184].

## THE BIRTH OF THE CHILD, MARISSA LYNE MEUSE, AND PANE'S INABILITY TO COPE WITH THE INFANT

37.    On 4 August 1999, the child Marissa Lyne Meuse ["Marissa "] was born to Pane and Meuse **[Exh. RR]**.

38.    Because Pane breast-fed the child, the pills she ingested got to the baby through the breast milk.

39.    On 12 August 1999, eight days after Marissa's birth, according to a nurse's notes, Pane visited Women's Health Care, 21 Highland Avenue, Suite 25, Newburyport, MA, office and being in crisis, almost dropped the child **[Trial, 5/17/02, at 169-170; Trial Exh. B]**.

40.    Pane was having a very difficult time caring for Marissa and continuously sought Meuse to return from work to help her. As a result, around the end of September 1999, Meuse stopped working at Compaq **[Trial, 5/21/02, at 188-189]** in order to be the primary caretaker of the child **[Trial, 5/22/02, at 223, 226-227]**.

41.    Pane's moods swang from rage to hysteria and created a vicious cycle, during which the infant was at serious risk of harm from her mother, who was operating with impaired judgment . . . drowsy, reactions dulled, depressed, and heart palpitations from drug overuse **[Trial Exh. B]**.

42.    Ann Kalip, who was later called by the Commonwealth as a witness at Meuse's criminal trial, was in and out of Meuse's home frequently during the week, testified that right after Pane gave birth to the baby, "Brian pretty much took care of [Marissa] because [Pane] had health problems. [Pane] was on the couch, she didn't move" **[Table, 5/20/02, 162-163]**.

## ABDUCTION OF CHILD BY SUSAN PANE, 10/1/99

43.    On 13 September 1999, Meuse filed an action for custody and paternity and a motion seeking the court to order Pane to remain in Massachusetts. [Trial Exh. L].

44.    On 21 September 1999, Pane's mother, Barbara Pane, arrived in Haverhill, Massachusetts, to stay with Pane, Meuse, and the child.

45.    At trial, Pane testified that on 23 September 1999, she told Dr. Barrie Paster that she wanted to go to Florida for a one-week vacation **[Trial, 5/17/02, at 109, 116; Trial Exh. DDD]**.

46.    Pane was in constant communication with Attorney Stults prior to leaving Meuse's home **[Trial, 5/20/02, at 65; Trial Exh. DDD]**.

47.    On 1 October 1999, Pane told Meuse that she, Pane's mother, and the child were going for an outing to Newburyport, Massachusetts, but they did not return in the evening.

48.    On Monday, 4 October 1999, Meuse obtained a temporary restraining order pursuant to M.G.L. c. 209A **[Trial Exhs. M and N]**. The order gave Meuse custody and restrained

Pane from leaving the Commonwealth with the child [Trial, 5/20/02, at 66; Trial Exh. M].\²/

49.    Throughout the month of October 1999, Meuse caused Deputy Jay Roberts and Sheriff Robert L. Vogel, Jr., respectively, to attempt to serve the order on Pane at 291 Sagewood Drive, her mother's house, in Port Orange, Florida [Trial, 5/17/02, at 110, 111; Trial, 5/20/02 at 57-59; Trial Exh. K and Exh. NN].

50.    On or around 21 October 1999, Defendant Attorney Stults made her appearance as counsel for Pane in Haverhill District Court. [Trial Exh M, special appearance on page 4].

51.    During the month of October 1999, Pane's mother repeatedly told the process server that Pane did not live at the mother's house [Trial, 5/20/02 at 58-59; Trial Exh. K].

52.    At trial on 5/17/02, Pane testified that she was living at her mother's house when the process servers came and that her mother had lied when she told them that Pane lived at an unknown location [Trial, 5/20/02 at 57-59, 64].

53.    On 14 October 1999, Pane caused to be filed a Complaint for Custody in the 7th Judicial Circuit Court in Volusia County, Florida [Trial, at 5/17/02, at 112].

54.    On 26 October 1999, after paying a $500 bond, Meuse was granted a Temporary Emergency Injunction from the Seventh Judicial Circuit Court in Volusia County against Pane. The injunction enjoined Pane from removing Marissa from the county without order of the court\³/ [Exh. OO].

55.    Because of the lies of Pane's mother, Meuse was unable to effect service of Judge Kevin M. Herlihy's restraining order upon Pane until 29 October 2000, when he saw Pane in the Volusia County court [Trial, at 5/17/02, at 112].

56.    On 1 November 1999, Jim Beck wrote an affidavit swearing that on 29 October 1999, he made service on Pane at the courthouse in Daytona Beach, Florida [Exh. NN].

57.    On 3 November 1999 at 8:57, Volusia County Deputy Sheriff Crabtree served (a) the Massachusetts Abuse Prevention Order and the petition on Susan Pane and (b) the Temporary Emergency Injunction at 291 Sagewood Drive, Port Orange, Florida, [Trial, at 5/17/02, 112; Trial, at 5/20/02, at 69-71; Trial Exhs. O and P; Trial, 5/23/02, at 166].\/

58.    On 3 November 1999, Volusia County Deputy Sheriff Crabtree had the warrant division send a teletype to Haverhill District Court, advising them of service of the chapter 209A restraining order on Pane [Trial, at 5/20/02, at 70; Trial, 5/22/02, at 164; Trial Exh. P].

