## MOYNIHAN'S INVESTIGATION AFTER PANE REPORTS CHILD TAKEN

194. Moynihan testified that he did not contact or check with the Florida court to learn whether there was any outstanding order that Meuse was supposed to comply with [Trial, 5/21/02, at 5].

195. Moynihan did not know if there was an order in Florida that Meuse broke [Trial, 5/21/02, at 5].

196. Moynihan did not check in Massachusetts, with the Probate and Family Court, whether there was any outstanding order that the court had found him in contempt of [Trial, 5/21/02, at 6].

197. Moynihan at first testified did not believe there was an order that Meuse was in contempt of [Trial, 5/21/02, at 6]; then Moynihan testified that he believed there "could be a contempt order,: but "who ordered it [he did not] know" and he did not believe he had seen such a document [Trial, 5/21/02, at 68].

198. Moynihan testified that "if [he] had such a document or if [he] had seen such a document, [he] would have given it to . . . the office of District Attorney. [Trial, 5/21/02, at 68-69]. By the end of his testimony, Moynihan believed that Meuse had not been found in contempt in Lawrence [Trial, 5/21/02, at 69].

199. Moynihan did not believe there were any charges brought up against Meuse in Haverhill District Court [Trial, 5/21/02, at 7].

200. Moynihan did not believe there was any Haverhill Court order of which Meuse was in contempt or had broken [Trial, 5/21/02, at 6].

201. Moynihan testified that Meuse did not take any child from anyone in Massachusetts [Trial, 5/21/02, at 7, 8].

202. Moynihan testified that there was nothing in Florida that said Meuse could not take the child in Florida [Trial, 5/21/02, at 7-8].

203. Moynihan testified that "[a]s far as [he was] concerned, there was no crime in Florida" [Trial, 5/21/02, at 8].

## WHAT THOMPSON AND MOYNIHAN KNEW BEFORE THEY SOUGHT ARREST WARRANT

204. Although Thompson knew **(a)** that the probate and family court had found neither Pane nor Meuse in contempt, **(b)** that Meuse had been awarded custody by Judge Herlihy of District Court, **(c)** that Judge Manzi had found that Pane had wrongfully removed the child from Massachusetts, Thompson allowed his subordinate Detective Moynihan to seek a warrant to arrest Meuse [Trial, 5/22/02, at 48; Trial Exhs. M and T].

205. Thompson testified that he believes that "a man has all the same rights as a woman" " [Trial, 5/22/02, at 50].

206. Thompson testified that he was not ready to convict and get a warrant because it was known that "the baby, in the beginning, was in Florida with the mother, it was known where the baby was. The courts were aware of the situation. The District Attorney's office was aware of the situation. The judge was aware of the situation. When the baby left with the father, we did not know where the baby was. We didn't -- the judge did not know where the baby was, the District Attorney's office did not know where the baby was, and that's why at that point we proceeded with a warrant" **[Trial, 5/22/02, at 50-51]**.

207. Thompson denied feeling that because he knew that everyone else wasn't doing their job, he felt comfortable in not having to do his job either **[Trial, 5/22/02, at 51]**.

208. Thompson testified that the basis for the warrant was "that the child remained away from the mother **[Trial, 5/22/02, at 84]**.

209. Thompson knew that the probate court did not issue a warrant for either Pane or Meuse **[Trial, 5/22/02, at 85-86]**.

210. Thompson could not or would not provide on the witness stand a reason for the Probate Court not issuing a warrant either for female Susan Pane or for male Brian Meuse, but the police went after Meuse and not Pane **[Trial, 5/22/02, at 86]**.

211. Thompson admitted that he never saw a contempt order out of Lawrence **[Trial, 5/22/02, at 90]**. He believed, however, that there was a contempt order against Meuse solely because Moynihan had been on the department for 25 years **[Id.]**.

212. When he had written to the Chief on 17 January 2001, Thompson had never checked whether there was a contempt of court out of Lawrence, and did not know whether or where the court kept its records **[Trial, 5/22/02, at 108-109]**.

213. Thompson never saw an affidavit written by Detective Moynihan or by anyone else to support the warrant sought **[Trial, 5/22/02, at 83]**.

214. Thompson never heard Detective Moynihan swear to any facts before the Court for that warrant **[Trial, 5/22/02, at 83]**.

## THE UNLAWFUL WARRANT FOR MEUSE'S ARREST

215. On 25 October 2000, Moynihan filed an application for a warrant without a supporting affidavit at Haverhill District Court for Meuse's arrest **[Trial, 5/21/02, at 66]**.

216. Before Moynihan brought an application for criminal complaint and warrant, the only people he used as a resource of information beside Susan Pane and her lawyer, Rosalyn Stults, was his captain, Captain Thompson **[Trial, 5/21/02, at 62]**.

217. Moynihan testified that he never had conversation with Chief Barone **[Trial, 5/21/02, at 62]**.

218. Moynihan admitted that neither the copy nor the original arrest warrant had a sig-

23

nature by anyone, that he was the complainant, but did not sign it [**Trial, 5/21/02, at 29-30; Trial Exhs. Y**]. The court copy of the warrant is in red and black and was signed by Kim Marotta and is dated 25 October 2000 [**Trial Exh. Z**].

219. Moynihan never saw the correspondence between Captain Thompson and Chief Barone [**Trial, 5/21/02, at 62-63; Trial Exh. CC, letter dated 17 January 2001 from Thompson to Barone**] and never saw the federal or FBI warrant out for Meuse's arrest [**Trial, 5/21/02, at 63**].

220. Moynihan testified that "Agent Kelly" told the captain there was one [**Trial, 5/21/02, at 63**].

221. Moynihan does not recall telling Captain Thompson that Brian was a fugitive in flight [**Trial, 5/21/02, at 63**].

222. On 25 October 2000, Clerk Kim Marotta signed the warrant even though it did not have a supporting affidavit [**Trial Exh. Z**].

223. Moynihan admitted that he had "never physically and visually seen" the alleged FBI warrant for the Unlawful Flight to Avoid Prosecution [**Trial, 5/21/02, at 69**].

