UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-10255-EFH

**Brian J. Meuse**
Plaintiff

v.

**Susan Pane,
Rosalyn Stults,
Lt. Detective Daniel R. Moynihan**, in his official and individual capacities,
**Captain Donald Thompson**, in his official and individual capacities,
**City of Haverhill, Massachusetts,**
**Louis Freeh**, in his official capacity,
**Charles S. Prouty**, in his official and individual capacities,
**Charles P. Kelly,** in his official and individual capacities,
**FOX Television Stations, Inc.,
America's Most Wanted,
National Center for Missing and Exploited Children,
Wal-Mart Stores, Inc.**
Defendants

---

**MEUSE'S OPPOSITION TO
ROSALYN STULTS' MOTION TO STRIKE PLAINTIFF'S COMPLAINT**

Now comes Brian J. Meuse ["Meuse] to oppose Rosalyn Stults' Motion to Strike Plaintiff's Complaint.

As grounds, Meuse states that the Complaint might be lengthy, but it is well-organized and is divided into sections with descriptive headings. It also contains a table of contents of the counts (on page 1) and of the facts (on page 4). The majority of the paragraphs are literally only 2 or 3 lines in length. It is anything but "rambling" or "chaotic" [RS Mot. pp. 4 and 5]. Meuse does not dispute that there are cases in which lengthy complaints have been stricken, but the opposite is also true. For the most part, the length is not the deciding factor: the content of the complaint and the structure thereof are the factors to be considered. Important to note also is that there are a dozen defendants, and the acts of each are detailed with specificity.

Moreover, the complaint is composed of facts gathered at a criminal trial at which three of

the named defendants testified, namely, Pane, the police detective, and his captain. The addendum consists of Exhibits A through HHH, many of which were entered into the criminal trial as exhibits. The police detective (Defendant Moynihan) and police captain (Defendant Thompson), under oath, incriminated Defendants Stults, Pane, FBI Agent Kelly, and the NCMEC as acting in concert to deprive Meuse of his civil rights. Defendant agent Prouty incriminated himself on a FOX25News broadcast, a videotape of which is in Meuse's possession and formed the basis for Prouty's acts. AMW's, NCMEC's, and WalMart's own websites were also sources of facts: for instance, posters showing Meuse and the child were on both the AMW and NCMEC's websites, and the three websites acknowledged the affiliation of the three entities. The posters complete with photographs are replicated in the complaint and its addendum.

As further grounds, Meuse states that he pled each element of each cause of action he brought against Stults, that §1983 cases must be pled with particularity, and that against each of the named defendants, there was an abundance of evidence, gathered as a result of the due diligence of Meuse and his counsel before bringing the Complaint.

In factual support of his opposition to the motion to strike the claim against the movant, Meuse submits to this court in Table 1, the facts involving Stults. In Table 1, Meuse includes the 10 paragraphs Stults identified as those paragraphs in which her name was called. In actual fact, there were **33** paragraphs referring **explicitly** to Stults and many, many, many dozens more -- that included Stults **implicitly** under the umbrella of the word "Defendants."

Following Table 1, which is *infra* at pages 3 and 4, is a section containing a summary of Stults' role in the underlying events. That section is followed by Meuse's legal arguments:

1. Stults is liable for false arrest, detention, imprisonment, assault, battery, malicious prosecution, abuse of process, and defamation of and conspiracy against Meuse, as well as the intentional infliction of emotional distress, by providing false information that caused the diverse harms imposed upon him.

2. Stults has not shown that the complaint is in noncompliance with F.R.Civ.P. 8(e). In fact Stults and her counsel appear to have misread Rule 8(e).

