UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-10255-EFH

**Brian J. Meuse**
Plaintiff

v.

**Susan Pane,
Rosalyn Stults,
Lt. Detective Daniel R. Moynihan**, in his official and individual capacities,
**Captain Donald Thompson**, in his official and individual capacities,
**City of Haverhill, Massachusetts,**
**Louis Freeh**, in his official capacity,
**Charles S. Prouty**, in his official and individual capacities,
**Charles P. Kelly,** in his official and individual capacities,
**FOX Television Stations, Inc.,
America's Most Wanted,
National Center for Missing and Exploited Children,
Wal-Mart Stores, Inc.**
Defendants

---

### MEUSE'S OPPOSITION TO
### SUSAN PANE'S MOTION TO STRIKE PLAINTIFF'S COMPLAINT,
### WITH MEMORANDUM IN SUPPORT OF OPPOSITION

Now comes Brian J. Meuse ["Meuse] to oppose Susan Pane's Motion to Strike Plaintiff's Complaint.  Given that Pane incorporated Stults' motion to strike and supporting memorandum, Meuse incorporates herein in entirety his memorandum in opposition to that motion.

As grounds, Meuse states that Pane's arguments in her supporting memorandum are inadequate to support a motion to strike.

In factual support of his opposition to the motion to strike the claim against the movant, Meuse submits to this court in Table 1, the facts involving Pane.  In Table 1, Meuse includes the 16 **sets** of paragraphs Pane identified as those paragraphs in which her name was called.  In actual fact, there were **99** individual paragraphs referring **explicitly** to Pane's conduct and many, many, many dozens more -- that included Pane **implicitly** under the umbrella of the word "Defendants."

1

Following Table 1, which is *infra* at pages 3 and 4, is a section containing a summary of Pane's role in the underlying events. That section is followed by Meuse's legal arguments:

1. Pane is liable for false arrest, detention, imprisonment, assault, battery, malicious prosecution, abuse of process, and defamation of and conspiracy against Meuse, as well as the intentional infliction of emotional distress, by providing false information that caused the diverse harms imposed upon him.

2. Pane has not shown that the complaint is in noncompliance with F.R.Civ.P. 8(e). In fact Pane and her counsel appear to have misread Rule 8(e).

| Table 1. The 99 Paragraphs Explicitly Calling Out "Pane" (An Uncounted Number of Paragraphs Implicitly Refer to Pane Under "Defendants" |
|---|
| **NOTE** The BOLDFACED paragraphs below are those which Pane did not include in her list of 16 sets of paragraphs. |
| 4.  **Defendant Susan Pane ["Susan"], who is a natural person, was residing at 291 Sagewood Drive, Port Orange, Volusia County, Florida 32127, United States of America, at all times relevant to this Complaint.** |
| 19. **Defendant Susan Pane and Brian Meuse were living together in a home on Oxford Avenue in the Ward Hill area of Haverhill, Massachusetts. The home was owned by his parents.** |
| 21. Pane began working in Andover, Massachusetts, as a level-one pharmaceutical technician at Merck-Medco, a mail-order pharmacy, where she dispensed prescription drugs **[Trial, 5/17/02, at 77]**. |
| 22. About a year later, when she became pregnant, she was promoted to the position of a level-two technician **[Trial, 5/17/02, at 132]**. |
| 23. According to Meuse, Pane was promoted to the level-two position because of the danger of exposure to the narcotics in the working environment. People were to wear face masks, protective suits and gloves, but Pane would not wear the gear that was offered, so they moved her into the level-two position **[Trial, 5/22/02, at 190]**. |
| 24. According to Pane, as a level-two technician at Merck-Medco, she deciphered the doctor's handwriting on a prescription and input her interpretation into Merck-Medco's computer system. The computer then generated a computerized prescription that went to the level-one technician **[Trial, 5/17/02, 125-126]**.\fn1/ <br><br>  fn1  Pane had access to the DEA numbers of all doctors nationwide and had the capability of entering any prescription she wanted into the system. So long as the DEA and the doctor's name matched on a prescription, the prescription could be filled by a level-one technician or by a pharmacy **[Trial, 5/22/02, at 181]** |
| 25. Also according to Pane, the level-two technician, more specifically, "get[s] a bin with just a prescription in it. You read the prescription. . . . [T]he person's name, address should be on there; whatever other relative information, their phone number, their date of birth, their Social Security number. You read what the prescription says; for what drug it is, what milligrams, quantity, directions, and the doctor's name and the DEA number, if applicable, and you put all this information into the computer" **[Trial, 5/17/02, 131]**. |

26. A level-one technician's job begins with the prescription generated by the level-two technician's computer. The output prescription contains a UPC-type bar code, the person's name (but not the address and not the date), the name of the pill, the quantity and the milligrams, and "other jumbled numbers." The level-one technician holds the bar code under a laser light scanner. The computer counts the pills and sends them to the chute. The medication "comes through the chute, goes into the bottle, you put the label on, cap the bottle, that one's done" **[Trial, 5/17/02, at 124-129]**. The name of the person who gets the pills is not put on the prescription; it only appears on the label **[Trial, 5/17/02, at 126-127]**.

