UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-10255-EFH

**Brian J. Meuse**
Plaintiff
v.

**Susan Pane,**
**Rosalyn Stults,**
**Lt. Detective Daniel R. Moynihan**, in his official and individual capacities,
**Captain Donald Thompson**, in his official and individual capacities,
**City of Haverhill, Massachusetts,**
**Louis Freeh**, in his official capacity,
**Charles S. Prouty**, in his official and individual capacities,
**Charles P. Kelly**, in his official and individual capacities,
**FOX Television Stations, Inc.,**
**STF Productions, Inc.**, a/k/a America's Most Wanted,
**National Center for Missing and Exploited Children,**
**Wal-Mart Stores, Inc.**
Defendants

_____

## OPPOSITION TO MOTION OF FOX TELEVISION STATIONS, INC., TO DISMISS COMPLAINT

Now comes Plaintiff Brian J. Meuse ["Meuse"] and opposes the motion by Defendant Fox Television Stations, Inc. ["FOX"]\[1]/ to dismiss all counts of the Second Amended Verified Complaint ["Complaint"] with respect to FOX.

As grounds for his opposition, Meuse states the following and argues them in the ARGUMENT section, *infra*:

1.    FOX TV cannot be protected under the fair report privilege for the following reasons:

    a.    the televised broadcast of 10 February 2001 [the "Broadcast"] was not a report of an official statement, of judicial, legislative or other official proceedings, or of a meeting open to the public;

---

[1]  In Meuse's Complaint, he used the following shorthand expressions: "FOXNews" or "FOX25News" or "FOX." Counsel for Defendant Fox Television Stations, Inc., prefers the expression "FOX TV." Meuse uses "FOX TV" and "FOX" in this document.

b.    the Broadcast did not include a press conference;

c.    the statements of FBI Agent Charles Prouty were made not at a press conference, but during a private interview that was not open to the public;

d.    FOX TV knew or should have known that the unofficial declarations by FBI Agent Charles Prouty were false; as such they are outside the scope of fair report privilege;

e.    "the privilege 'does not apply to statements made by the police ... as to the facts of the case or the evidence expected to be given which have not yet been made a part of the judicial proceeding or of the arrest process'";

f.    FOX TV had information that there was a dispute as to the existence of one or more warrants; they taped Meuse's counsel informing the feature reporter that the so-called warrants were never shown or produced by the FBI or the Haverhill police to Meuse or to his family or counsel.

2.    Fox TV is a private entity that metamorphosed into a state actor acting under color of law.

3.    The conduct of FOX TV deprived Meuse of the oldest fundamental liberty interests secured by the Constitution or laws.

4.    It is **un**true that Plaintiff has admitted that the Broadcast was not the cause of the alleged injuries on which Meuse's claims are based.

5.    Plaintiff pled well the existence of a conspiracy involving FOX TV as a co-conspirator under §1983 and common-law conspiracy.

**FACTS AS TO FOX TV**

Meuse incorporates herein all the facts set forth in his Complaint and in the spirit of

Educadores Puertorriqueños en Acción v. Hernández, 2004 WL 1045546, slip op. 1, No. 03-

1588 (1st Cir. (Puerto Rico) May 10, 2004), in which the First Circuit retreated from the

"heightened pleading standard in civil rights actions," summarizes them here with the infer-

ences to be drawn from them.

This case arises out of a custody dispute between the Plaintiff Meuse and Defendant Pane

regarding their daughter, Marissa.  On October 1, 2000, Meuse went to Florida for "a week's visi-

tation" with Marissa and promptly flew her out of Florida to Massachusetts.  Amended Complaint,

¶¶ 152-164.\²/  Meuse then "dropped out of sight with the child" on or about October 5, 2000.

Comp., ¶ 170.  During a national "search" campaign by the conspirators, on 10 February 2001,

Fox TV aired the Broadcast regarding Marissa's disappearance and the FBI's efforts to locate her.

Comp., ¶¶313-315, 325-26.   Meuse was arrested in Oklahoma on 22 March 2001.  Comp., ¶¶378-

80.  On 23 May 2002, Meuse was found "not guilty."  Comp ¶395.

Defendants FOX TV and STF Productions, Inc. ["America's Most Wanted" or "AMW"]

are sister subcorporations under the umbrella The News Corporation Limited, a mammoth, multi-

corporation, K-Rupert-Murdoch enterprise [Comp. ¶¶12-13].   Defendants AMW and National

Center for Missing and Exploited Children ["NCMEC"] are "Gold-Star partners" [Comp. ¶13,

Comp.Exh. HHH], and Defendants NCMEC and Wal-Mart are "Premiere" partners [Comp. ¶¶14-

15, Comp.Exh. EEE].   "The Missing Children's Network is a partnership program between Wal-

Mart and . . . NCMEC. As part of the agreement, the NCMEC packages approved posters and

ships them to Wal-Mart stores each month."  Kenney v. Wal-Mart Stores, Inc., 100 S.W.3d 809,

2003.MO.0000486 at ¶29 <http://www.versuslaw.com> (Mo. 2003).

Meuse contends that NCMEC also ships so-called approved posters to AMW, which is a

television show featured nationwide its sister on FOX TV's stations.  In the instant case, the "Un-

solved Mysteries" segment on AMW/FOX TV featured a story on Meuse and the child.   Appear-

ing on pages 32-33 of the Complaint is a likeness of the poster published on that show.  Addition-

ally, both AMW and NCMEC maintain websites with a multitude of pages devoted to posters for

alleged fugitives from justice.  On them, posters showing Meuse and the child were exhibited liter-

ally for years, from sometime in 2001 through that time in 2004 when the Complaint in this action

was served on those defendants, notwithstanding the fact that Meuse had been found Not Guilty of

Parental Kidnapping by a jury in May 2002 [Comp. Exhs. FF and GG].\³/  FOX TV's Reporter

---

² The Amended Complaint is abbreviated "Comp." throughout this opposition and memorandum.
³ The exhibits cited in this opposition were all Trial Exhibits and are included in the addendum to the Complaint.

Bob Ward interviewed Defendant FBI Agent Charles Prouty for AMW/FOX TV's "Unsolved Mysteries" segment broadcast in February 2001 [the "Broadcast].

According to Defendant Moynihan, he and FBI Agent Charles Kelly spent "close to a couple of hundred hours between the Fall of 2001and March 2002 [Comp. ¶¶268-269]. They performed stakeouts, went to the homes of different people' whose names were provided by Pane, performed "follow-ups" [Comp. ¶269].

The FBI defendants instructed the Haverhill police defendants, actively searched for Meuse by conducting investigations, and coordinated the cooperation of Wal-Mart, the NCMEC, the FOX news channel, and AMW [Comp. ¶¶268-326]. "'The FBI set that up and that was all set up through, I believe, through the Wal-Mart'" [Comp.¶302].\[4]/ "Moynihan testified that the FBI 'put out that [Meuse] was a fleeing felon'" [Comp. ¶303]. The extensive communication between all the defendants is captured in a **flow chart in Table 1, as Exhibit A**, attached to this memorandum.

