UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

| | |
|---|---|
| BRIAN J. MEUSE,<br>   Plaintiff,<br>v.<br>SUSAN PANE, et al.,<br>   Defendants. | Civil Action No. 04-10255-EFH<br><br>MEMORANDUM IN SUPPORT OF<br>MOTION OF STF PRODUCTIONS, INC. TO<br>DISMISS COMPLAINT |

Pursuant to Fed. R. Civ. P. 12(b)(6), defendant STF Productions, Inc. ("STF") moves to dismiss all counts of the Second Amended Verified Complaint ("Complaint") of plaintiff Brian J. Meuse ("Plaintiff" or "Meuse") with respect to STF. The allegations against STF arise from the posting of an Internet web page involving the Plaintiff and law enforcement efforts to locate a missing child (the "AMW Poster"), and STF's alleged sponsorship of a television program that displayed a wanted poster of the Plaintiff.

The grounds on which the Complaint against STF should be dismissed are similar in most respects to the grounds on which defendant Fox Television Stations, Inc., has moved to dismiss the Complaint.[1] Exhibit A to STF's motion is a chart summarizing the reasons why each of the Plaintiff's claims must be dismissed against STF; Exhibit B to the motion is a chart reproducing the allegations of the Complaint specifically referring to STF. Dismissal is particularly warranted in this case in order to protect the First Amendment rights of the media and the strong public interest in media participation in efforts to locate missing children; these efforts would be chilled even if STF were subject to costly discovery, but not trial, in a meritless case.

FACTUAL BACKGROUND

This case arises out of a custody dispute regarding the Plaintiff's daughter, Marissa. On October 1, 2000, the Plaintiff went to Florida for "a week's visitation" with Marissa and

---

[1] Material differences exist in Sections II (discussing the application of the fair report privilege to the Internet), IV.B.2 (discussing allegations of "sponsorship" of a third-party broadcast) and V (discussing recent case law regarding dismissal of claims under 42 U.S.C. § 1983).

1

promptly flew her out of Florida to Massachusetts. Complaint, ¶¶ 152-64. The Plaintiff then "dropped out of sight with the child" on or about October 5, 2000. Id., ¶ 170. The Plaintiff was arrested in Oklahoma on March 22, 2001, after a national search. Id., ¶¶ 378-80. The Plaintiff alleges that, during this search, STF posted the AMW Poster on the "America's Most Wanted Website." Id., ¶¶ 305, 422. Subsequently, the word "Recovered" appeared over Marissa's picture on the AMW Poster, instead of the word "Missing." Id., ¶ 317. At a criminal trial ending on May 23, 2002, the Plaintiff was found "not guilty." Id. at ¶ 395.

## ARGUMENT

I. THE COMPLAINT DOES NOT STATE A CLAIM THAT SATISFIES THE STANDARDS OF RULE 12(b)(6).

The Plaintiff's Complaint must be dismissed because the Complaint fails to plead any actionable claim against STF. To survive a motion to dismiss, the Plaintiff has the burden of pleading the necessary factual averments with respect to each material element of each underlying legal theory. Fleming v Lind-Waldock & Co., 922 F.2d 20, 24 (1st Cir. 1990). While a court must take as true the plaintiff's assertions of fact, the court need not accept legal conclusions or "bald assertions." See New Eng. Cleaning Services v Am. Arbitration Ass'n, 199 F.3d 542, 545 (1st Cir. 1999). "[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome. Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition." DM Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999) (italics in original). "[I]f the facts narrated by the plaintiff do not at least outline or adumbrate a viable claim, his complaint cannot pass Rule 12(b)(6) muster." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988).

2

Dismissal of the Plaintiff's claims is particularly appropriate in this case, given the First Amendment rights of STF. Resolution prior to trial is "especially favored in defamation cases" under Massachusetts law. King v. Globe Newspaper Co., 400 Mass. 705, 708 (1987) (summary judgment case). Where First Amendment rights are implicated, "the stake…is free debate. …The threat of being put to the defense of a lawsuit…may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." Cefalu v. Globe Newspaper Co., 8 Mass. App. Ct. 71, 74 (1979). Even if a defendant in a libel case is ultimately successful at trial, the costs of litigation may induce undesirable self-censorship. King, 400 Mass. at 708.

## II. THE PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE THE AMW POSTER WAS PRIVILEGED AS A FAIR REPORT OF GOVERNMENTAL ACTIVITY.

The only action that the Plaintiff alleges that STF took toward him in this case was the posting of the AMW Poster.[2] However, the Plaintiff is barred from asserting claims arising out of the AMW Poster, because, on the allegations of the Complaint, the AMW Poster is privileged against defamation and other tort claims as a fair report of government activity. Specifically, the AMW Poster is a fair report of the FBI's public statements regarding the charges against the Plaintiff, and is therefore not actionable as discussed below.

