UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-10255-EFH

**Brian J. Meuse**
Plaintiff
v.

**Susan Pane,
Rosalyn Stults,
Lt. Detective Daniel R. Moynihan**, in his official and individual capacities,
**Captain Donald Thompson**, in his official and individual capacities,
**City of Haverhill, Massachusetts,
Louis Freeh**, in his official capacity,
**Charles S. Prouty**, in his official and individual capacities,
**Charles P. Kelly**, in his official and individual capacities,
**STF/AMW Television Stations, Inc.,
STF Productions, Inc.**, a/k/a America's Most Wanted,
**National Center for Missing and Exploited Children,
Wal-Mart Stores, Inc.**
Defendants

___

## OPPOSITION TO MOTION OF STF PRODUCTIONS, INC., TO DISMISS COMPLAINT

Now comes Plaintiff Brian J. Meuse ["Meuse"] and opposes the motion by Defendant STF Productions, Inc. ["STF" or "STF/AMW"] to dismiss all counts of the Second Amended Verified Complaint ["Comp."] with respect to STF.\[1]/

As grounds for his opposition, Meuse states the following and argues them in the ARGU-MENT section, *infra*:

1.  STF/AMW cannot be protected under the fair report privilege for the following reasons:

    a.  the poster published on STF/AMW's website from some unknown date after 25 October 2000 and a day after the original Complaint in this case was

___

[1] STF Productions, Inc., is the corporation under which the television show America's Most Wanted ["AMW"] does business. STF is a **division** of Fox Television Stations, Inc. (Meuse learned this after the case was filed.) .STF uses several corporate addresses: its own in Washington, D.C., that of FTSI on Bundy Drive in Los Angeles, and that of News Corporation, also in Los Angeles. STF appears to be a chameleon, choosing the address it needs for its particular agenda at any one time. Michael Streger is "[c]ounsel for STF Productions, Inc. since 2000, serving as in-house counsel for the **FOX show "America's Most Wanted"** . . ." http://www.dciff.org/seminarsspeakers/speakers_steger.htm

1

  served on AMW was not a report of an official statement, of judicial, legislative or other official proceedings, or of a meeting open to the public;

b. the poster was not an FBI poster as STF contends [STF Memo., at 3]; it was a product of a collaborative effort by all the defendants. The contact information appears below [Comp. at 33]:

> ANYONE HAVING INFORMATION SHOULD CONTACT
> **National Center for Missing & Exploited Children**
> **1-800-843-5678 (1-800-THE-LOST)**
> or
> **Haverhill Police Department (Massachusetts) 1-978-373-1212 or Your Local FBI**
>
> 
>
> **AMW Contact: Gina Long (202) 204-2625**
> Please tell the person you speak with that you saw this poster on the AMW.com SEARCHLIGHT

c. STF/AMW knew or should have known that the unofficial declarations had not been verified as being true; as such they are outside the scope of fair report privilege;

d. "the privilege 'does not apply to statements made by the police ... as to the facts of the case or the evidence expected to be given which have not yet been made a part of the judicial proceeding or of the arrest process'";

e. STF/AMW had information that there was a dispute as to the existence of one or more warrants; their immediate parent company, on whose network the STF/AMW show appeared weekly, had taped Meuse's counsel informing the feature reporter that the so-called warrants were never shown or produced by the FBI or the Haverhill police to Meuse or to his family or counsel.

2. STF/AMW is a private entity that metamorphosed into a state actor acting under color of law.

3. The conduct of STF/AMW deprived Meuse of the oldest fundamental liberty interests secured by the Constitution or laws.

4. It is **un**true that Plaintiff has admitted that the poster was not a cause of alleged injuries on which Meuse's claims are based.

5. Plaintiff pled well the existence of a conspiracy involving STF/AMW as a co-conspirator under §1983 and common-law conspiracy.

**FACTS AS TO STF/AMW**

Meuse incorporates herein all the facts set forth in his Amended Complaint and in the spirit of Educadores Puertorriqueños en Acción v. Hernández, 2004 WL 1045546, slip op. 1, No. 03-1588 (1st Cir. (Puerto Rico) May 10, 2004), in which the First Circuit retreated from the "heightened pleading standard in civil rights actions." He summarizes them here with the inferences to be drawn from them.

This case arises out of a custody dispute between the Plaintiff Meuse and Defendant Pane regarding their daughter, Marissa. On October 1, 2000, Meuse went to Florida for "a week's visitation" with Marissa and promptly flew her out of Florida to receive medical care in Massachusetts. Amended Complaint, ¶¶ 152-164.[2]/ Meuse then "dropped out of sight with the child" on or about October 5, 2000. Comp., ¶ 170. Throughout, and two years beyond, a national "search" campaign by the conspirators, STF/AMW published a poster advertising that Meuse was an "Abductor" who had made an "Unlawful Flight to Avoid Prosecution." Comp., ¶¶305-306, 317-319, 422, Exhs. FF and GG. Meuse was arrested in Oklahoma on 22 March 2001. Comp., ¶¶378-80. On 23 May 2002, Meuse was found "not guilty." Comp ¶395.

Defendants FOX TV and its STF division are sister subcorporations under the umbrella The News Corporation Limited, a mammoth, multicorporation, K-Rupert-Murdoch enterprise [Comp. ¶¶12-13].[3]/ Defendants AMW and National Center for Missing and Exploited Children ["NCMEC"] are "Gold-Star partners" [Comp. ¶13, Comp.Exh. HHH], and Defendants NCMEC and Wal-Mart are "Premiere" partners [Comp. ¶¶14-15, Comp.Exh. EEE]. "The Missing Children's Network is a partnership program between Wal-Mart and . . . NCMEC. As part of the

---

[2] The Amended Complaint is abbreviated "Comp." throughout this opposition and memorandum.

