UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-10255-EFH

**Brian J. Meuse**
Plaintiff

v.

**Susan Pane,
Rosalyn Stults,
Lt. Detective Daniel R. Moynihan**, in his official and individual capacities,
**Captain Donald Thompson**, in his official and individual capacities,
**City of Haverhill, Massachusetts,**
**Louis Freeh**, in his official capacity,
**Charles S. Prouty**, in his official and individual capacities,
**Charles P. Kelly,** in his official and individual capacities,
**FOX Television Stations, Inc.,**
**STF Productions, Inc.**, a/k/a America's Most Wanted,
**National Center for Missing and Exploited Children,**
**Wal-Mart Stores, Inc.**
Defendants

---

**MEUSE'S LOCAL RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF HIS OPPOSITION TO ROSALYN STULTS' MOTION FOR SUMMARY JUDGMENT**
**(An opposition and a supporting memorandum accompany this Local Rule 56.1 Statement of Facts, and an affidavit appears below the signature on page 12.)**

Now comes Brian J. Meuse ["Meuse] and submits his Local Rule 56.1 Statement of Facts in support of his opposition to the motion for summary judgment by Defendant Rosalyn Stults ["Stults"]. Meuse's Statement demonstrates that there are genuine issues of material fact, making summary judgment inappropriate.

This pleading is divided into four sections:

- Part I: Summary of Facts Pled in Complaint (with Addendum Exhs. A-HHH) (This is an updated excerpt from OPPOSITION TO STULTS' MOTION TO STRIKE THE COMPLAINT and included here for the convenience of the court as a "fast way" into the facts of the case. These facts are uncontroverted by Stults.

- Part II: Undisputed Facts According to Meuse

- Part III: Disputed Facts

- Part IV: Facts Taken out of Context by Stults (it is impossible to discern whether Stults agrees or disagrees with the underlying paragraph she cites)

1

**Part I: SUMMARY OF FACTS PLED IN COMPLAINT AND ADDENDUM EXHIBITS**

In August 1999, Meuse and Pane had a child out of wedlock [**Ver. Compl. ¶37**]. Meuse was upset by Pane's excessive use of prescription drugs, before, during, and after pregnancy [**Ver. Compl. ¶¶28-30, *et seq.*; drug use, *passim***]. Pane made plans to leave for Florida after she had consulted with Stults [**Ver. Compl. ¶46**]. Meuse filed an action for custody and paternity [**Ver. Compl. ¶44**] and obtained a temporary restraining order on 4 October 1999 against Pane [**Ver. Compl. ¶¶48, 73**]. The TRO gave custody of the child to Meuse and ordered Pane not to leave the Commonwealth with the infant. **Id.**

After Pane told Meuse that she, her mother (visiting from Port Orange, Florida), and the child were going for a day's outing to Newburyport, MA, all three disappeared [**Ver. Compl. ¶47**]. Pane caused a pleading to be filed in Florida regarding custody, but did not herself resurface physically until the end of October 1999 in Florida. Meuse made several unsuccessful attempts at service [**Ver. Compl. ¶49**]. Pane testified at the criminal trial of Meuse that her mother had lied when she told the process servers that Pane did not live with her in Port Orange [*see* **Ver. Compl. ¶¶51-52, 55**]. Question: Who was lying, her mother or Pane?

The Haverhill District Court ["HDC"] TRO was renewed against Pane several times and expired on 10 December 1999 [**Ver. Compl. ¶59**]. Although Pane appeared in HDC during November and December of 1999, neither the court nor the police made any effort to enforce the TRO [**Ver. Compl. ¶¶60-61**].\[1]/,\[2]/

---

[1] At the end of Pane's testimony at the criminal trial, Meuse requested that Pane be held and produce the child. Meuse was refused the request.