59.    Pane was in Haverhill District Court for a hearing on the c. 209A restraining order and that order was continued several times until 10 December 1999 [Trial, 5/20/02, at 73-74].

---

²    Meuse had alleged that Pane had impaired her judgment by the drug usage, that she was jeopardizing the child's safety. The Haverhill District Court restraining order gave Meuse temporary custody to Meuse [Trial Exh. M].

³    On 25 October 2001, the cash bond of $500 was released to Brian Meuse [Exh. PP].

60.    Although Pane was in Haverhill District Court several times in November and December 1999, neither the court nor the Haverhill Police Department and/or Captain Thompson enforced it against her **[Trial, 5/22/02, at 164-165; Trial Exhs. M and P, the latter showing service].**

61.    By keeping the child in Florida, Pane was in violation of the chapter 209A order **[Trial, 5/22/02, at 167]**.

62.    Thompson testified that a violation of the 209A order while the order was in effect may be prosecuted for three years **[Trial, 5/22/02, at 169]**.

63.    The Florida action against Meuse was declared "null and void" in March 2000 **[Trial, 5/20/02, at 84]**.

64.    On 3 May 2000, Judge Mary McCauley Manzi declared Massachusetts the home state of the child, declared Massachusetts would exercise jurisdiction, and wrote that the mother, Susan Pane, wrongfully removed the child to Florida in October 1999 **[Trial, 5/20/02, at 81-82; Trial, 5/21/02, at 17; Trial Exh. T]**.

## CHILD'S MEDICAL CONDITION AS OF JUNE 2000

65.    On 5 June 2000, Judge Mary Anne Sahagian issued a visitation schedule predicated on Pane bringing the child for an examination by the Florida Early Intervention Program and for the follow-up therapy **[Exh. W]**.

66.    On or around 22 June 2000, when the child was 10 months of age, the child was examined by Florida Early Intervention Program and determined to have the ability of only a 5-month-old  **[Trial Exh. D, (Early Intervention, at page 70]**.

67.    By the time the child was 10 months old, the child was unable to sit up on her own (an activity a child can do around the age of 5 months), was unable to hold a spoon, was unable to hold a baby bottle or a baby's cup, was unable to hold, for instance, a graham cracker, was unable to crawl.

68.    The medical professionals determined that both physical and occupational therapy were necessary for the child, i.e. two physical therapy sessions and two occupational therapy session per week **[Trial Exh. D; Exh. W, court order 6/5/00]**.

## MEUSE RETAINS NEW COUNSEL AND BEGINS DISCOVERY

69.    Performing discovery in July and August, Meuse learned that Pane had cancelled all but the first two weeks of scheduled physical and occupational therapy, that Pane had had almost 80 prescriptions for pills -- Ultram and assorted narcotics, including  oxycodone with acetominaphen, also known as OxyContin, which was her drug of choice – allegedly given her by over a score of doctors from several states and filled by numerous pharmacies, and wanted morphine on at least one occasion **[Trial, 5/20/02, at 41-43; Trial Exhs. A, C, D, E, F, G, I, J, X, KK]**. *Polymedica, polypharmica*, the pharmacists call the syndrome of the prescription drug abuser **[Exhs. TT, UU, VV, WW, XX, YY]**.

70.    The alleged prescriptions included two by a doctor (Bruce Pastor) who has sworn that Susan Pane was not a patient of his [**Trial Exhs. F, KK, SS**], and by many where the doctors have not been identified [**Trial Exhs. F and KK**].\[4]/

71.    Pane took a Schedule III narcotic drug (oxycodone with acetominaphen) before and during pregnancy and while she was nursing the child within the first week after her birth.  Pane continued to take the narcotic drugs until she left Massachusetts for Florida in October of 1999 [**Trial Exh. A, C, E, F, G, I, J, and KK, list of drugs with prescription details compiled from the documentation received as a result of subpoenas; Exhs. TT, UU, VV, WW, XX, YY**].

72.    The child Marissa was in immediate danger, and would have suffered irreparable injury if the child were not put into Meuse's care immediately.

## MOYNIHAN IGNORED RESTRAINING ORDER AGAINST SUSAN PANE: INVIDIOUS GENDER DISCRIMINATION

73.    In the Haverhill District Court, however, in the Fall of 1999, Meuse had been given custody by Judge Herlihy [**Trial Exh. M**].

74.    Moynihan did not alert the District Attorney's Office, Kevin Burke's office, that Marissa was wrongfully removed by Pane from Massachusetts [**Trial, 5/21/02, at 20-21**].

75.    Moynihan did not alert the Attorney General's Office, Thomas Reilly's office, that Marissa was wrongfully removed by Pane from Massachusetts [**Trial, 5/21/02, at 21**].

76.    Moynihan did not ask Carol Beaulieu, Meuse's attorney at the time, why she was doing nothing [**Trial, 5/21/02, at 21**].