## WHAT THOMPSON KNEW ABOUT THE ALLEGED FBI UNLAWFUL FLIGHT WARRANT

224. Thompson testified that he had not seen the alleged federal unlawful flight warrant [**Trial, 5/22/02, at 93**].

225. Thompson told the Chief that there was an Unlawful Flight to Avoid Prosecution warrant by the FBI [**Trial, 5/22/02, at 93**].

226. Thompson testified that "an unlawful flight is how the FBI enters a case. That gives them the jurisdiction, the authority to enter the case and to conduct a search. Charles Kelly, the FBI agent, obtained the unlawful flight warrant" [**Trial, 5/22/02, at 93**].

227. On 18 January 2001, Captain Thompson, detective commander, wrote something that appears to be an interview with Tim Allen. He gave that letter to Detective Moynihan and FBI Agent Kelly. Tim Allen is the brother of a police officer who stated that he knows the Meuse family and is friendly with them [**Trial, 5/22/02, at 114; Trial Exh. EE**].

228. Thompson wrote that Tim Allen had stated the day before on January 17th that he was at the home of Jan and Owen Meuse, and he was there from 6:00 to 8:00 and at around 7:20 he was told that Brian Meuse was on line with his family. [**Trial, 5/22/02, at 116; Trial Exh. EE**]. And, according to Thompson, Allen told Thompson that Brian said "Tell Tim I said hi" and that the family told Tim Allen that Brian was in New Zealand.

229. Thompson testified that the FBI did contact somebody in New Zealand [**Trial, 5/22/02, at 116**].

230. Thompson testified that the FBI did check whether Meuse had a passport [**Trial, 5/22/02, at 116-117**].

24

231. Thompson testified that although Allen also told him that he believed that the baby's mother, Sue Pane, had some type of drug problem and that the courts have been unfair to Meuse, he, Allen, wants to help in this situation: He would do what he can to convince Brian Meuse to turn himself in. And Mr. Allen asked you several questions regarding what Brian would be facing if he returned [Trial, 5/22/02, at 117].

232. Thompson testified that he and Detective Moynihan told Allen that if Meuse turned himself into the police Thompson would attempt to drop the federal charge of Unlawful Flight [Trial, 5/22/02, at 118].

## WHAT THOMPSON DID NOT INVESTIGATE ABOUT THE BABY'S HEALTH

233. Thompson knew that Marissa was supposed to have therapy [Trial, 5/22/03, at 69].

234. Thompson was made aware of problems with the child's health, with the child's deficits, physical deficits [Trial, 5/22/03, at 71; Trial Exh. D and Exh. BBB].

235. Thompson was aware that Marissa had only been brought to therapy for two weeks between the period from June 22nd, when she was examined and diagnosed as needing therapy, and mid-September [Trial, 5/22/03, at 70].

236. Thompson was aware that Detective Moynihan had the therapy records in his file, but neither attempted to see them nor saw them [Trial, 5/22/03, at 69].

237. Thompson never had his detective speak to some medical people, for instance, the child's doctors, as to the child's health [Trial, 5/22/03, at 73].

238. Thompson testified, "During the investigation, Detective Moynihan talked to Ms. Pane regarding the child's health. He reported back to me that ...that there had been missed appointments, that the child was not in the best of health. He also had made contact with the doctor's office, and actually, in an attempt to provide, if there would be any other information that we could gather to find the whereabouts of the child" [Trial, 5/22/03, at 74].

239. Thompson did not recall whether Susan Pane contacted Children's Hospital regarding Brian and the child [Trial, 5/22/03, at 76].

240. Thompson himself did not contact Children's Hospital or any other doctors regarding Brian and the child [Trial, 5/22/03, at 76-77].

241. Thompson knew that Brian brought the child to Children's Hospital, to a local doctor, and to a local therapy company [Trial, 5/22/03, at 78].

242. Thompson was not concerned that the child received proper medical care or appropriate therapy locally.

## WHAT THOMPSON KNEW ABOUT MOYNIHAN'S INVESTIGATION OF THE BABY'S HEALTH

25

243. Thompson knew that Moynihan's purpose in making several phone calls to Boston Children's Hospital, Dr. Tanguay at the Wilmington Pediatrics Group, and the West Newbury Pentucket Early Intervention Program was to alert the doctors and therapists to call Moynihan if Brian showed up again with the child so that Moynihan could arrest him and grab the child [**Trial, 5/22/03, at 79-81**].

244. Thompson testified that Detective Moynihan made inquiries into the child's medical history, but did not know which doctor's office Moynihan contacted [**Trial, 5/22/03, at 74, 77**].

245. Thompson asked Moynihan about the Florida therapy records [**Trial, 5/22/03, at 69**].

246. Thompson did not know whether Detective Moynihan called Dr. Tanguay at Wilmington Pediatrics regarding the baby [**Trial, 5/22/03, at 77**].

## MOYNIHAN NON-INVESTIGATION REGARDING PANE'S CARE OF THE CHILD

247. Moynihan investigated " [t]o a certain point" [**Trial, 5/20/02, at 166**].

248. Moynihan handwrote in **Trial Exh. II** that Annie Kalip provided day care for 15 years and Brian brought Marissa to her, that the baby had "symptoms, locked jaw effect. Baby grit her teeth so badly that the top right teeth were worn down. The child could not crawl or put legs together. Ann tried to work with child to try to get her to be able to put her legs together. Child has six-month skills, could not talk or crawl. She thought baby was kept in a confined area port-a-crib long periods of time" [**Trial, 5/21/02, at 99-100; Trial Exhs. HH and II**].

249. Moynihan testified that he asked Kalip "if she noticed any unusual symptoms with the child. She said the child would lock its jaw and grind its teeth. From doing so, the child's top right teeth were worn down. She also said the child could only drag itself. Her right foot was pointed out and the left foot was pointed behind her. The child's legs could not be put together. Her opinion was that the child was in a confined area (a port-a-crib) for long periods of time. She also said the child could not talk. She said the child's skills were that of a six month old and told Brian she needed Marissa's medical records and also his custody papers" [**Trial, 5/21/02, at 100-102**].

250. Moynihan testified that he asked Susan Pane what kind of care she gave to the child, that he asked her whether she had kept the child confined in the port-a-crib, but Pane denied it " [**Trial, 5/21/02, at 101-102**].