| Table 1. The 33 Paragraphs Explicitly Calling Out "Stults" (An Uncounted Number of Paragraphs Implicitly Refer to Stults Under "Defendants" ||
|---|---|
| 5. | **Rosalyn Stults ["Stults"], who is an attorney, was a resident of Massachusetts, and represented Susan Pane at all relevant times in this Complaint [Trial, 5/20/02, at 65].** |
| 46. | Pane was in constant communication with Attorney Stults prior to leaving Meuse's home **[Trial, 5/20/02, at 65; Trial Exh. HHH]**. |
| 50. | On or around 21 October 1999, Defendant Attorney Stults made her appearance as counsel for Pane in Haverhill District Court. **[Trial Exh M, special appearance on page 4]**. |
| 165. | On 5 October 2000, Meuse's lawyer informed Pane's local lawyer, Rosalyn Stults, about the visits to the hospital, with the therapists and the local doctor, and the future appointments **[Trial Exh. LL]**. |
| 166. | Pane and/or Stults contacted the doctors with whom Meuse had made contact to examine the child and told them that Meuse was in contempt of court **[Trial, 5/21/02, at 125; Trial Exh. LL]**. |
| 168. | Almost immediately upon his return to his home in Ward Hill, Meuse learned from messages on his answering machine that Pane and Stults had called the doctors and had threatened them with suit were they to continue seeing Marissa. |
| 171. | On 6 October 2000, Stults set up a hearing before Judge Manzi at Probate & Family Court at Lawrence, Massachusetts, for Wednesday, 11 October 2000. |
| 216. | Before Moynihan brought an application for criminal complaint and warrant, the only people he used as a resource of information beside Susan Pane and her lawyer, Rosalyn Stults, was his captain, Captain Thompson **[Trial, 5/21/02, at 62]**. |
| 252. | Moynihan had knowledge that Pane and/or Stults contacted the doctors with whom Meuse had made contact to examine the child **[Trial, 5/21/02, at 124; Trial Exh. LL]**. |
| 284. | The domestic violence advocate Jean Walker, kept a steady correspondence up with Rosalyn Stults, Pane's lawyer, and with Charles Kelly of the FBI **[Trial, 5/21/02, at 91-92]**. |
| 291. | Moynihan's domestic violence advocate, Jean Walker, maintained a file on Meuse's defense counsel. The material was supplied to Walker by Pane's lawyer, Stults **[Trial, 5/21/02, at 144-145]**. |
| 330. | Moynihan spoke to Rosalyn Stults, her attorney, once every other week **[Trial, 5/21/02, at 23; Trial Exh. II]**. |
| 331. | Moynihan never told Stults that her client wrongfully removed the child and that she should get her client back to Massachusetts or otherwise a warrant would issue to bring her back **[Trial, 5/21/02, at 23]**. |
| 334. | Moynihan testified that he kept no notes or records of Stults' calls, but testified that Stults called wanting "to know what was going on in the investigation," telling him "what was going on down in Florida, what they were proceeding to do as far as getting out the posters and that certain people they were getting to help them in trying to recover the kidnapped child" **[Trial, 5/21/02, at 61-62]**. |
| 335. | **Stults communicated with Charles Kelly [perhaps spelled "Kelley"] by FAXed letters on numerous dates, including but not limited to a 29-page letter on 14 November 2000 and a 3-page letter on 16 November 2000.** |

337. In the press release of 31 December 2000, Pane identified that donations were to be made payable to the "Susan Pane Legal Defense Fund" and to be sent to "Attorney Roslyn [*sic*] Stults, 14 Lynde Street, Salem, MA 01970" **[Exh. GGG]**.

367. **Later that day Meuse learned that Susan Pane's attorney, Rosalyn Stults, was in contact with them and that Stults was getting the medical records from Children's Hospital and Tanguay's office.**

368. Stults and Pane canceled the Early Intervention Program appointments that Meuse had made.

369. **On a document found in Moynihan's file, Stults had handwritten "Cathy at Children's Hospital, phone number at the Children's Hospital, fax for Dr. Sun which is one of the doctors in the emergency, to get the release forms of the emergency evaluation. More phone numbers for Dr. Tanguay. Called him at 4:30 on October 6, 2000. Called back to check if we received a fax requesting his -- my records of Marissa with Dr. Tanguay. Another phone number for Dr. Gordon at the Early Intervention, has Linda Schaeffer as Susan's contact person" [Trial, 5/22/02, at 204; Trial Exh. LL].**

406. **Stults's purpose was to aid and abet Pane, her client, in the custody action, to benefit Stults herself financially and reputationally from depriving Meuse of his property and liberty.**