27. Pane technically worked at Merck-Medco until she left Haverhill. She phoned in her resignation. She had not been physically working there throughout the latter part of her pregnancy. She had not been out on maternity leave, but out on short-term disability. Eventually the short-term disability turned into a long-term disability, for when she was ready to go back to work she had, so she testified, pilonidal cysts on her tailbone, making her unable to sit as a level-two technician and input the information into the computer. "The only thing I could do if I wanted to remain working would be standing -- would be the level-one job. The doctor did not want me in the room, inhaling any types of the prescription medications. Therefore, keeping me out on my disability. . . . [Y]ou can get the scents of medication when you're working that closely with all these different medications. So, not to do any physical harm to myself or the baby, they kept me out of the pharmacy" **[Trial, 5/17/02, at 132-133]**

28. Meuse complained that Pane was pill-dependent and Pane has denied being pill-dependent.

29. Meuse requested on many occasions that Pane quit drinking, but her drinking continued and the drug addiction was getting increasingly worse and the pills were scattered all over the house. She never went for help. Instead, she started arguments, fights, and became volatile and very upset **[Trial, 5/22/02, at 188]**.

30. After Meuse burnt his hand, he had a 30-pill prescription for Percoset. He took one for the immediate pain of the first day. Pane took the other 29, even though he told her not to and tried to hide them from her **[Trial, 5/22/02, at 187]**.

31. Pane also took pills from his parents' freezer while visiting at their home **[Trial, 5/22/02, at 187-188]**.

32. Pane had a prescription plan with Merck-Medco Managed Care **[Trial, 5/17/02, at 135; Trial Exh. KK and A]**.

33. Merck-Medco Managed Care produced a claims history of the pills that Pane had received from diverse pharmacies **[Trial Exh. KK and A]**. There were approximately 140 prescriptions on that list **[Trial, 5/22/02, at 40]**.

34. Around 27 November 1998, while she was pregnant, Pane purchased amongst other pills, 360 Ultram pills.

35. On Pane's Merck-Medco claims history list was one prescription allegedly ordered by Dr. Bruce Pastor and others by Dr. Barrie Paster. The latter was, indeed, Pane's doctor. The former was not. In response to a subpoena, Dr. Bruce Pastor wrote Meuse's counsel asserting that he did not have any records for Susan Pane, that he had never written a prescription for her, and that she had never been his patient **[Trial, 5/22/02, at 183]**. And Pane admitted Pastor was not her doctor **[Trial, 5/17/02, at 151, 172; Trial Exhs. F, KK, SS]**.

36. Pane was able to do this because at Merck-Medco she had access to the DEA numbers of all the doctors, and was able to create a prescription for herself on the Merck-Medco system **[Trial, 5/17/02, at 130-131, 134; Trial, 5/22/02, at 184]**.

37. On 4 August 1999, the child Marissa Lyne Meuse ["Marissa"] was born to Pane and Meuse **[Exh. RR]**.

38. Because Pane breast-fed the child, the pills she ingested got to the baby through the breast milk.

39. On 12 August 1999, eight days after Marissa's birth, according to a nurse's notes, Pane visited Women's Health Care, 21 Highland Avenue, Suite 25, Newburyport, MA, office and being in crisis, almost dropped the child **[Trial, 5/17/02, at 169-170; Trial Exh. B]**

3

40. Pane was having a very difficult time caring for Marissa and continuously sought Meuse to return from work to help her. As a result, around the end of September 1999, Meuse stopped working at Compaq **[Trial, 5/21/02, at 188-189]** in order to be the primary caretaker of the child **[Trial, 5/22/02, at 223, 226-227]**.

41. Pane's moods swang from rage to hysteria and created a vicious cycle, during which the infant was at serious risk of harm from her mother, who was operating with impaired judgment . . . drowsy, reactions dulled, depressed, and heart palpitations from drug overuse **[Trial Exh. B]**.

42. Ann Kalip, who was later called by the Commonwealth as a witness at Meuse's criminal trial, was in and out of Meuse's home frequently during the week, testified that right after Pane gave birth to the baby, "Brian pretty much took care of [Marissa] because [Pane] had health problems. [Pane] was on the couch, she didn't move" **[Table, 5/20/02, 162-163]**.

43. On 13 September 1999, Meuse filed an action for custody and paternity and a motion seeking the court to order Pane to remain in Massachusetts [Trial Exh. L]

44. On 21 September 1999, Pane's mother, Barbara Pane, arrived in Haverhill, Massachusetts, to stay with Pane, Meuse, and the child.

45. At trial, Pane testified that on 23 September 1999, she told Dr. Barrie Paster that she wanted to go to Florida for a one-week vacation **[Trial, 5/17/02, at 109, 116; Trial Exh. DDD]**.

46. Pane was in constant communication with Attorney Stults prior to leaving Meuse's home **[Trial, 5/20/02, at 65; Trial Exh. DDD]**.

47. On 1 October 1999, Pane told Meuse that she, Pane's mother, and the child were going for an outing to Newburyport, Massachusetts, but they did not return in the evening.

48. On Monday, 4 October 1999, Meuse obtained a temporary restraining order pursuant to M.G.L. c. 209A **[Trial Exhs. M and N]**. The order gave Meuse custody and restrained Pane from leaving the Commonwealth with the child **[Trial, 5/20/02, at 66; Trial Exh. M]**.\fn2/

> fn2 Meuse had alleged that Pane had impaired her judgment by the drug usage, that she was jeopardizing the child's safety. The Haverhill District Court restraining order gave Meuse temporary custody to Meuse **[Trial Exh. M]**.

49. Throughout the month of October 1999, Meuse caused Deputy Jay Roberts and Sheriff Robert L. Vogel, Jr., respectively, to attempt to serve the order on Pane at 291 Sagewood Drive, her mother's house, in Port Orange, Florida **[Trial, 5/17/02, at 110, 111; Trial, 5/20/02 at 57-59; Trial Exh. K and Exh. NN]**.