"The poster," Moynihan testified, "said Parental Kidnapping" [Comp.¶304]. The poster on the AMW's website (linked to from the fox.com website) was and remained there until the Complaint in this action was served [Comp. ¶305]. The poster by NCMEC names Meuse as an 'abductor' and falsely accuses him of fleeing unlawfully to avoid prosecution on November 6th, 2000 [Comp. ¶306]. Moynihan believed that the "local FBI" was mainly responsible for the poster [Comp. ¶308]. On a second Wanted poster, the FBI wrote that an arrest warrant for Meuse issued for "Parental Kidnapping" and "Unlawful Flight to Avoid Prosecution." Readers were to contact the FBI Violent Fugitive Task Force by calling 617-742-5533 [Comp. ¶¶309-310, Exh. GGG]. A third "Family Abduction" poster claimed that an FBI warrant for Meuse, the "Abductor," issued on 6 November 2000 for "Unlawful Flight to Avoid Prosecution" [Comp. ¶¶311-312, Exh. FF].

---

[4] The quotations are from the transcript of Moynihan's testimony at the criminal trial. The volume and page numbers appear in the Complaint. The trial exhibits noted are in the addendum to the Complaint.

Throughout Saturday, 10 February 2001 (as well as earlier in the week), FOX TV broadcast the promotional advertisement "The Kidnapping by a Haverhill man, Wanted by the FBI" [Comp. ¶313]. Later that day, FOX aired "New England's Unsolved Mysteries: The Hunt for Brian and Marissa Meuse" ("the Broadcast") and published the poster defaming Meuse as an "Abductor" and fleeing felon and instructing the audience to call the FBI Violent Fugitive Task Force at 617-742-5533 [Comp. ¶314, Exh. GG].

On the show, the head of the Boston office of the FBI, Charles Prouty, misrepresented that Meuse took the law into his own hands and that there was a custody agreement [Comp. ¶315-316]. **(1)** There was no custody agreement. **(2)** In July 2002, Judge Alan Swan determined that no custody order had issued prior to Meuse taking the child [Exh. CCC]. **(3)** A year earlier, in May 2000, Judge Margaret Macauley Manzi of the Probate & Family Court found that Pane had unlawfully removed the child from Massachusetts [Exh. T]. **(4)** In 1999, Meuse had been granted custody by a district court of the child on the grounds of fear for her safety [Comp.Exhs. M (Order), N (affidavit)].

Also on the show, Prouty and the poster also untruthfully asserted that Meuse was a fleeing fugitive [Comp. ¶325]. It is that story line which FOX TV used in its promos for the show: Meuse was a kidnapper wanted by the FBI [Comp. ¶326, Exh. GG].

## STANDARD OF REVIEW

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded factual assertions in plaintiff's complaint, and draw all reasonable inferences from those assertions in plaintiff's favor. Kiely v. Raytheon Co., 105 F.3d 734, 735 (1st Cir., 1997); Hogan v. Eastern Enterprise/Boston Gas, 165 F.Supp.2d 55, 57 (D. Mass., 2001). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (footnote omitted).

Defendant FOX has argued the motion to dismiss as if it were a motion for summary judgment.  Notwithstanding the difference of the standard for determining the motions, FOX TV's reliance on the proposition that "[r]esolution prior to trial is 'especially favored in defamation cases' under Massachusetts law is misplaced.   "[D]efendants in a defamation case 'must still meet the usual burden under [Mass.R.Civ.P. 56] of demonstrating by evidence' considered with an indulgence in the plaintiff's favor, 'the absence of disputed issues of material fact and their entitlement to judgment as a matter of law.'"  Salvo v. Ottaway Newspapers, Inc., 57 Mass.App.Ct. 254, 259 (2003), quoting Mulgrew v. Taunton, 410 Mass. 631, 633  (1991).

In Schiavone Constr. Co. v. Time, Inc., 735 F.2d 94 (3d Cir. 1984), the court rejected the notion that media defendants can more easily obtain summary judgment than other defendants, for "a substantial dispute of material fact does not disappear merely because a media defendant is being sued, . . . and plaintiff's right to a jury trial is entitled to no less respect."  Lavin, at 1419.\[5]/

**ARGUMENT**

I.      **Where FBI Agent Prouty's statements regarding Meuse, and the poster shown on the FOX broadcast were not fair reports of governmental activity, FOX may find no defense in the fair report privilege.**

Under Massachusetts law, the well-established fair report privilege **(a)** protects reports of any official hearing or meeting, even though no other action is taken, **(b)** protects the dissemination of information about reports filed by an officer or agency of the government,  **(c)** protects a report relating to matters of public concern prepared for a government entity by an independent contractor, and **(d)** protects investigative memoranda and letters from the General Services Administration which had not previously been available to the public.  The "rationale in so extending the privilege was the public policy benefit of free discussion of governmental affairs."  Bruenell v.

---

[5]  "Where there is an issue of fact as to whether the article was based on an official action or proceeding, [a] newspaper [is] not entitled to summary judgment on [a] defamation claim."  Mourao v. Town of Framingham, 1998 WL 1184194 at *3, No. 9700731  (Mass.Super. Dec. 7, 1998) (Neel, J.).

Harte-Hanks Communications, Inc., 23 Media L. Rep. 1378, 1994 WL 790830 * 3, No. 93-2018

(Mass.Super. 1994) (Fremont-Smith, J.1994 WL 790830 *3, citing Jones, 400 Mass. at 797.

> Massachusetts recognizes the "fair report privilege," which allows those who fairly and accurately report certain types of official or governmental action to be immune from liability for claims arising out of such reports. See, e.g., Jones v. Taibbi, 400 Mass. 786, 794-795 (1987) (Published reports of judicial, legislative or other official proceedings are privileged); Sibley v. Holyoke Transcript-Telegram Publishing Co., Inc., 391 Mass. 468, 470-471 (1984) (fair report of judicial proceedings).

Elm Medical Laboratory, Inc. v. RKO General, Inc., 403 Mass. 779, 782 (1989). Ingenere v.

ABC, 11 Media L.Rep. (BNA) 1227 (D.Mass. 1984).

The privilege does not, however, protect **(e)** a report of an official proceeding that is not

public or available to the public or internal memoranda not intended for public disclosure.\ [6]/

The Broadcast, however, was not an official statement.  Neither did it contain a report of

judicial, legislative, or other official proceedings.  It was not even a press conference.  It was but a

private interview that was not open to the public.  No other media were present when FOX inter-

viewed Prouty.  FOX knew or should have known that the unofficial declarations by FBI Agent

Charles Prouty were false.

### a.    An officer's own comments and/or opinions do not entitle the media to the fair report privilege.

"'There is also no privilege to report the unofficial talk of such officials as policemen, as

distinct from their official utterances or acts, such as an arrest." Jones, 400 Mass. at 796 (footnotes

omitted), citing W. Prosser & W. Keeton, *supra* at 836.  "The privilege 'does not apply to state-

ments made by the police ... as to the facts of the case or the evidence expected to be given which

have not yet been made a part of the judicial proceeding or of the arrest process.'" Jones v. Taibbi,

400 Mass. at 804, quoting Yerkie v. Post-Newsweek Stations, Michigan, Inc., 470 F.Supp. 91, 94

(D.Md. 1979) and citing Restatement (Second) of Torts, *supra* at §611, comments d and h.