### A. The AMW Poster is Privileged as a Fair Report of the FBI's Public Statements.

On the allegations of the Complaint, the AMW Poster states that Marissa Meuse was abducted by the Plaintiff and that an "FBI warrant for Unlawful Flight to Avoid Prosecution was issued for the abductor." Complaint, ¶¶ 305, 317-18, and image at pp. 32-33. The AMW Poster accurately reproduces information contained in posters that the Plaintiff admits were publicly released by the FBI. See Complaint, ¶¶ 310, 312 and Exs. FF, GG. Thus, the Plaintiff's claims

---

[2] There is also a cryptic reference in Count 12 of the Complaint to "sponsorship" of a television show on ABC. See ¶¶ 506-09. This allegation is addressed in Section IV.B.2, below, and does not affect this analysis.

must be dismissed, because, on the face of the Complaint, the AMW Poster was privileged against liability as a fair report of governmental actions.

"There is a well established privilege to publish reports of judicial, legislative, or other official proceedings." Jones v. Taibbi, 400 Mass. 786, 794 (1987). As set forth in ELM Med. Lab., Inc. v. RKO Gen., Inc., 403 Mass. 779 (1989):

> The [fair report] privilege recognizes that (1) the public has a right to know of official government actions that affect the public interest, (2) the only practical way many citizens can learn of these actions is through a report by the news media, and (3) the only way news outlets would be willing to make such a report is if they are free from liability, provided that their report was fair and accurate.

Id. at 782. See also Yohe v. Nugent, 321 F.3d 35, 43 (1st Cir. 2003). Because "[a]n arrest by an officer is an official action, ... a report of ... the charge of crime made by the officer in making or returning the arrest" is within the fair report privilege. Yohe, 321 F.3d at 43. Likewise, a report of public statements made by governmental officials is also privileged as a fair report. See Yohe, 321 F.3d at 44 (fair report privilege applies to statements made by police chief in interview); ELM Med. Lab., 403 Mass. at 783 (extending fair report privilege to reports of health warnings by Department of Health whether issued in "a news release or in interviews with officials"). The privilege extends to publications on the internet as well as traditional media. See, e.g., Misek-Falkoff v. McDonald, 177 F. Supp. 2d 224, 231-32 (S.D.N.Y. 2001) (fair report privilege bars claims against author of law journal article published both in print and on World Wide Web).[3]

This " 'fair report privilege'... allows those who fairly and accurately report certain types of official or governmental action to be immune from liability for claims arising out of such reports." ELM Med. Lab., 403 Mass. at 782. A report of government activity does not need to attribute each quote or statement to an official document or proceeding; "[r]ather, it is necessary

---

[3] "The proper scope of the fair report privilege is a matter of law appropriate for summary disposition." Brown v. Hearst Corp., 862 F. Supp. 622, 629 (D. Mass. 1994).

4

only that, when considered in context, it is clear that the article is quoting, paraphrasing or otherwise drawing upon official documents or proceedings." Pittman v. Gannett River States Publ'g Corp., 836 F. Supp. 377, 383 (S.D. Miss. 1993). A report need only give "a rough-and-ready summary that was substantially correct" in order to qualify for the fair report privilege. MiGi, Inc. v. Gannett Mass. Broadcasters, Inc., 25 Mass. App. Ct. 394, 396 (1988). A report is substantially correct "if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." Yohe, 321 F.3d at 43.[4]

Importantly, the Plaintiff does not allege that STF repeated the content of the FBI posters inaccurately; rather, he asserts that the official statements themselves were untrue. See, e.g., Complaint, ¶ 495. However, the test of substantial accuracy requires an accurate report of what government officials say and do; it does not concern the truth of the statements made by officials or of any underlying charges. According to the Massachusetts Appeals Court,

> Such a privilege would not be lost if the substance of the official statement, and hence of the report, was false; indeed, according to an emergent rule, the privilege should not be forfeited even if the party making the report knew the statement to be false.

MiGi, 25 Mass. App. Ct. at 397; see also Yohe, 321 F.3d at 44. Thus, even if the charges made were false (which STF does not concede), the report of those charges is privileged against claims arising out of the report. MiGi, 25 Mass. App. Ct. at 396.

---

[4] Any suggestion that the AMW Poster was not precise in its legal terminology is entitled to no weight. "[A] journalist's report need not describe legal proceedings in technically precise language," if it meets "a common sense standard of expected lay interpretation." Ricci v. Venture Magazine, Inc., 574 F. Supp. 1563, 1567 (D. Mass. 1983); see also Riley v. Harr, 292 F.3d 282, 296-97 (1st Cir. 2002) (quoting Ricci). Thus, for example, a report that a parent had "kidnapped" his daughter was held to be protected as a fair report because, even if the precise charge against the plaintiff was removal of a child in violation of the Hague Convention, the report was "substantially the same in its gist or sting." Harrison v. Chicago Sun-Times, Inc., 341 Ill. App. 3d 555, 572 (2003).