[3] K. Rupert Murdoch is Chairman an Chief Executive Officer of News Corporation, of which STF/AMW Television Stations, Inc., and STF Productions, Inc. (AMW) are subcorporations.. STF uses any one of several corporate addresses, according to its agenda to meet its immediate needs.

3

agreement, the NCMEC packages approved posters and ships them to Wal-Mart stores each month." Kenney v. Wal-Mart Stores, Inc., 100 S.W.3d 809, 2003.MO.0000486 at ¶29 <http://www.versuslaw.com> (Mo. 2003).

Meuse contends that the poster on AMW was shipped to the show by NCMEC. Both AMW and NCMEC maintain websites with a multitude of pages devoted to posters for alleged fugitives from justice. On them, posters showing Meuse and the child were exhibited literally for years, from sometime in 2001 through that time in 2004 when the Complaint in this action was served on those defendants, notwithstanding the fact that Meuse had been found Not Guilty of Parental Kidnapping by a jury in May 2002 [Comp. Exhs. FF and GG].\[4]/

The FBI defendants instructed the Haverhill police defendants, actively searched for Meuse by conducting investigations, and coordinated the cooperation of Wal-Mart, the NCMEC, the FOX news channel, and AMW [Comp. ¶¶268-326]. "'The FBI set that up and that was all set up through, I believe, through the Wal-Mart'" [Comp.¶302].\[5]/ The extensive communication between all the defendants is captured in a **flow chart in Table 1  [Exh. A**, attached to opposition to FOX TV's motion to dismiss and incorporated in entirety herein by reference].

"The poster," Moynihan testified, "said Parental Kidnapping" [Comp. ¶304]. The poster on the AMW's website (linked to from the fox.com website) was and remained there until the Complaint in this action was served [Comp. ¶305]. The poster names Meuse as an "abductor" and falsely accuses him of fleeing unlawfully to avoid prosecution on November 6th, 2000 [Comp. ¶306]. Moynihan believed that the "local FBI" was mainly responsible for the poster [Comp. ¶308]. On a second Wanted poster, the FBI wrote that an arrest warrant for Meuse issued for "Parental Kidnapping" and "Unlawful Flight to Avoid Prosecution." Readers were to contact the FBI

---

[4]  The exhibits cited in this opposition were all Trial Exhibits and are included in the addendum to the Complaint.

[5]  The quotations are from the transcript of Moynihan's testimony at the criminal trial. The volume and page numbers appear in the Complaint. The trial exhibits noted are in the addendum to the Complaint.

Violent Fugitive Task Force by calling 617-742-5533 [Comp. ¶¶309-310, Exh. GGG].  A third "Family Abduction" poster claimed that an FBI warrant for Meuse, the "Abductor," issued on 6 November 2000 for "Unlawful Flight to Avoid Prosecution"  [Comp. ¶¶311-312, Exh. FF]. That was untrue: **(1)** In 1999, Meuse had been granted custody by a district court of the child on the grounds of fear for her safety [Comp.Exhs. M (Order), N (affidavit)].   **(2)** In May 2000, Judge Margaret Macauley Manzi of the Probate & Family Court found that Pane had unlawfully removed the child from Massachusetts [Comp. ¶64; Exh. T].  **(3)** The child was allowed to be kept in Florida solely because arrangements had been made to diagnose and treat the child [Comp. ¶65].  **(4)** The child was examined in Florida but the mother, in noncompliance with the purpose of the court order, cancelled the physical and occupational therapy sessions [Comp. ¶¶141, 144].  **(5)**  Fearing for the child's safety, Meuse took the child to Boston for medical diagnosis and treatment [Comp. ¶¶154-155].  **(6)** Prior to Meuse taking the child, there was neither a custody agreement nor a custody order. [Comp. ¶343;  Exh. CCC, Decision dated July 2002 (Swan, J.].  Therefore the assertion on the poster that Meuse was a fleeing fugitive was untrue [Comp. ¶325].

### STANDARD OF REVIEW

Plaintiff incorporates herein in entirety by reference the section entitled "STANDARD OF REVIEW" from his Opposition to the Motion to Dismiss by Fox Television Stations, Inc.

### ARGUMENT

**I.**  **Where FBI Agent Prouty's statements regarding Meuse, and the poster shown on the STF/AMW broadcast were not fair reports of governmental activity, STF/AMW may find no defense in the fair report privilege.**

Under Massachusetts law, the well-established fair report privilege **(a)** protects reports of any official hearing or meeting, even though no other action is taken, **(b)** protects the dissemination of information about reports filed by an officer or agency of the government,  **(c)** protects a report relating to matters of public concern prepared for a government entity by an independent

contractor, and **(d)** protects investigative memoranda and letters from the General Services Administration which had not previously been available to the public. The "rationale in so extending the privilege was the public policy benefit of free discussion of governmental affairs." Bruenell v. Harte-Hanks Communications, Inc., 23 Media L. Rep. 1378, 1994 WL 790830 * 3, No. 93-2018 (Mass.Super. 1994) (Fremont-Smith, J.1994 WL 790830 *3, citing Jones, 400 Mass. at 797.