[2] In Florida, Pane got a temporary order of custody [**Compl. Exh. QQ**] and Meuse, finding her, got a temporary emergency injunction ordering Pane not to remove the child from Volusia County [**Ver. Compl. ¶¶54, 57; Compl. Exh. OO**]. She repeatedly defied and violated the injunction. Meuse alerted the courts, resulting in a Massachusetts judge (Manzi, J.) and a Florida judge communicating, in accordance with the Massachusetts Child Custody Jurisdiction Act. Judge Manzi held a hearing in March 2000 and on 3 May 2000 declared that Massachusetts was the Home State of the child, that Massachusetts would exercise jurisdiction, and that Susan Pane wrongfully removed the child to Florida in October 1999. [**Ver. Compl. ¶64, Compl. Exh. T**] The Florida court dismissed the Pane's case in two ways: initially by operation of law and later in writing (so that Meuse would have a piece of paper to use in a court as evidence of the Florida dismissal).

Fast-forward to June 2000, when the infant was 10 months old and brought to a Florida Early Intervention team for a medical examination due to her inability to hold a bottle, sit up on her own, crawl [**Ver. Compl. ¶66-67; Compl. Exh. D**]. The team set up four physical and occupational therapy sessions a week for the child [**Ver. Compl. ¶68; Compl. Exh. D**]. Pane took the child for therapy two weeks and then cancelled the sessions and left Florida to go on a vacation in another State [**Ver. Compl. ¶¶69, 140-141, 144-146**]. Meuse traveled again from Massachusetts to Florida and saw the child again for a week in August 2000 and observed no improvement in her condition [**Ver. Compl. ¶142;** *see also* **Ver. Compl. ¶150**].

Between June and August, Meuse sought the child's medical records (as the family court had allowed). He learned about the cancellation of the therapy visits and feared the muscles of the child's appendages would atrophy [**Compl. Exh. D**]. On 7 August 2000, Meuse and Pane, via their counsel, entered into an agreement (filed in court) that they would let each other know where they were with the child [**Ver. Compl. ¶143**]. Pane never abided by that agreement. Around Labor Day 2000, Meuse sought a *habeas corpus*, but five courts refused to hear it with or without diverse reasons.

On 1 October 2000, when the child was 14 months old, Meuse again arrived in Florida to visit with the child for one week [**Ver. Compl. ¶152**]. When he observed that the child still could not hold a bottle or sit up on her own or crawl, he put himself and the child on a plane to Massachusetts and brought her to the Children's Hospital Emergency Room and set up appoint-

---

      Stults not only omitted telling the authorities that the Florida temporary order had been dismissed or vacated by operation of law but also misinformed them that the Florida temporary custody order was still in effect. [*see* **Ver. Compl. ¶¶63, 334-335; Crim. Trial Transcript, 5/22/02, at 169**].
      The defendant FBI agents either did not understand how certain things happen by operation of law, or they were never trained in a very significant facet of the law, or they intentionally ignored the law, for they wrongly declared that the Florida order that had been dismissed in May 2000 was still active on 1 October 2000 [**FBI Mem. Dism/SJ at 2, ¶¶2 and 3**]. If the agents were properly trained and understood how the law operates, then their statement in their memorandum is but an intentional smokescreen to hide the truth of the agents' intentional tortious acts or of their incompetence.

3

ments for therapy and examination by a specialist in pediatric neurology associated with Boston Floating Hospital [**Ver. Compl. ¶¶153-155, 162-164;** *see also* **¶¶156-161**, for graphic description by certified daycare owner—the Commonwealth's witness at the criminal trial—of the child's physical condition].

Immediately thereafter, in keeping with the August 7th agreement, Meuse's counsel notified Stults where the child was and the contact information for the doctors and therapists involved [**Ver. Compl. ¶165**].

Stults and Pane immediately phoned the medical professionals and cancelled the appointments Meuse had set up for the child [**Ver. Compl. ¶166-167,** *see also* **¶169, 368-369**]. On 5 October 2000, after learning of the cancellations, Meuse disappeared with the child [**Ver. Compl. ¶¶168, 170**].