77.    Moynihan also had a copy of the October 4th chapter 209A RO and the November RO 209A, the Abuse Prevention order, which Brian got from Judge Herlihy against Susan" [**Trial, 5/20/02, at 186; Trial Exh. M**].

78.    Moynihan was familiar with the DV guidelines  [**ITrial, 5/20/02, at 187**].

79.    Moynihan made no attempt to enforce the orders that Judge Herlihy had issued and that remained in effect from 4 October 1999 through 10 December 1999, and put out no warrant to bring Pane back with the baby to Massachusetts [**Trial, 5/20/02, at 189; Trial Exh. M**].

80.    When Moynihan sought a warrant for Meuse's arrest, his basis was that the child physically lived with the mother and that Meuse only had visitation with the child [**Trial, 5/21/02, at 15**].  He did not consider that when the mother abducted the child to Florida, the child had been living with both Meuse and Pane.

81.    Moynihan admitted that Judge Manzi's order giving Pane custody of the child occurred on 11 October 2000, eleven days **after** Meuse took the child from Florida child [**Trial, 5/21/02, at 16-17; Exh ZZ**].

---

4    Barrie Paster **is** one of her doctors.

82.    Moynihan admitted that he had never seen Judge Manzi's order of 3 May 2000. In that order, Judge Manzi wrote that Pane had wrongfully removed the child to Florida in October 1999, over six months prior to Meuse taking the child from Florida and prior to giving Pane custody on 11 October 2000 **[Trial, 5/21/02, at 17; Trial Exh. T]**.

83.    Moynihan did not read the file in the Probate & Family Court **(a)** because there was never a warrant for Ms. Pane and **(b)** because both Florida and Massachusetts allowed the child Marissa to stay in Florida **[Trial, 5/21/02, at 19]**.

84.    Moynihan never wrote a complaint against Susan Pane **[Trial, 5/20/02, at 194]**.

85.    The Haverhill Police Department did not issue a warrant to arrest Pane, of the opposite gender of Meuse **[Trial, 5/22/02, at 48]**.

86.    Although Thompson was aware that Pane had unlawfully removed the child from Massachusetts, Thompson and the Haverhill Police Department did **(a)** nothing to address the criminal action by Susan Pane and **(b)** nothing to bring the child back from Florida and **(c)** nothing to provide Meuse a remedy for the wrong committed by Pane.

## MOYNIHAN NON-INVESTIGATION REGARDING STATUS OF CASE IN FAMILY COURTS OF MASSACHUSETTS AND FLORIDA

87.    Moynihan never made inquiry in Probate and Family Court in Lawrence, Essex County, as to who the lawful custodian of the child was **[Trial, 5/20/02, at 200]**.

88.    Moynihan admitted that he never looked at the Meuse/Pane file in Probate & Family Court file **[Trial, 5/20/02, at 212]**.

89.    Moynihan testified that the courts did nothing to get the child returned to Meuse **[Trial, 5/20/02, at 94, 200-201, and 213-214]**. .

90.    Moynihan testified that he believed that Susan Pane was the lawful custodian of the child, and admitted that he never went to look at Probate Court.

91.    Moynihan testified that he had no idea what the police department did to get Susan Pane back here with the child during those three months the 209A restraining order was in effect **[Trial, 5/20/02, at 210-211]**.

92.    Moynihan was not aware that an order was in Probate Court which said that if either one of those people left Volusia County, they were to tell the other where they were **[Trial, 5/20/02, at 212. Exh. AAA, stipulation of 8/7/00]**.

93.    Moynihan admitted that he was unaware that Susan Pane would not reveal where she was all summer and fall of 2000 **[Trial, 5/20/02, at 212]**.

94.    Moynihan testified that he "wasn't aware of anything until Jan Meuse walks in [his] office and was asking help to provide that her, Ms. Pane, was a drug addict and that the child was

suffering because of that and there was abuse to the child because of that" [Trial, 5/20/02, at 212; Exh. BBB, letters from Meuse's parents seeking help from the Haverhill Police Department].

## INFORMATION SUPPLIED TO AND GATHERED BY THE HAVERHILL POLICE DEPARTMENT

95.    Beginning on or around 16 August 2000 through early October 2000, Meuse's mother, Jan Meuse, contacted Defendant Detective Moynihan [Trial, 5/20/02, at 165; Exh. BBB].

96.    In September through early October 2000, according to Moynihan, Jan Meuse, the mother of Meuse, gave him "a list from Merck-Medco of prescription drugs that a Sue Pane was listed as the person who was taking the drugs, and there were several pages and a multiple different variety of drugs" [Trial, 5/20/02, at 165, 174; Trial Exhs. A and KK].

97.    When Pane left Meuse's home on Oxford Avenue, she inadvertently left behind the empty pill bottle in Meuse's home. Jan Meuse, Meuse's mother, took the pill bottle to Detective Moynihan as evidence of Pane's writing falsified prescriptions [Trial Exhs. D and X].

98.    Thompson testified that he was aware that both of Meuse's parents wrote letters to Thompson, to the chief of police, the mayor, district attorney's office, the city council [Trial, 5/22/02, at 111; Exh. BBB].