251. Moynihan told Thompson that Marissa, the child, had missed some appointments with the therapist down in Florida [**Trial, 5/22/03, at 69-70**].

252. Moynihan had knowledge that Pane and/or Stults contacted the doctors with whom Meuse had made contact to examine the child [**Trial, 5/21/02, at 124; Trial Exh. LL**].

## CAPTAIN THOMPSON'S GENERAL POLICE KNOWLEDGE

253. Thompson knew nothing of the Parental Kidnapping Act, federal or state [**Trial,

26

5/22/02, at 41-46].

254. Thompson denied receiving a bonus incentive for the department from the federal government [Trial, 5/22/02, at 105].

255. Thompson denied receiving a bonus incentive for the department from the federal government based on the number of people that are arrested for domestic violence or parental kidnapping cases [Trial, 5/22/02, at 105-106].

256. Thompson admitted that he, as a detective commander, has a responsibility to use due diligence [Trial, 5/22/02, at 119].

257. Thompson explained to the jury what due diligence means in his position: "That I have the obligation to investigate -- I believe that this is the area that we're headed -- that I have the obligation to conduct these investigations in a reasonable, proper, use the same word, diligent manner. To carry on, as we're talking about an Unlawful Flight warrant, I believe that it certainly is due diligence when you receive a call from the FBI stating, we have obtained an Unlawful Flight warrant. That's what enables the posters to go out. That's when they tell you that they are entering the case and going to conduct a search. I feel that my obligations towards that issue; due diligence with the Unlawful Flight warrant were certainly covered. There was a warrant then. The warrant has been dismissed. I have absolutely zero doubts that there was never not an Unlawful Flight warrant" [Trial, 5/22/02, at 121-122.

258. Thompson believed without question whatever the FBI told him regarding a warrant " [Trial, 5/22/02, at 122]: "I was told by the FBI that there was warrant, Unlawful Flight warrant for Mr. Meuse. The knowledge of one officer is considered to be the knowledge of all officers. . . . That is a rule in police investigations" [Trial, 5/22/02, at 123-124].

259. Thompson knew that there was no crime in Florida, i.e., that Florida was not handling the case, but he did not learn that on his own. He never communicated with anyone in Florida about the Meuse case [Trial, 5/22/02, at 126]; Melissa Alleruzo and Eileen Forman in the DA's office spoke to someone in Florida about the Meuse case [Trial, 5/22/02, at 127; Trial Exh. CC].

260. Thompson testified that Florida felt that the case belonged in the Massachusetts courts because there were court orders in effect in Massachusetts and they referred it to us for investigation and/or prosecution [Trial, 5/22/02, at 129].

261. Thompson admitted, in words for all intents and purposes that he does not have the authority to prosecute someone who commits a crime in another jurisdiction, for instance, in another State [Trial, 5/22/02, at 133-134].

262. If Meuse had committed a crime in Florida, Thompson would not have had a right to try him for that crime here in Haverhill District Court [Trial, 5/22/02, at 134].

263. Thompson testified that Meuse was not charged with a crime in Florida [Trial, 5/22/02, at 137]. Meuse did not take the baby from Pane in Massachusetts [Id.]. "The baby was taken in Florida, [Id.].

264. Thompson testified that before he can bring a criminal complaint, he must first determine that a crime has been committed before he tries to charge someone with the crime [Trial, 5/22/02, at 142].

265. Thompson denied, however, that one of the first things that he has to determine in a parental kidnapping case, in Massachusetts is whether a parent took the child in Massachusetts [Trial, 5/22/02, at 142].

266. Ada, Oklahoma, police contacted Moynihan's captain,, Captain Thompson" [Trial, 5/20/02, at 173].

267. On 5 April 2001, the day Meuse was arraigned, Judge Herlihy wanted to see the FBI warrant and requested Assistant District Attorney DePaolo to produce it.

## THOMPSON, MOYNIHAN, THE FBI, AND FBI AGENT CHARLES KELLY COORDINATE ACTIVITIES

268. Moynihan was involved with Charles Kelly of the FBI Boston unit in the investigation of this case [Trial, 5/20/02, at 168-169].

269. Moynihan and the FBI, including Kelly, performed stakeouts, went to the homes of different people' whose names were provided by Pane, performed "follow-ups" [Trial, 5/20/02, at 170-172]. He, Agent Kelly, and others spent "close to a couple of hundred hours" [Trial, 5/20/02, at 173]: "two hundred hours" [Trial, 5/20/02, at 188].

270. Thompson testified that the police made (a) note that Meuse was assisted by a fathers' group, the Fatherhood Coalition, (b) note of articles that were in the newspaper, (c) note of articles that were on the internet, (d) note of signs that were in front of the Meuses' home, (e) note of picketing of the courthouse [Trial, 5/22/02, at 99-100].

271. Thompson testified that Detective Moynihan worked with Agent Kelly of the FBI, but he, Thompson, was not aware of any direct contact that Agent Kelly had with the Fatherhood. He was aware, however, that Detective Moynihan had such contact [Trial, 5/22/02, at 100].

272. The FBI chased Meuse's friends, knocked on their doors in the middle of the night, tapped people's phones.

273. Thompson testified that he knew Meuse had been interviewed by local TV and newspaper reporters [Trial, 5/22/02, at 100].

274. Thompson testified that he knew Pane had been interviewed by local newspaper reporters [Trial, 5/22/02, at 104].

275. Moynihan spoke to Captain Thompson a couple of times a week anywhere from 5 to 20 minutes about the Meuse/Pane case [Trial, 5/21/02, at 76]:

> It was always ongoing, whether it was once or twice a week. Whenever something was discovered or if I had to go someplace, a surveillance or something like that, I

28

always advised the captain as to what was going on. I just couldn't like go off on my own and do things. He had to have knowledge of like what I was doing and where I was going.

A lot of times it would have to do with Agent Kelly. The FBI was the one that did a lot of the extensive investigation on this part. They have the resources. The city police department has nowhere near the resources. So, Agent Kelly called me, I have this bit of information, you want to come with me, I'd like to go here and check this location, or I'd like to go here and do this surveillance, and that's what would happen.