418. **Rosalyn Stults was interviewed by the Eagle-Tribune, publishing in Essex County, Massachusetts, and advertised the then-upcoming Sally Jessy Raphael show.**

426. **Rosalyn Stults advised and strategized with Susan about how to evade service of process of the 209A order and to keep the child from him before and after the original 209A temporary restraining orders had expired.**

428. **Stults and Pane had the goal to get posters published nationwide to capture Meuse and with the an agreement Susan intentionally misrepresented that there had been a custody order prior to Meuse taking the child from Florida.**

429. **FOXNews, the Haverhill police department, Thompson, Moynihan, Stults, Prouty, NCMEC, and Pane misrepresented that Meuse was a fleeing felon.**

430. **In concert with Pane's and Stults's representations and misrepresentations, Moynihan, Thompson, Barone, Kelly, and Prouty indirectly caused the detention and confinement of Meuse on the grounds that Meuse violated a custody order.**

443. **Susan Pane and Rosalyn Stults played an active part in the initiation and continuation of the criminal proceedings.**

444. **Stults played an indirect role by advising Susan how to evade service of process of the original 209A temporary restraining order.**

454. **Stults instigated or participated in the prosecution by pressing police to apply for a complaint for an improper purpose.**

460. **Stults knew or should have known that the complaint was groundless and she sought to use the process for an ulterior purpose, including, but not limited to, the purpose of aiding her client to gain advantage in her divorce.**

467. **Defendants Susan Pane, Stults, Moynihan, Thompson, Barone, Kelly, and Prouty interfered with or attempted to interfere by threats, intimidation, or coercion with Plaintiff's exercise and enjoyment of his rights -- e.g., his rights to his liberty, and his right to due process -- secured by the state and federal constitutions or laws of the United States and/or the Commonwealth of Massachusetts.**

492. **Rosalyn Stults advised and strategized with Susan about how to evade service of process of the 209A order and to keep the child from him before and after the original 209A temporary restraining orders had expired;**

494. **Stults and Pane had the goal to get posters published nationwide to capture Meuse and with the an**

> agreement Susan intentionally misrepresented that there had been a custody order prior to Meuse taking the child from Florida.
>
> 498. In concert with Pane's and Stults's representations and misrepresentations, Moynihan, Thompson, Barone, Kelly, and Prouty indirectly caused the detention and confinement of Meuse on the grounds (a) that he violated a custody order; (b) that he was wanted for parental kidnapping, and (c) that he was fleeing unlawfully to avoid prosecution.

## SUMMARY OF FACTS PLED IN COMPLAINT (WITH ADDENDUM EXHS. A-HHH)

In August 1999, Meuse and Pane had a child out of wedlock. Meuse was upset by Pane's excessive use of prescription drugs, before, during, and after pregnancy. Pane made plans to leave for Florida after she had consulted with Stults. Meuse obtained a temporary restraining order on 4 October 1999 against Pane. The TRO gave custody of the child to Meuse and ordered that Pane not leave the Commonwealth with the infant.

After Pane told Meuse that she, her mother (visiting from Port Orange, Florida), and the child were going for a day's outing to Newburyport, MA, all three disappeared. Pane caused a pleading to be filed in Florida regarding custody, but did not herself resurface physically until the end of October 1999 in Florida. Meuse made several unsuccessful attempts at service. Pane admitted at trial that her mother had lied when she told the process servers that Pane did not live with her in Port Orange.

The Haverhill District Court TRO was renewed against Pane several times and expired in mid-December 1999. Although Pane appeared in that court during the Fall of 1999, law enforcement made no effort to enforce the TRO.

Fast forward to June 2000, when the infant was 10 months old and brought for a medical examination due to her inability to hold a bottle, sit up on her own, crawl. The Florida Early Intervention team set up four physical and occupational therapy sessions a week for the child. Pane took the child for therapy two weeks and then cancelled the sessions and left Florida to go on a vacation in another State. Meuse saw the child again for a week in August 2000 and ob-

5

served no improvement in her condition.