50. On or around 21 October 1999, Defendant Attorney Stults made her appearance as counsel for Pane in Haverhill District Court. **[Trial Exh M, special appearance on page 4]**.

51. During the month of October 1999, Pane's mother repeatedly told the process server that Pane did not live at the mother's house **[Trial, 5/20/02 at 58-59; Trial Exh. K]**.

52. At trial on 5/17/02, Pane testified that she was living at her mother's house when the process servers came and that her mother had lied when she told them that Pane lived at an unknown location **[Trial, 5/20/02 at 57-59, 64]**.

53. On 14 October 1999, Pane caused to be filed a Complaint for Custody in the 7th Judicial Circuit Court in Volusia County, Florida **[Trial, at 5/17/02, at 112]**.

54. On 26 October 1999, after paying a $500 bond, Meuse was granted a Temporary Emergency Injunction from the Seventh Judicial Circuit Court in Volusia County against Pane. The injunction enjoined Pane from removing Marissa from the county without order of the court **[Exh. OO].\fn3 (not included here)/**

| | |
|---|---|
| 55. | Because of the lies of Pane's mother, Meuse was unable to effect service of Judge Kevin M. Herlihy's restraining order upon Pane until 29 October 2000, when he saw Pane in the Volusia County court **[Trial, at 5/17/02, at 112]**. |
| 56. | On 1 November 1999, Jim Beck wrote an affidavit swearing that on 29 October 1999, he made service on Pane at the courthouse in Daytona Beach, Florida **[Exh. NN]**. |
| 57. | On 3 November 1999 at 8:57, Volusia County Deputy Sheriff Crabtree served **(a)** the Massachusetts Abuse Prevention Order and the petition on Susan Pane and **(b)** the Temporary Emergency Injunction at 291 Sagewood Drive, Port Orange, Florida, **[Trial, at 5/17/02, 112; Trial, at 5/20/02, at 69-71; Trial Exhs. O and P; Trial, 5/23/02, at 166]**. |
| 58. | On 3 November 1999, Volusia County Deputy Sheriff Crabtree had the warrant division send a teletype to Haverhill District Court, advising them of service **of t**he chapter 209A restraining order on Pane **[Trial, at 5/20/02, at 70; Trial, 5/22/02, at 164; Trial Exh. P]**. |

| | |
|---|---|
| 59. | **Pane was in Haverhill District Court for a hearing on the c. 209A restraining order and that order was continued several times until 10 December 1999 [Trial, 5/20/02, at 73-74]**. |
| 60. | Although Pane was in Haverhill District Court several times in November and December 1999, neither the court nor the Haverhill Police Department and/or Captain Thompson enforced it against her **[Trial, 5/22/02, at 164-165; Trial Exhs. M and P, the latter showing service]**. |
| 61. | **By keeping the child in Florida, Pane was in violation of the chapter 209A order [Trial, 5/22/02, at 167]**. |
| 64. | **On 3 May 2000, Judge Mary McCauley Manzi declared Massachusetts the home state of the child, declared Massachusetts would exercise jurisdiction, and wrote that the mother, Susan Pane, wrongfully removed the child to Florida in October 1999 [Trial, 5/20/02, at 81-82; Trial, 5/21/02, at 17; Trial Exh. T]**. |
| 65. | On 5 June 2000, Judge Mary Anne Sahagian issued a visitation schedule predicated on Pane bringing the child for an examination by the Florida Early Intervention Program and for the follow-up therapy **[Exh. W]**. |

| | |
|---|---|
| 66. | On or around 22 June 2000, when the child was 10 months of age, the child was examined by Florida Early Intervention Program and determined to have the ability of only a 5-month-old **[Trial Exh. D, (Early Intervention, at page 70]**. |
| 67. | By the time the child was 10 months old, the child was unable to sit up on her own (an activity a child can do around the age of 5 months), was unable to hold a spoon, was unable to hold a baby bottle or a baby's cup, was unable to hold, for instance, a graham cracker, was unable to crawl. |
| 68. | The medical professionals determined that both physical and occupational therapy were necessary for the child, i.e. two physical therapy sessions and two occupational therapy session per week **[Trial Exh. D; Exh. W, court order 6/5/00]**. |
| 69. | Performing discovery in July and August, Meuse learned that Pane had cancelled all but the first two weeks of scheduled physical and occupational therapy, that Pane had had almost 80 prescriptions for pills -- Ultram and assorted narcotics, including oxycodone with acetominaphen, also known as Oxy-Contin, which was her drug of choice – allegedly given her by over a score of doctors from several states and filled by numerous pharmacies, and wanted morphine on at least one occasion **[Trial, 5/20/02, at 41-43; Trial Exhs. A, C, D, E, F, G, I, J, X, KK]**. *Polymedica, polypharmica*, the pharmacists call the syndrome of the prescription drug abuser **[Exhs. TT, UU, VV, WW, XX, YY]**. |
| 70. | The alleged prescriptions included two by a doctor (Bruce Pastor) who has sworn that Susan Pane was not a patient of his [**Trial Exhs. F, KK, SS**], and by many where the doctors have not been identified **[Trial Exhs. F and KK]**.\fn4/ |
| | **fn4** Barrie Paster **is** one of her doctors |

71. Pane took a Schedule III narcotic drug (oxycodone with acetominaphen) before and during pregnancy and while she was nursing the child within the first week after her birth. Pane continued to take the narcotic drugs until she left Massachusetts for Florida in October of 1999 **[Trial Exh. A, C, E, F, G, I, J, and KK, list of drugs with prescription details compiled from the documentation received as a result of subpoenas; Exhs. TT, UU, VV, WW, XX, YY]**.