---

[6]  Clearly, here, the public, in their capacity as citizens and voters, did not need to be informed of the Meuse case.

In this case there is at least an issue of fact as to whether the article was based on an official action or proceeding. Because Kerstetter based the article on his interview with officer Harrington rather than directly upon the police report, warrant, or other official action, (FN3) the article is not indisputably privileged. It is unclear from the record whether Officer Harrington simply read from the police report and warrant, or added comments of his own. See Jones v. Taibbi, 400 Mass. at 796 (statements by police or witnesses regarding the facts of a case are not yet part of an official proceeding and therefore are not privileged). Consequently, Middlesex News is not entitled to summary judgment on the defamation claim.

Mourao v. Town of Framingham, 1998 WL 1184194 at *3, No. 9700731 (Mass.Super. Dec. 7, 1998) (Neel, J.). Mourao is remarkably similar to the instant case: i.e., the FOX TV Broadcast *and* the defaming Wanted poster were based on Prouty's opinion, on "comments of his own."

Those "unofficial statements made by police sources are outside the scope of the fair report privilege." Jones, at 796, citing Phillips v. Evening Star Newspaper Co., 424 A.2d 78, 89 (D.C.1980) (reliance on unofficial police "hot line" not privileged); and Bufalino v. Associated Press, 692 F.2d 266, 272 (2d Cir.1982) ("Only reports of official statements or records made or released by a public agency are protected by the [Restatement (Second) of Torts] §611 privilege" [emphasis in original]).

Meuse contends that the work of the Defendant FBI agents are the federal analogs to the Haverhill police defendants: that Agent Charles Kelly ["Kelly"] is the federal equivalent of Detective Moynihan and that Head Agent Prouty was the equivalent of Captain Thompson. As the federal agents are the equivalent of municipal policemen, the statements of the FBI are outside the scope of the fair report privilege.

Further, in February 2001, when Prouty made his statements and FOX displayed one of the three Wanted posters, **(a)** Meuse had not been found in contempt of an order from any court, **(b)** Meuse had not been charged criminally with Parental Kidnapping or with any other charge [Comp.¶267], \7/ **(c)** there had been no judicial proceeding in criminal court, and **(d)** there was no

---

7        Paragraph 267 of the Amended Complaint also reads, in relevant part, "On 5 April 2001, the day Meuse was arraigned, Judge Herlihy wanted to see the FBI warrant and requested Assistant DA DePaolo to produce it."

federal warrant, **(e)** the State warrant was not accompanied by any affidavit, **(f)** neither the copy nor the original arrest warrant had a signature by Det. Moynihan or by any judge\\[8]/ **[**Comp. ¶215**]**, **(g)** Moynihan was the complainant, but did not sign the State warrant **[Comp. ¶215, Exh. Y]**, and **(h)** Meuse had not been arrested.

In Gist v. Macon County Sheriff's Dep't, 284 Ill.App.3d 367, 1996.IL.3033 <http://www.-versuslaw.com> (1996) (dismissing claim against the media for broadcasting a "most wanted fugitives" flyer), a case cited by FOX on p. 16, the appellate court noted that years earlier, the supreme court of Illinois "created a 'hybrid' privilege: 'conditional' in that only those reports of governmental proceedings which are accurate and complete or fair abridgments of the proceedings are privileged; 'absolute' in that once the prerequisites of the privilege are met, the privilege cannot be defeated by a showing of malice." Id. at ¶55 of 1996.IL.3033 <http://www.versuslaw.- com>. The court in Gist also wrote that in Cox Broadcasting Corp v. Cohn, 420 U.S. 469, 492 (1975), the U.S. Supreme Court, too, required the report to be of "the proceedings of government." Id. So under both Illinois' hybrid privilege and the Supreme Court's Cox, FOX would absolutely **not** have the privilege of fair report, given that Prouty was **not** reporting on a governmental proceeding.

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.

Jones v. Taibbi, 400 Mass. at 794-795 n. 11.

Given the close-working relationship between Moynihan and FBI Agent Charles Kelly, who reported to Charles Prouty, the latter, the head of the Boston office, knew or should have

---

[8]     The court copy of the warrant is in red and black and was signed by Kim Marotta and is dated 25 October 2000 **[**Exh. Z**]**.   **[**Comp. ¶215**]**.

known\\[9]/ that that which he was stating to FOX TV was baseless, false, and defamatory.  And FOX had the obligation to check the reliability and validity of the information where it knew that Prouty was not making an official statement and, significantly, that Prouty never showed FOX the warrant, because Meuse's attorney had informed the FOX investigative reporter that no warrant – federal or local -- had been produced as requested for inspection and that it appeared none existed.

## II.    Meuse was deprived of his liberty interest in the care, custody, and control of his and Pane's child.

Prouty also knew that were Meuse to be captured, as Prouty intended, Meuse would be deprived not only of his liberty interests -- false arrest, false imprisonment, assault, battery – and would be forced to stand trial for a non-existent crime.  Meuse would also be deprived of his liberty interest in the care, custody, and control of his and Pane's child, a liberty interest that "is perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57,  65 (2000).  And when Meuse was arrested, as a direct result of the Wanted poster, on which the FBI phone number appears, his child, whom he had rescued from further harm by the mother, was, indeed, taken from him.   His deprivation became real.

In this case, Meuse's paramount liberty interest was his parental right and obligation to protect his child from continuing and imminent harm by Pane.\\[10]/   "As a general matter, this fundamental right is inviolate, and the deprivation of such right would constitute a violation of substantive due process." Tower v. Leslie-Brown, 326 F.3d 290, 2003.C01.0000148 at ¶44 <http://www.versuslaw.com> (1st Cir. 2003), citing Hatch v. Dep't for Children, Youth & Their

---

[9]   The Complaint paragraphs that set out what Moynihan told the FBI agents are ¶¶ 82-83, 87-88, 90, 92-93, 176, 194-204, 212, 340, 346, 350.  The Table of Contents on page 4 of the Complaint identifies even more facts.

[10]   Generally, "there is a presumption that fit parents act in the best interests of their children." Troxel, 530 U.S. at 68. Here, there was no suspicion of child abuse or reason to suspect that the child would be in imminent peril, and thus no reason to sever Suboh's parental rights prior to the state's resolution of the custody dispute through its normal procedures. See Hatch, 274 F.3d at 20.

Suboh v. District Attorney's Office of Suffolk, 298 F.3d 81, 91 (1st Cir. 2002)

Families, 274 F.3d 12, 22 (1st Cir. 2001).  In Hatch, the court held that reasonable suspicion of

imminent danger is required to justify a state actor temporarily taking a child from her parent

pending a hearing.  Id. at 23-24.   Prouty and FOX ignored during the Broadcast, and NCMEC

AMW and Wal-Mart ignored when they published and distributed the posters, their knowledge

that given the child's debilitating physical condition when Meuse took her from Florida, there was

a reasonable suspicion of imminent danger to the child if she were returned to the mother.