Furthermore, the Plaintiff's allegations do not indicate that STF abused the fair report privilege. See Yohe, 321 F.3d at 44; see also Foley v. Polaroid Corp., 400 Mass. 82, 94 (1987). As the Massachusetts Appeals Court has recognized,

> It is often said that the benefits of [the fair report] privilege are forgone where a complainant shows that the reporter was actuated by malice toward him. But "malice" would require some redefinition if it were taken not to comprehend knowing falsehood; perhaps repetition of such falsehood with a purpose to do the complainant maximum injury would still qualify as malice.

MiGi, 25 Mass. App. Ct. at 397; see also Yohe, 321 F.3d at 44. There is no allegation in the Complaint to the effect that that STF published the AMW Poster "to do the complainant maximum injury," and thus, there is no basis to find that the defendants abused the privilege, and liability cannot attach. Cf. Friedman v. Israel Labour Party, 957 F. Supp. 701, 714-15 (E.D. Pa. 1997) (plaintiff failed to show abuse of fair report privilege where plaintiff did not demonstrate that sole motivation for article was intent to injure him).

    B.    <u>Events Occurring Subsequent to the Publication of the AMW Poster Do Not Affect the Fair Report Privilege.</u>

As discussed above, STF's Internet publication of the original AMW Poster, and of the subsequent fact that Marissa was "recovered," is protected as a fair report of government activity as of the time of publication. STF's publication remains privileged, even though there were post-publication events such as the Plaintiffs' trial and a jury verdict. Thus, as discussed below, the Plaintiff's allegation, that the AMW Poster did not indicate that he was "found Not Guilty by a jury of his peers" (see Complaint, ¶ 319), does not affect the privilege.

A publisher is not required to publish a balanced report to qualify for the fair report privilege. In Alfego v. Columbia Broad. Sys., Inc., 7 Med. L. Rptr. 1075 (D. Mass. 1981), the plaintiff claimed that he had been libeled by a broadcast indicating that he had taken his child in violation of a custody order, and argued that the fair report privilege did not apply because the

broadcast did not mention the plaintiff's visitation rights or the fact that the child's mother had been required to post a court-ordered bond. The U.S. District Court for the District of Massachusetts rejected this argument:

> The requirement of substantial accuracy does not prevent broadcasters from airing films which present a specific point of view, nor does it mandate the inclusion of every fact and detail sympathetic to each side of an issue. It is necessary only that the facts which are selected for presentation be substantially true and accurate and not distortive of the underlying event.

Id. at 1076. See also Kenney v. Scripps Howard Broad. Co., 28 Med. L. Rptr. 2512, 2519 (W.D. Mo. 2000), aff'd 259 F.3d 922 (8th Cir. 2001) (broadcast report of possible abduction of child by parent was fair report, despite omission of fact that there was no custody order in effect regarding child). In the case at bar, the underlying events with which the AMW Poster was concerned were Marissa's disappearance and her recovery, and, in context, the AMW Poster could not be construed as an ongoing report of the Plaintiff's prosecution. Although the Plaintiff might have wished that more favorable information had been posted after his trial, the AMW Poster remained a fair report of Marissa's disappearance and of FBI efforts to locate Marissa and recover her from the Plaintiff.

Indeed, the AMW Poster never accuses Meuse of being guilty of the charges against him; rather, it simply states that certain charges were made. These statements were, and still remain, an accurate report of the FBI statements acknowledged by the Plaintiff. The Supreme Judicial Court has recognized that, as a matter of law, an article identifying criminal charges filed against a plaintiff cannot be read to accuse the plaintiff of being guilty of those charges. See Foley v. Lowell Sun Publ. Co., 404 Mass. 9, 11 (1989) (article reporting plaintiff's arrest on charge of assaulting officer could not be read as accusing plaintiff of assaulting officer).

7

Requiring website publishers to maintain updated, current reports of government activity in order to qualify for the fair report privilege would undermine the protection granted by the courts to the development of the communicative aspects of the Internet. The U.S. Supreme Court has recognized that, "[f]rom the publisher's point of view, [the World Wide Web] constitutes a vast platform from which to address and hear from a worldwide audience of millions of readers, viewers, researchers, and buyers." Reno v. American Civil Liberties Union, 521 U.S. 844, 853 (1997). In order to protect this electronic forum, courts have extended to the Internet the protections accorded to traditional media, rejecting distinctions based upon the nature of electronic communication. See, e.g., Mitan v. Davis, 243 F. Supp. 2d 719, 724 (W.D. Ky. 2003) ("A statement electronically located on a server which is called up when a web page is accessed, is no different from a statement on a paper page in a book lying on a shelf which is accessed by the reader when the book is opened.").

For example, in the context of the "single publication rule,"[5] the Court of Appeals of New York has rejected the argument that Internet publishers should be held to a higher standard than traditional media because websites can be modified after publication. Recognizing that "many Web sites are in a constant state of change," the Court of Appeals held that failing to apply the single publication rule "would either discourage the placement of information on the Internet or slow the exchange of such information, reducing the Internet's unique advantages." Firth v. State, 98 N.Y.2d 365, 371-72 (2002). Similarly, courts have held that a decision not to update a website does not subject an Internet publisher to liability. See, e.g., Van Buskirk v.