> Massachusetts recognizes the "fair report privilege," which allows those who fairly and accurately report certain types of official or governmental action to be immune from liability for claims arising out of such reports. See, e.g., Jones v. Taibbi, 400 Mass. 786, 794-795 (1987) (Published reports of judicial, legislative or other official proceedings are privileged); Sibley v. Holyoke Transcript-Telegram Publishing Co., Inc., 391 Mass. 468, 470-471 (1984) (fair report of judicial proceedings).

Elm Medical Laboratory, Inc. v. RKO General, Inc., 403 Mass. 779, 782 (1989). Ingenere v. ABC, 11 Media L.Rep. (BNA) 1227 (D.Mass. 1984).

The privilege does not, however, protect **(e)** a report of an official proceeding that is not public or available to the public or internal memoranda not intended for public disclosure.[6],[7]

The poster, however, was not an official statement. Neither did it contain a report of judicial, legislative, or other official proceedings. It was not even supplied at a press conference. It was but a privately made poster. STF/AMW knew or should have known that the unofficial declarations had not been checked as to whether they were true.

> In this case there is at least an issue of fact as to whether the article was based on an official action or proceeding. Because Kerstetter based the article on his interview with officer Harrington rather than directly upon the police report, warrant, or other official action, (FN3) the article is not indisputably privileged. It is unclear from the record whether Officer Harrington simply read from the police report and warrant, or added comments of his own. See Jones v. Taibbi, 400 Mass. at 796 (statements by police or witnesses regarding the facts of a case are not yet part of an official proceeding and therefore are not privileged). Consequently, Middlesex News is not entitled to summary judgment on the defamation claim.

---

[6]  Clearly, here, the public, in their capacity as citizens and voters, did not need to be informed of the Meuse case.
[7]  In STF Mem. at 4, STF argues that Misek-Falkoff v. McDonald, 177 F.Supp.2d 224 (2003) held that the fair report privilege bars claims against the author of a law-review article both in print and on the Web. In fact, on appeal, the Second Circuit held that the defendants' reportage was not sufficiently inaccurate to be excepted "from the protection of Civil Rights Law §74" [Misek, 2003.C02.0000443 at ¶ 20 < http://www.versuslaw.com> (2d Cir. 2003)], and not barred.

6

Mourao v. Town of Framingham, 1998 WL 1184194 at *3, No. 9700731 (Mass.Super. Dec. 7, 1998) (Neel, J.). Mourao is remarkably similar to the instant case: i.e., the Fox Broadcast *and* the defaming Wanted poster were based on information from Defendants Susan Pane, Rosalyn Stults, and "comments of [Agent Prouty's] own."

Those "unofficial statements made by police sources are outside the scope of the fair report privilege." Jones, at 796, citing Phillips v. Evening Star Newspaper Co., 424 A.2d 78, 89 (D.C.1980) (reliance on unofficial police "hot line" not privileged); and Bufalino v. Associated Press, 692 F.2d 266, 272 (2d Cir.1982) ("Only reports of official statements or records made or released by a public agency are protected by the [Restatement (Second) of Torts] §611 privilege" [emphasis in original]). As the federal agents are the equivalent of municipal policemen, the statements of the FBI are outside the scope of the fair report privilege.

Further, in February 2001, when Defendant Agent Charles Prouty made his statements and STF/AMW displayed one of the three Wanted posters, **(a)** Meuse had not been found in contempt of an order from any court, **(b)** Meuse had not been charged criminally with Parental Kidnapping or with any other charge [Comp.¶267], [8]/ **(c)** there had been no judicial proceeding in criminal court, and **(d)** there was no federal warrant, **(e)** the State warrant was not accompanied by any affidavit, **(f)** neither the copy nor the original arrest warrant had a signature by Det. Moynihan or by any judge[9]/ **[Comp. ¶215]**, **(g)** Moynihan was the complainant, but did not sign the State warrant **[Comp. ¶215, Exh. Y]**, and **(h)** Meuse had not been arrested.

In Gist v. Macon County Sheriff's Dep't, 284 Ill.App.3d 367, 1996.IL.3033 <http://www.versuslaw.com> (1996) (dismissing claim against the media for broadcasting a "most wanted fugi-

---

[8] Paragraph 267 of the Amended Complaint also reads, in relevant part, "On 5 April 2001, the day Meuse was arraigned, Judge Herlihy wanted to see the FBI warrant and requested Assistant DA DePaolo to produce it."

[9] The court copy of the warrant is in red and black and was signed by Kim Marotta and is dated 25 October 2000 **[Exh. Z]**. [Comp. ¶215].

7

tives" flyer), a case cited by STF on p. 18, the appellate court noted that years earlier, the supreme court of Illinois "created a 'hybrid' privilege: 'conditional' in that only those reports of governmental proceedings which are accurate and complete or fair abridgments of the proceedings are privileged; 'absolute' in that once the prerequisites of the privilege are met, the privilege cannot be defeated by a showing of malice." Id. at ¶55 of 1996.IL.3033 <http://www.versuslaw.com>.

The court in Gist also noted that the U.S. Supreme Court, too, in Cox Broadcasting Corp v. Cohn, 420 U.S. 469, 492 (1975), required the report to be of "the proceedings of government." Id. So under both Illinois' hybrid privilege and the Supreme Court's Cox, STF would absolutely **not** have the privilege of fair report, given that Prouty was **not** reporting on a governmental pro ceeding.

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.

Jones v. Taibbi, 400 Mass. at 794-795 n. 11.