On 5 October 2000, Stults got a short order of notice and scheduled a hearing for 11 October 2000 [**Ver. Compl. ¶171**]. At that hearing a judge gave Pane physical custody [**Ver. Compl. ¶344**]. Meuse personally was already out of contact and had no knowledge of either the hearing or the temporary custody order of October 11th [**Ver. Compl. ¶¶172, 345**].

Stults and Pane then began a campaign to find Meuse and the child [**Ver. Compl.,** *passim*]. To do so, they said that Meuse was in contempt of court. That was not true. No contempt hearing was held. No judgment of contempt had issued. HPD Detective Moynihan obtained an arrest warrant without an affidavit [**Ver. Compl. ¶215**]. A judge did not sign the warrant; a clerk did [**Ver. Compl. ¶222; Compl. Exh. Z**]. Susan provided the information for posters [**Ver. Compl. ¶299-300, page 32, Compl. Exhs. FF-GG**]. Stults handled the media and set up and adver-tised\[3]/—a Susan Pane Legal Defense Fund – for funds that were to be sent to Stults -- although Pane was not being tried for a crime or sued civilly outside family court [**Ver. Compl. ¶337**]. In

---
[3] In newspaper articles, press releases, flyers. . . .

4

fact, with Meuse out-of-contact, there was no activity in family court. At the expense of Meuse's reputation, Stults made money, and so did Pane, if the funds went to pay her legal bills from Stults.

Between October 2000 and March 2001, Defendants HPD Detective Moynihan and Captain Thompson coordinated continuous activities through constant contact with FBI Agent Kelly, Stults, and Pane [**Ver. Compl. ¶¶215**]. The posters (by Pane, the NCMEC, and the FBI) were shown on television (FOX25News, featuring an interview of FBI Agent Prouty, America's Most Wanted, and the Sally Jessy Raphael show), uploaded to the AMW and NCMEC websites, and hung in Wal-Marts across the country [**Ver. Compl. ¶¶304*ff*, 325-326; Compl. at 32-33; and Compl. Exhs. FF and GG**]. (Wal-Mart is a sponsor of NCMEC.) In the press and posters and on the airwaves, Meuse was presented as being wanted for Parental Kidnapping and Unlawful Flight to Avoid Prosecution. **Id.**

In March 2001, Meuse was captured at gunpoint in Oklahoma as a result of a Wal-Mart poster describing him as a fugitive [**Ver. Compl. ¶380**]. The child was turned over to Pane. Fortunately, in Meuse's care, she had learned finally how to smile, sit up, walk, run, and play [**Ver. Compl. ¶374**].

Back in Massachusetts shortly thereafter, Meuse was arraigned for Parental Kidnapping [**Ver. Compl. ¶387**]. He was never tried for Unlawful Flight to Avoid Prosecution because 18 U.S.C. §1073 (the UFAP statute) requires a State felony warrant and the State warrant obtained by Moynihan was a State misdemeanor warrant,[4]/ and there never was evidence to support the

---

[4] Defendant FBI Agent Kelly, knowing that the State warrant was for a misdemeanor [**Doc 116, FBI Exh. 1, p. 7 of 20**], perjured himself when he affianced that Meuse had fled to avoid a felony [**Doc 116, FBI Exh. 4, ¶2(G) and ¶4**]. Until 3 February 2006, when Meuse's counsel received Document 116, filed by the FBI defendants, she was unaware that U.S. Attorney Robert Weiner was involved in the Meuse debacle by having in his possession the State misdemeanor warrant, and seeking, on 2 November 2000, from U.S. Attorney Donald Stern a federal flight warrant [**Doc 116, FBI Exh. 2**]. It appears that knowing that a State felony warrant is required for a UFAP warrant, U.S. Attorney Stern did nothing more on the case.

The U.S. Attorney's apparent inaction appears to have caused Defendant FBI Agents Kelly and Prouty to go it alone. Hence **(a)** Kelly's affidavit of 6 November 2000, **(b)** the unsigned Warrant for Arrest, dated 6 November 2000, and **(c)** a Criminal Complaint, USA v. Meuse, dated 6 November 2000.