99.    In all the letters, Meuse's parents were worried about the child: the mother is a drug addict. In words, for all intents and purposes, they wrote: "The poor baby has not developed: she can't walk, she can't put her feet together, she can't hold a bottle, she can't hold a cracker. Would you please help us? We want Brian to have the child. We haven't heard from him, but we want you to look into the drugs, look into this drug situation."

100.    The police did nothing to help the Meuses.

101.    Thompson also received the Merck-Medco list of pills [Trial, 5/22/02, at 38; [Trial Exhs. A and KK].

102.    Captain Thompson also gave the list to Detective Moynihan to look into to see if there was something illegal about the obtaining of those drugs [Trial, 5/22/02, at 39].

103.    Thompson denied knowing that Susan Pane had at least 140 (Thompson's count) \[5\]/ narcotic prescriptions and was left with this young child and she had wrongfully removed her [Trial, 5/22/02, at 51;Trial Exh. T].

104.    Thompson never ordered Moynihan to check with the Merck-Medco insurance company that provided the claim history of the approximately 140 prescriptions (Thompson's count) of Defendant Susan Pane's claim history [Trial, 5/22/02, at 40].

105.    Thompson denied knowing that because there were two Susan Panes but had not proof that his testimony was true.

---

[5]  Compare ¶72, *supra*, where Meuse reports only 80 prescriptions.

106.    Thompson did agree that there's some unique information would have to be supplied by each one of policyholder to his or her insurance company if he or she were making a claim [**Trial, 5/22/02, at 62**].

107.    Thompson never checked the Probate Court to read Judge Manzi's decisions [**Trial, 5/22/02, at 46**].

108.    Thompson testified that he has no knowledge of the ongoing, daily Probate Court matters and has not looked  [**Trial, 5/22/02, at 161**].

109.    Thompson never read Judge Manzi's decision of 3 May 2000 which said that the mother wrongfully removed the child from Massachusetts to Florida in October 1999, over six months prior to the decision [**Trial, 5/22/02, at 46-47; Trial Exh. T**], but he was aware of it [**Trial, 5/22/02, at 47**].

110.    Thompson testified that he "asked for guidance from the District Attorney's office on this and the fact that it was presented before a judge, the judge was aware of this. The judge had not issued a warrant or any request that we make an attempt to pick up Ms. Pane" [**Trial, 5/22/02, at 48**].

111.    Thompson admitted that he is Moynihan's supervisor, that he supervised Moynihan [**Trial, 5/22/02, at 65**], and that he was responsible for Detective Moynihan's work [**Trial, 5/22/02, at 67**].

112.    Thompson never contacted Merck-Medco by letter, by phone, or in person; [**Trial, 5/22/02, at 67-68**].

113.    Thompson never told Detective Moynihan or any one of his other officers to contact Merck-Medco [**Trial, 5/22/02, at 68**].

114.    The police did not do a proper investigation of the drugs and see whether the mother's drug use when she was taking narcotics going through her breasts when she was breast-feeding, to learn whether the cause of some of the problems the child was having were due to the mother's drug use.

115.    The police made no inquiry as to whether the mother's using drugs while she was pregnant and while she was breastfeeding harmed the child, causing the child to be in such severe bad health.

## MOYNIHAN'S NON-INVESTIGATION REGARDING THE DRUGS' LIST

116.    Moynihan "brought the documentation over to the D.A. over here to see if he thought there was anything, you know, that could be anything unusual about it" " [**Trial, 5/20/02, at 167**].

117.    Of the list of drugs\\[6]/ he showed to the DA, the only prescription in which the assistant DA was interested was "the Ultram and that was only because of the large count, which was 360" **[Trial, 5/21/02, at 118]**.   The ADA was not concerned with the abundance here of codeine and other narcotic drugs **[Trial, 5/21/02, at 118]**.  *See also* Trial Exhs. A, C, D, E, F, G, I, X, **and KK, SS.**

118.    Assistant District John DePaolo told Moynihan to check the 360 Ultram pills and then opined that the allegations were unsubstantiated **[Trial, 5/21/02, at 67; Trial Exhs. A and KK]**.

119.    Detective Moynihan reported to Thompson that he had gone so far as to contact the pharmacy on a prescription and they were unable to find any record at all of the prescription he presented to them **[Trial, 5/22/02, at 39]**.

120.    Neither Moynihan nor Thompson questioned that a prescription presented to the insurer for payment allegedly by the pharmacy was not in the pharmacy records **[Trial, 5/22/02, at 39-40]**.

121.    Moynihan knew that Susan Pane was a pharmaceutical technician and that she dispensed drugs **[Trial, 5/20/02, at 174]**.

122.    Moynihan did not inquire at Merck-Medco regarding Pane's position as a pharmaceutical technician **[Trial, 5/20/02, at 174]**.

123.    Moynihan did not learn that Pane had the ability to create prescriptions.

124.    Moynihan contacted a Westgate Pharmacy pharmacist, who said he had "no such record [of certain drugs, such s Ultram] being purchased **[Trial, 5/20/02, at 175, 177]**.