And I'd relay that information to my captain that I'd be with Agent Kelly, I'd be going out of town, and that's about what it boiled down to.

276. Moynihan took guidance from the FBI: "Whenever they came up with something they wanted to investigate with me, we went and did it" **[Trial, 5/21/02, at 79]**.

277. According to Moynihan, Captain Thompson, to a certain extent, gave him guidance or guidelines to follow in this case **[Trial, 5/21/02, at 78-79]**; for instance, "[o]nce Mr. Meuse became a defendant, he told me . . . that I was no longer to deal with Jan Meuse; that he had become the defendant and that we were no longer to provide her with any information or try to do any investigation on the part of Mr. Meuse" **[Trial, 5/21/02, at 79]**.

278. Moynihan testified that he received that instruction from Thompson when Meuse allegedly became a fugitive from justice **[Trial, 5/21/02, at 78]**.

279. Moynihan defined fugitive as being "a person [who] has a warrant on him and he's running from the law, he was hiding from the law, he is concealing himself from justice, not coming forth to the court system, as ordered" **[Trial, 5/21/02, at 78]**.

280. Moynihan equated the alleged knowledge that Meuse's family had with Meuse's knowledge **[Trial, 5/21/02, at 78]**.

281. Moynihan admitted that he had no "proof that his family even knew where [Meuse] was on October 25th or after October 25th" **[Trial, 5/21/02, at 79]**.

282. Moynihan admitted that Meuse "was just running because he had no knowledge of it, whatsoever. That's why they found him in Oklahoma. He had no idea that anybody was looking for him" **[Trial, 5/21/02, at 80]**.

283. Moynihan admitted that he told Timothy Allen that if Brian turned himself in, Moynihan would attempt to drop the federal charge of Unlawful Flight, which didn't exist, and to keep the Parental Kidnapping charge a misdemeanor, but the Parental Kidnapping charge was always just a misdemeanor **[Trial, 5/21/02, at 84; Trial Exh. EE]**.

284. The domestic violence advocate Jean Walker, kept a steady correspondence up with Rosalyn Stults, Pane's lawyer, and with Charles Kelly of the FBI **[Trial, 5/21/02, at 91-92]**.

285. Kelly got in touch with the HPD "[p]robably to set up a time and date for us to get

29

together to go on a surveillance or, you know, to interview people [Trial, 5/21/02, at 92].

286. Moynihan and the FBI were working off a list of names supplied to the FBI [Trial, 5/21/02, at 92].

287. According to Moynihan, the FBI got telephone bills from Mr. and Mrs. Meuse's phone [Trial, 5/21/02, at 134]. He, Moynihan, "had nothing to do with the phone bills or the -- anything, any type of contacts that came out of their house" [Trial, 5/21/02, at 134].

288. The bills the FBI obtained were the Meuses' phone bills from August 2000 through October 2000 [Trial, 5/21/02, at 135].

289. According to Moynihan, Agent Kelly "conveyed to [him] certain phone calls to certain locations and the FBI conducted investigations into those locations, but he did confide in to me where the locations were, and which I don't have recall. Some, I believe were in New Hampshire. Some were in Maine" [Trial, 5/21/02, at 136].

290. Moynihan described photographs he was shown of the child after Meuse had been caring for her: he observed that Marissa was walking, running, smiling, picking up a toidy potty [Trial, 5/21/02, at 139-140, 142]. The photos were date stamped by the camera on 8 January 2001 and 12 January 2001 [Trial, 5/21/02, at 140], three and a half months after he took the child from Florida [Trial, 5/21/02, at 142].

291. Moynihan's domestic violence advocate, Jean Walker, maintained a file on Meuse's defense counsel. The material was supplied to Walker by Pane's lawyer, Stults [Trial, 5/21/02, at 144-145].

292. Jean Walker is the department's Domestic Violence civilian professional partially she's paid under the Violence Against Women Act [Trial, 5/22/02, at 115]. She maintains the office.

293. In response to Meuse's counsel's question, "She kept an eye on me?" Moynihan responded. "Yes, she did. I believe so. The eye in the sky" [Trial, 5/21/02, at 145].

294. Moynihan testified that all of the material provided to Moynihan's victim witness advocate was provided to the FBI [Trial, 5/21/02, at 145].

## PANE AND MOYNIHAN AND THE FBI COORDINATE POSTER ACTIVITIES

295. Pane, too, "quite often" had conversations with Agent Charles Kelly of the FBI Boston unit in the investigation of this case [Trial, 5/17/02, at 98-99, 100, 104-105].

296. Pane was in continuing communication with Moynihan during the investigation of the case: "I just remember calling him quite often" [Trial, 5/17/02, at 97-98, 100, 104-105; Trial Exhs. HH and II].

297. Because of her "numerous phone conversations with the police and the FBI," she was living in New York during the time of the investigation [Trial, 5/17/02, at 99-100].

30

298. Between October 2000 and 22 March 2001, Pane had about 50 conversations with different organizations: **(a)** National Center for Missing and Exploited Children, **(b)** Voice for the Children, **(c)** a California-based organization. **[Trial, 5/17/02, at 102-103].**

299. Pane provided the organizations current pictures, height, weight, skin color, sufficient information so that the organizations could put together a package, including a poster, for distribution **[Trial, 5/17/02, at 102-103].**

300. Pane had 500 posters made at a time, provided them to the NCMEC in the very beginning of October 2000, distributed them throughout many states, and hung them in laundromats, grocery stores, other stores, hotels, gas stations in Massachusetts generally, the Haverhill and Methuen areas in particular, and in many, many towns in New York **[Trial, 5/17/02, at 103-104].**

301. Moynihan had nothing "to do with FBI Most Wanted show on Fox TV" **[Trial, 5/20/02, at 188].**

302. "The FBI set that up and that was all set up through, I believe, through the Wal-Mart" **[Trial, 5/20/02, at 188].**

303. Moynihan testified that the FBI "put out that [Meuse] was a fleeing felon" **[Trial, 5/20/02, at 188].**

304. The poster, Moynihan testified, said Parental Kidnapping.

305. The poster on the America's Most Wanted Website was and remains at http://www.amw.com/site/searchlight/missmeusemarissa200010.html. The poster may be seen on page 32, *infra*.