Between June and August, Meuse sought the child's medical records (as the family court had allowed). He learned about the cancellation of the therapy visits and feared the muscles of the child's appendages would atrophy. On 7 August 2000, Meuse and Pane, via their counsel, entered into an agreement (filed in court) that they would let each other know where they were with the child. Pane never abided by that agreement. Around Labor Day 2000, Meuse sought a habeas corpus, but five courts refused to hear it with or without diverse reasons.

On 1 October 2000, when the child was 14 months old, Meuse again arrived in Florida to visit with the child for one week. When he observed that the child still could not hold a bottle or sit up on her own or crawl, he put himself and the child on a plane to Massachusetts and brought her to the Children's Hospital Emergency Room and set up appointments for therapy and examination by a specialist in pediatric neurology associated with Boston Floating Hospital.

Immediately thereafter, in keeping with the August 7th agreement, Meuse's counsel notified Stults where the child was and the contact information for the doctors and therapists involved.

Stults and Pane immediately phoned the medical professionals and cancelled the appointments Meuse had set up for the child. On 5 October 2000, after learning of the cancellations, Meuse disappeared with the child.

On 5 October 2000, Stults got a short order of notice and scheduled a hearing for 11 October 2000. At that hearing a judge gave Pane physical custody. Meuse personally was already out of contact and had no knowledge of either the hearing or the custody order of October 11th.

Stults and Pane then began a campaign to find Meuse and the child. To do so, they said that Meuse was in contempt. That was not true. No contempt hearing was held. No judgment of contempt had issued. HPD Detective Moynihan obtained an arrest warrant without an affidavit.

6

The warrant was not signed by a judge. Susan provided the information for posters. Stults handled the media and set up and advertised a Susan Pane Legal Defense Fund – funds were to go to Stults -- although Pane was not being tried for a crime or sued civilly outside family court.

Between October 2000 and March 2001, Defendants HPD Detective Moynihan and Captain Thompson coordinated continuous activities through constant contact with FBI Agent Kelly, Stults, and Pane. The posters (by Pane, the NCMEC, and the FBI) were shown on television (FOX25News, featuring an interview of FBI Agent Prouty, America's Most Wanted, and the Sally Jessy Raphael show), uploaded to the AMW and NCMEC websites, and hung in WalMarts across the country. (WalMart is a sponsor of NCMEC.) In the press and posters and on the airwaves, Meuse was presented as being wanted for Parental Kidnapping and Unlawful Flight to Avoid Prosecution.

In March 2001, Meuse was captured at gunpoint in Oklahoma as a result of a WalMart poster describing him as fugitive. The child was turned over to Pane. Fortunately, in Meuse's care, she had learned finally how to smile, sit up, walk, run, and play.

Back in Massachusetts shortly thereafter, Meuse was arraigned for Parental Kidnapping. He was never tried for Unlawful Flight to Avoid Prosecution because that was never true and there never was evidence to support the allegation.

In July 2001, a court (Swan, J.) wrote that no custody order had been in effect prior to Meuse taking the child from Florida.

Meuse was tried during May 2002, after which he was found Not Guilty by a jury of his peers. It was the testimony by the Commonwealth's own witness of the tragic condition of the child at the time Meuse rescued her and the beautiful pictures of the child at play close to the time of the Oklahoman siege that clinched the jury verdict.

Notwithstanding the Not Guilty verdict, the posters representing Meuse as a fugitive re-

mained on the websites of AMW and NCMEC after the criminal trial. The poster on AMW remained on its website until the Complaint in this action was served, in February 2004.

**ARGUMENTS RELATED TO THE "STULTS" FACTS FOR EACH COUNT**

1.  **Stults is liable for false arrest, detention, imprisonment. assault, battery, malicious prosecution, abuse of process, and defamation of and conspiracy against Meuse, as well as the intentional infliction of emotional distress, by providing false information that caused the diverse harms imposed upon him.**

    The key to this case begins with Pane and Stults. They gave life to the full-bodied falsities – that Meuse was in contempt and that Pane had legal custody prior to Meuse taking the child to Massachusetts -- when they kept on pushing the police to find Meuse and the child. Considerable trial testimony, included in the complaint, confirms that Pane and Stults were in constant contact with the HPD, the FBI, and NCMEC.