72. The child Marissa was in immediate danger, and would have suffered irreparable injury if the child were not put into Meuse's care immediately.

**97.** **When Pane left Meuse's home on Oxford Avenue, she inadvertently left behind the empty pill bottle in Meuse's home. Jan Meuse, Meuse's mother, took the pill bottle to Detective Moynihan as evidence of Pane's writing falsified prescriptions [Trial Exhs. D and X].**

**131.** **In actual fact, a Susan "Paine" lived on Mercury Terrace and Susan "Pane" had signed her handwriting on a script from Dr. Byrne that was for a narcotic and filled the fake prescription at a CVS pharmacy [Trial, 5/22/02, at 182; Trial Exhs. C, X, KK, and JJ].**

140. Pane took the child to the therapists for about two weeks – 7/17/00 (initial visit for occupational therapy), 7/19/00, 7/25/00 00 (initial visit for physical therapy), 7/27/00, 7/31/00 -- and then stopped **[Trial, 5/20/02, at 105-110; Trial Exh. D]**.

141. Pane cancelled the child's therapy visits scheduled for 8/3/00, but since it was Meuse's visitation week, he brought the child to therapy **[Trial, 5/20/02, at 106, 110; Trial Exh. D]**.

142. During the week of 3 August 2000, Meuse saw the child and noticed no improvement in the child's physical condition.

143. On 7 August 2000, the attorneys for Pane and Meuse signed a stipulation requiring each of them to keep the other informed of the address and telephone number where they were and could reached when they had the child **[Exh. AAA]**.

144. Pane cancelled the child's therapy visits scheduled for 8/9/00, 8/10/00, 8/15/00, 8/22/00, 8/24/00, 8/29/00, 8/31/00, 9/5/00, 9/7/00, and 9/12/00 **[Trial, 5/20/02, at 105-110; Trial Exh. D]**.

145. As a reason for cancelling the child's therapy appointments on 8/22/00, 8/24/00, 8/29/00, 8/31/00, 9/5/00, 9/7/00 and 9/12/00, Pane testified that she went with the child on vacation **[Trial, 5/20/02, at 113, 116-117]**.

146. Pane testified going out of Florida with the child, resulting in her violation of **(a)** the 26 October 1999 injunction from the Florida court, **(b)** Judge Sahagian's order of 5 June 2000, and **(c)** the stipulation signed by Pane's and Meuse's counsel on 7 August 2000\fn7/  **[Trial Exh. W and Exhs. OO, QQ, and AAA]**.

> FN7  Also on 3 November 1999, the Seventh Judicial Circuit Court issued an interim order restraining Pane from removing the child from Volusia County **[Exh QQ]**.

147. Asked **"**Wouldn't it have been nice for Marissa to get the therapy that was required so the poor child could learn how to crawl and walk and hold a bottle and (inaudible)?" Pane answered, "No" **[Trial, 5/20/02, at 118]**. By way of explanation, Pane said, "She could do all of those things" **[Trial, 5/20/02, at 118]**.

148. After her vacation, Pane brought Marissa to therapy on 9/14/00, 9/19/00, 9/21/00, and 9/26/00; on 9/28/00, occupational therapy only **[Trial, 5/20/02, at 122]**.

149. Pane testified that she was unemployed and that her Florida residence, in a town noted as a tourist attraction, is 15 minutes from the ocean, but she needed the vacation **[Trial, 5/20/02, at 113].\fn8/**

> FN8  Pane continued to receive disability payments from Merck-Medco for several months after the child was born in August 1999 **[Trial, 5/20/02, at 75, 77-78; Trial Exh. R]**. Between October 2000 and March 2001, while Meuse had physical custody of the child, Pane was living on Long Island, in New York, and worked part-time in the evenings at Kohls, a department store, in Center Reach, Long Island, in New York

6

| | |
|---|---|
| | **[Trial, 5/20/02, at 114]**. She remained unemployed until some time in 2001, when she went to work dispensing pills for Wal-Mart **[Trial, 5/20/02, at 113, 115-116]**. Around the time of the criminal trial, she was working as a cashier and doing other tasks at Wal-Mart **[Trial, 5/20/02, at 115]**. |
| 150. | Meuse saw the child during June 2000, August 2000, October 2000, and observed that the child's physical development was not within normal ranges. |