Officers Moynihan and Thompson had been informed of the dispute between Meuse and

Pane regarding the health of the child while in the care of her mother.  It is reasonable and logical

to presume that Agents Kelly and Prouty were informed by Moynihan, if not also Thompson, both

of the health of the child and of her imminent peril were the child to be returned to the mother.\[11]/

> State action requires both an alleged constitutional deprivation caused by acts taken pursu-
> ant to state law and that the allegedly unconstitutional conduct be fairly attributable to the
> State. E.g., Lugar, v. Edmondson Oil Co., 457 U. S. 922, 937. . . . Whether such a nexus
> exists, depends on, among other things, whether the State has provided such significant
> encouragement, either overt or covert, that the choice must in law be deemed to be that of
> the State.

American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999).   Anderson v. Boston Sch.

Comm., 105 F.3d 762, 766 (1st Cir. 1997).  The constitutional deprivation is clear, as is the en-

couragement by the FBI (who had been encouraged by the Haverhill police defendants) of FOX

TV to operate as a "willful participant in joint activity with the State or its agents," Lugar, supra,

at 941 (internal quotation marks omitted).

> ...We have treated a nominally private entity as a state actor when it is controlled by an
> "agency of the State," Pennsylvania v. Board of Directors of City Trusts of Philadelphia,
> 353 U. S. 230, 231 (1957) (per curiam), when it has been delegated a public function by
> the State, cf., e.g., West v. Atkins, supra, at 56; Edmonson v. Leesville Concrete Co., 500
> U. S. 614, 627-628 (1991), when it is "entwined with governmental policies" or when gov-
> ernment is "entwined in [its] management or control," Evans v. Newton, 382 U. S. 296,
> 299, 301 (1966).

---

[11]  What FOX did, both through the posters on the AMW website and in the Unsolved Mysteries segment, was mali-
cious.  Where there is a question of malice, it must go to a jury.  A reasonable jury could find by clear and convincing
evidence that FOX TV acted with actual malice.  Anderson v. Liberty Lobby, 477 U.S. 242 (1986).

Brentwood Academy v. Tennessee Secondary School Athletic Association, 531 U.S. 288, 180 F.3d 758, 2001.SCT.0000022 at ¶ 42 <http://www.versuslaw.com> (2001). FOX TV's conduct may be deemed to have fallen into all three of the categories identified by Brentwood. To use FOX TV's own words, the FBI did "deputize FOX TV and transform the private television company into a state actor for purposes of §1983." [FOX Mem. at 10]. Thus Meuse's Complaint alleged facts sufficient to meet both requirements.

III.   **Assuming *arguendo* that FOX was entitled to the fair report privilege, FOX abused the privilege, and it thus became unavailable to FOX as a defense.**

FOX contends that they had a privilege to "report" Prouty's defamatory statements.[12]/ As FOX recognized, in Lavin v. New York News, Inc., 757 F.2d 1416, 1419 (3rd Cir. 1985), the court emphasized that the fair report privilege must be properly applied. If properly applied, the defendants' First Amendment rights would be "fully vindicate[d]." Id. at 1419.[13]/

Were we to assume *arguendo* that the "privilege is applicable, the question [becomes] whether the privilege was abused." Id.

> The privilege is abused, and therefore lost, if the account is inaccurate, misleadingly incomplete, or unfair. Whether abuse of the privilege has been shown is ordinarily a question for the jury, "unless the facts are such that only one conclusion can reasonably be drawn."

Lavin, at 1419 (internal cites omitted), which then concluded "that 'malice in fact' can defeat the fair report privilege." Lavin, at 1421. An actual intent to harm is "malice in fact." Schiavone, 847 F.2d 1069, 1085 n. 25 (3d Cir. 1988), citing Lavin, at 1421.

---

[12]   As Defendant FOX asserted, Plaintiff Meuse did, indeed, assert that the actionable information broadcast by FOX TV came from Agent Prouty's and the poster's statements, but contrary to FOX TV's assertion, Meuse never considered those oral and written statements as "official government sources."

[13]   Because "it could not properly be ruled as a matter of law that plaintiff would be unable to establish abuse of the fair report privilege on the part of the defendants," the court in Lavin "reversed a dismissal under Fed. R. Civ. P. 12(b)(6). Id. at 1417, citing Schiavone Constr. Co. v. Time, Inc., 735 F.2d 94 (3d Cir. 1984) (remanded for development of a factual record). On remand, lower-court judge held that Time could not assert a fair report privilege under New Jersey common law. Lavin, *supra*.

The privilege extends to an "accurate, complete, and fair abridgement" of the official document. See Schiavone, supra, 735 F.2d at 97; Medico v. Time, Inc., 643 F.2d 134 (3d Cir.), cert. denied, 454 U.S. 836 (1981). Conversely, the privilege is abused, and therefore lost, if the account is inaccurate, misleadingly incomplete, or unfair.\[14]/ Whether abuse of the privilege has been shown is ordinarily a question for the jury, "unless the facts are such that only one conclusion can reasonably be drawn". Restatement (Second) of Torts § 619(2) comment b; see also Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 382 149 A.2d 193, 206 (1959).

Lavin, at 1419.

"A plaintiff forfeits the privilege under New Jersey law if he exceeds the bounds of fair reporting." Schiavone Construction Co. v. Time Inc., 847 F.2d 1069, 1087 (3rd Cir. 1988) (affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion). Time forfeited the fair report privilege. Id., at 1087.

> Not only must the report be accurate, but it must be fair. Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it. . .

Id., at 1419 (internal cites omitted). "The district court found that Time had forfeited its fair report privilege because its omission of the exculpatory language rendered the report incomplete and inherently unfair." Schiavone, 847 F.2d at 1088, citing Schiavone II, 619 F.2d 684, 699-700 (D.N.J. 1985).

Given the nature of the private interview and the information FOX knew through its reporter prior to the Broadcast only one conclusion can reasonably be drawn. i.e., the privilege, if any, was abused. For example, FOX TV had information – both documentary and verbal -- from the Meuse camp prior to the Broadcast:\[15]/,\[16]/

---

[14]  "New Jersey courts would continue to apply the rule that the privilege is defeated by proof of actual intent to harm ("malice in fact"). ... Accordingly, we conclude that "malice in fact" can defeat the fair report privilege." Lavin, 1421.

[15]  The Broadcast was the Unsolved Mysteries feature segment, which played seamlessly at both ends between AMW and the FOX News segment.