---

[5] The "single publication rule" provides that, no matter how many copies of a particular writing are published and no matter for how long the publication is available, any given writing gives rise to only a single cause of action accruing at the time that the writing was first published. See, e.g., Firth v. State, 98 N.Y.2d 365, 369 (2002). The rule was developed in response to the advent of mass media publication, in order to prevent "exposure of publishers to stale claims," and "a multiplicity of actions, leading to potential harassment and excessive liability, and draining of judicial resources." Id. at 369-70.

8

New York Times Co., 28 Med. L. Rptr. 2525, 2526-27 (S.D.N.Y. 2000), aff'd 325 F.3d 87 (2d Cir. 2003) (dismissing libel claim based on website on statute of limitations grounds, and rejecting argument that failure to withdraw websites is equivalent to decision to republish "every minute of every day").

There can be no basis for the Plaintiff to claim that, in order to qualify for the fair report privilege, publishers of Internet websites regarding government activity should have to watch out for months or years after publication for developments that might occur (as in this case, where the Plaintiff's trial ended over a year after Marissa's recovery, see Complaint, ¶¶ 380, 395). This Court should reject as unfounded in law any interpretation of the fair report privilege that would deter publishers from using the Internet to communicate government activities to the public, and that would thus violate the rights and policies that the fair report privilege is intended to protect.

C. The Fair Report Privilege is Not Limited to Claims for Defamation, and Bars All State and Federal Claims Based Upon the STF AMW Poster.

The fair report privilege renders STF immune from liability for any claim arising out of the AMW Poster, whether or not the claim is described as an action for defamation, because the privilege reflects First Amendment values and applies regardless of how the Plaintiff has phrased his Complaint. Thus, the First Circuit has rejected the argument that a statement can be privileged against a defamation claim as a fair report, yet nevertheless remain actionable for intentional infliction of emotional distress, stating, "[A] plaintiff cannot evade the protections of the fair report privilege merely by re-labeling his claim." Yohe, 321 F.3d at 44. In reaching its holding in Yohe, the First Circuit recognized the constitutional dimension of the fair report privilege when it cited to cases involving the application of First Amendment protections to non-defamation claims. See Yohe, 321 F.3d at 45, citing Hustler Magazine v. Falwell, 485 U.S. 46, 56-57 (1988) and Brown v. Hearst Corp., 54 F.3d 21, 27 (1st Cir. 1995). See also Misek-

9

Falkoff, 177 F. Supp. 2d at 231-32 (publication, "not so removed from the facts as to lose its First Amendment protection as a fair report of a public judicial proceeding," was privileged against civil rights claim, defamation claim, and various other tort claims); Restatement (Second) of Torts § 611, *Comment b* (1977) ("If the report of a public official proceeding is accurate or a fair abridgment, an action cannot constitutionally be maintained[.]").[6]

In this case, and in light of the constitutional values reflected in the fair report privilege, this Court should find that the privilege overrides the Plaintiff's federal statutory claims, as well as his state law causes of action. Accordingly, all of the Plaintiff's claims against STF must be dismissed, to the extent that they are based upon the privileged AMW Poster.

III. THE PLAINTIFF'S CLAIMS UNDER 42 U.S.C. § 1983 AGAINST STF MUST BE DISMISSED.

Counts 1, 2 and 3 of the Complaint, which allege civil rights violations pursuant to 42 U.S.C. § 1983,[7] must also be dismissed because the Plaintiff has not stated a claim under that statute. Under § 1983, the plaintiff must demonstrate that the defendant (1) acted "under color of state law," and, while acting under color of law, (2) deprived the plaintiff of "a right secured by the Constitution or laws of the United States." American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). The Complaint fails to allege facts sufficient to meet either requirement.

A. STF Did Not Act "Under Color of State Law."

STF was a private actor, and as such, the Plaintiff's § 1983 claims must be dismissed because STF did not act "under color of law." The "under color of law" element of § 1983 excludes from its reach "merely private conduct, no matter how discriminatory or wrongful."

---

[6] For a further discussion of the interaction of the First Amendment and the fair report privilege, see Medico v. Time, Inc., 643 F.2d 134, 143-46 (3rd Cir. 1981).

[7] Count 4 of the Complaint, which alleges violations of 42 U.S.C. § 1983 for "Refusing or Neglecting to Prevent," is not alleged against STF. Even if Count 4 had been so alleged, it would fail for the same reasons as Counts 1 – 3.

10

American Mfrs. Mut. Ins. Co., 526 U.S. at 50.  Where a private party such as STF is a defendant in a § 1983 action, a plaintiff must demonstrate that the private party acted jointly with state actors to deprive the plaintiff of his civil rights.  See Alexis v. McDonald's Restaurants of Mass., Inc., 67 F.3d 341, 351 (1st Cir. 1995).  The Plaintiff has failed to do so here.