Given the close-working relationship between Pane, Stults, the FBI, NCMEC, FOX, and AMW, STF/AMW knew or should have known that the information on the poster – other than the descriptions of Meuse and the child -- was baseless, false, and defamatory. STF/AMW had the obligation to check the reliability and validity of the information where it knew that the AMW poster was not an official poster and, significantly, that the AMW executives and staff never saw the alleged federal warrant, particularly because Meuse's attorney had informed the FOX investigative reporter that no warrant – federal or local -- had been produced as requested for inspection and that it appeared that none existed.

## II. **Meuse was deprived of his liberty interest in the care, custody, and control of his and Pane's child.**

STF complains that Meuse did not allege in his Complaint that STF intended "to do the

8

complainant maximum injury" [STF Memo, at 6]. Common sense demands that we believe that STF/AMW intended to do injury to Meuse; to believe otherwise would have been foolish: there is no other purpose to publishing a WANTED poster than to capture, charge, and imprison the person portrayed and/or described in the poster.

It is reasonable, in fact, inescapable, therefore, to conclude that STF/AMW knew that were Meuse to be captured, as STF/AMW intended, Meuse would be deprived not only of his liberty interests -- false arrest, false imprisonment, assault, battery – and would be forced to stand trial for a non-existent crime. Meuse would also be deprived of his liberty interest in the care, custody, and control of his and Pane's child, a liberty interest that "is perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57, 65 (2000). And when Meuse was arrested, as a direct result of one of the Wanted posters, on which the FBI phone number appears, his child, whom he had rescued from further harm by the mother, was, indeed, taken from him. His deprivation became real.

In this case, Meuse's paramount liberty interest was his parental right and obligation to protect his child from continuing and imminent harm by Pane. "As a general matter, this fundamental right is inviolate, and the deprivation of such right would constitute a violation of substantive due process." Tower v. Leslie-Brown, 326 F.3d 290, 2003.C01.0000148 at ¶44 <http://www.versuslaw.com> (1st Cir. 2003), citing Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 22 (1st Cir. 2001). In Hatch, the court held that reasonable suspicion of imminent danger is required to justify a state actor temporarily taking a child from her parent pending a hearing. Id. at 23-24. When they published and distributed the posters, STF/AMW and NCMEC and Wal-Mart ignored their knowledge that given the child's debilitating physical condition when Meuse took her from Florida, there was a reasonable suspicion of imminent danger to the child if she were returned to the mother.

9

Officers Moynihan and Thompson had been informed of the dispute between Meuse and Pane regarding the health of the child while in the care of her mother. It is reasonable and logical to presume that they informed the FBI agents, who, in turn, informed the other defendants both of the health of the child and of her imminent peril were the child to be returned to the mother.\[10]/

> State action requires both an alleged constitutional deprivation caused by acts taken pursuant to state law and that the allegedly unconstitutional conduct be fairly attributable to the State. E.g., Lugar, v. Edmondson Oil Co., 457 U. S. 922, 937. . . . Whether such a nexus exists, depends on, among other things, whether the State has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.

American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999). Anderson v. Boston Sch. Comm., 105 F.3d 762, 766 (1st Cir. 1997). The constitutional deprivation is clear, as is the encouragement by the FBI (who had been encouraged by the Haverhill police defendants) of STF/AMW to operate as a "willful participant in joint activity with the State or its agents," Lugar, *supra*, at 941 (internal quotation marks omitted).

> ...We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," Pennsylvania v. Board of Directors of City Trusts of Philadelphia, 353 U. S. 230, 231 (1957) (per curiam), when it has been delegated a public function by the State, *cf*., e.g., West v. Atkins, *supra*, at 56; Edmonson v. Leesville Concrete Co., 500 U. S. 614, 627-628 (1991), when it is "entwined with governmental policies" or when government is "entwined in [its] management or control," Evans v. Newton, 382 U. S. 296, 299, 301 (1966).

Brentwood Academy v. Tennessee Secondary School Athletic Association, 531 U.S. 288, 180 F.3d 758, 2001.SCT.0000022 at ¶ 42 <http://www.versuslaw.com> (2001). STF/AMW's conduct may be deemed to have fallen into all three of the categories identified by Brentwood. To use some of STF/AMW's own words, the FBI did "deputize STF and transform the private television company into a state actor for purposes of §1983." [STF/AMW Mem. at 12]. Thus Meuse's Complaint alleged facts sufficient to meet both requirements.

---

[10] What STF/AMW did, both through the posters on the AMW website and in the Unsolved Mysteries segment, was malicious. Where there is a question of malice, it must go to a jury. A reasonable jury could find by clear and convincing evidence that STF/AMW acted with actual malice. Anderson v. Liberty Lobby, 477 U.S. 242 (1986).

10

**III.** **Assuming *arguendo* that STF/AMW was entitled to the fair report privilege, STF/AMW abused the privilege, and it thus became unavailable to STF/AMW as a defense.**

STF/AMW contends that they had a privilege to publish the poster containing *per se* defamatory statements. As FOX recognized, in Lavin v. New York News, Inc., 757 F.2d 1416, 1419 (3rd Cir. 1985), the court emphasized that the fair report privilege must be properly applied. If properly applied, the defendants' First Amendment rights would be "fully vindicate[d]." Id. at 1419.\[11]/ Were we to assume *arguendo* that the "privilege is applicable, the question [becomes] whether the privilege was abused." Id.