From this point, the evidence inculpates the FBI in skullduggery, possibly criminal skullduggery: according

5

allegation that Meuse had fled for such a purpose.

In July 2001, a court (Swan, J.) wrote that no custody order had been in effect prior to Meuse taking the child from Florida [**Ver. Compl. ¶343**].

Meuse was tried during May 2002, after which a jury of his peers found Meuse Not Guilty [**Ver. Compl. ¶395**]. It was the testimony by the Commonwealth's own witness of the tragic condition of the child at the time Meuse rescued her [**Ver. Compl. ¶¶156-161**] and the beautiful pictures of the child at play [**Compl. Exh. MM**] close to the time of the Oklahoman siege that clinched the jury verdict.

---

to the docket sheet for Case No. 00-MJ-889-MBB [**Figure 1**], the Complaint dated 6 November 2000 was **filed** on "10/8/2000" (October 8th, a Sunday), a month **before** the Complaint form was filled out, and was entered into the docket on "4/25/01," after Meuse had been captured and after Haverhill District Court Judge Herlihy said he, too, wanted to see the federal warrant. The Essex County assistant district attorney assigned to the case promised to produce it but never did. He could not.

| Filing Date | # | Docket Text |
|---|---|---|
| 10/08/2000 | 1 | COMPLAINT as to Brian Meuse , filed. (fmr) (Entered: 04/25/2001) |
| 04/24/2001 | 2 | MOTION by USA , as to Brian Meuse to dismiss , filed. (fmr) (Entered: 04/25/2001) |
| 04/24/2001 |   | Mag. Judge Marianne B. Bowler . ENDORSED ORDER as to Brian Meuse : granting [2-1] motion to dismiss as to Brian Meuse (1). (fmr) (Entered: 04/25/2001) |
| 04/24/2001 |   | DISMISSAL of Count(s) on Government Motion as to Brian Meuse . Complaint dismissed. (fmr) (Entered: 04/25/2001) |
| 04/25/2001 |   | Case closed as to all defendants, as to Brian Meuse party Brian Meuse (fmr) (Entered: 04/25/2001) |

**Figure 1. An excerpt from the docket sheet for <u>USA v. Meuse</u>, Case No. 00-MJ-889-MBB
<u>Compare with FBI Exh. 1 to Document 116, filed 02/03/2006</u>**

Meuse contends—as his counsel has repeatedly asserted— the federal warrant never existed, the information on the three posters Meuse discovered was false, and given the number of sophisticated corporations and the other defendants who played along with the FBI, there was a conspiracy by the defendants, with diverse ulterior motives, to capture, imprison, and prosecute Meuse and to cause the consequences therefrom to harm him. To fake the existence of a federal Warrant for Arrest was but one step in the conspiracy, a step with which all the co-conspirators were in agreement.

While it is reasonable to assume that the nonlawyer defendants did not know, literally, the requirement of §1073 that a State felony warrant exist, it is not reasonable to conclude that none of them wanted to see the federal warrant. The reasonable conclusion is that all the co-conspirators knew there was no federal warrant. As a lawyer, Stults knew or should have known her obligation to check out her facts before speaking to the press and other media persons about the existence of a federal warrant. Clearly she did not check out the facts that should have formed the basis of her statements to the media. Why? Because she knew the federal warrant did not exist.

6

Notwithstanding the Not Guilty verdict, the posters representing Meuse as a fugitive remained on the websites of AMW and NCMEC after the criminal trial. The poster on AMW remained on its website until the Complaint in this action was served, in February 2004 [**Ver. Compl. ¶¶305, 317**].

**Part II:** **MEUSE'S UNDISPUTED FACTS**

**Introduction.** In factual support of his opposition to the motion for summary judgment, Meuse submits to this court the facts involving Stults. Meuse incorporates herein by reference his OPPOSITION TO STULTS' MOTION TO STRIKE THE COMPLAINT and includes the **33** paragraphs referring **explicitly** to Stults and dozens more that included Stults **implicitly** under the umbrella of the word "Defendants."