125.    Moynihan

    a.  never contacted Merck-Medco to inquire how come they had it on their list of Pane history **[Trial, 5/20/02, at 176-177; Trial, 5/21/02, at 119]**, or Dr. Byrnes, one of Pane's primary doctors **[Id.; Trial Exhs. A and KK]**,

    b.  "never talked to [any of the two dozen] doctors] whatsoever **[Trial, 5/20/02, at 180]**,

    c.  never counted the number of prescriptions **[Trial, 5/20/02, at 179]**.

    d.  never added up the number of narcotic pills, and checked with only one of the pharmacists **[Trial, 5/20/02, at 181]**,

    e.  never checked "with Merck-Medco as to whether they had a system in place for pilfering" **[Trial, 5/22/02, at 186]**,

    f.  never discussed that Pane's prescription drug use – over five pages of over 80 prescriptions -- with the Haverhill Police Department Drug Unit at all; he

---

[6] The list included Ultram, hydrocodone with Apap, Vicodin, codeine, propoxiphene, Napsalet with Apap, propoxiphene, oxycodone (Oxycontin with acetaminophen), amongst other drugs.

"brought it to the District Attorney's office.  That's where I brought it" **[Trial, 5/20/02, at 212-213]**.

126.    Moynihan concluded that "whether Ms. Sue Pane was stealing drugs from the company she was working with, number one, it would have been a very difficult thing to prove" **[Trial, 5/20/02, at 177]**.

127.    Incompetently, Moynihan ignored the Merck-Medco Managed Care claims history list for Susan Pane simply because he did not check the policy or with Merck-Medco **[Trial, 5/21/02, at 150]**.

128.    Moynihan did **not** agree that it is fair to conclude that all prescriptions listed by Merck-Medco Managed Care on the claims history report for Susan Pane are for Susan Pane unless proven otherwise **[Trial, 5/21/02, at 152]**.

129.    Moynihan concluded **(a)** that Merck-Medco produced a claims-history report for Susan Pane, **(b)** that the report contained **both** Susan **Pane**'s and Susan **PaIne**'s prescriptions on it, and **(c)** that Merck Medco paid the pharmacists under Susan Pane's policy number for Susan PaIne's prescriptions **[Trial, 5/21/02, at 152]**.

## MOYNIHAN'S NON-INVESTIGATION REGARDING THE TWO SUSANS

130.    Detective Moynihan reported to Thompson that he was unable to substantiate that the Susan Pane, in this case, was the same Susan Pane that's appearing on all that drug list, that there was another Susan Paine living in town **[Trial, 5/22/02, at 39]**.

131.    **In actual fact,** a Susan "Paine" lived on Mercury Terrace and Susan "Pane" had signed her handwriting on a script from Dr. Byrne that was for a narcotic and filled the fake prescription at a CVS pharmacy  **[Trial, 5/22/02, at 182; Trial Exhs. C, X, KK, and JJ]**.

132.    **In actual fact,** Susan PaIne and her husband's pornography and sexual paraphernalia shop was still in existence a few blocks from the courthouse at time of trial.

133.    Moynihan used the introduction of a "Susan Paine" as a reason to reject the legitimate claims history list from Merck-Medco.

134.    He had "no idea: . . . [how the] "other Sue PaIne would have known what our Sue Pane's Merck-Medco insurance number was" **[Trial, 5/22/02, at 184]**.

135.    Moynihan did not consider that the second Susan "Paine" did not know Susan Pane's driver's license number, date of birth, social security number, in addition to the insurance policy number.

136.    Moynihan did not consider that Pane had access to that information for everyone who went through **any** prescription system.  That was an integral part of Pane's job.

137.    Moynihan defense was that there was another Sue Pane in Haverhill. **[Trial, 5/22/02, at 186]**.

138.    Captain Thompson testified that Detective Moynihan ran into trouble when he found two Susan Panes; one that had lived on Oxford and one who had lived on Orchard. Thompson testified that Moynihan unsuccessfully attempted to find the other Susan Palne and was unable to do so **[Trial, 5/22/02, at 40]**.

139.    Thompson claimed that the other Susan Palne's forwarding address led to a dead end **[Trial, 5/22/02, at 40; Trial Exh. JJ]**.

## CHILD'S MEDICAL CONDITION BETWEEN JULY 2000 AND 1 OCTOBER 2000

140.    Pane took the child to the therapists for about two weeks – 7/17/00 (initial visit for occupational therapy), 7/19/00, 7/25/00 00 (initial visit for physical therapy), 7/27/00, 7/31/00 -- and then stopped **[Trial, 5/20/02, at 105-110; Trial Exh. D]**.

141.    Pane cancelled the child's therapy visits scheduled for 8/3/00, but since it was Meuse's visitation week, he brought the child to therapy **[Trial, 5/20/02, at 106, 110; Trial Exh. D]**.

142.    During the week of 3 August 2000, Meuse saw the child and noticed no improvement in the child's physical condition.

143.    On 7 August 2000, the attorneys for Pane and Meuse signed a stipulation requiring each of them to keep the other informed of the address and telephone number where they were and could reached when they had the child **[Exh. AAA]**.