306. The poster by National Center for Missing and Exploited Children ["NCMEC"] names Meuse as an "abductor" and November 6, 2000, as the date when Meuse allegedly fled unlawfully to avoid prosecution **[Trial, 5/21/02, at 86].**

307. Moynihan denied having anything to do with the information written on the NCMEC poster **[Trial, 5/21/02, at 86].** He did not know whether the Haverhill Police Department or the Office of the District Attorney in Essex County had anything to do with what was on this poster **[Trial, 5/21/02, at 87].**

308. He believed that the local FBI was mainly responsible for the poster **[Trial, 5/21/02, at 87-88].**

309. There was also a second Wanted poster for Parental Kidnapping **[Trial, 5/21/02, at 88-89; Trial Exh. GG].**

310. On the poster in **Trial Exh. GG**, the FBI wrote that an arrest warrant for Meuse issued for "Parental Kidnapping" and "Unlawful Flight to Avoid Prosecution." Readers were to contact the FBI Violent Fugitive Task Force by calling 617-742-5533.

311. There was also a third "Family Abduction" poster **[Trial, 5/21/02, at 88-89; Trial Exh. FF].**

31

312. On the poster in **Trial Exh. FF**, the FBI wrote that on 6 November 2000, an FBI warrant for Meuse, the "Abductor," issued for "Unlawful Flight to Avoid Prosecution."

313. On Saturday 10 February 2001, following the America's Most Wanted show, the advertisement "The Kidnapping by a Haverhill man, Wanted by the FBI" was aired on the FOX stations.

| MISSING | ABDUCTOR[12] |
|---|---|
|  |  |
| **MARISSA LYNE MEUSE** | **BRIAN MEUSE** |
| Case type: FamilyAbduction<br>DOB: Aug-04-1999<br>Missing: Oct-08-2000<br>Age Now: 1<br>Sex: Female<br>Height: 2' 7" - 79cm<br>Weight: 22 lbs - 10 kg<br>Hair: Lt Brown<br>Eyes: Brown<br>Missing from: Port Orange, Fl USA | DOB: Jun-26-1962<br>Sex: Male<br>Height: 5'8" 173cm<br>Weight: 160 lbs - 73 kg<br>Hair: Brown<br>Eyes: Hazel<br>Case No: 897945 |

Marissa was abducted by her non-custodial father, Brian Jeffrey Meuse. A FBI warrant for Unlawful Flight to Avoid Prosecution was issued for the abductor on November 6, 2000.

They may travel out of state in a black and grey 1978 Chevrolet Corvette with Massachusetts license plates 1978HD.

---

[12] "'Abduction' is physical taking of minor child from parent having legal custody." Murphy v. I.S.K. Con. of New England, Inc., 409 Mass. 842, 860 (1991).

**ANYONE HAVING INFORMATION SHOULD**

**CONTACT**

National Center for Missing & Exploited Children

1-800-843-5678 (1-800-THE-LOST) or

Haverhill Police Department (Massachusetts) 1-978-373-1212 or Your Local FBI



AMW Contact: Gina Long (202) 204-2625

314.   On Saturday 10 February 2001, on a FOX news segment entitled "New England's Unsolved Mysteries: The Hunt for Brian and Marissa Meuse," the poster marked as **Trial Exh. GG** appeared. It instructed the audience to call the FBI Violent Fugitive Task Force at 617-742-5533.

| Wanted for Parental Kidnapping |
| Unauthorized Flight to Avoid Prosecution |
| FBI Violent Fugitive Task Force    617-742-5533 |

315.   On that television show, on Saturday 10 February 2001, the head of the Boston office of the FBI, Charles Prouty, made two statements: "Our investigators are working very closely with the Haverhill Police Department and we have spent a lot of time on this in the last couple of months and I believe that we will find him. I don't doubt that he does love his daughter, but he has taken the law into his own hands and the custody agreement is um, . . . exists and he simply has to abide by that."

316.   FBI Boston Chief Prouty misrepresented that there was a custody agreement.

## THE WARRANT ON AMERICA'S MOST WANTED WEBSITE

317.   As of the writing of this Complaint, the poster remains on America's Most Wanted website: http://www.amw.com/site/searchlight/main200101.html. The word MISSING over Marissa's picture now reads "RECOVERED.

318.   And below the names of the child and Meuse is now added the row reading

33

"**CLICK ON PICTURES FOR MORE DETAILS.**"  After clicking, the same details as shown above are displayed.

319.  Nowhere on the website does it read that Meuse was found Not Guilty by a jury of his peers.

320.  Moynihan did not know whether the Haverhill Police Department ever did anything to locate Susan Pane or ever contacted the National Center for Missing and Exploited Children or contacted the FBI to get their help to locate Susan Pane **[Trial, 5/20/02, at 190]**.

321.  In his 19-year career, Moynihan had arrested a dozen or so women and around a hundred men, around 10 percent women, 90 percent men.  "That's the national rate, ten to one." **[Trial, 5/20/02, at 192-193]**.

322.  Moynihan wrote the complaint against Meuse for Kidnapping of a Minor by a Relative, to wit; her father, pursuant to chapter 265 section 26A **[Trial, 5/20/02, at 198]**.

323.  The complaint read, "On 10/8/2000, being a relative of Marissa Meuse, a child less than 18 years old, did without lawful authority hold or intend to hold such child permanently for a period, protracted period did take or entice such child from such child's lawful custodian" 26A **[Trial, 5/20/02, at 199]**.

324.  On page two of His Honor's memorandum dated 30 July 2001, Judge Alan Swan wrote, "[T]here is still no order or judgment of custody" in the Probate & Family Court case entitled Meuse v. Pane **[Trial, 5/21/02, at 15, and Trial Exh. CCC]**.  Moynihan agreed that there had been neither a judgment nor order of custody **[Trial, 5/21/02, at 15]**.

## FOXNEWS TELEVISED BROADCAST

325.  On or around 9 or 10 February 2001, FOX25News New England Unsolved Crimes broadcast a story about Meuse.  The story was somewhat balanced, but Charles Prouty asserted untruthfully that Meuse was a fleeing fugitive.