    WalMart and AMW and Fox 25News got into the act because of the FBI's and NCMEC's contact with them. FBI Agent Prouty ran the FBI Boston office. He was interviewed in FOX25News' New England Unsolved Crimes segment that featured the Meuse-Marissa poster. WalMart and AMW are sponsors of NCMEC, which is in actuality an instrument of the federal government, not just the independent nonprofit it purports to be, and customarily work with the FBI. The problem in the Meuse case is that none of the four entities – WalMart, AMW, the NCMEC, and the FBI – checked to confirm whether Pane and Stults were truthful and whether the Haverhill Police Department gave them valid and reliable information. Before defaming Meuse nationwide, WalMart, AMW, the NCMEC, the FBI, and the HPD had an obligation to perform their duties in a lawful and competent manner. They did not.

    The incompetence of Defendant Detective Moynihan – as well as his captain -- was remarkable. Moynihan had an obligation to check whether that which Pane and Stults told him was true or not before he sought an arrest warrant. The warrant he sought had no legal basis and no

8

affidavit. Further, when Moynihan spoke of the warrant, he told everyone it was a federal warrant. At the criminal trial, he and his captain, Thompson, admitted they had never seen the federal warrant. In fact, the FBI warrant was not even seen by the Oklahoman police force that arrested Meuse or by the Oklahoman court that held him for extradition. If it existed, it never surfaced before, during, and after Meuse's arrest and subsequent trial for Parental Kidnapping.

Everything that happened to Meuse is attributable to Pane and Stults. But for their lies and misrepresentations to the law-enforcement entities and to the media, all the consequences that Meuse suffered would not have occurred.

> A person may be liable for false imprisonment **not only** when the person's own acts directly impose a restraint upon the liberty of another **but also** when that person, by providing false information, causes such restraint to be imposed. Karjavainen v. Buswell, 289 Mass. 419, 427 (1935) (questioned on other grounds by Mezullo v. Maletz, 331 Mass. 233, 239-240 [1954]). Restatement (Second) of Torts s 37 (1965) ("If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement").

Sarvis v. Boston Safe Deposit and Trust Co., 47 Mass.App.Ct. 86, 97-98 (1999) (emphasis supplied). *See also* Restatement (Second) of Torts § 35 (1965).

> An assault and battery is the intentional, unprivileged, unjustified touching of another with such violence that bodily harm is likely to result. See Commonwealth v. Burke, 390 Mass. 480, 482-483, 457 N.E.2d 622 (1983). **The offensive touching may be** direct, as by striking another, or it may **be indirect, as by setting in motion some force or instrumentality with the intent to cause injury**. See Commonwealth v. Stratton, 114 Mass. 303 (1873); Perkins & Boyce, *Criminal Law* 153-154 (3d ed. 1982).

Com. v. Dixon, 34 Mass.App.Ct. 653, 654-655 (1993) (emphasis supplied); Com. v. Cohen, 55 Mass.App.Ct. 358, 359-360 (2002) (holding indirect touching constitutes criminal battery), quoting Dixon, at 654, and citing United States v. Frizzi, 491 F.2d 1231, 1232 (1st Cir.1974), amongst others.

> In [People v.] Moore, [50 N.Y. Sup.Ct. 356 (1888),] the victim was driving a horse-drawn sleigh. The defendant intercepted the sleigh, grabbed the reins, and, over the driver's protests, caused it to be turned around and headed in the opposite direction. It is this series of events to which the court was referring when it stated that "[t]he horses and sleigh were the instruments with which [the defendant] directed and augmented his personal and physical

9

force against and upon the body of [the victim]." 50 N.Y. Sup.Ct. at 358. If there was a battery on the occupant of the sleigh, it follows that there must have been a battery on the occupants of the automobile hit by the defendant in this case. (FN7)

Aside from the Moore case, this theory has support in two treatises**. In both, the writers note that the "touching" element of a battery does not require the actual touching of the victim.** See LaFave & Scott, Jr., *Criminal Law* § 81, at 604 (1972); Perkins, *Criminal Law* c. 2, § 2, at 108-109 (2d ed.1969). . . .