| | |
|---|---|
| 166. | **Pane and/or Stults contacted the doctors with whom Meuse had made contact to examine the child and told them that Meuse was in contempt of court [Trial, 5/21/02, at 125; Trial Exh. LL].** |
| 167. | **Prior to getting a custody order, Pane told Dr. Tanguay, Children's Hospital emergency department, and other doctors that she was the custodial parent [Trial, 5/21/02, at 126; Trial Exh. D, dated 10/9/00; Trial Exh. LL].** |
| 168. | **Almost immediately upon his return to his home in Ward Hill, Meuse learned from messages on his answering machine that Pane and Stults had called the doctors and had threatened them with suit were they to continue seeing Marissa.** |
| 185. | According to the Haverhill Police Department incident report, Susan Pane reported on 20 October 2000 that the child had been taken from Florida **[Trial Exh. BB, Haverhill Police Department incident report signed by Steven Iannialfo for Clerk of the Court]**. |
| 284. | **The domestic violence advocate Jean Walker, kept a steady correspondence up with Rosalyn Stults, Pane's lawyer, and with Charles Kelly of the FBI [Trial, 5/21/02, at 91-92].** |
| 295. | **Pane, too, "quite often" had conversations with Agent Charles Kelly of the FBI Boston unit in the investigation of this case [Trial, 5/17/02, at 98-99, 100, 104-105].** |
| 296. | **Pane was in continuing communication with Moynihan during the investigation of the case: "I just remember calling him quite often" [Trial, 5/17/02, at 97-98, 100, 104-105; Trial Exhs. HH and II].** |
| 297. | **Because of her "numerous phone conversations with the police and the FBI," she was living in New York during the time of the investigation [Trial, 5/17/02, at 99-100].** |
| 298. | Between October 2000 and 22 March 2001, Pane had about 50 conversations with different organizations: **(a)** National Center for Missing and Exploited Children, **(b)** Voice for the Children, **(c)** a California-based organization. **[Trial, 5/17/02, at 102-103]**. |
| 299. | Pane provided the organizations current pictures, height, weight, skin color, sufficient information so that the organizations could put together a package, including a poster, for distribution **[Trial, 5/17/02, at 102-103]**. |
| 300. | Pane had 500 posters made at a time, provided them to the NCMEC in the very beginning of October 2000, distributed them throughout many states, and hung them in laundromats, grocery stores, other stores, hotels, gas stations in Massachusetts generally, the Haverhill and Methuen areas in particular, and in many, many towns in New York **[Trial, 5/17/02, at 103-104]**. |
| 327. | **Pane had written several letters to Detective Moynihan [Trial, 5/21/02, at 42; Trial Exh. HH].** |
| 328. | **Moynihan spoke to Susan Pane when she called maybe once or twice a week [Trial, 5/21/02, at 22-23].** |
| 336. | On or around 31 December 2000, Pane released to the print and broadcasting media an "Open Letter to Brian Meuse" **[Exh. GGG]**. |
| 337. | In the press release of 31 December 2000, Pane identified that donations were to be made payable to the "Susan Pane Legal Defense Fund" and to be sent to "Attorney Roslyn [*sic*] Stults, 14 Lynde Street, Salem, MA 01970" **[Exh. GGG]**. |

| | |
|---|---|
| 338. | The complaint alleged that Meuse took the child on 8 October 2000. Thompson testified that he did not know in which of the 50 States Meuse and the child were on October 8th [Trial, 5/22/02, at 146]. |
| 351. | Therefore Susan Pane had not been given custody of that child by the court on 1 October 2000 [Trial, 5/22/02, at 153], and did not have lawful authority to have the child at the very least until 11 October 2000. |
| 368. | Stults and Pane canceled the Early Intervention Program appointments that Meuse had made. |
| 405. | Pane had the improper purpose of trying to gain an advantage in the custody action and to unlawfully deprive Meuse of his property and liberty. |
| 417. | Susan Pane secured an interview with NBC-TV's Sally Jessy Raphael show and they televised the FBI's Wanted Poster two times during the broadcast across the nation. |
| 427. | Susan Pane intentionally told her mother to lie to a deputy sheriff and a process server that Susan was living in an unknown location. [Trial Exh. K, attempt at service; Trial Exh. NN, affidavit] |
| 428. | Stults and Pane had the goal to get posters published nationwide to capture Meuse and with the an agreement Susan intentionally misrepresented that there had been a custody order prior to Meuse taking the child from Florida. |
| 429. | FOXNews, the Haverhill police department, Thompson, Moynihan, Stults, Prouty, NCMEC, and Pane misrepresented that Meuse was a fleeing felon. |
| 430. | In concert with Pane's and Stults's representations and misrepresentations, Moynihan, Thompson, Barone, Kelly, and Prouty indirectly caused the detention and confinement of Meuse on the grounds that Meuse violated a custody order. |
| 443. | Susan Pane and Rosalyn Stults played an active part in the initiation and continuation of the criminal proceedings. |
| 452. | Pane recklessly made categorical statements to Officer Moynihan accusing the plaintiff of violating a court order by taking the child, statements that resulted in Meuse's arrest.\fn21 (not included here)/ |
| 453. | Pane instigated or participated in the prosecution by pressing police to arrest and apply for a complaint for an improper purpose.\fn22 (not included here)/ |
| 459. | Pane knew that the complaint initiated was groundless and made misrepresentations to the officers to gain advantage in the custody action. \fn25 (not included here)/ |
| 460. | Stults knew or should have known that the complaint was groundless and she sought to use the process for an ulterior purpose, including, but not limited to, the purpose of aiding her client to gain advantage in her divorce. |
| 467. | Defendants Susan Pane, Stults, Moynihan, Thompson, Barone, Kelly, and Prouty interfered with or attempted to interfere by threats, intimidation,\fn26 (not included here)/ or coercion with Plaintiff's exercise and enjoyment of his rights -- e.g., his rights to his liberty, and his right to due process -- secured by the state and federal constitutions or laws of the United States and/or the Commonwealth of Massachusetts.\fn27 (not included here)/ |
| 493. | Susan Pane intentionally told her mother to lie to the deputy sheriff that Susan was living in an unknown location. |
| 494. | Stults and Pane had the goal to get posters published nationwide to capture Meuse and with the an agreement Susan intentionally misrepresented that there had been a custody order prior to Meuse taking the child from Florida. |

> 495. FOXNews, Prouty, Wal-Mart, NCMEC, AMW, Moynihan, and Susan misrepresented that Meuse was a fleeing felon.
>
> 498. In concert with Pane's and Stults's representations and misrepresentations, Moynihan, Thompson, Barone, Kelly, and Prouty indirectly caused the detention and confinement of Meuse on the grounds (a) that he violated a custody order; (b) that he was wanted for parental kidnapping, and (c) that he was fleeing unlawfully to avoid prosecution.