[16]  The FBI works closely and often with FOX TV and AMW. The FBI contacted FOX TV and "requested" that FOX

- the FOX TV had (and still has) a business relationship with AMW,
- the two corporations had (and have) the same parent corporation, namely, The News Corporation Limited [Comp. ¶¶12-13],\[17]/
- the program was initiated upon the "request" of the Charles Prouty,
- the intention of the Broadcast was to do harm to Meuse by capturing him,
- there was a dispute as to the existence of a federal warrant, one sought by the FBI; one had not been seen by the Defendant Haverhill police nor by Meuse's family or counsel,
- that there was a dispute as to the existence of a warrant by Haverhill; one had not been seen by Meuse's family or counsel,
- that there was a dispute as to the prescription drug use by Pane,
- that there was a dispute as to the physical health of the child,
- that there was a dispute as to which parent, if any, had been given custody of the child.

The arguments of FOX TV are misplaced and FOX's conclusions are inconsistent with existing law.  See, particularly, FOX Mem. at 5 n. 1.

First, the Broadcast had no official basis for the report, and "the context of the entire broadcast" was **_not_** "based upon official statements of governmental officials."  The Broadcast was simply part of Prouty's intent to bolster his own position by capturing Meuse, whether or not he should have been captured.  Prouty had clearly ignored the serious failing physical condition of the child when Meuse rescued her from the harmful care of her mother (Pane).

In that same footnote (FOX Mem. at n. 1), FOX cited Pittman v. Gannett River States Publ'g Corp., 836 F. Supp. 377, 383 (S.D. Miss. 1993).  Pittman declared that the statement in the "report" must be, at the very least, "quoting, paraphrasing or otherwise drawing upon official documents or proceedings."  This, of course, is exactly what Prouty did **_not_** do.  There were no official documents or official proceedings to quote, paraphrase, or draw upon.  Thus, under ELM Medical Laboratory, 403 Mass. at 782, which FOX cited, the Broadcast is **_not_** entitled "to be im-

---

produce an Unsolved Mysteries feature segment about Meuse, whereupon the Unsolved Mysteries reporter contacted Meuse's counsel in the family-law action.

[17]  K. Rupert Murdoch is Chairman an Chief Executive Officer of News Corporation, of which Fox Television Stations, Inc., and STF Productions, Inc. (AMW) are subcorporations..  STF uses any one of several corporate addresses, according to its agenda to meet its immediate needs.

mune from liability for claims arising out of such reports." <u>Id</u>.  For example,

- Where the Broadcast gave an alleged "a rough-and-ready summary that was substantially" ***IN***correct," it did not qualify for the fair report privilege.  *Cf.* <u>Yohe v. Nugent</u>, 321 F.3d 35, 44 (1st Cir. 2003).

- Where the Broadcast did ***not*** "produce the same effect on the mind of the recipient which the precise truth would have produced," the fair report privilege was inapplicable.  <u>Yohe</u>, 321 F.3d at 43.\[18]/

- Where the report was unfair and inaccurate," the fair report privilege was inapplicable.  <u>ELM Medical</u>, 403 Mass. at 782.

- Where the investigation was not yet complete, that the leak was major, and made a definitive statement concerning abduction and fleeing to avoid prosecution, the fair report privilege was inapplicable.  *Compare* <u>Sunoco v. Community Newspaper Co.</u>, 1999 WL 788612, 1999 Mass.App.Div. 126 (1999) (where the leak was minor and no definitive statement regarding contamination was made, privilege was applicable).  No such reservations as in <u>Sunoco</u> were expressed in the FOX Broadcast.

"If . . . the matter was of public concern, . . . liability would turn on whether there was knowing falsity or reckless disregard of the truth on the defendant's part."  <u>MiGi, Inc. v. Gannett Mass. Broadcasters, Inc.</u>, 25 Mass. App. Ct. 394, 397 n.6 (1988), citing <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 351-352 (1974).\[19]/

Here, Prouty's statements were false ***and*** UNofficial in that they were statements of Prouty's own unproven beliefs, but FOX presented them as factual truths.  And where they were presented as factual truths, the reporting of those statements are ***not*** privileged against claims arising out of the Broadcast.  *See* <u>MiGi</u>, 25 Mass. App. Ct. at 396.

## IV.    **The First Amendment privilege does not bar inquiry into the editorial process.**

---

[18]    <u>Kenney v. Scripps Howard Broad. Co.</u>, No. 98-1079-CV-W-BD, 2000 WL 33173915, 28 Med.LRptr. 2512 (W.D. Mo. 2000), <u>aff'd</u>, 259 F.3d 922 (8th Cir. 2001), which FOX cited to support its contention that a broadcast report of the ***possible*** abduction of a child by her parent was a fair report, the FOX Broadcast did not report that Meuse possibly abducted the child; it reported that not only **had** he abducted the child, he was also a fugitive fleeing from justice.

[19]    It is often said that the benefits of this privilege are forgone where a complainant shows that the reporter was actuated by malice toward him.  But "malice" would require some redefinition if it were taken not to comprehend knowing falsehood; perhaps repetition of such falsehood with a purpose to do the complainant maximum injury would still qualify as malice.

<u>MiGi, Inc. v. Gannett Massachusetts Broadcasters, Inc.</u>, 25 Mass.App.Ct. at 397..

FOX also contends that it is entitled to dismissal because to allow the case to proceed will chill the stations' First Amendment right.  In certain circumstances, that argument might be appropriate, but here it is not.  The court in <u>Bruenell</u>, *infra*, at 1994, recognized the competing interests of the defamed to seek redress for defamation, and the public to be informed as citizens and voters.  <u>Bruenell v. Harte-Hanks Communications, Inc.</u>, 23 Media L. Rep. 1378, 1994 WL 790830 * 3, No. 93-2018 (Mass.Super. 1994) (Fremont-Smith, J.), citing <u>ELM Medical</u>, 403 Mass. at 782-783; Restatement (Second) of Torts § 611 (1977).

Thus, no First Amendment privilege bars inquiry into editorial process.  <u>We Inc. v. City of Philadelphia</u>, 174 F.3d 322, 1999.C03.42075 <http://www.versuslaw.com> (3d Cir. 1999), citing <u>Herbert v. Lando</u>, 441 U.S. 153 (1979).  Therefore, FOX's First Amendment argument must fail.

**V.     Where the determination of whether the fair report privilege is applicable does not depend on the cause of action, if the privilege is inapplicable under one theory of law, it is inapplicable under all others.**

FOX has portrayed its role as being that of an innocent broadcaster who was simply reporting what a government official with an FBI affiliation stated.  That is not the case.  FOX was a co-conspirator with FBI Agent Prouty to provide entertainment for the public through its two television shows, namely, America's Most Wanted and Unsolved Mysteries.  AMW and Unsolved Mysteries are significant profit-making shows.   They have sponsors who spend significant monies for paid advertisements to FOX TV and/or its multi-layered subcorporations.

| The News Corp. | ⇨ | FOX Television Stations, Inc. | ⇨ | FOXNews | ⇨ | FOX25News |
| The News Corp. | ⇨ | FOX Television Stations, Inc | ⇨ | Unsolved Mysteries | ⇨ | New England Unsolved Mysteries |
| The News Corp. | ⇨ | STF Productions, Inc | ⇨ | America's Most Wanted | | |

The public personas of the shows give the impression that these entities exist to protect the public, to do good.  Meuse does not dispute that some good is, in fact, done by the shows.  But as with all entertainment, there is an element of advertising hype to sustain their existence as successful, profitable cost-centers with a potential for growth with increased productivity and increased

profits. To do that, FOX TV advertises on its shows and their websites the pictures of alleged fugitives and the number of those alleged fugitives caught as a result of their exposure on those shows, by the Wanted posters displayed and continuously republished on their websites, by the further distribution through their partners, such as Wal-Mart and NCMEC.