General allegations of cooperation between private entities and government agencies are not sufficient to sustain a cause of action under § 1983; rather, "[i]t is appropriate to require that the relationship or nature of cooperation between the state and a private individual be pled in some detail."  Glaros v. Perse, 628 F.2d 679, 685 (1st Cir. 1980).  "Even a considerable degree of cooperation between a private party and the state does not, standing alone, justify a finding that the challenged action…occurred under color of state law."  Jones v. Taibbi, 508 F. Supp. 1069, 1073 n.7 (D. Mass. 1981), citing Rendell-Baker v. Kohn, 641 F.2d 14, 24 (1st Cir. 1981) (internal citations omitted).

This is particularly true when a plaintiff attempts to hold the media liable as a state actor. "Attempts to charge the media with state action have generally met with a cool reception in the courts," Jones, 508 F. Supp. at 1073 n.6 (citing cases), because interaction and exchange of information between the media and state officials is part of normal newsgathering activity, and is not, in itself, sufficient "state action" to give rise to a § 1983 claim against the media.  In Jones, a reporter agreed to delay broadcasting certain information about a suspect, in exchange for the police permitting the reporter to be present if and when they arrested the suspect.  508 F. Supp. at 1071.  The court stated that "Taibbi and the LAPD had a coincidence of interest in the plaintiff as a suspect, but not the concert of involvement that would transform Taibbi's telecast from a private venture to action taken under color of state law."  Id. at 1073.  The court further noted that the ultimate decision of when and whether to broadcast this information was that of the

reporter alone, not that of the police, and refused to "deputize" the media merely because its broadcasting decisions are "of some ancillary benefit and assistance to the police." Id. at 1074.

Thus, in this case, STF's decision to disseminate information provided by state and federal officials regarding the Plaintiff did not deputize STF and transform the private company into a state actor for purposes of § 1983. Because STF's actions were not "under color of law," Plaintiff's claims against STF pursuant to § 1983 must be dismissed.

### B. STF is Not Alleged to Have Deprived the Plaintiff of a Right or Privilege Secured by the Constitution or the Laws.

The Plaintiff's § 1983 allegations also fail to state a claim that STF deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. The Plaintiff's allegations of actions taken by STF suggest nothing more than a state common-law tort claim (specifically, a claim for defamation). See Complaint, ¶¶ 495, 508. As here relevant, the U.S. Supreme Court has held that neither state nor private actors can be held liable under § 1983 merely because there exists a common law cause of action for injuries allegedly sustained. See Paul v. Davis, 424 U.S. 693, 712 (1976). Although common law causes of action recognize certain legal interests (such as the plaintiff's reputation in a defamation claim), "any harm or injury to that interest, even where as here inflicted by an officer of the State, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law." Id.; see also Aponte v. Calderón, 284 F.3d 184, 195 (1st Cir.), cert. denied 537 U.S. 886 (2002) (state tort claim for defamation does not amount to claim of deprivation of rights under Due Process Clause).[8] Thus, the Plaintiff fails to state a § 1983 claim, and these counts must be dismissed.[9]

---

[8] The First Circuit has adopted the "defamation-plus" test, which requires that injury to reputation be "accompanied by a change in the injured person's status or rights" to give rise to a § 1983 claim. Aponte, 284 F.3d at 196. No such change in status as a result of STF's actions has been alleged here. Business and reputation losses alone do not constitute the "plus" that is required to transform an ordinary defamation claim into a claim under § 1983. See Buckey v. County of Los Angeles, 968 F.2d 791, 795 (9th Cir. 1992).

IV. THE PLAINTIFF'S STATE LAW CLAIMS MUST BE DISMISSED BECAUSE THE PLAINTIFF ADMITS THAT STF DID NOT CAUSE THE ALLEGED TORTS.

The Plaintiff's state law claims are all based upon the allegation that STF is somehow responsible for acts committed by third parties, primarily in the course of the Plaintiff's arrest, detention and confinement. However, Counts 5 through 10 and 13 must be dismissed on the grounds that the Plaintiff has failed to plead facts to support the claim that STF caused these actions. Furthermore, certain state law claims, including the plaintiff's defamation claim (Count 12), must also be dismissed for other reasons.[10]

    A.     <u>Counts 5 through 10 and Count 13 Against STF Must Be Dismissed Because the Plaintiff Cannot Show that STF Caused Plaintiff's Alleged Injuries.</u>