> . . . [T]he privilege is abused, and therefore lost, if the account is inaccurate, misleadingly incomplete, or unfair. Whether abuse of the privilege has been shown is ordinarily a question for the jury, "unless the facts are such that only one conclusion can reasonably be drawn."

Lavin, at 1419 (internal cites omitted), which then concluded "that 'malice in fact' can defeat the fair report privilege." Id., at 1421. An actual intent to harm is "malice in fact." Schiavone, 847 F.2d 1069, 1085 n. 25 (3d Cir. 1988), citing Lavin, at 1421.

"A plaintiff forfeits the privilege under New Jersey law if he exceeds the bounds of fair reporting." Schiavone Construction Co. v. Time Inc., 847 F.2d 1069, 1087 (3rd Cir. 1988) (affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion). Time forfeited the fair report privilege. Id., at 1087.

> Not only must the report be accurate, but it must be fair. Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it. . .

Lavin, at 1419 (internal cites omitted). "The district court found that Time had forfeited its fair re-

---

[11] Because "it could not properly be ruled as a matter of law that plaintiff would be unable to establish abuse of the fair report privilege on the part of the defendants," the court in Lavin "reversed a dismissal under Fed. R. Civ. P. 12(b)(6). Id. at 1417, citing Schiavone Constr. Co. v. Time, Inc., 735 F.2d 94 (3d Cir. 1984) (remanded for development of a factual record). On remand, the lower-court judge held that Time could not assert a fair report privilege under New Jersey common law. Lavin, *supra*.

11

port privilege because its omission of the exculpatory language rendered the report incomplete and inherently unfair." Schiavone, 847 F.2d at 1088, citing Schiavone II, 619 F.2d 684, 699-700 (D.N.J. 1985).

Given the nature of the information STF/AMW knew through FOX, only one conclusion can reasonably be drawn. i.e., the privilege, if any, was abused. For example, FOX had information – both documentary and verbal -- from the Meuse camp prior to AMW and FOX displaying the poster and prior to the Broadcast,[12] for example:

- that there was a dispute as to the existence of a federal warrant, sought by the FBI; one had not been seen by the Defendant Haverhill police nor by Meuse's family or counsel,
- that there was a dispute as to the existence of a warrant by Haverhill; one had not been seen by Meuse's family or counsel,
- that there was a dispute as to the prescription drug use by Pane,
- that there was a dispute as to the physical health of the child,
- that there was a dispute as to which parent, if any, had been given custody of the child.

The arguments of STF/AMW are misplaced and its conclusions are inconsistent with existing law.

Further, STF argues that the same protections apply to information on a website as apply to traditional media, namely that a webpage is to be treated as if it were a book page. Mitan v. Davis, 243 F. Supp. 2d 719, 724, 2003.WKY.0000009< http://www.versuslaw.com> (W.D.Ky. 2003) (No. 3:00 CV-841-S) (a webpage "is no different from a statement on a paper page in a book lying on a shelf . . ."), cited in STF Mem. at 8.

Although Mitan addresses the statute of limitations and the "single publication rule," and does not at all address the fair report privilege, STF impliedly assumes that a court will in the future rule that the same exceptions to the fair report privilege would exist for a webpage as those

---

[12] The Broadcast was the Unsolved Mysteries feature segment, which played seamlessly at both ends between AMW and FOX News segment. The FBI works closely and often with FOX TV and AMW. The FBI contacted FOX and "requested" that FOX produce an Unsolved Mysteries feature segment about Meuse, whereupon the Unsolved Mysteries reporter contacted Meuse's counsel in the family-law action.

12

which exist for traditional media. But, of course, we do not know that yet.\[13]/ Meuse discusses this *infra*, at 17.

In Pittman v. Gannett River States Publ'g Corp., 836 F. Supp. 377, 383 (S.D. Miss. 1993), cited by STF, the court declared that the statement in the "report" must be, at the very least, "quoting, paraphrasing or otherwise drawing upon official documents or proceedings." There were no official documents or official proceedings to quote, paraphrase, or draw upon. Thus, under ELM Medical Laboratory, 403 Mass. at 782, which STF/AMW cited, the poster is ***not*** entitled "to be immune from liability for claims arising out of such reports." Id. For example,

- Where the posters did not give an alleged "a rough-and-ready summary that was substantially" correct," they did not qualify for the fair report privilege. *Cf.* Yohe v. Nugent, 321 F.3d 35, 44 (1st Cir. 2003).

- Where the posters did ***not*** "produce the same effect on the mind of the recipient which the precise truth would have produced," the fair report privilege was inapplicable. Yohe, 321 F.3d at 43.\[14]/

- Where the posters were unfair and inaccurate," the fair report privilege was inapplicable. ELM Medical, 403 Mass. at 782.

- Where the investigation was not yet complete, that the leak was major, and made a definitive statement concerning abduction and fleeing to avoid prosecution, the fair report privilege was inapplicable. *Compare* Sunoco v. Community Newspaper Co., 1999 WL 788612, 1999 Mass.App.Div. 126 (1999) (where the leak was minor and no definitive statement regarding contamination was made, privilege was applicable). No such reservations as in Sunoco were expressed in the STF/AMW poster.