With spins of her own, Stults appears to have accepted the following paragraphs of Meuse's Ver. Complaint as undisputed: ¶¶ 3, 28-31, 40-41, 43, 48, 53-54, 57-59, 151-152, 172 [**Stults' Memo. at 2**]. Meuse does not repeat those paragraphs in the list below, given that none of which has any particular relevance to the issues Stults raised in her motion for summary judgment and her supporting memorandum.

1. Rosalyn Stults ["Stults"], who is an attorney, was a resident of Massachusetts, and represented Susan Pane in the family court at all relevant times in this Complaint **[Ver. Complaint ¶5; Crim. Trial Transcript, 5/20/02, at 65]**.

2. Pane was in constant communication with Attorney Stults prior to leaving Meuse's home **[Ver. Complaint ¶46; Crim. Trial Transcript, 5/20/02, at 65; Compl. Exh. HHH]**.

5. On or around 21 October 1999, Defendant Attorney Stults made her appearance as counsel for Pane in Haverhill District Court **[Ver. Complaint ¶50; Compl. Exh. M, special appearance on page 4]**. It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶50** of the Verified Complaint.

6. On 5 October 2000, Meuse's lawyer informed Pane's local lawyer, Rosalyn Stults, about the visits to the hospital, with the therapists and the local doctor, and the future appointments **[Ver. Complaint ¶165; Compl. Exh. LL]**. It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶165**

7

of the Verified Complaint.

7. Pane and/or Stults contacted the doctors with whom Meuse had made contact to examine the child and told them that Meuse was in contempt of court **[Ver. Complaint ¶166; Crim. Trial Transcript, 5/21/02, at 125; Compl. Exh. LL]**. It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶166** of the Verified Complaint.

8. Almost immediately upon his return to his home in Ward Hill, Meuse learned from messages on his answering machine that Pane and Stults had called the doctors and had threatened them with suit were they to continue seeing Marissa **[Ver. Complaint ¶168]**.

9. On 6 October 2000, Stults set up a hearing before Judge Manzi at Probate & Family Court at Lawrence, Massachusetts, for Wednesday, 11 October 2000 **[Ver. Complaint ¶171]**. It appears that on pages 3 and 4 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶171** of the Verified Complaint.

10. Before Moynihan brought an application for criminal complaint and warrant, the only people he used as a resource of information beside Susan Pane and her lawyer, Stults, was his captain, Captain Thompson **[Ver. Complaint ¶216; Crim. Trial Transcript, 5/21/02, at 62]**.

11. Moynihan had knowledge that Pane and/or Stults contacted the doctors with whom Meuse had made contact to examine the child **[Ver. Complaint ¶252; Crim. Trial Transcript, 5/21/02, at 124; Compl. Exh. LL]**.

12. The domestic violence advocate Jean Walker, kept up a steady correspondence with Stults and with Charles Kelly of the FBI **[Ver. Complaint ¶284; Crim. Trial Transcript, 5/21/02, at 91-92]**.\[5]/

13. Moynihan's domestic violence advocate, Jean Walker, maintained a file on Meuse's defense counsel. Stults supplied the material to Walker for Moynihan's file on Meuse and his counsel **[Ver. Complaint ¶291; Crim. Trial Transcript, 5/21/02, at 144-145]**. It appears that on pages 3 and 4 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶291** of the Verified Complaint. *See* note 3 in the margin of this pleading.

14. It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶¶269-277** of the Verified Complaint.

---

[5] The facts in ¶¶12 and 13, among others, in the list above demonstrate a "**close nexus between the State and the challenged action of the private entity [Stults] so that the action of the latter may be fairly treated as that of the State itself**" [Blum, *infra*], to wit, **(a)** that Haverhill Police Detective Moynihan relied heavily on Stults for his information regarding the Meuse case and **(b)** that Moynihan's assignment of Jean Walker, the Domestic Violence advocate, to the task of compiling information from Stults worked to give "**significant encouragement**" to Stults to continue doing *police work*, "**traditionally the exclusive prerogative of the State**." Blum v. Yaretsky, 457 U.S. 991. 1003-1005 (1982) and Stults Memo, at 8. Gerena c. P.R. Legal Servs., Inc., 697 F.2d 447, 449 (1st Cir. 1983), which, similarly, requires "some connection between the private entity and the state" for a determination of state action. Stults Memo, at 8.