144.    Pane cancelled the child's therapy visits scheduled for 8/9/00, 8/10/00, 8/15/00, 8/22/00, 8/24/00, 8/29/00, 8/31/00, 9/5/00, 9/7/00, and 9/12/00 **[Trial, 5/20/02, at 105-110; Trial Exh. D]**.

145.    As a reason for cancelling the child's therapy appointments on 8/22/00, 8/24/00, 8/29/00, 8/31/00, 9/5/00, 9/7/00 and 9/12/00, Pane testified that she went with the child on vacation **[Trial, 5/20/02, at 113, 116-117]**.

146.    Pane testified going out of Florida with the child, resulting in her violation of **(a)** the 26 October 1999 injunction from the Florida court, **(b)** Judge Sahagian's order of 5 June 2000, and **(c)** the stipulation signed by Pane's and Meuse's counsel on 7 August 2000[7]/ **[Trial Exh. W and Exhs. OO, QQ, and AAA]**.

147.    Asked "Wouldn't it have been nice for Marissa to get the therapy that was required so the poor child could learn how to crawl and walk and hold a bottle and (inaudible)?" Pane answered, "No" **[Trial, 5/20/02, at 118]**. By way of explanation, Pane said, "She could do all of those things" **[Trial, 5/20/02, at 118]**.

148.    After her vacation, Pane brought Marissa to therapy on 9/14/00, 9/19/00, 9/21/00,

---

[7]      Also on 3 November 1999, the Seventh Judicial Circuit Court issued an interim order restraining Pane from removing the child from Volusia County **[Exh QQ]**.

and 9/26/00; on 9/28/00, occupational therapy only [Trial, 5/20/02, at 122].

149.    Pane testified that she was unemployed and that her Florida residence, in a town noted as a tourist attraction, is 15 minutes from the ocean, but she needed the vacation [Trial, 5/20/02, at 113].[8]/

150.    Meuse saw the child during June 2000, August 2000, October 2000, and observed that the child's physical development was not within normal ranges.

## MEUSE'S LEGAL ATTEMPTS TO TAKE MARISSA OUT OF HARM'S WAY

151.    During the first week of September 2000, Meuse filed a Writ of Habeas Corpus and sought relief for his daughter from Judge Mary Anne Sahagian (who said she had no jurisdiction to hear the petition), Judge Mary McCauley Manzi (who refused to come out of her chamber and onto the bench), Judge Spencer M. Kagan (who said that he had no authority as the "Emergency Judge" of the day, Judge Edward Rockett (who said that it was Judge Manzi's case and would not hear the writ of habeas corpus prepared by Meuse), and Judge Mary McCauley Manzi (who for a second time refused to come to the bench) [Trial Exh. U].

## FACED WITH COURT'S FAILURE TO ACT, MEUSE MUST ACT TO SAVE CHILD

152.    Meuse returned to Florida for "a week's visitation" on 1 October 2000, when the child was 14 months old.

153.    At 14 months, the child was still unable to sit up on her own (an activity a child can do around the age of 5 months), was unable to hold a spoon, was unable to hold a baby bottle or a baby's cup, was unable to hold, for instance, a graham cracker, was unable to crawl.

154.    Meuse got on an airplane with the 14-month-old child in Florida on Sunday, 1 October 2000, returned with her to Massachusetts, and brought her to Children's Hospital the next morning, Monday, 2 October 2000 [Trial Exh. LL].

155.    The Children's Hospital doctors set up an immediate visit with their therapy department, which took place on Monday, 2 October 2000. The CH therapists arranged for the Pentucket Area Early Intervention Program to visit the Meuse home on Wednesday, 4 October 2000 [Trial Exh. LL].

---

8        Pane continued to receive disability payments from Merck-Medco for several months after the child was born in August 1999 [Trial, 5/20/02, at 75, 77-78; Trial Exh. R]. Between October 2000 and March 2001, while Meuse had physical custody of the child, Pane was living on Long Island, in New York, and worked part-time in the evenings at Kohls, a department store, in Center Reach, Long Island, in New York [Trial, 5/20/02, at 114]. She remained unemployed until some time in 2001, when she went to work dispensing pills for Wal-Mart [Trial, 5/20/02, at 113, 115-116]. Around the time of the criminal trial, she was working as a cashier and doing other tasks at Wal-Mart [Trial, 5/20/02, at 115].

156.    Ann Kalip[9]/ provided daycare for Marissa for a few hours on each of three days that week in early October 2000 **[Table, 5/20/02, 145-147]**. The "main thing I remember . . . was that for the age she was, she did not walk, talk. She didn't do a lot of things I thought she should have been doing at that age." For Marissa's age, she should have had "at least . . . some kind of speech, at least a few words and to be walking somewhat. She did not walk at all. . . . [S]he did what I call, she scootchied on the floor. She would do an **S**. She would have one foot in front of her and one leg behind her." **[Trial, 5/20/02, 149]**.