326.  Before the local feature story, FOX25News advertised the story as a Kidnapper wanted by the FBI, and showed the picture of Meuse and Child poster **[Trial Exh. GG]**.

## MOYNIHAN'S COMMUNICATION WITH PANE AND STULTS

327.  Pane had written several letters to Detective Moynihan **[Trial, 5/21/02, at 42; Trial Exh. HH]**.

328.  Moynihan spoke to Susan Pane when she called maybe once or twice a week **[Trial, 5/21/02, at 22-23]**.

329.  Moynihan never told Pane to get back to Massachusetts with the child **[Trial, 5/21/02, at 22]**.

330.  Moynihan spoke to Rosalyn Stults, her attorney, once every other week **[Trial,**

34

5/21/02, at 23; Trial Exh. II].

331.  Moynihan never told Stults that her client wrongfully removed the child and that she should get her client back to Massachusetts or otherwise a warrant would issue to bring her back [Trial, 5/21/02, at 23].

332.  Moynihan never considered issuing a warrant to get Susan to bring back the child [Trial, 5/21/02, at 23].

333.  Moynihan testified that he did not consider issuing a warrant to arrest Susan because Meuse and Pane were "in court on a custody battle at the time and it was the court's decision at the time that a decision had never been made" [Trial, 5/21/02, at 23].

334.  Moynihan testified that he kept no notes or records of Stults' calls, but testified that Stults called wanting "to know what was going on in the investigation," telling him "what was going on down in Florida, what they were proceeding to do as far as getting out the posters and that certain people they were getting to help them in trying to recover the kidnapped child" [Trial, 5/21/02, at 61-62].

## STULTS' WORKING WITH THE FBI AND MAINTAINING THE "SUSAN PANE LEGAL DEFENSE FUND"

335.  Stults communicated with Charles Kelly [perhaps spelled "Kelley"] by FAXed letters on numerous dates, including but not limited to a 29-page letter on 14 November 2000 and a 3-page letter on 16 November 2000.

336.  On or around 31 December 2000, Pane released to the print and broadcasting media an "Open Letter to Brian Meuse" [Exh. GGG].

337.  In the press release of 31 December 2000, Pane identified that donations were to be made payable to the "Susan Pane Legal Defense Fund" and to be sent to "Attorney Roslyn [sic] Stults, 14 Lynde Street, Salem, MA 01970" [Exh. GGG].

## PROBABLE CAUSE

338.  The complaint alleged that Meuse took the child on 8 October 2000. Thompson testified that he did not know in which of the 50 States Meuse and the child were on October 8th [Trial, 5/22/02, at 146].

339.  Thompson testified that he did not know whether Meuse and the child were together on 8 October 2000 [Trial, 5/22/02, at 146].

340.  Thompson testified that he knew from Judge Manzi's order of 3 May 2000 that Susan Pane had the child wrongfully because she had wrongfully removed the child [Trial, 5/22/02, at 146].

341.  It is undisputed that Judge Manzi's order of 3 May 2000 was never vacated or modified [Trial Exh. T].

35

342. Thompson was unable to prove that Pane had lawful authority and that Meuse did not have any lawful authority to have the child.

343. Judge Alan Swan on 30 July 2001 ruled that there had been even by that date no judgment or order of custody in the Meuse v. Pane case in the probate and family court [Trial, 5/21/02, at 12-15; Exh. CCC, Judge Swan's Memorandum and Decision, p. 2].

344. Judge Manzi gave Pane custody of the child on 11 October 2000, eleven days after Meuse had taken the child.\[13]/

345. Meuse was not present in court on 11 October 2000 and had no personal notice of the proceeding [Trial, 5/23/02, at 14-15].

346. Moynihan admitted knowing that Meuse took the child from Florida before Judge Manzi issued the order of custody to Pane [Trial, 5/21/02, at 168].

347. Thompson was relying on Judge Manzi's order of 11 October 2000 Trial, 5/22/02, at 149].

348. The Criminal Complaint was written on 25 October 2000 [Trial, 5/22/02, at 148].

349. Thompson never saw Judge Swan's memorandum and decision of 30 July 2001 in this case [Trial, 5/22/02, at 149; Exh. CCC].

350. Thompson agreed at trial that Judge Manzi's order of May 3d, in which she said Susan had wrongfully removed, was valid and lawful [Trial, 5/22/02, at 150; Trial Exh T].

351. Therefore Susan Pane had not been given custody of that child by the court on 1 October 2000 [Trial, 5/22/02, at 153], and did not have lawful authority to have the child at the very least until 11 October 2000.

---

[13]. A law affects substantive rights and is ex post facto, according to that decision, if it makes criminal an action innocent when done; makes a crime more aggravated than when committed; increases the punishment for the crime, . . . or "alters the legal rules of evidence, and [requires] less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender " (emphasis in the original).

Stewart v. Chairman of Massachusetts Parole Bd., 35 Mass.App.Ct. 843, 846 (1994) (internal cite omitted), quoting Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798).

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

Calder, at 390.

36

352.   Thompson admitted that he was aware that Pane did not have custody on 1 October 2000, on 2 October 2000, on 3 October 2000, on 4 October 2000, on 5 October 2000, on 6 October 2000, and on 7 October 2000 **[Trial, 5/22/02, at 154-155]**.

353.   Thompson did not admit that he was aware that Pane did not have custody on 8 October 2000 **[Trial, 5/22/02, at 155]**: Thompson testified: "I did not read the order and I would have to say that there must be something in the order which gave her custody" **[Trial, 5/22/02, at 155]**.

354.   Thompson testified that he was not aware that the 11 October 2000 order was not in effect on 8 October 2000 **[Trial, 5/22/02, at 156]**.

355.   Thompson ultimately testified that Pane had not yet been awarded custody on October 8th **[Trial, 5/22/02, at 157]**.

356.   Thompson admitted that he was aware that Pane did not have custody on 9 October 2000 and on 10 October 2000 **[Trial, 5/22/02, at 157]**.

357.   Thompson testified that on October 11th then Susan got custody **[Trial, 5/22/02, at 157]**.

358.   Thompson was aware that she never had a hearing on October 11th and that Meuse was not in court on that date **[Trial, 5/22/02, at 158]**.