> (FN8.) Moore appears to be the leading case on **indirect assault and battery**. Accordingly, it has been cited with approval in various jurisdictions. [Internal cites omitted.]

In view of the foregoing, we adopt the reasoning of Moore, and hold that the trial judge's instructions regarding "extension" were not erroneous. Accordingly, we affirm the convictions for assault and battery by means of a dangerous weapon on Officers Brown and Minor based on the "intentional" act theory.

Com. v. Burno, 18 Mass.App.Ct. 796, 802, 802 n. 8 (1984) (holding that an automobile is an extension of a person) (emphasis supplied).

> . . . W. Prosser and P. Keeton, *The Law of Torts* (5th ed. 1984), at 43, describes the tort [of assault](and, thereby, one form of the crime):
>
>> "The interest in freedom from apprehension of a harmful or offensive contact with the person, as distinguished from the contact itself, is protected by an action for the tort known as assault. No actual contact is necessary to it, and the plaintiff is protected against a purely mental disturbance of this distinctive kind. This action, which developed very early as a form of trespass, is the first recognition of a mental, as distinct from a physical, injury. There is **'a touching of the mind, if not of the body.'**" (footnotes omitted).
>
> For this variety of assault, it is not necessary that the victim be actually frightened or placed in fear of an imminent battery at the hands of one with the apparent present ability to commit such a battery. The critical state of mind on the part of the victim is to be placed "in reasonable apprehension" of an impending battery. This distinction preserves the rights of the intrepid crime victim or intrepid plaintiff. As W. LaFave and A. Scott, *Criminal Law* (2d ed. 1986) explained, at 693 n. 18:
>
>> "The word 'scare' or 'frighten' is sometimes used loosely herein as a short term for the more cumbersome but more accurate expression 'causing reasonable apprehension of immediate bodily harm.' See W. Prosser & W. Keeton, Torts § 10 (5th ed. 1984), speaking of the requirement of apprehension of immediate bodily harm required for a civil assault: **'Apprehension is not the same thing as fear, and the plaintiff is not deprived of his action merely because he is too courageous to be frightened or intimidated.'**"

Lamb v. Maryland, 93 Md. App. 422, 613 A.2d 402, 1992.MD.40091 ¶¶73-76 <http://www.ver-suslaw.com> (1992) [emphasis supplied].

In another Maryland case, Taylor v. State, 52 Md.App. 500, 504-505 (1982), cited in Burno, 18 Mass.App.Ct at 802 n.8, the court concluded, when defining "battery" and "assault": "He who acts through another acts himself." Taylor at 505 n. 2.

> There are a number of British and American cases to the same effect. In Her Majesty's Advocate v. Keay, 1 Swin. 543 (Scot. 1837), the evidence showed that the defendant, without just cause, whipped a pony being ridden by a young boy as the defendant was passing in his carriage. As a result of the whipping, the pony bolted and threw its rider. The court concluded that a criminal assault had been committed, Lord Cockburn opining, at p. 546:
>
>> "If [the defendant] had seized the boy in his arms and carried him away, that would most clearly have constituted an assault, and the fact of his having made the pony the instrument of carrying him off makes no difference. The maxim '*qui facit per alium facit per se*,' makes the act of the pony the act of the [defendant]."

Taylor, 52 Md.App. at 504-505.

In the case at bar, Stults used the other defendants as instruments for her wrongdoing.

**2.  Stults has not shown that the complaint is in noncompliance with F.R.Civ.P. 8(e). In fact Stults and her counsel appear to have misread Rule 8(e).**

F.R.Civ.P. 8(e) reads ""(1) Each averment of a pleading shall be simple, concise, and direct." Nevijel, *infra* at 673.\[1]/ Given that the large majority of Meuse's averments are only 1, 2, or 3 lines long, it cannot be deemed that Rule 8(e) was violated. Ironically, that each averment was composed of one direct fact or statement was one reason there are so many numbered paragraphs.