### SUMMARY OF FACTS PLED IN COMPLAINT (WITH ADDENDUM EXHS. A-HHH)

In August 1999, Meuse and Pane had a child out of wedlock. Meuse was upset by Pane's excessive use of prescription drugs, before, during, and after pregnancy. Pane made plans to leave for Florida after she had consulted with Stults. Meuse obtained a temporary restraining order on 4 October 1999 against Pane. The TRO gave custody of the child to Meuse and ordered that Pane not leave the Commonwealth with the infant.

After Pane told Meuse that she, her mother (visiting from Port Orange, Florida), and the child were going for a day's outing to Newburyport, MA, all three disappeared. Pane caused a pleading to be filed in Florida regarding custody, but did not herself resurface physically until the end of October 1999 in Florida. Meuse made several unsuccessful attempts at service. Pane admitted at trial that her mother had lied when she told the process servers that Pane did not live with her in Port Orange.

The Haverhill District Court TRO was renewed against Pane several times and expired in mid-December 1999. Although Pane appeared in that court during the Fall of 1999, law enforcement made no effort to enforce the TRO.

Fast forward to June 2000, when the infant was 10 months old and brought for a medical examination due to her inability to hold a bottle, sit up on her own, crawl. The Florida Early Intervention team set up four physical and occupational therapy sessions a week for the child. Pane took the child for therapy two weeks and then cancelled the sessions and left Florida to go

9

on a vacation in another State. Meuse saw the child again for a week in August 2000 and observed no improvement in her condition.

Between June and August, Meuse sought the child's medical records (as the family court had allowed). He learned about the cancellation of the therapy visits and feared the muscles of the child's appendages would atrophy. On 7 August 2000, Meuse and Pane, via their counsel, entered into an agreement (filed in court) that they would let each other know where they were with the child. Pane never abided by that agreement. Around Labor Day 2000, Meuse sought a habeas corpus, but five courts refused to hear it with or without diverse reasons.

On 1 October 2000, when the child was 14 months old, Meuse again arrived in Florida to visit with the child for one week. When he observed that the child still could not hold a bottle or sit up on her own or crawl, he put himself and the child on a plane to Massachusetts and brought her to the Children's Hospital Emergency Room and set up appointments for therapy and examination by a specialist in pediatric neurology associated with Boston Floating Hospital.

Immediately thereafter, in keeping with the August 7th agreement, Meuse's counsel notified Stults where the child was and the contact information for the doctors and therapists involved.

Stults and Pane immediately phoned the medical professionals and cancelled the appointments Meuse had set up for the child. On 5 October 2000, after learning of the cancellations, Meuse disappeared with the child.

On 5 October 2000, Stults got a short order of notice and scheduled a hearing for 11 October 2000. At that hearing a judge gave Pane physical custody. Meuse personally was already out of contact and had no knowledge of either the hearing or the custody order of October 11th.

Stults and Pane then began a campaign to find Meuse and the child. To do so, they said that Meuse was in contempt. That was not true. No contempt hearing was held. No judgment of

**10**

contempt had issued. HPD Detective Moynihan obtained an arrest warrant without an affidavit. The warrant was not signed by a judge. Susan provided the information for posters. Not only Stults but also Pane handled the media and set up and advertised a Susan Pane Legal Defense Fund – funds were to go to Stults -- although Pane was not being tried for a crime or sued civilly outside family court.

Between October 2000 and March 2001, Defendants HPD Detective Moynihan and Captain Thompson coordinated continuous activities through constant contact with FBI Agent Kelly, Stults, and Pane. The posters (by Pane, the NCMEC, and the FBI) were shown on television (FOX25News, featuring an interview of FBI Agent Prouty, America's Most Wanted, and the Sally Jessy Raphael show), uploaded to the AMW and NCMEC websites, and hung in WalMarts across the country. (WalMart is a sponsor of NCMEC.) In the press and posters and on the airwaves, Meuse was presented as being wanted for Parental Kidnapping and Unlawful Flight to Avoid Prosecution.

In March 2001, Meuse was captured at gunpoint in Oklahoma as a result of a WalMart poster describing him as fugitive. The child was turned over to Pane. Fortunately, in Meuse's care, she had learned finally how to smile, sit up, walk, run, and play.

Back in Massachusetts shortly thereafter, Meuse was arraigned for Parental Kidnapping. He was never tried for Unlawful Flight to Avoid Prosecution because that was never true and there never was evidence to support the allegation.

In July 2001, a court (Swan, J.) wrote that no custody order had been in effect prior to Meuse taking the child from Florida.

Meuse was tried during May 2002, after which he was found Not Guilty by a jury of his peers. It was the testimony by the Commonwealth's own witness of the tragic condition of the child at the time Meuse rescued her and the beautiful pictures of the child at play close to the time

of the Oklahoman siege that clinched the jury verdict.

Notwithstanding the Not Guilty verdict, the posters representing Meuse as a fugitive remained on the websites of AMW and NCMEC after the criminal trial. The poster on AMW remained on its website until the Complaint in this action was served, in February 2004.