The problem arose here because these entities – FOX, AMW, NCMEC, and Wal-Mart -- did not check the truth of story the FBI and the police department gave them. They do not check because it would considerably decrease the number of so-called fugitives both at large and caught, and decrease the opportunity for self-aggrandizement by producing statistics of dubious value.

## VI.    Meuse properly pled his §1983 conspiracy and his common-law defamation claims.

FOX's arguments are blurred. Meuse pled his common-law defamation claim in a classic manner. For his §1983 conspiracy claim, in which he identifies the defamatory oral and written statements, Meuse pled with particularity those of his constitutional rights of which he was deprived. His pleading was sufficient to meet the defamation-plus requirements in Brennan v. Hendrigan, 888 F.2d 189, 195 (1st Cir. 1989).

Citing Paul v. Davis, 424 U.S. 693, 709-710 (1976), *reh'g denied* 425 U.S. 985 (1976), the court in Brennan wrote, "reputational injury must coincide with some other 'alteration of status.'" *See also* Celia v. O'Malley, 918 F.2d 1017, 1021 (1st Cir. 1990). Required for a successful "defamation-plus" claim is, for example, an allegation that a stigmatization has occurred in connection with a termination in employment. Aponte v. Calderón, 284 F.3d 184, 2002.C01.0000115 at ¶70 http://www.versuslaw.com (1st Cir.), *cert. denied* 537 U.S. 886 (2002), a case cited by FOX and citing Brennan, 888 F.2d at 196. The court in Aponte required also an adjudication.

Meuse met both requirements. At Comp. ¶395, Meuse wrote that he was found Not Guilty, and at Comp. ¶396, Meuse wrote of his stigmatization, the alteration of his status, to wit, that since trial, he has been unable to find employment, and is known as the 'kidnapper' almost everywhere

he goes."  The "sting" of the Broadcast is a question for the jury.  <u>Schiavone</u>, 847 F.2d at 1073.

For the above reasons, FOX's argument regarding reputational injury must fail.

Further, in addition to all the facts in the Complaint, there is sufficient circumstantial evidence to prove a conspiracy.  <u>Earle v. Benoit</u>, 850 F.2d 836, 845 (1st Cir. 1988).\[20]/

Lastly, FOX complains that Plaintiff's two conspiracy claims substantially overlap one another.  Meuse responds that the claim is brought under two theories of law, one under federal law, one under state common law.  Meuse has demonstrated that FOX both engaged in independent tortious conduct of its own [*see* <u>Heinrich ex rel. Heinrich v. Sweet</u>, 49 F. Supp. 2d 27, 44 (D. Mass. 1999)] and that Fox's "encouragement or assistance" was a "substantial factor" in causing the resulting tort.  *See* <u>Estate of Halloran v. United States</u>, 268 F. Supp. 2d 91, 95 (D. Mass. 2003).

## VII.  **FOX TV is liable for tortious acts or civil rights deprivations committed by others where its acts were done with the intent to commit those acts.**

FOX TV is responsible:

- under §1983 and common law for Meuse's false arrest and imprisonment,
- for conspiracy under §1983 and common-law conspiracy,
- violating the Mass. Civil Rights Act (M.G.L. c. 12, sec. 11*l*),
- for common-law malicious prosecution, abuse of process, assault, battery,  defamation, and the intentional infliction of emotional distress

FOX contends [FOX Mem. at 12] that only direct causation may cause liability.  Some of its cited cases do not discuss the issue, and one does not convey the meaning Fox contends; e.g.:

> The giving of the information or the making of the accusation, however, does not constitute a procurement of the proceedings that the third person initiates if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit.

Restatement (Second) of Torts § 653, comment d, at 408 (1977).  The inference is that "The giving of the information or the making of the accusation" *does* constitute procurement if the third

---

[20]  "Taking the record as a whole, we believe there was sufficient circumstantial evidence (had the jury found in Earle's favor on the substantive claims) for a reasonable jury to have inferred a **conspiracy** among the three troopers. The court's direction of a verdict was, therefore, erroneous."  <u>Earle v. Benoit</u>, *supra*.

person is controlled.

In fact, most cases hold a position contrary to that of FOX: i.e., it is immaterial whether the act directly or indirectly caused, for example, confinement or torts in general (i.e., assault, etc.).

A person may be liable for false imprisonment not only when the person's own acts directly impose a restraint upon the liberty of another but also when that person, by providing false information, causes such restraint to be imposed. Karjavainen v. Buswell, 289 Mass. 419, 427 (1935) (questioned on other grounds by Mezullo v. Maletz, 331 Mass. 233, 239-240 [1954]).  Restatement (Second) of Torts s 37 (1965) ("If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement").

Sarvis v. Boston Safe Deposit and Trust Co., 47 Mass.App.Ct. 86, 97-98 (1999).  This excerpt appeared in Comp. 34 n. 28.  Com. v. Santos, 58 Mass.App.Ct. 701, 705-706 (2003) (trespass and torts in general), citing Restatement (Second) of Torts §158(a) comment j: "If, by any act of his, the actor intentionally causes a third person ... to enter land in the possession of another, the actor is responsible for the third person's entry if it be a trespass") and Restatement (Second) of Agency §212 comment b (1958) ("If a person directs a particular act which is performed as directed, he is subject to liability if the act directed constitutes a tort."

A cause of action under Section(s) 1985(3) has four elements: (1) two or more persons must conspire, (2) to deprive, **either directly or indirectly**, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) one or more of the conspirators must have done or caused to be done an act in furtherance of the object of the conspiracy, and (4) the plaintiff must have suffered either an injury to person or property or a deprivation of a constitutionally protected right or privilege as a result of the conspiracy.

Andrade v. Jamestown Housing Authority, 82 F.3D 1179, 1192 (1st Cir. 1996) (emphasis supplied).\[21]/

---

[21]    Proof of an intent to restrain commerce having been shown, it is immaterial whether respondents' conspiracy is said to have directly or indirectly restrained commerce -- in either case there is a violation of the Sherman Act. Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 310.

Apex Hosiery Co. v. Leader, 310 U.S. 469, 1940.SCT.40618 at ¶22  <http://www.versuslaw.com> (1940).  United States v. Sawyer, 85 F.3d 713, 729, 1996.C01.0000299 at 729 (1st Cir. 1996) (bribery under M.G.L. c. 268A, §2(a)); DeMauro v. DeMauro, 215 F.3d 1311 (1st Cir. 2000) (RICO); United States v. Angiulo, 897 F.2d 1169 (1st Cir. 1990) (RICO); Associated General Contractors California v. California State Council Carpenters, 459 U.S. 519, 1983.SCT.40862 <http://www.versuslaw.com> (1983) (antitrust violation).