Counts 5 through 10 and Count 13 of the Complaint (malicious prosecution, abuse of process, violation of the Massachusetts Civil Rights Act ("MCRA"), false arrest and imprisonment, assault, battery, and intentional infliction of emotional distress, respectively) all must be dismissed for failure to allege that actions attributable to STF were the cause of any alleged injuries to the Plaintiff. For each of these state law claims, there must be a direct causal link between STF's conduct and any injury caused. <u>See</u> Restatement (Second) of Torts, § 653 and *comment d* (1977) (malicious prosecution); <u>Jones v. Brockton Pub. Markets, Inc.</u>, 369 Mass. 387, 389 (1975) (abuse of process); <u>Therrien v. Hamilton</u>, 849 F. Supp. 110, 115 (D. Mass. 1994) (violation of the Massachusetts Civil Rights Act); <u>Karjavainen v. Buswell</u>, 289 Mass. 419, 427 (1935) (false arrest and imprisonment); <u>Perras v. Hi-Hat, Inc.</u>, 326 Mass. 78, 80-81 (1950) (assault and battery); <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 145 (1976) (intentional

---

[9] The Plaintiff has admitted that STF did not cause any other deprivation of rights that might support a Section 1983 claim. While the Plaintiff has separately alleged injuries from his arrest, detention, confinement and prosecution, he has admitted that these events were the result of two women recognizing him from a wanted poster in a Wal-Mart. See Complaint, ¶¶ 382-83.

[10] Count 11, the Plaintiff's state law conspiracy claim, is dealt with separately in Section V, below.

infliction of emotional distress). Critically, however, the Plaintiff does not allege any direct action by STF toward him as a basis for any of these claims, see Complaint, ¶¶ 441-87, 513-21; thus, the Plaintiff must allege facts to show that STF was responsible for causing third parties to commit the tortious acts. On the admitted facts of the Complaint, the Plaintiff cannot meet this burden, and these claims must be dismissed.

By the time that the AMW Poster was published, state and federal law enforcement were already in pursuit of the Plaintiff. See, e.g., id., ¶¶ 215, 315. Nor is the AMW Poster alleged to have induced any third parties to take any actions toward the Plaintiff; as discussed above, the Plaintiff admits that the AMW Poster was not the impetus for the Plaintiff's arrest, detention, and confinement. See id., ¶¶ 382-83 (admitting that the Plaintiff was arrested after two women in Oklahoma saw a wanted poster of Meuse in a Wal-Mart and contacted the police about having seen Meuse with his daughter at a nearby laudromat).

Thus, there is no claim for malicious prosecution and abuse of process, because STF cannot, on the face of the Complaint, be found to have instituted or to have had any control over the institution of criminal proceedings against Meuse. See Restatement (Second) of Torts, § 653, *Comment d* (1977) ("the giving of the information or the making of the accusation…does not constitute a procurement of the proceedings that the third person initiates if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit"); Jones v. Brockton Pub. Markets, Inc., 369 Mass. at 389 (to survive Rule 12(b)(6) motion, plaintiff must allege facts to support claim that defendant's actions caused damage from abuse of process). Likewise, the admissions discussed above demonstrate that STF did not induce or compel the arrest, detention and confinement that form the bases of the Plaintiff's MCRA claim (see Complaint, ¶¶ 465-70), false arrest and imprisonment claim (see id., ¶¶ 471-78), assault claim

14

(see id, ¶¶ 479-83), battery claim (see id, ¶¶ 484-87), and intentional infliction of emotional distress claim (see id, ¶¶ 513-21).

Under the facts set forth in the Complaint, the AMW Poster did not directly cause the Plaintiff's alleged harms, and did not indirectly compel or induce any third party to commit the acts alleged. Therefore, Counts 5 through 10 and Count 13 against STF must be dismissed.

    B.    The Plaintiff's MCRA, Defamation and Intentional Infliction of Emotional Distress Claims Also Must Be Dismissed Because the Nature of the Conduct Alleged Does Not Satisfy the Requirements of Those Claims.

        1.    *The Plaintiff has not pleaded that STF used threats, intimidation, or coercion in violation of MCRA.*

The Plaintiff's MCRA claim (Count 7) also must be dismissed because the Complaint does not allege facts supporting an allegation that STF used threats, intimidation, or coercion to interfere with the Plaintiff's rights. To state a claim under the MCRA, the plaintiff must demonstrate that the defendant (1) interfered with or attempted to interfere with (2) his exercise or enjoyment of rights secured by the constitution or laws of the United States, or by the constitution or laws of the commonwealth (3) by means of threats, intimidation or coercion. See G.L. c. 12, §§ 11H, 11I (1979); Columbus v. Biggio, 76 F. Supp. 2d 43, 54 (D. Mass. 1999), citing Freeman v. Planning Bd. of West Boylston, 419 Mass. 548, 564 (1995).