---

**13**  STF cites Firth v. State of New York, 98 N.Y.2d 365 (2002), to invoke the "single publication rule." While an interesting issue, it is not relevant to STF's motion to dismiss, for STF does not discuss even were the single publication rule to be applied, why it would be sufficient to dismiss Meuse's complaint. In Firth v. State of New York, 184 Misc.2d 105, 706 N.Y.S.2d 835 (N.Y. Ct.Cl. 2000), applied the single publication rule to an Internet defamation and held that the statute of limitations ran from when the report at issue first was made available on the Internet. Given **(a)** that it is as yet unknown as to the exact date on which the AMW poster was first published, **(b)** that the statute of limitations in Massachusetts is three years (not one year as in Kentucky) and **(c)** that the discovery rule, long recognized by this court, would preclude dismissal until, at the very least, after discovery and then only after a new motion and memorandum were filed, the fair report privilege does not preclude Meuse's defamation claims..

**14**  Kenney v. Scripps Howard Broad. Co., No. 98-1079-CV-W-BD, 2000 WL 33173915, 28 Med.LRptr. 2512 (W.D. Mo. 2000), aff'd, 259 F.3d 922 (8th Cir. 2001), which STF/AMW cited to support its contention that a broadcast report of the ***possible*** abduction of a child by her parent was a fair report, the STF/AMW poster did not report that Meuse possibly abducted the child; it reported that not only **had** he abducted the child, he was also a fugitive fleeing from justice.

"If . . . the matter was of public concern, . . . liability would turn on whether there was knowing falsity or reckless disregard of the truth on the defendant's part." <u>MiGi, Inc. v. Gannett Mass. Broadcasters, Inc.</u>, 25 Mass.App.Ct. 394, 397 n.6 (1988), citing <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 351-352 (1974).\[15]/

Here, the posters were false **_and_** UNofficial in that they contained false statements that were presented as factual truths. And where they were presented as factual truths, the publication of those false statements are **_not_** privileged against claims arising out of the publication of the posters. *See* <u>MiGi</u>, 25 Mass. App. Ct. at 396.

For instance, at <u>STF Mem. at 7</u>, STF invoked <u>Foley v. Lowell Sun Publ. Co.</u>, 404 Mass. 9, 11 (1989), for the proposition that "an article identifying criminal charges filed against a plaintiff cannot be read to accuse the plaintiff of being guilty of those charges." The instant case is distinguishable from <u>Foley</u>.

First, in <u>Foley</u>, charges had been filed. Charges against Meuse had not been filed. Second, in <u>Foley</u>, the publication did not have the intent to inflict a deprivation of civil rights. The defendant had already been put under arrest. The publisher had nothing to do with Foley's arrest. The publisher was merely publishing an actual event that had occurred. We call that "News."

In contrast, the intent of the publication of the Wanted poster for Meuse was to deprive Meuse of his liberty. That he took the child was factual. The conclusion, however, that he abducted the child was not an actual event. The determination of what is an "abduction" must be adjudicated by the court. The statement that he took "Unlawful Flight to Avoid Prosecution" was also false. Unlawful flight requires charges to have been issued. No charges had issued. There

---

[15]  It is often said that the benefits of this privilege are forgone where a complainant shows that the reporter was actuated by malice toward him. But "malice" would require some redefinition if it were taken not to comprehend knowing falsehood; perhaps repetition of such falsehood with a purpose to do the complainant maximum injury would still qualify as malice.

<u>MiGi, Inc. v. Gannett Massachusetts Broadcasters, Inc.</u>, 25 Mass.App.Ct. at 397.

14

was not even a finding of contempt in the family court.

Further, STF cited <u>Kenney v. Scripps Howard Broadcasting Co.</u>, 28 Media L. Rep. 2512, 2000 WL 33173915 (W.D.Mo. 2000), a case related to <u>Kenney v. Wal-Mart</u>, *supra* at 4, for the proposition that a broadcast about a possible abduction was protected by the fair report privilege. The instant case is distinguishable from <u>Kenney v. Scripps</u> in the following ways:

**(1)** In <u>Kenney</u>, the allegation that the grandmother was an abductor was not made. The broadcast spoke of a "possible abduction." 2000 WL 33173915 *1. The poster explicitly identified Meuse as the "ABDUCTOR," in bold, brightly colored capital letters;

**(2)** in <u>Kenney</u>, the broadcast was not accompanied by a WANTED poster for the grandmother, and the broadcast did not state that the grandmother took unlawful flight to avoid prosecution. <u>Id.</u> The poster identifying Meuse was a WANTED poster and accused him also of unlawfully fleeing to avoid prosecution;

**(3)** in <u>Kenney</u>, the plaintiff "argues that giving the words of the newscast their plain and ordinarily understood meaning, the news report ***implies*** that plaintiff abducted her granddaughter." <u>Id</u>. at 4 (emphasis supplied). In the instant case, the poster ***explicitly*** identified Meuse as an abductor of his daughter;

**(4)** in <u>Kenney</u>, the plaintiff did not dispute that the insinuation was true, she lost no income, and admitted that she did not suffer any damage to her professional reputation. In contrast, Meuse disputes the primary facts in the poster, has lost income, was tried criminally, incurred debt for legal fees, and has suffered damage to his professional reputation.

The only similarity between the two cases is that in neither the <u>Kenney</u> nor the <u>Meuse</u> family-law case was there a custody order prior to the taking. <u>Id</u>. at 7 and <u>Comp.</u> ¶343.