15. It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶¶295-299** of the Verified Complaint.

16. It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶¶298-300** of the Verified Complaint.

17. Moynihan spoke to Rosalyn Stults once every other week **[Ver. Complaint ¶330; Crim. Trial Transcript, 5/21/02, at 23; Compl. Exh. II].** It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶330** of the Verified Complaint.

18. Moynihan never told Stults that her client, Pane, wrongfully removed the child and that she should get her client back to Massachusetts or otherwise a warrant would issue to bring Pane back **[Ver. Complaint ¶331; Crim. Trial Transcript, 5/21/02, at 23].**

19. Moynihan testified that he kept no notes or records of Stults' calls, but testified that Stults called wanting "to know what was going on in the investigation," telling him "what was going on down in Florida, what they were proceeding to do as far as getting out the posters and that certain people they were getting to help them in trying to recover the kidnapped child" **[Ver. Complaint ¶334; Crim. Trial Transcript, 5/21/02, at 61-62].** It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶334** of the Verified Complaint.

20. Stults communicated with Charles Kelly by FAXed letters on numerous dates, including but not limited to a 29-page letter on 14 November 2000 and a 3-page letter on 16 November 2000 **[Ver. Complaint ¶335].** It appears that on pages 3 and 4 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶335** of the Verified Complaint.

21. In the press release of 31 December 2000, Pane identified that donations were to be made payable to the "Susan Pane Legal Defense Fund" and to be sent to "Attorney Roslyn [*sic*] Stults, 14 Lynde Street, Salem, MA 01970" **[Ver. Complaint ¶337; Compl. Exh. GGG].** It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶337** of the Verified Complaint.

22. Later that day Meuse learned that Rosalyn Stults was in contact with them and that Stults was getting the medical records from Children's Hospital and Tanguay's office **[Ver. Complaint ¶367].**

23. Stults and Pane canceled the Early Intervention Program appointments that Meuse had made **[Ver. Complaint ¶368].** It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶368** of the Verified Complaint.

24. On a document found in Moynihan's file, Stults had handwritten "Cathy at Children's Hospital, phone number at the Children's Hospital, fax for Dr. Sun which is one of the doctors in the emergency, to get the release forms of the emergency evaluation. More phone numbers for Dr. Tanguay. Called him at 4:30 on October 6, 2000. Called back to check if we

received a fax requesting his -- my records of Marissa with Dr. Tanguay. Another phone number for Dr. Gordon at the Early Intervention, has Linda Schaeffer as Susan's contact person" **[Ver. Complaint ¶369; Crim. Trial Transcript, 5/22/02, at 204; Compl. Exh. LL].**

25. It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶380** of the Verified Complaint.

26. It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶¶382-383** of the Verified Complaint.

27. It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶¶394-395** of the Verified Complaint.

28. Stults' purpose was to aid and abet Pane, her client, in the custody action, to benefit Stults herself financially and reputationally from depriving Meuse of his property and liberty **[Ver. Complaint ¶406].** It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶406** of the Verified Complaint.

29. Rosalyn Stults was interviewed by the Eagle-Tribune, publishing in Essex County, Massachusetts, and advertised the then-upcoming Sally Jessy Raphael show **[Ver. Complaint ¶418].** It appears that on pages 3 and 4 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶418** of the Verified Complaint.

30. Stults advised and strategized with Susan Pane about how to evade service of process of the 209A order and to keep the child from him before and after the original 209A temporary restraining orders had expired **[Ver. Complaint ¶426].** It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶426** of the Verified Complaint.