157.    Kalip continued: "[T]he thing that bothered me the most was she couldn't talk so she would get frustrated which she would just lock her body and arch her back. When she did that you could see the way she would grind her teeth, she had ground her teeth down to gums. . . . But only on one side. The way she would cross her teeth and she would grit so hard and she was just frustrated that she had actually done it so much on one side of her mouth she had ground her teeth down to gums" **[Trial, 5/20/02, 150]**. "A lot of children grind their teeth, but I had never seen it where they had ground it to that point" **[Trial, 5/20/02, 151]**. *See also* **Trial Exhs. HH and II and Detective Moynihan's testimony at Trial, 5/21/02, 99-100, and ¶¶241-242,** *infra].*

158.    Marissa's relationship with Meuse was "[g]ood. She was very, very happy when he came to pick her up **[Trial, 5/20/02, 151-152]**.

159.    Kalip testified that "kids that aren't up to speed have different things that you recognize which would be the arching of the back, the clenching of the fists, swinging of the head. It was just one thing that I notice" **[Trial, 5/20/02, 153]**. And Marissa had all three **[Id.]**.

160.    Kalip testified that Marissa was not able scribble with a crayon " **[Trial, 5/20/02, 156]**. "No, she was very delayed. . . . Like I told you before, she was not walking, she was not verbally -- no speech whatsoever" **[Id.]**. "[Y]ou have to realize when you have a bunch of children in a room together, most of them start earlier if they're around other children. She was definitely by herself; no other children. Which means she might not be around ten months to start crawling and walking. But, over a year she should be walking. She should be saying a few words. She may not say sentences. But she did not say anything; nothing. No crawling, no nothing because she would sit, like I say, she scootchied where she would just pull herself along the floor" **[Table, 5/20/02, 156-157]**.

161.    It appeared to Kalip that Marissa had not been socializing with children prior to that **[Trial, 5/20/02, 157]**. "She was so excited to see children. She was not afraid. That's where I think, and I can't speak for Brian, I thought that he'd be -- even though she didn't know me, when they're included with other children they tend to feel more comfortable. If Brian had just brought her to me, alone, to watch her, I think she would have been hysterical, but she was thrilled to see other kids" **[Trial, 5/20/02, 157-158]**. She "definitely" had not been with children prior to that" **[Table, 5/20/02, 158]**. It was the level of her excitement: "Oh, she was gleaming. She was thrilled to be with the kids. She was smiling. She was happy" **[Id.]**. She was like that for the few

---

9      Kalip was infant-CPR and first-aid certified. She had received 12 hours of training every year **[Trial, 5/20/02, at 145-146]**. And she had the day care center for 15 years **[Trial, 5/20/02, at 152]**.

days Kalip saw her [**Trial, 5/20/02, 158**].\[10]/

162.    On Wednesday, 4 October 2000, three therapists (physical and occupational therapists) from the Pentucket Area Early Intervention Program did visit the Meuse home to examine the child. They then set up appointments for Marissa's therapy for Tuesday, 10 October 2000 [**Trial Exh. LL**].

163.    On Thursday, 5 October 2000, Meuse brought Marissa to a pediatrician, Normand Tanguay, at Wilmington Pediatrics in Wilmington, Massachusetts [**Trial Exh. LL**].

164.    From the pediatrician, Meuse learned of a specialist at Boston Floating Hospital, Dr. Mark H. Libenson, a Child Neurologist who specialized in international adoptions and worked with children who had been ignored emotionally and physically, whose physical movement had been impaired, and who had the same symptoms Marissa had [**Trial Exh. LL**].

165.    On 5 October 2000, Meuse's lawyer informed Pane's local lawyer, Rosalyn Stults, about the visits to the hospital, with the therapists and the local doctor, and the future appointments [**Trial Exh. LL**].

166.    Pane and/or Stults contacted the doctors with whom Meuse had made contact to examine the child and told them that Meuse was in contempt of court [**Trial, 5/21/02, at 125; Trial Exh. LL**].

167.    Prior to getting a custody order, Pane told Dr. Tanguay, Children's Hospital emergency department, and other doctors that she was the custodial parent [**Trial, 5/21/02, at 126; Trial Exh. D, dated 10/9/00; Trial Exh. LL**].

168.    Almost immediately upon his return to his home in Ward Hill, Meuse learned from messages on his answering machine that Pane and Stults had called the doctors and had threatened them with suit were they to continue seeing Marissa.

169.    By Thursday afternoon of 5 October 2000, all the doctors contacted by Meuse had cancelled his visits to them with the child [**Trial Exh. LL**].

170.    At some time thereafter, on 5 October 2000, Meuse dropped out of sight with the child.

171.    On 6 October 2000, Stults set up a hearing before Judge Manzi at Probate & Family Court at Lawrence, Massachusetts, for Wednesday, 11 October 2000.

172.    On 11 October 2000, Judge Manzi, after Meuse had left Florida with the child and in Meuse's absence, at a proceeding\[11]/ of which he had no personal notice, gave Pane temporary custody of the child [**Exh. ZZ**].

---

[10]    Later, Detective Moynihan from Haverhill Police Department called her. "He actually came to my home. He asked if I had seen her, and I had not" [**Table, 5/20/02, 159**]. "After she was missing he had come to the house which I had already known about a week later when everything I had seen in the newspapers and so forth" [**Trial, 5/20/02, 159**].

## MOYNIHAN'S UNDERSTANDING OF THE LAW

173.    Moynihan went to the police academy, studied law at the police academy, and had 19 years of service with the Haverhill Police Department, the last five of which were as a detective **[Trial, 5/21/02, at 8]**.