359.   Thompson testified that he was not aware that Meuse never knew about that order by Judge Manzi on October 11th **[Trial, 5/22/02, at 158]**: "I don't know whether he knows it or not, no" **[Trial, 5/22/02, at 158]**.

360.   Thompson testified that he believed that Meuse intended to hold Marissa permanently or for a protracted period **[Trial, 5/22/02, at 159]**. Thompson's belief was based on Meuse not having returned the child for six months **[Trial, 5/22/02, at 160]**.

### MEUSE NEVER INTENDED TO REMOVE CHILD PERMANENTLY FROM MOTHER

361.   Meuse testified that he "never had any intention of removing the child from her mother or anybody else, permanent or otherwise. . . . I would not have wanted to have taken away from Marissa the rights to know her mother or anyone else. I did not do it for any malicious or intent of purpose to remove her for any period of time, no. My only concern was for my daughter's health, safety and welfare, that her muscles were atrophying and that to prevent her from becoming permanently handicapped, either a paraplegic or quadriplegic and from her condition" **[Trial, 5/22/02, at 193]**.

362.   Upon taking her he took her immediately to the Boston Children's Hospital emergency outpatient in Boston **[Trial, 5/22/02, at 193]**.

363.   He did not bring her to a hospital in Florida, he testified:

37

". . . because I only had visitations one week out of every eight, which would not have allowed me to make sure that she got the medical attention that she needed only on that one week that of course I would have had.

"Second, because that there was already supposed to be medical attention for her in Florida and it was being neglected and denied her by the mother. So, there was absolutely no evidence to me whatsoever, that if I tried to start any more Florida help for her that it would have continued unless I was -- maybe the week that I was there.

"And even the week that I was there in Florida for the Early Intervention that was set up by Judge Sahagian's order, it was denied by the mother that I was allowed to even give my daughter that attention during my visitation. So, it was clear to me that the child would not get her medical help" [Trial, 5/22/02, at 194].

361. That is why Meuse brought her to Massachusetts [Trial, 5/22/02, at 194]. He also had exhausted any money he had saved in trying to even visit her prior to this [Trial, 5/22/02, at 194-195].

362. Meuse testified, "[When] I brought her to the emergency outpatient. They did an evaluation. They made note of the condition of the child was basically a lifeless rag doll that had no ability to hold up her own feet or her own arms or sometimes her own head, would just lifelessly fall back. We could not pick up her arm. It would just flop back down. They did not deem her as an emergency because she was not bleeding to death or dying of a heart attack or anything, but they did take her as important enough to have me immediately bring her right upstairs to another department. . . . That was [the] Early Intervention's Program that is set up for specifically children that have immediate needs. [There] we did another evaluation and the woman there who did evaluate her deemed her in dire need of help and she set up immediately appointments for her to have home evaluation and therapy, and she deemed that it was important that it was done immediately within the next day or two and they even canceled other appointments and fit her in, specifically, to get her attention as soon as possible [Trial, 5/22/02, at 195-196].

363. That visit by two people from West Newburyport Early Intervention occurred [Trial, 5/22/02, at 197].

364. Meuse described the session: "They evaluated Marissa. They tried to work with her to find out exactly what her abilities were. I had her on the floor in the living room on a bed quilt, as the only thing she could do was lie down on the floor. So, she was lying there and then they approached her and tried to see what abilities she had. Whether or not, like has been stated before, whether she could sit, stand, crawl, have the ability to hold something in her grasp; in her fingers. In the reports and going through that she did not -- she would sit up if you placed her sitting up and she'd stay sitting up if you kept her attention. Had you not kept her attention, she would get bored with it and fall back and lock her legs in a crossed position, as stated by Annie Kalip, that she was very frustrated and couldn't communicate [Trial, 5/22/02, at 197].

365. Meuse continued: "They said it was very important that Marissa has immediate medical attention and continues therapy and also suggested other doctors and avenues that I should

38

look into, and they scheduled the future appointments and I did also follow their recommendations and looked for a pediatrician, neurologist, and other doctors and help [**Trial, 5/22/02, at 198**].

366. Meuse found Dr. Normand Tanguay, of Wilmington Pediatrics in Wilmington, Mass. and visited with him on 5 October 2000 [**Trial, 5/22/02, at 198**]. The doctor told Meuse that Marissa had what he described as "Russian Baby syndrome." Dr. Tanguay referred Meuse to a pediatric neurologist at Boston Children's Floating Hospital. Meuse set up an appointment for Marissa with the pediatric neurologist.

367. Later that day Meuse learned that Susan Pane's attorney, Rosalyn Stults, was in contact with them and that Stults was getting the medical records from Children's Hospital and Tanguay's office.

368. Stults and Pane canceled the Early Intervention Program appointments that Meuse had made.

369. On a document found in Moynihan's file, Stults had handwritten "Cathy at Children's Hospital, phone number at the Children's Hospital, fax for Dr. Sun which is one of the doctors in the emergency, to get the release forms of the emergency evaluation. More phone numbers for Dr. Tanguay. Called him at 4:30 on October 6, 2000. Called back to check if we received a fax requesting his -- my records of Marissa with Dr. Tanguay. Another phone number for Dr. Gordon at the Early Intervention, has Linda Schaeffer as Susan's contact person" [**Trial, 5/22/02, at 204; Trial Exh. LL**].

370. He did not want to leave Massachusetts, but his only concern at that time was to get the child medical attention to help her, to prevent her muscles from atrophying and being a permanent handicapped person. The only way "I could obtain that without it being canceled, interrupted, or not getting it, either through Florida or Massachusetts or anywhere else was to do it without anyone knowing where I was, who I was with, who I was seeing for a doctor, what therapists I brought her to or whatever, I could do to get her help. So, I was on my own with my daughter seeking her medical attention until she was capable to walk or crawl or be at the level age that she was; as old as she was" [**Trial, 5/22/02, at 207**].

371. The examination of her in Florida was when she was ten months old. At that time, the doctors concluded that she had the physical ability of a five-month old [**Trial, 5/22/02, at 208**].