Stults' arguments must also fail for the following reasons stated: For example, Stults cited

---

[1] Each of three of Stults' authorities are wrongly cited:
- "Nevi**g**el" should have been "Nevi**j**el";
- "Green" should have been "Gordon v. Green";
- "Callas Vakalis" should have been either "Vakalis" or "Mary Vakalis and George Vakalis." The name "Callas" does not appear anywhere in the text;
- The volume in which Vakalis is found is *not* 929. but 925.

**11**

Nevijel v. North Coast Life Insurance Co., 651 F.2d 671 (9th Cir. (WA) 1981), for the proposition that noncompliance with Rule 8(e) may be dismissed with prejudice. Beyond that naked assertion, Stults and her counsel say nothing about Nevijel, which, Meuse contends, is distinguishable from the instant case. In Nevijel, the court wrote:

> . . . The original complaint . . . was verbose, confusing and almost entirely conclusory. It consisted of 48 pages with 14 pages of addenda and 9 pages of exhibits. Even though the appellees moved immediately for dismissal, appellants did not respond for over 19 months.

Moreover, in the original Nevijel complaint, there appears to have been at least two dozen defendants[2] initially and upon amendment, "many other defendants" were added "without leave of the court." Id. at 673. And Nevijel's counsel had brought multiple related cases against diverse defendants and all his complaints were "confusing, distracting, ambiguous, and unintelligible" [id. at 675] to the extent that it was "impossible to designate the cause or causes of action attempted to be alleged in the complaint." Id.

Because such conclusions are subjective to the reader, Meuse cannot prove that the attributes of Nevijel cannot be attributed to his complaint. He can only simply contend and state that his complaint might be lengthy, but it sets out the facts with clarity in an over-all well-organized structure.

In Gordon v. Green, 602 F.2d 743 (5th Cir. 1979), wrongly cited by Stults for the proposition that violations of Rule 8(e) are not to be tolerated. In fact, that court wrote: "The District Court's judgment was vacated and the case was remanded for dismissal of the complaints 'without prejudice to the right to promptly file a complaint in compliance with Rule 8." Id. at 747.

A few years later, a court in a related case, Gordon v. Terry, 684 F.2d 736, 738-739 (11th

---

[2] "The named defendants include four insurance companies, including their directors, officers and other individuals associated with the insurance companies; their attorneys; the former Washington State Insurance Commissioner; the court-appointed trustee of Federal Shopping Way, and his attorney; the former Administrator of the Seattle Region Office of the Securities and Exchange Commission; the receiver of FOL, and his attorney; and others." Nevijel, at 672.

**12**

Cir. (Fla.) 1982) (reversing summary judgment as to Green and affirming as to the remaining defendants), wrote of Gordon v. Green:

> On remand, the first set of amended complaints were dismissed by the District Court on Rule 8 grounds. The plaintiff then filed second amended complaints and third amended complaints. The District Court ruled that the third amended complaints satisfied Rule 8. The third amended complaints allege that the defendants violated various provisions of the federal securities laws (FN2) and also set forth several state law claims.

Gordon v. Terry, 684 F.2d 736, 738-739 (11th Cir. (Fla.) 1982).

Stults also cited (see note 1, *supra*) Vakalis v. Shawmut Corp., 925 F.2d 34 (1st Cir. 1991), but failed to state the proposition for which it was being cited. In Vakalis, when the plaintiffs did not correct the defects as ordered by the magistrate and violated the terms of the scheduling order, the court ordered that the defective allegations be dismissed. Such is not the situation in the instant case. Id. at 35.

> As to the violation of Rule 8 (and the order that the amended complaint comply with Rule 8), the court considered but rejected the option of dismissal with prejudice under Rule 41(b). It noted that a district court has the power to dismiss with prejudice where a party has failed to comply with an order of the court or with the rules of procedure, including Rule 8, [cite omitted], but declined to do so because (1) the appellants had not yet been warned that their failure to comply would result in dismissal, (2) the complaint was so confusing that it was difficult to determine the *res judicata* effect of a dismissal at this stage of proceedings, and (3) a lesser sanction--a fine--was available under Rule 11.