**ARGUMENTS RELATED TO THE "PANE" FACTS FOR EACH COUNT**

1. **Meuse's complaint does not contain, as Pane asserts, "indiscernible factual allegations, many of which are redundant, immaterial, impertinent and scandalous as to Pane." Meuse's allegations are not redundant, they are material, and they are not impertinent and scandalous. They are material and true.**

Pane asserts that Meuse's allegations are redundant but fails to identify any redundancies. Pane asserts that Meuse's allegations are immaterial but fails to identify specifically any immaterial allegations. Pane asserts that Meuse's allegations are impertinent but fails to identify specifically by paragraph number any impertinent allegations. And lastly, Pane asserts Meuse's allegations are scandalous as to her. She does state in general terms allegations that she contends are both "irrelevant" and made with the intention of defaming Pane's name:

- that she used drugs
- that she is unfit as a mother
- that she failed to accept service
- that her attempts to find Marissa
- that Meuse's allegations were made with the intention of defaming Pane's name

**As to her use of drugs**, Meuse averred not only the testimony but also Pane's admissions in ¶¶24, 25, 28-36, 69-71, 97, 131. He also included in the addendum the following exhibits as proof of Pane's prescription drug use:

| | |
|---|---|
| Exh A | Merck-Medco Prescription History (the history of Pane's claims for her prescription insurer – also her employer) to pay for her prescriptions. |
| Exh B | 8-12-99 Women's Health Care: Pane Almost Dropped Baby, Depressed, Florida |
| Exh C | CVS #1886 Records 10-26-00 |
| Exh E | Brooks Pharmacy Records |
| Exh F | CVS #1886 Records 8-1-00 |
| Exh G | CVS #1174 Records 7-27-00 |
| Exh H | Anna Jacques Hospital, 6-25-99 Well Cared For, Meuse Working Fulltime |
| Exh I | Lawrence General Addiction, Pane Seeking Morphine |

|  |  |
|---|---|
| Exh J | Anna Jacques Hospital, page 117, Addiction, Sleeping Pills, No Abuse |
| Exh X | Forging Prescription, Two Pane's |
| Exh JJ | The Other Paine's Signature |
| Exh KK | Merck-Medco Claim History for Susan Pane |
| Exh MM | 9-23-99 Barrie Paster, 1 Week in Florida, Restraining Order |
| Exh SS | Dr. Bruce Pastor, letter stating No Such Patient |
| Exh TT | Dr. B. Eugene Brady |
| Exh UU | Hale Hospital, Dept. of Nuclear Medicine (not included with Complaint – too thick) |
| Exh VV | Amesbury Health Center, Dr. Barrie Paster, (too thick for inclusion) |
| Exh WW | Hale Hospital, Excerpt from hospital records (too thick for inclusion) |
| Exh XX | Lawrence General Hospital, Excerpt from hospital records (too thick for inclusion) |
| Exh YY | Anna Jacques Hospital, Excerpt from hospital records (too thick for inclusion) |

At trial and in the newspapers, Pane claimed that the claims history produced by Merck-Medco was fabricated and that entries on the history were not for her prescriptions but for those of another person with a similar name, viz, "Susan Pa*i*ne." The weakness of Pane's defense is **(a)** that Meuse also had certified copies from diverse pharmacies of her drug orders, **(b)** that the social security number filed with the insurer for Pane is uniquely hers**, (c)** that Pane's account number with the insurer is uniquely hers **, (d)** that the birthdate filed with the insurer for Pane is hers, not Paine's, **(e)** that "Susan Paine" would have no way of knowing Pane's social security number, prescription-drug policy number, Pane's account number, and Pane's birthdate. And, of course, the insurer, Merck-Medco, would have no reason to put anyone else's claims into Pane's claim history.

|  |  |
|---|---|
| Exh X | Forging Prescription, Two Pane's |
| Exh JJ | The Other Paine's Signature |

**As to Pane's unfitness as a mother:** Meuse averred not only the testimony but also Pane's admissions in ¶¶28, 29, 34, 38-40, 42, 65-69, 71, 140, 141, 144-147, 149, 368. He also included in the addendum the following exhibits as proof of Pane's unfitness as a mother:

|  |  |
|---|---|
| Exh B | 8-12-99 Women's Health Care: Pane Almost Dropped Baby, Depressed, Florida |
| Exh D | Marissa's Medical Records and Bruce Pastor @ Last Page |
| Exh HH | 11-5-00 Moynihan Daily Log re Ann Kalip |
| Exh II | Moynihan Handwritten Daily Log re Ann Kalip |
| Exh LL | 10-2-00 Doctors Records for Marissa, and Susan's Stopping Help |

**As to Pane's failure to accept service:** Meuse averred not only the testimony but also

13

Pane's admissions in ¶¶4, 46, 49-53, 55-61, 64, 351, 427, 493.  He also included in the addendum the following exhibits as proof of Pane's failure to accept service:

| | |
|---|---|
| Exh K | Volusia County Sheriff's Department. Service Attempts, Dodging Service |
| Exh L | Complaint for Paternity and Motion to Remain in Massachusetts 9-13-99 |
| Exh M | 209A dated 10-1-99 |
| Exh N | 209A dated 10-1-99 and Affidavit |
| Exh O | Volusia County Sheriff's Dept. Return of Service Temporary Injunction 11-3-99 |
| Exh P | Volusia County Sheriff's Department. Served 209A and Petition of Paternity |
| Exh NN | Jim Beck, Attempted Service of Process of 209A (Pane Dodging Service) |

**As to Pane's attempts to find Marissa:**  Meuse averred not only the testimony but also Pane's admissions in ¶¶54, 166-168, 284, 295-300, 327, 328, 336, 337, 417, 428-430, 443, 452, 453, 459, 467, 494, 495, 498.  He also included in the addendum the following exhibits as proof of Pane's attempt to find Marissa:

| | |
|---|---|
| Exh FF | Family Abduction Poster |
| Exh GG | Wanted for Parental Kidnapping, Unauthorized Flight to Avoid Prosecution |

Additionally, Meuse incorporates here Table 1, *supra*, on pages 2-8.