FOX further wrongly argued [FOX Mot. at 4] in a table that Meuse "admitted that FOX TV did not cause injury" to him of any of the counts\\[22]/,\\[23]/ Meuse admitted nothing. There was nothing to admit that he had not already stated or written. Meuse can only surmise from FOX's untrue assertion that FOX's counsel **(1)** did not read footnotes 25 and 28 of Meuse's complaint and/or **(2)** did not understand the well-settled law that "[h]e who acts through another acts him-self." Taylor v. State, 52 Md. App. 500, 506 n. 2 (1982), a case cited by FOX [FOX Mem. at 14 n. 7]. That is, if an act is done with the intent to commit a tort or to deprive another of his or her constitutional rights, and such act is the legal cause of the harm to or deprivation of the rights of another, it is immaterial whether the act directly or indirectly causes the harm or deprivation, it is immaterial whether one acts directly or indirectly if caused the tort or civil rights deprivation. *Cf.* Karjavainen v. Buswell, 289 Mass. at 427.

For expediting the determination of merits of FOX's motion and memorandum and Meuse's opposition, Meuse presents the following shorthand factual analysis of Counts 1-13:

| **Counts** | |
|---|---|
| **1** | violation of §1983: arrest: FOX TV owns the station on which AMW and Unsolved Mysteries were shown and on which the Broadcast was aired. The intention of FOX, AMW (republished poster for years until Complaint in this action was filed), the FBI, NCMEC (whose posters were used and were republished for several years) and Wal-Mart (whose stores were where they were displayed) was to accomplish the goal of arresting Meuse. The arrest of Meuse was one of the goals of the conspiracy. |
| **2** | violation of §1983: detention and confinement: Same as Count 1, with the additional goal to detain and confine. |
| **3** | violation of §1983: conspiracy: FOX was an integral part of the conspiracy. It supplied the nationwide publicity and awareness. It supplied the platform for AMW from the initial take-off through the time the Complaint in this action was served. |
| **4** | violation of §1983: refusing or neglecting to prevent: FOX not in this count. |
| **5** | malicious prosecution: Same as Count 1, with the additional goal of prosecution. |

---

[22]  Because no claim was alleged against Fox in Count 4, that count was excluded.

[23]  A further comment about the table. **If there is no state action, which is what FOX contends, then that is an admission by FOX that the interview of Prouty by the FOX reporter was not a governmental conference and did not contain "official" statements. If this court deems this true, then those of FOX's arguments which assert that the interview contained official statements must fail and no further analysis of them is needed.**

| 6  | <u>abuse of process</u>: Corporate profits, personal benefits such as career enhancement were the ulterior motives of the conspirators, including FOX.  If there were no benefit to FOX, there would have been no Broadcast. |
|----|----|
| 7  | <u>violation of Mass. Civil Rights Act (M.G.L. c. 12, sec. 11*l*)</u>:  The nationwide FOX Broadcast was used to threaten Meuse to turn himself and the child in.  The show gave impetus to the other co-conspirators to continue their appointed roles in the conspiracy. |
| 8  | <u>false arrest and imprisonment</u>: As a co-conspirator, FOX indirectly acted to cause the arrest and detention and confinement of Meuse. |
| 9  | <u>assault</u>: As a co-conspirator, FOX indirectly acted to cause the assault of Meuse. |
| 10 | <u>battery</u>: As a co-conspirator, FOX indirectly acted to cause the battery of Meuse. |
| 11 | <u>conspiracy</u>: FOX was directly involved in the conspiracy as a co-conspirator. |
| 12 | <u>defamation</u>: FOX was directly involved in the defamation of Meuse in the Broadcast. |
| 13 | <u>intentional infliction of emotional distress</u>: FOX was directly involved in the intentional infliction of emotional distress. |

## VIII.   **Extreme and outrageous conduct is not always an element of a claim for intentional infliction of emotional distress.**

"Extreme and outrageous conduct is not required if the emotional distress resulted from the commission of another tort".  <u>American Velodur Metal, Inc. v. Schinabek</u>. 20 Mass.App.Ct. 460, 470-471, *cert. denied* 396 Mass. 1101 (1985).  This statement of law appeared in note 34 at <u>Comp. ¶56</u>.  Thus, Count 13 of the Complaint must ***not*** be dismissed as to Fox TV.  *Cf.* <u>Nancy P. v. D'Amato</u>, 401 Mass. 516, 520-522 (1988).

With that said, this case is, indeed, one "in which 'the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"'  Restatement (Second) of Torts, § 46, *comment d* (1965)" [FOX Mem. at 16].

The child had serious mobility problems, which Meuse believed were caused by the mother's continual use of prescription drugs [<u>Comp. *passim*</u>].  Pane had cancelled the therapy visits for the child and no progress was being made [<u>Comp. *passim*</u>].  Fearing that his daughter's muscles were atrophying and that she would become permanently handicapped, either a paraplegic or quadriplegic [<u>Comp. ¶361</u>], he rescued the child from Florida and took her immediately to Bos-

ton's Children's Hospital and to diverse therapists.  After he made arrangements for medical and therapeutic care and an appointment at Boston Floating Hospital with an expert to diagnose the child's condition, Pane and Stults, who were informed of his efforts, cancelled all appointments he had set up for the child [Comp. ¶¶168-169].   Upon learning of the cancellations, Meuse dropped out of sight with the child.  That was on 5 October 2000.  Prior to that date, Meuse had been re-fused help by the police and more than two dozen judges\[24]/ to order the child returned to him in Massachusetts so that she would be assured of getting the requisite health care.  [Comp. ¶391].\[25]/ Everyone failed to act in the child's best interests.  Only Meuse and his family cared about her well-being.

After he had rescued the child, and was restoring her to health, the co-conspirators began spreading the word that Meuse was a fleeing felon.  Fortunately the child was able to sit up, hold things, and even run and smile before Meuse was captured and the child taken from him and re-turned back into harm's way with the negligent mother.  "Outrageous!" every average member of the community could yell against the co-conspirators, all of whom were acting only to feather their own personal nests and agendas.

## IX.    Where FOX was jointly engaged with the FBI, it was acting under color of law for purposes of §1983 actions.

FOX contends that it cannot be held liable on Meuse's federal civil rights claims because it is a private entity and was not acting under color of state law on 10 February 2000.   In Civil Ac-tion #01-CV-10890-RBC in this court, a defendant, like FOX, argued that she, too, was a private individual not acting under color of state law, the Magistrate/Judge wrote:

---

[24]   Massachusetts, including appellate panels, and Florida judges.

[25]   There also had been only the determination that Pane had unlawfully removed the child from Massachusetts [Comp. ¶64, Exh.. T].  More than a year later, on 30 July 2001, Judge Alan Swan wrote, "[T]here is still no order or judgment of custody" in the Probate & Family Court case entitled Meuse v. Pane" [Comp. ¶324].