By enacting the MCRA, "the legislature did not intend to create a vast constitutional and statutory tort." Freeman, 419 Mass. at 565 (citation omitted). The legislature's requirement of "threats, intimidation, or coercion" was specifically intended to limit defendants' liability under the Act. Id. at 565-66. A "threat" under the MCRA requires an "intentional exertion of pressure to make another fearful or apprehensive of injury or harm;" "intimidation" requires "putting [a person] in fear for the purpose of compelling or deterring conduct;" and "coercion" requires the "application to another of such force, either physical or moral, as to constrain him to do against

15

his will something he would not otherwise have done." Anderson v. Boston Sch. Comm., 105 F.3d 762, 766 (1st Cir. 1997). The Complaint provides absolutely no foundation for the allegation that the AMW Poster constituted "threats, intimidation, or coercion," as thus defined. Even if the AMW Poster had threatened the Plaintiff's arrest, a threat to use lawful means to reach an intended result is not actionable under the MCRA. See, e.g., Sena v. Commonwealth, 417 Mass. 250, 263 (1994) (defendant's implicit threat to obtain a warrant and arrest the plaintiff through lawful means was not actionable under the MCRA).

Additionally, as with 42 U.S.C. § 1983, an MCRA claim requires an "actual deprivation of constitutional rights." See Therrien v. Hamilton, 849 F. Supp. 110, 115 (D. Mass. 1994), *citing* Elwood v. Pina, 815 F.2d 173, 177 (1st Cir. 1987). As discussed in Section III.B, above, defamation injuries are not a "deprivation of constitutional rights," and the Plaintiff has admitted that STF caused no injury to liberty or property interests that would constitute such a deprivation. Accordingly, the Plaintiff's MCRA claim must be dismissed as against STF.

2. *STF cannot be held liable for defamation based upon the mere sponsorship of a television broadcast.*

Count 12 of the Complaint (defamation) does not mention the privileged AMW Poster; rather, the Plaintiff alleges that STF "sponsored" a broadcast on the ABC television network which included a "Wanted poster" regarding Marissa and the Plaintiff. Complaint, ¶¶ 506-09. The Plaintiff neither identifies what, if anything, was false or defamatory about the "Wanted poster," nor alleges that this poster is the AMW Poster. Id. Even if the Plaintiff had made such allegations, this claim would fail based upon the fair report privilege, as discussed in Section II, above. Moreover, even if it were true that STF had sponsored an ABC television show (which it is not), mere sponsorship of a television program does not render a sponsor liable for defamation, when there is no allegation that STF had any control over the content of the alleged broadcast.

16

See Snowden v. Pearl River Broadcasting Corp., 251 So.2d 405, 411 (La. App. 1971) (sponsor of radio broadcast not liable for content of broadcast over which sponsor had no control). Thus, any such claim must be dismissed.

> 3. *The Plaintiff's claim for intentional infliction of emotional distress also must be dismissed because the actions attributed to STF's actions were not "extreme and outrageous."*

Count 13 of the Complaint alleges that STF intentionally inflicted emotional distress upon the Plaintiff. As with his defamation claim, the Plaintiff has not claimed that the privileged AMW Poster caused his alleged distress. See Complaint, ¶¶ 513-21. However, even if he had done so, the Plaintiff has not pleaded any facts to support the claim that STF's conduct was "extreme and outrageous." Therefore, this claim as to STF must be dismissed.

In order to state a claim for intentional infliction of emotional distress, the plaintiff must set forth sufficient facts to demonstrate, among other things, that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See Flibotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 27 (1st Cir. 1997). The case must be one in which "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement (Second) of Torts, § 46, *comment d* (1965); see also Agis, 371 Mass. at 145 (citing Restatement). This requirement is "aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." Agis, 371 Mass. at 145.

As a matter of law, STF's conduct in this case certainly does not rise to the level of being "extreme and outrageous." See Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996) (on motion to dismiss claim for intentional infliction of emotional distress, court may determine as a

17

matter of law that conduct is not "extreme and outrageous"). On the contrary, in disseminating information about a missing child, STF was performing a public service. "[T]he media in this type of situation...perform an invaluable service to both law enforcement and the public at large." Gist v. Macon County Sheriff's Dep't, 284 Ill.App.3d 367, 380 (1996) (dismissing claim against the media for broadcasting a "most wanted fugitives" flyer). Thus, Count 13 of the Complaint must be dismissed as to STF for this reason as well as the fair report privilege.

V. THE PLAINTIFF CANNOT TIE STF TO CLAIMS AGAINST OTHER DEFENDANTS THROUGH CONCLUSORY ALLEGATIONS OF CONSPIRACY.

In an attempt to hold STF liable for the conduct of every other defendant in this case, the Plaintiff, in Counts 3 and 11 of the Complaint, has made vague and conclusory allegations of a civil conspiracy under state and federal law. These claims fail on the face of the Complaint, and, accordingly, must be dismissed.

The Plaintiff's two conspiracy claims substantially overlap one another,[11] and in both cases, the Complaint does not satisfy the requirements for pleading a conspiracy under either state or federal law. With respect to claims under § 1983, the First Circuit has stated:

> Historically, this court has expressed concern about the use of skeletal pleadings in civil rights cases. Our concern was prompted in part by a fear that so loose a

---

[11] Count 3 of the Complaint alleges that STF was involved in a conspiracy to violate the Plaintiff's civil rights under 42 U.S.C. § 1983. Under § 1983, a civil rights conspiracy is defined as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'" Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (citation omitted).