Moreover, at <u>STF Mem. at 6</u>, STF invoked <u>Alfego v. Columbia Broad. Sys., Inc.</u>, 7 Med. L. Rptr. 1075 (D.Mass. 1981). The instant case is also distinguishable from <u>Alfego</u>. "[P]laintiff does not dispute the truth of the statements and events filmed and broadcast...." <u>Id</u>. at 1076. "Mrs. Ryan's statement that he was a 'criminal' is based on objective fact." <u>Id</u>. She began or included in each of the sentences "expressing her personal views and feelings" the phrase "in my opinion." <u>Id</u>. Meuse *does* dispute the truth of the statements; he was not fleeing to avoid prosecution, and had not abducted his child; and nothing in the posters was presented as an opinion.

15

STF/AMW states as an excuse that they were "concerned with Marissa's disappearance and her recovery" [STF Mem. at 7]. That cannot be true: if STF/AMW had been truly concerned about the child, STF/AMW would have been obliged to look into the living conditions of the child before she was taken by her father and the circumstances surrounding the event. Also, if STF/AMW's excuse were true, they would not have needed to call Meuse an abductor.

### IV. There were three publications – before and after the Broadcast and after the verdict of Not Guilty -- of the poster sufficiently inaccurate to be excepted from the fair report privilege.

In STF Mem. at 8 and n, 5, where STF cited the lower-court opinion in Firth, *supra* at 13 n. 14, STF raises the issue of republication, but fails to articulate the reason for raising the issue. Notwithstanding STF's random arguments regarding republication, Meuse states that on appeal, in Firth v. State, 306 A.D.2d 666, 761 N.Y.S.2d 361, 2003.NY.0005419 <http://www.versuslaw.com> (2003), the higher court denied the State's motion for summary judgment on the grounds that "an affidavit of a state employee without personal knowledge of the facts surrounding the alleged republication . . . lack[s] probative value and cannot aid defendant in sustaining its burden." Firth, 2003.NY.0005419 at ¶17. Here there was no affidavit.

"Republication, an exception to the single publication rule," the Second Circuit court wrote, "justifies renewing the statute of limitations when 'the subsequent publication is intended to and actually reaches a new audience.'" Id. at 16.

Here, in Meuse, there were – at least, under Firth -- three publications: **(1)** when the poster was first published, **(2)** after the television Broadcast, which was directed to a new audience that might have been led to the STF/AMW website, and **(3)** when the word "MISSING" was changed to the word "RECOVERED," making essentially a new publication, not merely a republication.

STF/AMW contends that it is entitled to the fair report privilege for publishing that they "recovered" the child. Without getting into the offensive innuendos of the word "RECOVERED,"

16

Meuse takes more offense at the continuing use of the word "ABDUCTOR" to identify him for two years after he had been found "Not Guilty" of Parental Kidnapping.

Meuse argues now an issue of apparent first impression in this jurisdiction: whether a book page and a webpage are always the same. Meuse contends that the answer must be No. A book stays a living product until the paper disintegrates. To change even a word on a page necessitates the reprinting of the entire book, with attendant costs and time. A word on a webpage may be changed and entire page uploaded within a minute, at no measurable cost and time that is most accurately measured with a stopwatch. The two, a book and a webpage, are not comparable. The cases cited by STF/AMW – <u>Firth</u>, *supra*; <u>Mitan</u>, *supra*; <u>Van Buskirk</u>, *supra*; and even <u>Reno v. American Civil Liberties Union</u>, 521 U.S. 844 (1997) – do not address this dissimilarity between the two types of "pages."

Certainly there are websites on which the information, like that in a book, is static, but the information on the STF/AMW website is dynamic. A different weekly show is described each week. Photographs are changed. News blurps are changed continually. New Wanted posters are added, changes are made to the old when the status of the person sought changes, the "Captures" catalogue is updated. But for STF/AMW's profit motive and self-aggrandizement (as described *infra*, at 19), there is no reason for the website to maintain the obsolete Wanted posters on line. It takes less than a minute to delete them and to re-upload the page to the website. There is nothing similar between the STF/AMW webpages and a book.

**V.    Where Meuse alleged that STF/AMW as well as the other defendants committed many unlawful overt acts against the plaintiff, and *not* the "'*mere sponsorship*' of a television broadcast," STF/AMW may be held liable for defamation.**

STF misleads the court by writing, in words for all intents and purposes, that Meuse seeks STF to be liable for defamation only for the "mere sponsorship of a television broadcast. In fact, Meuse identified seven overt acts in <u>Comp. ¶491</u> and explicitly wrote that the acts committed by the

17

defendants were not limited only to those seven. In that list, Meuse itemized that all the defendants, including AMW, "sponsored the posters across the nation" [Comp. ¶491(g)]. Meuse also wrote that while "Wal-Mart sponsored NCMEC and the America's Most Wanted segments in which the poster against Meuse was used" [Comp. ¶496], AMW and NCMEC sponsored the "My Child Has Been Stolen" episode on ABC's Sally Jesse Raphael show [Comp. ¶508].\[16]/

STF/AMW also misrepresents to this court that Meuse never "identifie[d] what, if anything. was false or defamatory about the 'Wanted poster'" nor that the "poster is an AMW poster" [STF Mem. at 16]. Those contentions are untrue: see Comp. passim: generally ¶¶295-326, or specifically, ¶¶299, 303-305, 309-314, 317-319, 325, 424(b-d), 490(c-d), 491(b-d), 495, 503-505(a-c). Meuse was not charged with Parental Kidnapping until 22 March 2001 [Comp. ¶394]. He was found Not Guilty on 23 May 2002 [Comp. ¶395].