31. Stults and Pane had the goal to get posters published nationwide to capture Meuse and with the an agreement Susan intentionally misrepresented that there had been a custody order prior to Meuse taking the child from Florida **[Ver. Complaint ¶428].** It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶428** of the Verified Complaint.

32. FOXNews, the Haverhill police department, Thompson, Moynihan, Stults, Prouty, NCMEC, and Pane misrepresented that Meuse was a fleeing felon **[Ver. Complaint ¶429].**

33. In concert with Pane's and Stults' representations and misrepresentations, Moynihan, Thompson, Barone, Kelly, and Prouty indirectly caused the detention and confinement of Meuse on the grounds that Meuse violated a custody order **[Ver. Complaint ¶430].**

34. Susan Pane and Rosalyn Stults played an active part in the initiation and continuation of the criminal proceedings **[Ver. Complaint ¶443].**

35. Stults played an indirect role by advising Pane how to evade service of process of the

10

original 209A temporary restraining order **[Ver. Complaint ¶444]**.  It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶444** of the Verified Complaint.

36. Stults instigated or participated in the prosecution by pressing police to apply for a complaint for an improper purpose **[Ver. Complaint ¶454]**.

37. Stults knew or should have known that the complaint was groundless and she sought to use the process for an ulterior purpose, including, but not limited to, the purpose of aiding her client to gain advantage in her divorce **[Ver. Complaint ¶460]**.  It appears that on page 3 of her memorandum, Stults acknowledges the truth of, i.e., does not dispute, the facts described in **¶460** of the Verified Complaint.

38. Defendants Pane, Stults, Moynihan, Thompson, Barone, Kelly, and Prouty interfered with or attempted to interfere by threats, intimidation, or coercion with Plaintiff's exercise and enjoyment of his rights -- e.g., his rights to his liberty, and his right to due process— secured by the state and federal constitutions or laws of the United States and/or the Commonwealth of Massachusetts **[Ver. Complaint ¶467]**.

39. Stults advised and strategized with Pane about how to evade service of process of the 209A order and to keep the child from him before and after the original 209A temporary restraining orders had expired **[Ver. Complaint ¶492]**.

40. Stults and Pane had the goal to get posters published nationwide to capture Meuse and with the an agreement Susan intentionally misrepresented that there had been a custody order prior to Meuse taking the child from Florida **[Ver. Complaint ¶494]**.

41. In concert with Pane's and Stults' representations and misrepresentations, Moynihan, Thompson, Barone, Kelly, and Prouty indirectly caused the detention and confinement of Meuse on the grounds **(a)** that he violated a custody order; **(b)** that he was wanted for parental kidnapping, and **(c)** that he was fleeing unlawfully to avoid prosecution **[Ver. Complaint ¶498]**.

### Part III: DISPUTED FACTS

42. Stults wrongly contends that Meuse admits in **¶¶152-154** of the Verified Complaint that he acted in "violation of various court orders.

    In those three paragraphs, Meuse described what he did, but certainly did not "admit" that those acts were in violation of any court order.  In fact, that Judge Alan Swan [**Compl. Exh. CCC**] found that there was no family-court custody order prior to Meuse taking the child from Florida to Massachusetts and that a jury of his peers found him Not Guilty of parental kidnapping are two pieces of evidence proving that Meuse did nothing contra to any court order.

43. Stults asserts that Meuse "dropped out of sight with the child" because he was "*[f]aced with the predictable judicial reaction to his unilateral action*"   [**Stults Memo, at 2, misquoting ¶170**].

11

        Meuse first states that Stults' statement or opinion of Meuse's state of mind is inadmissible for summary judgment purposes as well as trial evidence. Secondly, Meuse states that the reason he left with the child was because Stults and Pane **(a)** had contacted all the doctors and therapists to whom Meuse had either taken the child for examination and diagnosis or with whom Meuse had made appointments for the child's further diagnosis and treatment, and **(b)** had threatened them with suit were they to continue seeing Marissa **[Ver. Complaint ¶168;** see also **¶¶361-370].**

44.    Stults asserts that Meuse "*dropping out of sight*" with a two year old child over whom he did not have legal custody generated vigorous official response." **[Stults Memo, at 3, referring to ¶182 and inferring facts that are not contained within it]**.