174.    Moynihan testified that he knew that Massachusetts does not have jurisdiction over any crime committed in any other state **[Trial, 5/21/02, at 8]**.

175.    But Moynihan insisted at trial that Meuse did commit a crime in Massachusetts **[Trial, 5/21/02, at 9]**.

176.    To reach the conclusion that Meuse committed a crime in Massachusetts, Moynihan testified: "I'm referring to the common law that the Massachusetts. . . . If there's no judge's decision, a mother automatically has custody of the child" **[Trial, 5/21/02, at 9]**. "I've seen it a hundred times. . . . Right in the court. In the Court. . . . The mother always gets custody of the child until ---- . . . Until the court overturns it, the mother always has custody of the child. . . . I can bring in 400 women that have custody of their kids compared to your half a dozen [men]" **[Trial, 5/21/02, at 10]**. I think the basis [of concluding that Meuse committed a crime is that] Massachusetts had determined that they would be responsible for the custody. When it came down between who was given custody, either Florida or Massachusetts, Massachusetts took over that role. Florida would not accept -- have anything to do with the role of who had custody of the baby between Mr. Meuse and Ms. Pane" **[Trial, 5/21/02, at 10-11]**.

177.    Moynihan believed that "Florida really didn't care who had that child" **[Trial, 5/21/02, at 11]** and that Judge Mary McCauley Manzi had declared Massachusetts the "home state of the child" and that Massachusetts would exercise jurisdiction over the child **[Trial, 5/21/02, at 11-12]**.

178.    The police decided it would be easier to convict Meuse of parental kidnapping than it would to prove that Pane had falsified prescriptions, given that Pane had moved to Florida, Merck-Medco claimed to have had no safeguards in its pill dispensing department, and Merck-Medco had moved out of Massachusetts.

## THOMPSON ORDERS MOYNIHAN TO STOP INVESTIGATING AND LATER LIES TO THE CHIEF

179.    When Moynihan learned that Meuse had taken the child, Captain Thompson told Moynihan to do no further investigation work in the matter **[Trial, 5/20/02, at 176]**.

180.    Thompson swore on the witness stand that everything in his letter of 17 January 2001 to Chief Barone was the truth **[Trial, 5/22/02, at 94; Trial Exh. CC]**.

181.    Thompson testified, "The chief believed me when I told him that there was a [FBI] warrant **[Trial, 5/22/02, at 96]**.

---

[11]     At that proceeding of 11 October 2000, no evidence was taken.

182.    When faced with his letter of 17 January 2001 to his Chief, Leonard Barone, Thompson testified that Detective Moynihan had told him that "when Mr. Meuse did not show up with the child before Judge Manzi, she found him in contempt" **[Trial, 5/22/02, at 88-89].**

183.    According to Captain Thompson's letter to Chief Barone, the paperwork that Jan Meuse gave Moynihan accused Susan Pane of abusing prescription drugs **[Trial, 5/21/02, at 66; Trial Exh. CC, dated 17 January 2001].**  The captain also wrote that "Detective Moynihan looked into this paperwork and was unable to substantiate any illegal activity."  **[Id.]**

184.    Moynihan denied that the information that Thompson wrote to Chief Barone was, in fact, information that Thompson had received from Moynihan **[Trial, 5/21/02, at 69].**

## SUSAN PANE REPORTS CHILD TAKEN FROM FLORIDA

185.    According to the Haverhill Police Department incident report, Susan Pane reported on 20 October 2000 that the child had been taken from Florida **[Trial Exh. BB, Haverhill Police Department incident report signed by Steven Iannialfo for Clerk of the Court].**

186.    On 25 October 2000, Moynihan signed an Application for Complaint **[Trial, 5/21/02, at 70-71; Trial Exh. DD].**

187.    Moynihan lied on his Application for Complaint **[Trial, 5/21/02, at 73]**: specifically he lied when he wrote "The defendant, mother, and his lawyer were advised of the warrant to be taken on the defendant.  They both said they have not heard from the defendant." **[Trial, 5/21/02, at 74].**

188.    On the Application for Complaint, the Place of Offense is alleged to have been "Port Orange, Florida" **[Trial Exh. DD].**

189.    The Criminal Complaint issued on the same day as that on which the application was made, to wit, 25 October 2000 **[Trial Exh. Y].**

190.    On the Criminal Complaint, the Place of Offense is alleged to have been "Haverhill" **[Trial Exh. Y].**

191.    Moynihan admitted that he did not advise Meuse's counsel that there was a warrant against Meuse [**Trial, 5/21/02, at 73**].

192.    Also on the Application for Complaint, Moynihan testified that he wrote, in words for all intents and purposes, "Litigant came to Haverhill station and filed a missing person report on October 20th"  **[Trial, 5/21/02, at 74; Trial Exh. DD].**

193.    Moynihan knew or should have known that there was an outstanding violation of the chapter 209A restraining order against Susan Pane, and should have begun prosecution of her on 20 October 2000 for the violation that occurred in the Fall of 1999 **[Trial Exh. M].**