372. The child's ability to function did not improve between June 2000, when she was 10. If anything she was less able to hold her head up or when carrying her was like carrying a dead body [**Trial, 5/22/02, at 208**].

373. Around Thanksgiving, Meuse and the child were televised by Boston Channel 4 Eye Team reporter, Joe Bergantino. Moynihan and Thomson testified that they saw the TV show. On that tape, Marissa was, with the help of Meuse and Bergantino by either holding her hand or pushing or leaning or carrying, able to take a few steps unguided without holding on from . . . , like one bench to a table, but that was a much drastic improvement in the eight weeks until that tape was taken [**Trial, 5/22/02, at 209**].

39

374. By Christmas, Marissa had a very full vocabulary. "She had been transformed since 10/1 to Christmas into a very attentive, happy, joyful child that had the ability now to smile, to show expressions, to be able to hold, grasp, to stand, crawl, walk, run, talk. She could count to 20, knowing what she was counting and talking about. It was not just babble" [**Trial, 5/22/02, at 210; Trial Exh. MM, photographs of Marissa on 8 and 12 January 2001**].

375. The so-called child-protection agencies in both Florida and Massachusetts did nothing to help Marissa [**Trial, 5/22/02, at 212-214**].

376. Whether the 11 October 2000 order was valid and lawful is irrelevant, given that Meuse had no personal notice of the proceeding and had no knowledge of the order.

## MEUSE'S ARREST AND THE ENSUING CRIMINAL PROCESS

377. On or around the first week in December 2000, Meuse and the child were living in Ada, Oklahoma.

378. Meuse was renting a house at 808 West 12th Street in Ada, Oklahoma 74820.

379. Meuse and the child lived in a residential area across from a park with playground equipment. Marissa loved to play with the other children on the swings, slide, and other rides. Meuse was with Marissa 24 hours a day, 7 days a week. Meuse gave the child therapy every day and had her on a specific diet from an infant-raising book. He and the child were very active and always doing something or going somewhere like shopping or playing.

380. On 22 March 2001, while Marissa was taking her regular nap, Meuse was folding some laundry. The front door was open and Meuse noticed some people outside. As he went to take a closer look out the front door, an officer with a shotgun came running towards the door. The officer tripped on the step and went sliding across and off the porch on his face. As he stood up and rushed at Meuse standing in the front room, he was very shook up and nervously shaking his shotgun in Meuse's face. Wearing only a pair of shorts and hiding nothing, Meuse was standing in the middle of the room with his hands out and up. Meuse told the officer to relax so he would not accidentally shoot Meuse. Meuse said, in words for all intents and purposes, "I do not have any weapons or anything." Then Meuse turned around slowly so the officer could see that [**Exh. FFF**].

381. Meuse was not given his Miranda rights at that time. Instead, Meuse was arrested forthwith and then imprisoned and strip-searched.

382. Meuse learned from the local newspaper in Ada that two women, Glenda Thomas and Alberta Morris, had seen a Meuse Wanted poster on a Bulletin Board in a Wal-Mart Supercenter. The store is located at 1601 Lonnie Abbott Boulevard, Ada, Oklahoma [**Exh. FFF**].

383. Thomas and Morris women called the police and told them that they had seen Meuse and the child at Highlander Laundromat in the morning [**Exh. FFF**].

384. On 23 March 2001, Meuse was given his Miranda rights at the request of the court at Ada, Oklahoma and charged with parental kidnapping.

40

385. Meuse spent 11 days in the Pontococ Jail. He was kept in a 10-man jail cell with as many as 15 or 20 men in it at any given time. The conditions were inhuman. Where there once was a light socket in the ceiling, there were just live wires hanging from the ceiling. The floor was half-covered with puddles from the walls leaking in water from outside rains. Meuse had to sleep on a damp or even wet cement floor with only a thin, little mat and a small, thin blanket. The food was despicable and in very small portions. Sometimes someone didn't get any, because the jailers would run out of it. Meuse was then transported to Massachusetts in a van. The van was designed for 8 passengers but was filled at times with up to 12 men. Meuse and the other men were all shackled at the wrists and feet and together. It took several days of driving around the country before Meuse was delivered to the Essex County House of Correction ["Middleton"] in Middleton, Massachusetts.

386. Meuse spent three days housed in Middleton. Meuse was denied the right to counsel and the right to make a phone call to his counsel. Meuse was also confined to a 4-by-10-foot room with another man every minute of his stay there.

387. When brought to Haverhill District Court for arraignment, Meuse was able to persuade a court officer into contacting Meuse's attorney for him before he was brought from the holding cell upstairs to the courtroom.

388. Meuse's bail was set for $15,000.00. Meuse said that he was not going anywhere cause he had no reason to do so; he said, "The only reason I ever went anywhere was to get my daughter the care that she needed."

389. Meuse went to court several times in the 14 months before he had a jury trial.

390. To Meuse, those in the legal system appeared unconcerned about Marissa's health and welfare.

391. Prior to 6 October 2000, when he went away with the child, Meuse had asked for help from as many as 26 judges, prior to Judge Swan for the criminal trial. "Between my parents and me, we had contacted and asked for help from the newspapers, the Haverhill police, Haverhill Detective Daniel Moynihan, Haverhill Police Chief Leonard Barone, Haverhill's Judge Herlihy in his personal capacity, the FBI, DSS, the Haverhill District Court, the Family Probate Court in Lawrence, the Family Probate Court in Salem, the City of Haverhill's Mayor, the City of Haverhill's Attorney, each member of the City of Haverhill's City Council, and various televisions stations."

392. After being arrested, Meuse continued to ask for all of them to look at the evidence that Marissa was being put back in Harm's way, and asked them to help her [**Trial Exh. BBB**].

393. While waiting for trial, Meuse was not able to find a job. Possible employers denied him a job because of his CORI record. Meuse applied for food stamps at Welfare's Department of Human Resources. DHR said that Meuse could not do the mandatory, prerequisite volunteer work for receiving food stamps. He was excluded because of his CORI.

394. The criminal proceedings continued for 14 months. On the first day of trial in May 2002, Judge Alan Swan said that Meuse was precluded from using the necessity defense, a defense

41