Vakalis, 925 F.2d at 35-36. In Vakalis, the court sanctioned the appellants and their attorneys jointly and severally. The reasons, in the words of the court, were:

> According to the court, the amended complaint violated Rule 11 because the appellants had made only minimal efforts to correct the defects pointed out in the scheduling order, or to bring the prolix complaint into compliance with Rule 8. That, in addition to the appellants' delay in complying with the requirement that they obtain local counsel, Rule 6 of the Local Rules of the United States Court for the District of Massachusetts, indicated an unwillingness to take the rules seriously, and suggested that their "approach to this case seems to be designed to keep litigation alive without regard to the needs or directives of the judicial system."

Vakalis, 925 F.2d at 36.

In the instant case, none of the court's reasons to sanction the appellants and their attor-

13

neys is applicable to the <u>Meuse</u> case, and the due diligence of Meuse and his counsel before bringing this case was extraordinary. Thus, the option of dismissal with or without prejudice is inappropriate.

Still another case cited by Stults is <u>Agnew v. Moody</u>, 330 F.2d 868, 1964.C09.114, <http://www.versuslaw.com> (1964). Stults said the 55-page complaint was stricken. That naked statement is misleading. The court in <u>Agnew</u> wrote:

> Dismissal of the action for failure to obey the court's order was a severe sanction, but appellant left the court no choice. Two and a half months passed beyond the twenty days allowed by the court's order with no effort on appellant's part to comply. The power of the court to dismiss the action for failure to obey the order was clear (Rule 41(b), Federal Rules of Civil Procedure; and in the circumstances of this case exercise of the power was proper.

<u>Agnew</u>, 1964.C09.114 at ¶21 (internal citations omitted).

Clearly the cases cited by Stults ultimately dismissed lengthy complaints but **not** because the complaints were lengthy or because Rule 8(a) or (e) commanded dismissal, but because there were orders to amend and the plaintiffs failed to amend or failed to amend in a timely manner. In such instances, F.R.Civ.P. 41 was invoked by the diverse courts. In the instant case, there has been **no** and **no noncompliance** with any order.

**CONCLUSION**

That which must be acknowledged by this court is found in Fed.R.Civ.P. 8(f): "All pleadings shall be so construed as to do substantial justice." <u>Gorski v. New Hampshire Department of Corrections</u>, 290 F.3d 466, 2002.C01.0000193 <http://www.versuslaw.com> (2002).

Lastly, Meuse states that one of the many reasons contributing to the length of the complaint is the compelling evidence of the conspiracy out of which all the causes of action arose. Meuse's counsel believed and still believes that being forthright up front with her testimonial and documentary evidence (*see* Complaint Exhibits A through HHH) will ultimately promote both time- and cost-effectiveness as well as encourage early settlement between some if not all the par-

**14**

ties.

WHEREFORE, Plaintiff prays this court DENY Rosalyn Stults' motion to strike and award Plaintiff attorney's fees **(a)** for having to oppose a frivolous motion, **(b)** for serving a motion with several mis-citations, and **(c)** for citing misleading propositions of the authorities cited. If the award of fees to Meuse is made, Plaintiff's counsel prays that she be given at least 10 days (because of a full professional schedule) to prepare the accounting and supporting affidavit.

                                           Respectfully submitted,
                                           BRIAN J. MEUSE,
                                           By his attorney,

13 March 2004                   /s/ Barbara C. Johnson <barbaracjohnson@worldnet.att.net>
                                            Barbara C. Johnson, Esq.
                                            6 Appletree Lane
                                            Andover, MA 01810-4102
                                            978-474-0833
                                            BBO #549972

## CERTIFICATE OF SERVICE

I hereby certify that the within pleading was electronically filed through ECF. A true copy of the above document will have been served by first-class mail on 15 March 2004 upon the attorneys known and of record and to whom notice will not be electronically mailed.

Daniel P. O'Brien, Esq.
Posternak Blankstein & Lund LLP
100 Charles River Plaza
Boston, MA 02114

Chauncey D. Steele IV , Esq.
Craig & Macauley, PC
600 Atlantic Avenue
Boston, MA 02210

                                           /s/ Barbara C. Johnson <barbaracjohnson@worldnet.att.net>
13 March 2004                                             Barbara C. Johnson