**As to Pane's contention that Meuse's allegations were made with the intention of defaming Pane's name: :**  Meuse averred not only the testimony but also Pane's admissions in ¶¶43, 48, 64-69, 71-72, 141, 142, 150, 405.  Meuse neither intended to defame nor did he defame her: Everything Meuse averred that he said is true. Meuse at all times was concerned with the infant's health, safety, and welfare.  He pled facts that she used drugs to show her unfitness as a mother: she was using the drugs throughout her pregnancy and after her pregnancy, when she was breast-feeding the child.

To cover up the drug use was only one of Pane's motives to get the child back and to get Meuse arrested and jailed.  The custody and paternity trial had not yet (and still has not) taken place.  With Meuse in jail, there would be no trial.  With Meuse in jail, her drug use would not become a subject in the family court.  And when Meuse would be in jail or get out of jail, he would

**14**

continue to be obligated to pay her child support.

To gain a collateral advantage in the custody and paternity action was her primary purpose of contaminating the law-enforcement entities with falsehoods about Meuse.

Finally, to be defamatory, the facts that Meuse has pled would have to be untrue. Clearly, Susan admitted at trial that her mother lied about the Sagewood address not being Pane's address. That is circumstantial evidence that Pane was avoiding service of the restraining order issued from Haverhill District Court.

2.  **Pane is liable for false arrest, detention, imprisonment. assault, battery, malicious prosecution, abuse of process, and defamation of and conspiracy against Meuse, as well as the intentional infliction of emotional distress, by providing false information that caused the diverse harms imposed upon him.**

Like Stults, Pane is liable for the harm done to Meuse and the damages he suffered in each of the causes of action for the same reasons Stults is liable. Like Stults, Pane's arguments must fail for the same reasons Stults' arguments must fail. Given that Pane in her motion to strike incorporated fully therein her motion and memorandum that of Stults, Meuse herein fully incorporates by reference as if set forth herein his opposition to Stults' motion to strike and supporting memorandum.

And as Stults did, in the case at bar, Pane used the other defendants as instruments for her wrongdoing.

3.  **Pane has not shown that the complaint is in noncompliance with F.R.Civ.P. 8(e). In fact Pane and her counsel appear to have misread Rule 8(e).**

F.R.Civ.P. 8(e) reads ""(1) Each averment of a pleading shall be simple, concise, and direct." Given that the large majority of Meuse's averments are only 1, 2, or 3 lines long, it cannot be deemed that Rule 8(e) was violated. Ironically, that each averment was composed of one direct fact or statement was one reason there are so many numbered paragraphs.

Pane's arguments must also fail for the same reasons Stults' arguments must fail. Given that Pane in her motion to strike incorporated fully therein her motion and memorandum that of Stults, Meuse herein fully incorporates by reference as if set forth herein his opposition to Stults' motion to strike and supporting memorandum.

There is one difference between Pane's and Stults' reasons for invoking Rule 8(e). Stults identified only 10 paragraphs. Pane identified 16 **_sets_** of paragraphs, and offered a so-called summary of each set. The paragraphs in each set were consecutive, showing that the Complaint was well-organized, everything on a given subject was gathered into one section and under one heading. It appeared that Pane understood well the nature of the Complaint. Her complaint (little "c") was but a smokescreen, a false reason to file some responsive pleading other than an Answer . . . sort of like a puppy biting at your heels.

**Conclusion**

That which must be acknowledged by this court is found in Fed.R.Civ.P. 8(f): "All pleadings shall be so construed as to do substantial justice." <u>Gorski v. New Hampshire Department of Corrections</u>, 290 F.3d 466, 2002.C01.0000193 <http://www.versuslaw.com> (2002).

Lastly, Meuse states that one of the many reasons contributing to the length of the complaint is the compelling evidence of the conspiracy out of which all the causes of action arose. Meuse's counsel believed and still believes that being forthright up front with her testimonial and documentary evidence (*see* Complaint Exhibits A through HHH) will ultimately promote both time- and cost-effectiveness as well as encourage early settlement between some if not all the parties.

WHEREFORE, Plaintiff prays this court DENY Susan Pane's motion to strike and award Plaintiff attorney's fees for having to oppose a frivolous motion. If the award of fees to Meuse is

made, Plaintiff's counsel prays that she be given at least 10 days (because of a full professional schedule) to prepare the accounting and supporting affidavit.

                                                  Respectfully submitted,
                                                  BRIAN J. MEUSE,
                                                  By his attorney,

13 March 2004                    /s/ Barbara C. Johnson <barbaracjohnson@worldnet.att.net>
                                                  Barbara C. Johnson, Esq.
                                                  6 Appletree Lane
                                                  Andover, MA 01810-4102
                                                  978-474-0833
                                                  BBO #549972

## CERTIFICATE OF SERVICE

     I hereby certify that the within pleading was electronically filed through ECF.  A true copy of the above document will have been served by first-class mail on 15 March 2004 upon the attorneys known and of record and to whom notice will not be electronically mailed.

Daniel P. O'Brien, Esq.
Posternak Blankstein & Lund LLP
100 Charles River Plaza
Boston, MA 02114

Chauncey D. Steele IV , Esq.
Craig & Macauley, PC
600 Atlantic Avenue
Boston, MA 02210

                                                  /s/ Barbara C. Johnson <barbaracjohnson@worldnet.att.net>
13 March  2004                                                Barbara C. Johnson