Indeed, . . . there is case law to the effect that people who are solely complainants to, or witnesses for, the police in connection with a prosecution are not deemed to be state actors as a result. See, e.g., Grow v. Fisher, 523 F.2d 875, 879 (7th Cir., 1975). **That having been said, however, there is also case law supporting the proposition that to act under color of state law for §1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting see "under color" of law for purposes of §1983 actions.** Adickes v. S. H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 LEd.2d 142 (1970); United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966).

Dennis v. Sparks, 449 U.S. 24, 27 (1980) (footnote omitted) (emphasis supplied).  The First Circuit has reiterated the concept:

A private party's conduct is attributable to the state if the state "has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity." Barrios-Velazquez v. Asociacion De Empleados Del Estado LibreAsociado, 84 F.3d 487, 494 (1st Cir.l996) (citation and internal quotation marks omitted; alteration in the original).

Camilo-Robles v. Hoyos, 151 F.3d 1, 10 (1st Cir., 1998).

And in Wagenmann v. Adams, 829 F.2d 196, 209 (1st Cir. 1987), the court wrote:

Inasmuch as [he] is and was a private citizen, liability under 42 U.S.C. §1983 requires a showing that he collogued with state actors -- persons acting under color of state law -- to deprive the plaintiff of his civil rights. See Dennis v. Sparks, 449 U.S. 24, 27-28 (1980) ... Accord Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970); United States v. Price, 383 U.S. 787, 794 (1966). As the district court told the jury in its charge, "[a] §1983 defendant need not be an officer of the state.  **It is enough if he is a willful participant in joint activity with the state or its agents.**"

Wagenmann, at 209 (emphasis supplied).  The court presiding over #01-CV-10890-RBC continued:

**. . . Whether the evidence adduced in discovery will ultimately support the allegations that these two defendants are involved to a more "significant and blameworthy degree" is a question not yet ripe for decision.**

and then concluded:

As just noted, however, the plaintiff does assert that Dxxx and Pxxxx provided false information to the Boston police officers in order to obtain his arrest.[FN12]  The defendants' factual foundation is faulty, and, as a consequence, their argument is unpersuasive. Counts 6, 7 and 9 shall not be dismissed.

FOX also relies on <u>Slotnick v. Garfinkle</u>, 632 F.2d 163 (1st Cir. 1980), as being supportive of its contention that it was not a state actor on 10 February 2000.  In <u>Slotnick</u>, the private attorneys only participated in litigation.  <u>Id</u>., at 166.   It also appears that of the six private attorneys, three of them did not testify; they only appeared in court.  Two of them represented their associate, Defendant Garfinkle.  Garfinkle had petitioned the court to find Slotnick in contempt for violating an order prohibiting Slotnick from slandering Garfinkle.  Without more, participation as a litigator does not constitute state action.  <u>Id</u>.  Slotnick also failed to plead any facts whatsoever supporting his claim that the defendants conspired to commit him to a state hospital.   Clearly, there is nothing in <u>Slotnick</u> which is remotely similar to FOX's conduct in creating the Broadcast and falsely reporting to the nation that Meuse was an abductor and fugitive fleeing to avoid prosecution.

WHEREFORE, Plaintiff Brian Meuse prays this Court deny FOX TV's motion to dismiss.

Respectfully submitted,
BRIAN J. MEUSE,
By his attorney,

/s/Barbara C. Johnson <barbaracjohnson@worldnet.att.net>

24 May 2004                          Barbara C. Johnson, Esq., BBO #549972
                                     6 Appletree Lane
                                     Andover, MA 01810-4102
                                     978-474-0833

## AFFIDAVIT

I, Barbara C. Johnson, Esq., hereby depose that all statements and observations I attribute to myself saying or observing are true, and all other statements are true upon information and belief.
Sworn under the pains and penalties of perjury.

/s/Barbara C. Johnson <barbaracjohnson@worldnet.att.net>

24 May 2004                          Barbara C. Johnson, Esq., BBO #549972

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served by first-class mail upon each party not receiving ECF notification on 24 May 2004.

24 May 2004                          /s/Barbara C. Johnson <barbaracjohnson@worldnet.att.net>

| TABLE 1.   FLOW CHART OF CONSPIRATORIAL ACTS WITH INTENT TO CAPTURE MEUSE AND DEPRIVE HIM OF HIS LIBERTY | | |
|---|---|---|



**SUSAN PANE & ROSALYN STULTS**

• Pane called Detective Moynihan "quite often" [Comp. ¶296], [Comp.¶¶268-316, *passim*], and with Captain Thompson

• Stults communicated with the Haverhill police [Comp. ¶¶330, 334, 369],

• Pane conversed "quite often" with FBI Agent Kelly re investigation [Comp. ¶295],

• Stults communicated with the FBI [Comp. ¶¶284, 335].

• between October 2000 and 22 March 2001, Pane had about 50 conversations with different organizations, including **NCMEC** [Comp. ¶298],

• Pane provided the organizations current pictures, height, weight, skin color, sufficient information so that the organizations could put together a package, including a poster, for distribution [Comp. ¶299],

• Pane made 500 posters at a time, provided them to the **NCMEC** in the very beginning of October 2000, distributed them throughout many states, and hung them in laundromats, grocery stores, other stores, hotels, gas stations in Massachusetts generally, the Haverhill and Methuen areas in particular, and in many, many towns in New York [Comp. ¶300].

**CAPT. DT DET. DM**

communicated with FBI regularly [Comp.¶¶268-316, 419, *passim*]

**FBI**

**Agent Kelly to his boss**

↓

**Agent Prouty**

[Comp. ¶269]

**NCMEC**

which, according to Kenney v. Wal-Mart Stores, Inc., approved posters.

It is still unknown to Meuse of what NCMEC's approval process consists.

NCMEC, also, according to Kenney v. Wal-Mart Stores, Inc., shipped the approved posters to Wal-Mart. See Comp. ¶306.

Member, Missing Children's Network

**to Wal-Mart**

**WAL-MART**

Wal-Mart is a Premier partner of NCMEC.

Wal-Mart received so-called approved poster from NCMEC and then distributed them to i stores nationwide. Kenney, *supra*

Meuse was recognized in the poster by a woman in Ada, Oklahoma, and reported his presence in the area to the Ada police [Comp. ¶¶382-396],

The Ada police then seiged the home of Meuse and the child.

Member, Missing Children's Network

**AMW**

**America's Most Wanted**

Broadcast on 10 February 2001

Posters [Comp. ¶¶304-305. 310-312].

AMW is a Gold partner of NCMEC [Comp. ¶13]

Member of the ,Missing Children's Network

**FOX TV**

Broadcast on 10 February 2001, both AMW and Unsolved Mysteries, on which Agent Prouty's private interview was aired [Comp. ¶¶310-314, 325-326, 420-422, 425, 429, Exh. FF and GG].

According to Moynihan's trial testimony, the FBI set up the (FOX TV) "FBI Most Wanted Show: through Wal-Mart" [Comp. ¶¶303-305].

Member, Missing Children's Network