Count 11 of the Complaint, in turn, alleges civil conspiracy under Massachusetts law. Massachusetts recognizes two separate theories of conspiracy. See Estate of Halloran v. United States, 268 F. Supp. 2d 91, 94-95 (D. Mass. 2003). The first, called a "true conspiracy," requires the Plaintiff to demonstrate that: (1) two or more persons combined to accomplish a wrong; (2) the defendants, in combination, possessed a peculiar power of coercion over the plaintiff that an individual standing in similar relation to the plaintiff would not have had, and (3) the plaintiff suffered damages as a result. See id. The second theory, called the "concerted action" theory, requires that the defendant: (1) knew of a common plan and its purpose; (2) the goal of the plan was to commit a tortious act; and (3) the defendant took affirmative steps to encourage the achievement of the result. See id. at 95; Kurker v. Hill, 44 Mass. App. Ct. 184, 189 (1998). Under the latter theory, the Plaintiff must demonstrate that STF engaged in independent tortious conduct of its own, see Heinrich ex rel. Heinrich v. Sweet, 49 F. Supp. 2d 27, 44 (D. Mass. 1999), and that STF's "encouragement or assistance" was a "substantial factor" in causing the resulting tort, see Estate of Halloran, 268 F. Supp. 2d at 95.

> structure might needlessly embroil officials in contrived litigation, in part by worries that it might facilitate widespread misuse of section 1983, and in part by the desire not to erode the salutary protections afforded by the doctrine of qualified immunity.

Educadores Puertorriqueños en Acción v. Hernández, -- F.3d --, 2004 WL 1045546, * 2 (1st Cir. 2004). In response to this concern, the First Circuit has stated that "district courts [are not] at the mercy of overly aggressive plaintiffs," id. at *5, and has held that, with respect to a motion to dismiss under Fed. R. Civ. P. 12(b)(6),

> First, ... in a civil rights action as in any other action subject to notice pleading standards, the complaint should at least set forth minimal facts as to who did what to whom, when, where, and why – although why, when why means the actor's state of mind, can be averred generally. ...
> ...
> Second, in considering motions to dismiss courts should continue to eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets.

Id. at *6 (internal citations and quotation marks omitted). See also McGillicuddy v. Clements, 746 F.2d 76, 77 (1st Cir. 1984) (reversing district court denial of motion to dismiss § 1983 conspiracy claim where plaintiff failed to allege "some factual basis supporting the existence of a conspiracy").

With respect to allegations of conspiracy under Massachusetts common law, such allegations must be stated with particularity. See Heinrich, 49 F. Supp. 2d at 44. "Mere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated." Id.

Although the Plaintiff alleges independent actions on the part of each defendant, see, e.g., Complaint, ¶¶ 422-29, 490-95, and alleges in a conclusory manner that "the defendants agreed that the object or course of action was to arrest, detain, and confine Meuse without probable cause, and maliciously charge and prosecute him with crimes," see, id., ¶¶ 431, 499, the Plaintiff

19

sets forth no facts to support the existence of any such agreement including STF. There are no allegations regarding when or where this agreement was reached, the identities of the individuals who reached the agreements for each party, what "peculiar power of coercion" the defendants possessed in concert, or any other facts that would support the Plaintiff's conclusory allegations. Thus, the "who, what, whom, when, where and why" required by the First Circuit in Educadores are all absent. Nor does the Complaint identify the theory of conspiracy on which the Plaintiff's state law claim rests.[12]

Indeed, apart from the Plaintiff's conclusory language, which must be disregarded, his allegations of conspiracy are empty, see DM Research, Inc., 170 F.3d at 55 ("Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition."), and Counts 3 and 11 must therefore be dismissed.

## CONCLUSION

For the reasons stated above, defendant STF Productions, Inc., respectfully requests that this Court dismiss all counts of the Complaint against it.

Respectfully submitted,
STF PRODUCTIONS, INC.,
By its attorneys,

*Elizabeth A. Ritvo*
Elizabeth A. Ritvo (BBO #421440)
Jeffrey P. Hermes (BBO #637952)
Samantha L. Gerlovin (BBO #652389)
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

Dated: June 1, 2004

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY MAIL (BY HAND) ON 6/1/04

---

[12] To the extent that the Plaintiff bases his Massachusetts conspiracy claim on the "concerted action" theory, he has failed to assert an independent tortious act by STF. See Heinrich, 49 F. Supp. 2d at 44. As discussed in Section II, above, the AMW Poster is not actionable under the fair report privilege. The plaintiff has also failed to set forth any facts demonstrating that STF's acts were a "substantial factor" in causing a resulting tort. See Estate of Halloran, 268 F. Supp. 2d at 95. Rather, the Complaint indicates that the AMW Poster did not assist in Meuse's capture, which was the result of two women identifying him from a wanted poster in Wal-Mart. See Complaint, ¶¶ 382-83.