**VI.    The First Amendment privilege does not bar inquiry into the editorial process.**

STF/AMW also contends that it is entitled to dismissal because to allow the case to proceed will chill STF/AMW's First Amendment right. In certain circumstances, that argument might be appropriate, but here it is not. The court in Bruenell, infra, at 1994, recognized the competing interests of the defamed to seek redress for defamation, and the public to be informed as citizens and voters. Bruenell v. Harte-Hanks Communications, Inc., 23 Media L. Rep. 1378, 1994 WL 790830 * 3, No. 93-2018 (Mass.Super. 1994) (Fremont-Smith, J.), citing ELM Medical, 403 Mass. at 782-783; Restatement (Second) of Torts § 611 (1977).

But no First Amendment privilege bars inquiry into editorial process. We Inc. v. City of Philadelphia, 174 F.3d 322, 1999.C03.42075 <http://www.versuslaw.com> (3d Cir. 1999), citing Herbert v. Lando, 441 U.S. 153 (1979). Therefore, STF's First Amendment argument must fail.

---

[16] As to whether "STF had any control over the content of the [ABC Sally Jesse Raphael] broadcast is a matter to learn at discovery [STF Mem. at 16]. Nevertheless, STF does **not** deny having control over that show; instead, it skirts around the subject, which confirms that the issue is one for the discovery stage of these proceedings.

**VI.** **Where the determination of whether the fair report privilege is applicable does not depend on the cause of action, if the privilege is inapplicable under one theory of law, it is inapplicable under all others.**

FOX TV and FBI Agent Prouty conspired to provide entertainment for the public through its two television shows, namely, America's Most Wanted and Unsolved Mysteries. STF's AMW and Unsolved Mysteries are significant profit-making shows. They have sponsors who spend significant monies for paid advertisements to STF (a division of FOX Television Stations, Inc.) and/or its multi-layered subcorporations.

| The News Corp. | ⇨ | FOX Television Stations, Inc. | ⇨ | FOXNews | ⇨ | FOX25News |
| The News Corp. | ⇨ | FOX Television Stations, Inc | ⇨ | Unsolved Mysteries | ⇨ | New England Unsolved Mysteries |
| The News Corp. |   | ∨ |   |   |   |   |
|   | ⇨ | STF Productions, Inc (Div. of FTSI) | ⇨ | America's Most Wanted* |   |   |

\* Twentieth Century Fox Film Corporation, another subcorporation of The News Corp., holds the copyright on the AMW website, but it is hosted and managed by IQ Biometrix California, Inc., which has a corporate website at iqbiometric.com. William Scigliano, Chief Executive Officer and President of IQ Biometrix, **has acted as the government's liaison for the "America's Most Wanted" television show,** which had had 30,764,133 visitors as of the date this opposition has been filed, 9 June 2004.

The public personae of the shows give the impression that these entities exist to protect the public, to do good. Meuse does not dispute that some good is, in fact, done by the shows. But as with all entertainment, there is an element of advertising hype to sustain their existence as successful, profitable cost-centers with a potential for growth with increased productivity and increased profits. To do that, STF/AMW advertises on its shows and website the pictures of alleged fugitives, sells decks of playing cards with alleged "criminals" on them, extols the "number" of those alleged fugitives caught as a result of their exposure on those shows, by the Wanted posters displayed and continuously republished on their websites, and by the further distribution through their partners, such as Wal-Mart and NCMEC.

The problem arose here because these entities–FOX, AMW, NCMEC, and Wal-Mart--did not check the truth of the story the FBI and the police department gave them. They do not check because it would considerably decrease the number of so-called fugitives both at large and caught, and decrease the opportunity for self-aggrandizement by producing statistics of dubious value.

**VII.** **Meuse properly pled his §1983 conspiracy and his common-law defamation claims.**

**VIII.** **STF/AMW is liable for tortious acts or civil rights deprivations committed by others where its acts were done with the intent to commit those acts.**

**IX.** **Extreme and outrageous conduct is not always an element of a claim for intentional infliction of emotional distress.**

**X.** **Where STF/AMW was jointly engaged with the FBI, it was acting under color of law for purposes of §1983 actions.**

Plaintiff incorporates herein in entirety by reference the arguments for these **FOUR** same issues presented and numbered Issues VI through IX in his Opposition to the Motion to Dismiss by Fox Television Stations, Inc. STF/AMW makes the same argument as did FOX.

**CONCLUSION**

Clearly, there is no privilege or other legal or factual reason to preclude the maintenance of suit against STF/AMW for its conduct and liability in falsely reporting to the nation that Meuse was an abductor and fugitive fleeing to avoid prosecution.

WHEREFORE, Plaintiff Meuse prays this Court deny STF/AMW's motion to dismiss.

                            Respectfully submitted,
                            BRIAN J. MEUSE,
                            By his attorney,

                            /s/Barbara C. Johnson <barbaracjohnson@worldnet.att.net>
9 June 2004                 Barbara C. Johnson, Esq., BBO #549972
                            6 Appletree Lane
                            Andover, MA 01810-4102
                            978-474-0833


**AFFIDAVIT**

I, Barbara C. Johnson, Esq., hereby depose that all statements and observations I attribute to myself saying or observing are true, and all other statements are true upon information and belief. Sworn under the pains and penalties of perjury.

                            /s/Barbara C. Johnson <barbaracjohnson@worldnet.att.net>
9 June 2004                 Barbara C. Johnson, Esq., BBO #549972

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was serves upon each party not receiving ECF notification on 9 June 2004.
6/9/04   /s/Barbara C. Johnson <barbaracjohnson@worldnet.att.net>