        Meuse asserts that any "*generated vigorous official response*" was due to **(a)** Stults misinforming the officials that when Meuse "dropped out of sight," there was a custody order when there was **not** a custody order [**Compl. Exh. CCC, Judge Swan's order**, **(b)** Stults omitting that the order she was showing them issued **after** Meuse had "dropped out of sight," and **(c)** Stults not informing the officials that she had interfered—by threatening the medical professionals with suit should they continue to see the child—with the medical diagnosis and treatment Meuse was in the process of obtaining for the child **[Ver. Complaint ¶¶165, 169, and 369].**

**Part IV: FACTS TAKEN OUT OF CONTEXT BY STULTS**

45.    Stults wrote [**Stults Memo, at 3**] "*The Haverhill sought and obtained an arrest warrant for kidnapping*" and cited **Ver. Complaint ¶204** as her support.

        Meuse states that **Ver. Complaint ¶204** reads:

> Although Thompson knew **(a)** that the probate and family court had found neither Pane nor Meuse in contempt, **(b)** that Meuse had been awarded custody by Judge Herlihy of District Court, **(c)** that Judge Manzi had found that Pane had wrongfully removed the child from Massachusetts, Thompson allowed his subordinate Detective Moynihan to seek a warrant to arrest Meuse **[Crim. Trial Transcript, 5/22/02, at 48; Compl. Exhs. M and T].**

        Meuse did not aver in ¶204 that Moynihan obtained a warrant. Given that facts in items a, b, and c do not support getting an arrest warrant, Meuse was averring that items a, b, and c together inferred that Thompson acted with reckless disregard or with intentional disregard of the true underlying facts when he allowed Moynihan to seek an arrest warrant for Meuse.

        Further Moynihan wrote no affidavit in support of his application for an arrest warrant.

46.    Stults wrote "*The FBI was contacted and issued a warrant for 'unlawful to avoid prosecution,*'" and cites **Ver. Compl. ¶226** in support of her statement.

        Meuse disputes Stults' statement, for the FBI may not issue a warrant, it can only seek a warrant to issue from the court. Notwithstanding Meuse's correction that the FBI may not

issue a warrant, given the facts surrounding the so-called "federal warrant," it is likely that the FBI did, on its own, "issue" the arrest warrant **[Ver. Compl. ¶226;** *see also n. 4 in the margin, infra***].**[6]/

47. On page 3 of her memorandum, Stults states that the FBI and Moynihan "coordinate[d]" search activities and cited **¶¶269-277** of the Verified Complaint as supporting paragraphs. While those paragraphs do indeed describe activities and the communication between the HPD and the FBI agents, those paragraphs make no attempt to identify all the parties who coordinated diverse activities in the search for Meuse and the child.

                                      Respectfully submitted,
                                      BRIAN J. MEUSE,
                                      By his attorney,

                          /s/ Barbara C. Johnson <barbaracjohnson@worldnet.att.net>
8 February 2006                  Barbara C. Johnson, Esq.
                                      6 Appletree Lane
                                      Andover, MA 01810-4102
                                      978-474-0833
                                      BBO #549972

## AFFIDAVIT BY BARBARA C. JOHNSON

I, Barbara C. Johnson, Esq., hereby depose that all statements and observations I attribute to myself saying or observing are true, and all other statements are true upon information and belief.

Sworn under the pains and penalties of perjury.

8 February 2006                      /s/ Barbara C. Johnson <barbaracjohnson@worldnet.att/net>
                                                  Barbara C. Johnson, Esq.

---

[6] In his opposition to the FBI defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, Meuse will detail and explain all the facts alluded to here. Those facts, supported solely by documentary evidence will show that there was never a valid federal warrant . . . despite all the assertions by the various defendants to the contrary.