UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-10255-EFH

**Brian J. Meuse**
Plaintiff

v.

**Susan Pane,**
**Rosalyn Stults,**
**Lt. Detective Daniel R. Moynihan**, in his official and individual capacities,
**Captain Donald Thompson**, in his official and individual capacities,
**City of Haverhill, Massachusetts,**
**Louis Freeh**, in his official capacity,
**Charles S. Prouty**, in his official and individual capacities,
**Charles P. Kelly,** in his official and individual capacities,
**FOX Television Stations, Inc.,**
**STF Productions, Inc.**, a/k/a America's Most Wanted,
**National Center for Missing and Exploited Children,**
**Wal-Mart Stores, Inc.**
Defendants

---

## MEUSE'S MEMORANDUM IN SUPPORT OF OPPOSITION TO ROSALYN STULTS' MOTION FOR SUMMARY JUDGMENT
**(An opposition and a Local Rule 56.1 Statement of Facts accompany this opposition.**
**An affidavit appears at the bottom of this pleading.)**

Now comes Brian J. Meuse ["Meuse] and submits this memorandum in opposition to Motion for Summary Judgment by Rosalyn Stults ["Stults"].

| NOTE |
|------|
| Meuse incorporates herein by reference Document ## 1, 7, 70, and 116. |

## SUMMARY JUDGMENT STANDARD

In making its determination, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the non-moving party's case." \\[1]/ <u>Celotex Corp. v. Cat-</u>

---

[1]  The movant, Rosalyn Stults, has done neither: she offered no evidence to disprove Meuse's case and has not demonstrated an absence of evidence to support Meuse's case.

rett, 477 U.S. 317, 325 (1986). Once the movant has met its burden, the non-moving party must

"go beyond the pleadings, and by [its] own affidavits, or by the depositions, answers to interroga-

tories, and admissions on file, designate specific facts showing there is a material issue for trial."

Id. at 323 (internal quotation marks omitted). When facts asserted by the moving party go unrebut-

ted, the Court must still search the record on its own for genuine issues of material fact. See Ste-

phanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 930 (1st Cir. 1983).

## ARGUMENTS\²/

1. **Where Stults and the Haverhill Police Department were inextricably entwined, mak-
   ing Stults a state actor, summary judgment on Meuse's §1983 claims against Stults is
   inappropriate.**

"In a section 1983 action, a plaintiff can only sue a defendant that acted 'under color of

state law.'" Meuse v. Pane, et al, Memorandum an Order, June 9, 2004 (Harrington, J.) (internal

cite omitted). "[A] Section 1983 action against a private entity requires at least some connection

between the private entity and the state. Id. (cite omitted)

In this case, Meuse alleges that Stults was cooperating continuously with both the Haverhill

Police Department [**Ver. Compl. ¶¶216, 252, 284, 291, 330,-331, 334-369, 430, 443, 454, 467.

498**] and the FBI [**Ver. Compl. ¶335**] (the latter acting under state law, not federal law).\³/

---

²    See Meuse's Opposition for a list of the issues in the Arguments section in this memorandum.

³    In Meuse's forthcoming opposition to the FBI defendants' Motion to Dismiss or in the Alternative for Summary
Judgment, he will be arguing with definitive documentary evidence that the FBI defendants were acting under state
law, not federal law, for 18 U.S.C. §1073, under which the FBI allegedly charged Meuse with Unlawful Flight to
Avoid Prosecution ["UFAP"], requires that the related state crime be a felony. [**FBI Memo, p. 4, ¶¶10 (two para-
graphs, each numbered "10")**]. The crime with which Meuse was eventually charged was a misdemeanor and re-
mained a misdemeanor at all times, resulting in a trial in Haverhill District Court, which has no jurisdiction over felo-
nies. Thus Agents Prouty and Kelly were acting in this case under state law, for the federal law was inapplicable.
     In note 3 [**FBI Memo, p. 3**], the FBI defendants note that the state warrant [**FBI Memo, Exh 1**] identifies the
alleged crime as a misdemeanor, but that the Criminal Justice System Information System indicated that a state felony
warrant had issued [**FBI Memo, Exh 5**].
     Where the FBI had conflicting information, one of the many questions raised by the documentary evidence
becomes, Was it reasonable for the FBI defendants, who had a copy of the actual warrant in their possession, to be-
lieve the CJSIS report, filled out by an anonymous clerical worker, over the state warrant in their possession? That the
state misdemeanor warrant did not support the UFAP charge, which required an underlying felony, was likely the rea-
son the warrant was not signed by an Officer of the court [**FBI Memo, Exh. 3 (1 of 2)**], nor even docketed [**Exh. A of

2

Stults contends that she cannot be held liable on Meuse's federal civil rights claims because she is a private individual, and was not acting under color of state law during 2000 and 2001.  For instance, the facts in ¶¶12 and 13 in the Undisputed Facts list in Meuse's Statement of Facts, among other facts throughout the Complaint, demonstrate a "**close nexus between the State and the challenged action of the private entity [Stults] so that the action of the latter may be fairly treated as that of the State itself**" [Blum, *infra*], to wit, **(a)** that Haverhill Police Detective Moynihan relied heavily on Stults for his information regarding the Meuse case and **(b)** that Moynihan's assignment of Jean Walker, the Domestic Violence advocate, to the task of compiling information from Stults worked to give "**significant encouragement**" to Stults to continue doing *police work*, "**traditionally the exclusive prerogative of the State**."  Blum v. Yaretsky, 457 U.S. 991. 1003-1005 (1982) and Stults Memo, at 8.   Gerena c. P.R. Legal Servs., Inc., 697 F.2d 447, 449 (1st Cir. 1983), which, similarly, requires "some connection between the private entity and the state" for a determination of state action.   Stults Memo, at 8.  "[T]he focus must be on whether government action was involved in the particular conduct that is challenged as wrongful."  Phillips v. Youth Dev. Program, Inc., 390 Mass. 652, 656 (1983).   *See* Blum, *supra* at 1004, and Rendell-Baker v. Kohn, 457 U.S. 830, 839-841 (1982).

> Indeed, . . . there is case law to the effect that people who are solely complainants to, or witnesses for, the police in connection with a prosecution are not deemed to be state actors as a result. See, e.g., Grow v. Fisher, 523 F.2d 875, 879 (7th Cir., 1975). **That having been said, however, there is also case law supporting the proposition that to act under color of state law for §1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting see "under color" of law for purposes of §1983 actions.** Adickes v. S. H. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 LEd.2d 142 (1970); United States v. Price, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966).

> Dennis v. Sparks, 449 U.S. 24, 27 (1980) (footnote omitted) (emphasis supplied).  The First Circuit has reiterated the concept:

---

**Meuse's MOTION TO RECONSIDER MOTIONS OF FOX TELEVISION STATIONS, INC., AND  STF PRODUCTIONS, INC., TO DISMISS COMPLAINT**].  And that the FBI knew that they did not have evidence that a felony was committed can be seen in ¶2(G) of Defendant Agent Kelly's affidavit, in which he attempted an end run around the state warrant being a state misdemeanor warrant, and stated, instead, a half-truth, to wit, that c. 265 §26A is a felony, . . . knowing full well that §26A has two penalty components: one for a misdemeanor, the other for a felony [**FBI Memo, pp. 3-4, n. 3**].

3

> A private party's conduct is attributable to the state if the state "has so far insinuated itself into a po-
> sition of interdependence with [the private party] that it must be recognized as a joint participant in the
> challenged activity." Barrios-Velazquez v. Asociacion De Empleados Del Estado Libre Asociado, 84
> F.3d 487, 494 (1st Cir.l996) (citation and internal quotation marks omitted; alteration in the original).

Camilo-Robles v. Hoyos, 151 F.3d 1, 10 (1st Cir., 1998).

Gouin v. Gouin [hereafter "Gouin I"], No. 01-CV-10890-RBC, Paper 46, slip op. at 37-38

(Collings, M-J.) (emphasis supplied).

   a.    **(1) Whether Stults represented Susan Pane in family court is irrelevant and (2)
         where the events complained-of took place outside of family court, "absolute
         privilege" is inapplicable.**

In Gouin I, the private individual arguing that she was not acting under color of state law

was a defendant lawyer.   Plaintiff Gouin alleged that his wife and her stepbrother gave false in-

formation in their 911 calls to the police and to the responding officers,[4]/ so as to induce the police

to arrest Gouin, and thereby gain an advantage in the Gouin divorce proceedings.   He was arrested

and charged with four counts, but subsequently all four criminal charges were dismissed.

   During the following year and still hoping to gain an advantage in the family-court pro-

ceedings, the lawyer wife and her divorce lawyer together phoned 911[5]/ and caused another

criminal charge to be brought against Gouin.   When that criminal charge was dismissed, a second

§1983 case, Gouin v. Gouin [Gouin II], No. 03-CV-11895-MLW, was birthed.   In Gouin II,

---

[4]   The false information was that Gouin should not have been at a jointly-owner marital property and refused to leave.
The wife vacated the property a year earlier—when she moved out of state—and there was no restraining order
["RO"] prohibiting Gouin from being at the property, but the wife had, unbeknownst to Gouin, allowed her stepbrother
to occupy the property.  When Gouin returned to the property, both the wife's stepbrother and the wife, from Maine,
called 911.  Four charges were brought forward in a criminal action against Gouin.  All four charges were dismissed
prior to trial.  Subsequently, the malicious prosecution and civil rights case under §1983 was brought.  This case was
trifurcated.  Part of it remains pending.

[5]   A year later, the wife still wanted to gain a collateral advantage in the divorce and caused still another criminal ac-
tion to be brought against her estranged husband  She had no Massachusetts RO against but did have one from Maine.
By this time, Gouin had been given exclusive use and possession of the marital home.  He had also been ordered to
make the condo available to an appraiser for inspection on a certain date and a certain time.  His wife, without notice
to him, came down from Maine and arrived at the condo.  With her she had the Maine RO and her divorce lawyer,
who met her at the Boston property, phoned 911. Not to be daunted by the dismissal of Gouin I, the wife was in con-
tinuing contact with the police detective assigned to the case.  Subsequently, that criminal case, too, was dismissed
prior to trial, resulting in Gouin II, also a malicious prosecution and civil rights case under §1983, being filed in this
court.  Gouin sued the wife, her lawyer, the police detective, and the City of Boston.  Gouin II, also, remains pending.

Gouin survived all motions to dismiss and to reconsider, and the case today remains pending.

Meuse contends that the fact pattern in the instant case is similar to those in both <u>Gouin</u>

civil actions, in which the natural, civilian defendants, including one attorney for one of the other

parties, vigorously argued that they were not state actors.\[6]/

**2.    <u>Where Stults not only was a willing participant in the conspiracy, which included state actors, but also aided Pane in creating a situation out of which the potential prosecution of Meuse could and would likely grow and lead to possible conviction, summary judgment of Meuse's claims for conspiracy against Stults under both §1985(3) and State common law is inappropriate.</u>**

Stults is not a "mere complainant" where she is implicated in the conspiracy to a significant

and blameworthy degree.  <u>Gouin I</u>, Docket  # 01-CV-10890-RBC, slip op. at 39, citing <u>Wagen-</u>

<u>mann v. Adams</u>, 829 F.2d 196, 210 (1st Cir. 1987).   Stults supplied false information to the police,

to wit,

- that Pane had custody of the child when Meuse took the child from Florida [**Compl. Exh. CCC, a decision holding that there had been no custody order when Meuse took the child from Florida**],

- that there was a custody agreement [*see* **Ver. Compl. ¶315-316, FBI Mem. Sup- porting Mot./Dism./SJ, at 13, para. 2**], and

---

6    Stults cites <u>Slotnick v. Garfinkle</u>, 632 F.2d 163 (1st Cir. 1980), for the proposition that there are insufficient allega- tions of conspiracy in Meuse's complaint. Garfinkle had petitioned the court to find Slotnick in contempt for violating an order prohibiting Slotnick from slandering Garfinkle.  Slotnick, who had been institutionalized in a mental-health facility, then sued six attorneys but failed to plead any facts whatsoever supporting his claim that they conspired to commit him,. The six private attorneys only participated in litigation.  <u>Id.</u> at 166.  Three of the six did not testify; they only appeared in court.  Two of them represented their associate, Garfinkle.  No more is revealed in the case.  Subse- quently, in <u>Matter of Stavisky</u>, 7 Mass. Att'y Disc. R. 277 (1991), two of the <u>Garfinkle</u> defendants were suspended from the practice of law.

In the case underlying <u>Polk County v. Dodson, 454 U.S. 312 (1981)</u>, which Stults cited [**Stults Mem. at 11**], Dodson had sued the public defender assigned to represent him in the appeal of his criminal conviction.  The defender withdrew because Dodson's claims for the appeal were frivolous.  Unlike the case at bar, the defender was sued for actions she took **on**, not outside of court.  The court stated,

[W]e intimate no views as to a public defender's liability for malpractice in an appropriate case under state tort law. . . . With respect to Dodson's § 1983 claims against Shepard, we decide only that a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a de- fendant in a criminal proceeding.. . . Because it was based on such activities, the complaint against Shepard must be dismissed.

<u>Polk County</u>, at 325.

Stults also cites <u>Hill v. McLellan</u>, 490 F.2d 859 (5th Cir. 1974) [**Stults Mem. at 8**];  <u>Hamilton v. Arnold</u>, 135 F.Supp. 99 (D.Mass. 2001) [**Stults Mem. at 10**];  <u>Browne v. Dunne</u>, 409 F. 2d 341 (7th Cir. 1969) [**Stults Mem. at 11**]; and <u>Tunheim v. Bowman</u>, 366 F.Supp.1395 (D.Nev. 1973) [**Stults Mem. at 11**]. All four cases are, like <u>Slotnick</u> and <u>Polk</u>, readily distinguishable from the instant case.

- that Meuse was in contempt of court [**Crim. Trial Transcript, 5/21/02, at 125; Ver. Compl. ¶166; Trial Exh. LL**]

- that there was in effect when Meuse took the child to Massachusetts a custody order issued by a Florida court giving Pane custody of the child [**FBI Memo. Supporting Mot. to Dism./SJ, at 2, ¶2**]\[7]/

None of which facts was true.  Without these falsities having been reported by Stults and Pane, there  would not have been any criminal action taken against Meuse.

Stults was the primary source of that false information for Haverhill Police Department Defendant Detective Moynihan [**Crim. Trial Transcript, 5/21/02, at 23, 61-62, 91-92, 125, 144-145, 204; Ver. Compl. ¶¶ 166, 284, 292, 330, 369, 428; Trial Exhs. II, LL**].  She had frequent conversations with Moynihan, frequent correspondence with HPD Domestic Violence Advocate Jean Walker, and supplied her Walker the materials for Moynihan's Meuse file [**Ver. Compl. ¶¶284, 291, 330, 334, 369, 494, 498**].  Similarly, Stults communicated with and supplied materials re Meuse to FBI Agent Kelly [**Ver. Compl. ¶335**].

The First Circuit has had occasion to explain the law of civil conspiracy

in the Commonwealth at some length:

> Under Massachusetts law, either of two possible causes of action may be called "civil conspiracy."
>
> First. There is precedent supporting a "very limited cause of action in Massachusetts" for "civil conspiracy" of a coercive type. *See Jurgens v.*
>
> *Abraham*, 616 F. Supp. 1381, 1386 (D. Mass.1985). "In order to state a claim of [this type of] civil conspiracy, plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently." *Id.* (quotations omitted) (*citing Fleming v. Dane*, 304 Mass. 46, 22 N.E.2d 609 (1939))...
>
> *****

---

[7]  Detective Moynihan testified at Meuse's criminal trial that Stults was the source of information regarding Florida. [**Ver. Compl. ¶334 (in Item 19 in Meuse's LR 56.1 Statement of Facts); Trial Trans., 5/21/00, at 61-62**].  Significantly, there was *nothing* happening in the Florida courts in October 2000: the Florida case had been dismissed by operation of law in the Spring of 2000, when Judge Manzi held that Massachusetts was the Home State of the child and that Massachusetts had chosen to exercise jurisdiction.

> Second. This second type of civil conspiracy is more akin to a theory of common law joint liability in tort. It is explicitly recognized in Massachusetts law. *See Gurney v. Tenney*, 197 Mass. 457, 84 N.E. 428, 430 (1908); *see also Phelan v. Atlantic Nat'l Bank*, 301 Mass. 463, 17 N.E.2d 697, 700 (1938) ("[A]verment of conspiracy does not ordinarily change nature of cause of action [sounding in tort] nor add to its legal force."). In the civil context, both elsewhere and in Massachusetts, the word conspiracy is frequently used to denote vicarious liability in tort for "concerted action." *See* W. Page Keeton, *Prosser and Keeton on Torts* 322 (5th ed. 1984); *Restatement (Second) of Torts* §876 cmt. b (1977). That is, the concept is invoked to support liability of one person for a tort committed by another. For liability to attach on this basis, there must be, first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement. *See Restatement (Second) of Torts* §876 cmt. b. Where two or more persons act in concert, each will be jointly and severally liable for the tort. *See id.*; *see also New England Foundation Co. v. Reed*, 209 Mass. 556, 95 N.E. 935, 935 (1911) ("The gist of a civil action of this sort is not the conspiracy, but the deceit or fraud causing damage to the plaintiff, the combination being charged merely for the purpose of fixing joint liability on the defendants.").
>
> *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563-4 (1 Cir., 1994); *see also Tingley Systems, Inc. v. CSC Consulting, Inc.*, 152 F. Supp.2d 95, 113 (D. Mass., 2001).

Gouin I, Docket # 01-CV-10890-RBC), slip op. at 33-35.

**Meuse's Common Law Conspiracy Claim.** In the Commonwealth, there are two forms of conspiracy recognized. The one that is "akin to a theory of common law joint liability in tort" [*supra*] is akin to a theory of joint venture in the criminal context:

> "The test [for joint venture] is whether [the] defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." Com. v. Sabetti, 411 Mass. 770, 779 (1992), quoting Com. v. Costa, 407 Mass. 216, 224 (1990). See Com. v. Amaral, 13 Mass.App.Ct. 238, 242 (1982) (Commonwealth not required to show that defendant participated in actual commission of crime; it is sufficient to show that defendant "somehow participated in the venture to the extent that [he] sought to make it succeed"). "Knowledge or intent ... may be proved by inference from all the facts and circumstances developed at trial." Com. v. Costa, *supra* at 225. See Com. v. Beckett,

373 Mass. 329, 341 (1977) (person's intent may be shown "from circumstances and need not, and often cannot, be established by direct evidence"); Com. v. Santiago, 30 Mass.App.Ct. 207, 217 (1991) ("It is rare that one's state of mind can be proved by direct evidence". "[A] person who acts as a lookout while others are engaged in a criminal enterprise can be convicted on a joint enterprise theory." Com. v. Ward, 45 Mass.App.Ct. 901, 902 (1998), quoting Com. v. James, 30 Mass.App.Ct. 490, 499 n. 10 (1991).

Com. v. Miranda, 441 Mass. 783, 791 (2004).

In the instant case, Stults was responsible for the falsity told to the police (violating M.G.L. c, 269 §13A). She was committed to the planned conspiracy to get Meuse falsely accused and falsely convicted. Despite Stults' denial, her intent to participate in the conspiracy can be proved either directly from the facts iterated in the Complaint or by reasonable inferences to be developed by discovery or at trial. It is sufficient that Meuse can show that Stults "'somehow participated in the venture to the extent that [she] sought to make it succeed.'" Id., citing Amaral. The venture was, indeed, successful for 6 months, and resulted in a State criminal complaint issuing, as Pane, Stults, Moynihan, and the other defendants named in the caption intended.\[8]/

To establish a civil conspiracy, a plaintiff must demonstrate that "a combination of persons [acted] pursuant to an agreement to injure the plaintiff." J.R. Nolan & L.J. Sartorio, Tort Law § 99, at 136 (2d ed.1989).

Gutierrez v. Massachusetts Bay Transp. Authority, 437 Mass. 396, 415 (2002).

To establish a criminal conspiracy is a bit more demanding. Under either standard, Meuse has made out a *prima facie* case of conspiracy against both Pane, Stults, members of the City of Haverhill, the FBI, and the corporate defendants.

"The elements of conspiracy are 'a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose.... [T]he unlawful

---

[8]  There was on one issue of first impression an interlocutory appeal [Meuse v. Com., 437 Mass. 1004 (2002), which was argued. Meuse argued that M.G.L. c. 265, § 27A, "'presumes that [either] the counties referred to in the statute are Massachusetts counties or the statute is overbroad and facially vague.'" 437 Mass. at 1004. The case was sent back to the Haverhill District Court on the grounds that the issue could be dealt with in the normal avenue of appellate review. As a result of the denial of the appeal, **(1)** Meuse had to stand trial for a non-existent crime, i.e., an alleged crime that did not occur in either Massachusetts or Florida, **(2)** he continued to be caused physical and mental injuries, including, but not limited to, anxiety and horrific stress and distress, and damages, and **(3)** when he was found Not Guilty, the consideration of whether* § 27A was overbroad and facially vague escaped timely review.

agreement constitutes the gist of the offence....' " Com. v. Benson, 389 Mass. 473, 479, cert. denied, 464 U.S. 915 (1983), quoting from Com. v. Dyer, 243 Mass. 472, 483 (1922). See also Com. v. Fidler, 23 Mass.App.Ct. 506, 513 (1987) ("[t]he essence of the crime of conspiracy is the agreement of the conspirators").

Com. v. Costa, 55 Mass.App.Ct. 901, 901-902 (2002).

> "In the tort field, the doctrine appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." Stock v. Fife, 13 Mass.App.Ct. 75, 82 n. 10 (1982).

Kurker, 44 Mass.App.Ct. at 189. Here, Meuse has shown that Stults and Pane conceived the plan and its purpose, and "[took] affirmative steps to encourage the achievement of the result," that is, to tell the authorities so as to injure Meuse and violate his enumerated constitutional rights.

Additionally, "[l]iability may extend to those who merely assisted in or encouraged the tortious act and does not necessarily require proof of an explicit agreement between defendants." Ellis v. Varney, 2004 WL 574827, at 49, No. 9801397 (Mass.Super., 1/9/2004) (Fecteau, J.), citing Kyte v. Phillip Morris, Inc., 408 Mass 162, 167-68 (1990) and Massachusetts Laborers Health & Welfare Fund v. Phillip Morris, Inc., 62 F.Supp.2d 236, 244 (D.Mass.1999). "A tacit understand-ing is sufficient, and it may be inferred from the conduct of the parties, as proof of conspiracy commonly rests on circumstantial evidence." Ellis, 2004 WL 574827, at 49. "The inferences from the evidence need not be inescapable; they need only be reasonable." Id., quoting Com. v. Camer-ano, 42 Mass.App. 363, 366 (1997). Moreover,

> "The heart of a conspiracy is the formulation of the unlawful agreement or combination." Com. v. Cantres, 405 Mass. 238, 244 (1989). . . . But a conspiracy rarely wears its heart on its sleeve. Thus we have no explicit proof of the defendant's "agreeing" in so many words with Curtis to join in the scheme, although we have much about transactions with M & S, the defendant's company. Agreement, however, may be instinct in the situation as a whole, and proved by circumstantial means. . . . It is enough if the parties come even tacitly to an understanding, and this may be inferred from a course of conduct having a common design. See Direct Sales Co. v. United States, 319 U.S. 703, 714 (1943). Finally, "[t]he step from knowledge to intent and agreement may be taken. There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. There is informed and interested cooperation, stimulation, instigation. And there is also a 'stake in the ven-

ture' which, even if it may not be essential, is not irrelevant to the question of conspiracy."
Id. at 713 (Rutledge, J.).

Com. v. Melanson, 53 Mass.App.Ct. 576, 580-581 (2002) (some internal cites omitted).

> a.    **Invidious discriminatory animus is, under Bray, _infra,_ not an element of con-
> spiracy pursuant to the SECOND clause of §1985(3).  Invidious discriminatory
> animus was created by judicial fiat as an element for conspiracy pursuant to the
> FIRST clause of §1985(3) in Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).**

Section 1985(3) of Title 42 of the United States Code has three clauses.  Only the first

two have any relevance to this discussion.  Those clauses of the subsection of the statute read:

> **(3) Depriving persons of rights or privileges**
>
> [**Clause 1**] If two or more persons in any State or Territory conspire or go in disguise
> on the highway or on the premises of another, for the purpose of depriving, either di-
> rectly or indirectly, any person or class of persons of the equal protection of the laws, or
> of equal privileges and immunities under the laws;
>
> [**Clause 2**] or for the purpose of preventing or hindering the constituted authorities of
> any State or Territory from giving or securing to all persons within such State or Terri-
> tory the equal protection of the laws; . . .

The first clause of §1985(3) is broad in scope.  Because "the [first clause] [ ] was meant to

reach private action does not, however, mean that it was intended to apply to all tortious, conspir-

atorial interferences with the rights of others."  Griffin v. Breckenridge, 403 U.S. (Miss.) 88,

1971.SCT.42106 at ¶42  <http://www.versuslaw.com> (1971).   So, to guard against §1985(3)

becoming a "general federal tort law," the Court in Griffin imposed a fifth element— invidious

discriminatory animus—to make out a _prima facie_ case for conspiracy pursuant to Clause 1.[9]/

A decade later, the Court in Kush v. Rutledge, 460 U.S. 719 (1983), declined to impose

the judicially created _animus_ requirement onto the list of elements needed to make out a claim

for a conspiracy pursuant to the **second** clause of §1985(3).

---

[9]   None of the defendants argued in their motions to dismiss, nor Stults in her motion for summary judgment, that
discrimination is an element of a conspiracy claim under the first clause of §1985(3).  Because Meuse's counsel has
argued, in another case in this District Court, this issue—of the judicially imposed fifth element of a §1985(3) con-
spiracy claim—Meuse would like the opportunity to brief the issue more fully if the court is inclined to act _sua
sponte_ and base its decision on Meuse's §1985(3) conspiracy claim on discrimination grounds.

Commenting upon Kush still another decade later, Justice Stevens in Bray v. Alexandria Women's Health Clinic, 113 S.Ct, 753, 1993.SCT.40439 <http://www.versuslaw.com> (1993), wrote, "Kush suggests that Griffin 's strictly construed class-based animus requirement, developed for the first clause of § 1985(3), should not limit the very different second clause." Bray at ¶128 (Stevens, J., with whom Justice Blackmun, joins, dissenting). ""There is no suggestion in the opinion that its reasoning applies to any other portion of §1985." Bray, at ¶129, citing Kush, 460 U.S., at 726. "[O]f greatest importance, the statutory language that provides the textual basis for the 'class-based, invidiously discriminatory animus' requirement simply does not appear in the portion of the statute that applies to this case." 460 U.S., at 726.

In Bray, the alleged conspiracy was of a different type than that in Griffin. Similarly, so is the conspiracy in the case at bar.   According to Bray, **a clause-2 conspiracy** is one that "seeks by force of numbers to prevent local officials from protecting the victims' constitutional rights." Bray, at ¶12 (Stevens, J., with whom Justice Blackmun, joins, dissenting).  Such a conspiracy

> presents exactly the kind of pernicious combination that the second clause of § 1985(3) was designed to counteract.  As we recognized in Griffin, the second clause of § 1985(3) explicitly concerns such interference with state officials and for that reason does not duplicate the coverage of the first clause. Griffin, 403 U.S., at 99.

Bray, at ¶12.  Stults and the FBI directly—and the corporations indirectly—did just that, i.e., they interfered with the proper performance of the defendant police officers by building the Meuse case so that they all could enhance their own careers by enhancing, in turn, the City of Haverhill's and the police department's domestic violence statistics, which those entities use when applying for an award of grant money from the State and the federal governments.

Without out some ulterior motive and hidden benefit, there was no reason for the defendant police officers to circumvent proper investigating techniques, to forego checking with the courts to learn **(1)** whether there was a custody order, **(2)** whether there was a custody agreement, **(3)**

whether Meuse was in contempt of court, **(4)** whether there was in effect at the time Meuse took the child to Massachusetts a custody order issued by a Florida court giving Pane custody of the child.   The police failed to check into any of these items.  [**Ver. Compl. ¶¶82-83, 87-88, 194-203**]\[10]/   Meuse contends that the failure of the HPD to investigate properly is the reason Defendant Det. Moynihan failed to file an affidavit supporting his application for a warrant.\[11]/

> Limited to conspiracies that are sufficiently massive to supplant local law enforcement authorities, the second clause requires no further restriction to honor the congressional purpose of creating an effective civil rights remedy without federalizing all tort law.

Id., at ¶130.  In sum, a clause-2 conspiracy differs from a clause-1 conspiracy in that it "entails both a violation of the victims' constitutional rights and state involvement."   Id.

**3.**    **None of Meuse's claims against Stults may be dismissed on the grounds that a Bivens' claim may not lie against Stults, for none of Meuse's claims against Stults allege that she was acting under color of federal law.**

"The purpose of Bivens is to deter individual federal officers from committing constitutional violations."  Correctional Services Corp. v. Malesko, 534 U.S. (Cal.) 61, 70 (2001), a 3-2-4 decision with a vigorous dissent.\[12]/   Although in Corr. Servs. Corp. the Court held, at 61, that a

---

[10]    Was the failure to check intentional or was the failure caused by incompetence?  According to Moynihan **[Ver. Comp. ¶203]**, "as far as [he was] concerned, there was no crime in Florida."   In contrast, Defendant FBI Agent Kelly affianced that there was a crime in Florida, because he needed a crime out-of-state to invoke the felony facet of M.G.L. c. 265. §26A **[FBI Exh. 4, Kelly Aff. at ¶2(G); FBI Exh. 1, State misdemeanor warrant]**.  He had to ignore the State misdemeanor warrant, for without a State felony warrant, 18 U.S.C. §1073, which needs a State felony warrant in order to triggered, the so-called federal warrant is invalid.
    The lack of a State felony warrant to support an application for a federal warrant under §1073 is likely the reason the federal warrant **[FBI Exh. 3]** was not signed by Magistrate-Judge Bowler and the reason none Defendants Det. Moynihan and Capt. Thomson never saw the FBI's warrant **[As to Moynihan: Ver, Compl. ¶219, 223;Trial Trans., 5/21/02, at 63, 69.  As to Thompson: Ver. Compl. ¶224, Trial Trans., 5/22/02, at 93;  Ver. Compl. ¶225, Trial Trans., 5/22/02, at 93].  Thompson even told his Chief.  Id. at ¶225]**.  Thompson clearly did not know that 18 U.S.C. §1073 requires a State felony warrant to support the issuance of a federal warrant for Unlawful Flight to Avoid Prosecution **[Ver. Compl. ¶257, Trial Trans., 5/22/02, at 121-122]**.

[11]    [T]he Commonwealth lacked a validly issued arrest warrant due to the clerk's failure to administer an oath to the complainant and his failure to sign the arrest warrant.  This undoubtably is a substantial violation of law, and raises both State and Federal Constitutional issues.  See Payton v. New York, 445 U.S. 573, 603 (1980) . . . ;  Commonwealth v. Marquez, 434 Mass. 370, 374-75 (2001)….

Com. v. Alves, 2001 WL 1811964 *7, No. 0100156001005 (Mass.Super. Nov. 23, 2001) (Murphy, J.)(holding "that the violation ... warrants the exclusion of evidence and the good-faith exception is inapplicable to the facts presented").

[12]    "Because the Bivens remedy is recoverable against individuals, it is a more effective deterrent than the FTCA

party may not bring under <u>Bivens</u>, *infra*, a money-damage action against private entities who acted

under Federal law in such a way as to cause constitutional deprivations [<u>Corr. Servs. Corp.</u> at 61-

62], that case did **not** preclude a party from bringing under §1983 a money-damage action against

private entities who acted under State law in such a way as to cause constitutional deprivations.

<u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).

Where Meuse's claims do not allege that Stults was acting under color of Federal law, no

claims may be subject to a brevis disposition on the grounds that it was brought under <u>Bivens</u>.

Further, Stults has not identified the alleged Federal law of which she claims Meuse ac-

cused her.  The Federal law must be identified.  <u>Gardner v. Governor Apartments Associates</u>, 396

Mass. 661, 662-664 (1986) (vacated and remanded; judge made "no explicit ruling as to which

Federal law was violated by the defendants [engaging in State action]."

**4.      Where Stults published or caused to be published false information about Meuse,
         Stults is liable for defamation of Meuse, making summary judgment on his defama-
         tion claim inappropriate**

The key to this case was held by Pane and Stults.  They turned it and gave life to the full-

bodied falsities—that Meuse was in contempt and that Pane had legal custody prior to Meuse tak-

ing the child to Massachusetts—when they kept on pushing the police to find Meuse and the child.

Considerable trial testimony, included in the complaint, confirms that Pane and Stults were in con-

stant contact with the Haverhill Police Department ["HPD"], the FBI, and NCMEC.

Wal-Mart, AMW, and Fox 25News got into the act because of the FBI's and NCMEC's

---

remedy."  <u>Carlson</u>, 446 U. S. 14, 21 (1980).

    Further, "[t]he absence of a statutory remedy for the violation of constitutional rights cannot absolutely and in all cases bar judicial protection of those rights.  The Supreme Court of the United States has recognized this principle and, in the absence of special factors or an explicit alternative statutory remedy, has allowed direct actions to protect rights under the Federal Constitution."  <u>Phillips</u>, 390 Mass. at 658 n. 4, citing <u>Carlson</u>, *supra* at 18-19; <u>Davis v. Passman</u>, 442 U.S. 228, 242-243 (1979); and <u>Bivens</u>, *supra* at 396-397.  The Court in <u>Phillips</u>, drawing an analogy to federal law, considered the possibility of "a person whose [state] constitutional rights have been interfered with may be entitled to judicial relief even in the absence of a statute providing a procedural vehicle for obtaining relief."  <u>Phillips</u>, at 658.

contact with them.  FBI Agent Prouty ran the FBI Boston office.  He was interviewed in FOX25-News' New England Unsolved Crimes segment that featured the Meuse-Marissa poster.  Wal-Mart and AMW are sponsoring partners of NCMEC, which is in actuality an instrument of the federal government, not just the independent nonprofit it purports to be, and customarily works with the FBI [**Document #70**].  The problem was that none of the unnatural entities checked to confirm whether Pane and Stults were truthful and whether the HPD and the FBI gave them reliable information.  Before defaming Meuse nationwide, the FBI and HPD—as well as the corporations—had an obligation to perform their duties in a lawful and competent manner.  They did not so perform.

Moynihan had an obligation to check whether that which Pane and Stults told him was true or not before he sought an arrest warrant.   The warrant he sought had no legal basis and no affidavit.  Further, when Moynihan spoke of the warrant, he told everyone it was a federal warrant.  Yet, at the criminal trial, he and his captain, Thompson, admitted they had never seen the federal warrant.  In fact, the FBI warrant was not even seen by the Oklahoman police force that arrested Meuse or by the Oklahoman court that held him for extradition.  If it existed, it never surfaced before, during, and after Meuse's arrest and subsequent trial for Parental Kidnapping.\[13]/

Everything that happened to Meuse is attributable to Pane and Stults.  But for their lies and misrepresentations to the law-enforcement entities and the media, all the consequences that Meuse suffered might not have occurred—had the HPD officers and the FBI agents working the case not been either incompetent or have their own ulterior motives for not properly investigating the case.  A proper investigation required that the HPD or the FBI check with the courts to learn whether Meuse was in contempt and whether there had been an order awarding the child's custody to Pane—as Pane and Stults had repeatedly, wrongly informed them.

---

[13]    Meuse's counsel first received a copy of the unsigned warrant from STF (attached to a motion).  She received a second copy from the FBI in the Exhibits to Document #116 only a few days ago, on Friday, February 3d. 2006.

Both women had a societal duty of not lying to the police.  To make a false report to the police is a crime: M.G.L. 29, §13A.  Stults also denies owing any duty\[14]/ to Meuse [**Stults Mot/SJ at 2**] and contends that her statements are protected by "absolute privilege."  First, as a citizen and officer of the court, she has a duty not to break the law.  Second, the absolute privilege is inapplicable when false statements are published outside court and when there is no litigation pending.

    a.    **Where the statements by Stults were not made in the course of a state judicial proceeding, she is not protected by an "absolute privilege" and summary judgment on Meuse's defamation claim is inappropriate.**

In her brief [**Stults Mem. at 14-18**], Stults cites seven cases, all dealing with the doctrine of absolute privilege, which shields attorneys from liability for uttering false statements or misrepresentations made during court proceedings.  Meuse does not dispute that attorneys cannot be sued for defamation for the so-called spins or falsities they utter during argument in court.  Meuse, however, is not suing Stults for dishonest statements made in court.  He is suing for her false reporting to the FBI and the police.   Thus the cases she cites in her brief involve circumstances unlike those in this case. Because they are distinguishable from the instant case, those cases are irrelevant for the purposes of her motion for summary judgment.

For instance, in <u>Sax v. Sax</u>, 53 Mass.App.Ct. 765 (2002), the wife was immune from liability for the contents of her papers filed in court.  In <u>Doe v. Nutter, McClennen & Fish</u>, 41 Mass. App.Ct. 137 (1996), the c. 93A letter and the response to it were communications preliminary to litigation; the communication can be false, malicious, or in bad faith ***provided*** it is related to the litigation.  In <u>Sullivan v. Birmingham</u>, 11 Mass.App.Ct. 359 (1981), an *ad damnum* clause in a medical malpractice complaint was absolutely privileged; <u>Frazier v. Bailey</u>, 957 F.2d 920 (1st Cir. 1992 (same, applying both to the testimony of a party or witness, who "should not be hampered by fear of liability," and to the tort claims based on the same communications preliminary to litigation

---

[14]  *See* Issue 5, *infra.*

and during pendency of litigation); <u>Blanchette v. Cataldo</u>, 734 F.2d 869 (lst Cir.1984) (same).   In

<u>Sriberg v. Raymond</u>, 370 Mass. 105 (1976), a communication in which an attorney is threatening

to bring a lawsuit is privileged, ***providing*** the communication relates to a proceeding that is con-

templated in good faith and that is under serious consideration.   In <u>Correllas v. Viveiros</u>, 410 Mass.

314 (1991), the Court wrote:

> Viveiros provided information to [the] police while she was a suspect in a theft already un-
> der investigation. The prosecutor, in his affidavit, stated that, "[a]t no time did Ms. Viveiros
> come forward of her own free will and offer information concerning the missing money."
> The plaintiff offered no evidence to the effect that Viveiros encouraged or demanded that
> police institute criminal proceedings against Correllas.

Clearly, the circumstances in the first six cases cited above are totally unlike the circumstances

here, in that, in the six cases, the written statements were made in the course of litigation.  And in

<u>Correllas</u>, the oral statements were made in circumstances 180 degrees contrary to the circum-

stances here, i.e., Stults' statements were not voluntary, Stults came forward of her own free will,

she did the accusing, and Stults continuously encouraged and demanded that the police institute

criminal proceedings against Meuse.

Further, there is caselaw which holds that "statements made to police or prosecutors prior

to trial are absolutely privileged if they are made in the context of a proposed judicial proceeding"

[<u>Burke v. Town of Walpole</u>, 2004.DMA.0000022 *100 and *254 <http://www.versuslaw.com>,

Nos. 00-10376-GAO, 00-10384-GAO, and 00-12541-GAO (consolidated) (D.Mass. 01/22/2004)],

but in the circumstances of the instant case, there would have been no "proposed judicial proceed-

ing" but for the falsities told the police and prosecutors.   Public policy does not provide a special

dispensation, to wit, an "absolute privilege," for committing a crime—in this case, that of false re-

porting to the police.

**5.      That Stults was also Pane's attorney is no defense to a conspiracy claim by Meuse, re-
gardless of Meuse being her client's adversary in family court.**

Recovery is allowed under the concerted action theory of Restatement (Second) of Torts §876(b) where a defendant's deliberate conduct caused another to engage in tortious activity.  Kurker v. Hill, 44 Mass.App.Ct. 184, 189 (1998) (reversing the dismissal as to the defendant attorneys of count for civil conspiracy and count for interference with business relations), citing Nelson v. Nason, 343 Mass. 220, 222 (1961); and Pathe Computer Control Sys. Corp. v. Kinmont Indus., Inc., 955 F.2d 94, 98 (1st Cir.1992);   Payton v. Abbott Labs., 512 F.Supp. 1031, 1034-1035 (D.Mass. 1981);  Norman v. Brown, Todd & Heyburn, 693 F.Supp. 1259, 1264 (D.Mass.1988).

> Key to this cause of action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan.  "In the tort field, the doctrine appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result."

Kurker, 44 Mass.App.Ct. at 190, 190 n. 5 (internal cite omitted).

The bottom line is that where Meuse is not suing Stults for a breach of duty—he is suing her for her false reports to the police and the FBI and the consequences that flowed from her false reports— that Stults was also Pane's attorney is no defense to Meuse's conspiracy claims, regardless of Meuse being her client's adversary in family court.

**6.**    **Stults is liable for tortious acts or civil rights deprivations committed by others where her acts were done with the intent to commit those acts, thus shes is liable for false arrest, detention, imprisonment, assault, battery, malicious prosecution, and abuse of process, making summary judgment on these State pending claims inappropriate.**

Stults is responsible:

- under §1983 and common law for Meuse's false arrest and imprisonment,
- for conspiracy under §1983 and common-law conspiracy,
- violating the Mass. Civil Rights Act (M.G.L. c. 12, sec. 11*I*),
- for common-law malicious prosecution, abuse of process, assault, battery, defamation, and the intentional infliction of emotional distress

Most cases hold a position contrary to that of Stults: i.e., it is immaterial whether the complained-of act directly or indirectly caused, for example, confinement or some other tort.

A person may be liable for false imprisonment not only when the person's own acts directly impose a restraint upon the liberty of another but also when that person, by providing false information, causes such restraint to be imposed. Karjavainen v. Buswell, 289 Mass. 419, 427 (1935) (questioned on other grounds by Mezullo v. Maletz, 331 Mass. 233, 239-240 [1954]). Restatement (Second) of Torts s 37 (1965) ("If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement").

Sarvis v. Boston Safe Deposit and Trust Co., 47 Mass.App.Ct. 86, 97-98 (1999).

Cf. Restatement (Second) of Torts §158(a) comment j (1965) ("If, by any act of his, the actor intentionally causes a third person ... to enter land in the possession of another, the actor is responsible for the third person's entry if it be a trespass") ... and Restatement (Second) of Agency §212 comment b (1958) ("If a person directs a particular act which is performed as directed, he is subject to liability if the act directed constitutes a tort."…)

Com. v. Santos, 58 Mass.App.Ct. 701, 705-706 (2003) (trespass and torts in general).

A cause of action under Section(s) 1985(3) has four elements: (1) two or more persons must conspire, (2) to deprive, **either directly or indirectly**, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) one or more of the conspirators must have done or caused to be done an act in furtherance of the object of the conspiracy, and (4) the plaintiff must have suffered either an injury to person or property or a deprivation of a constitutionally protected right or privilege as a result of the conspiracy.

Andrade v. Jamestown Housing Authority, 82 F.3D 1179, 1192 (1st Cir. 1996) (emphasis supplied). That is, if an act is done with the intent to commit a tort or to deprive another of his or her constitutional rights, and such act is the legal cause of the harm to or deprivation of the rights of another, liability attaches. It is immaterial whether one acts directly or indirectly if it caused the harm or civil rights deprivation; liability attaches. Cf. Karjavainen v. Buswell, 289 Mass. at 427.

A person may be liable for false imprisonment **not only** when the person's own acts directly impose a restraint upon the liberty of another **but also** when that person, by providing false information, causes such restraint to be imposed. Karjavainen v. Buswell, 289 Mass. 419, 427 (1935) (questioned on other grounds by Mezullo v. Maletz, 331 Mass. 233, 239-240 [1954]). Restatement (Second) of Torts s 37 (1965) ("If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement").

Sarvis v. Boston Safe Deposit and Trust Co., 47 Mass.App.Ct. 86, 97-98 (1999) (emphasis supplied). See also Restatement (Second) of Torts § 35 (1965).

**18**

> An assault and battery is the intentional, unprivileged, unjustified touching of another with such violence that bodily harm is likely to result.  See Com. v. Burke, 390 Mass. 480, 482-483, 457 N.E.2d 622 (1983).  **The offensive touching may be** direct, as by striking another, or it may **be indirect, as by setting in motion some force or instrumentality with the intent to cause injury.**  See Com. v. Stratton, 114 Mass. 303 (1873); Perkins & Boyce, *Criminal Law* 153-154 (3d ed. 1982).

Com. v. Dixon, 34 Mass.App.Ct. 653, 654-655 (1993) (emphasis supplied); Com. v. Cohen, 55 Mass.App.Ct. 358, 359-360 (2002) (holding indirect touching constitutes criminal battery), quoting Dixon, at 654, and citing U. S. v. Frizzi, 491 F.2d 1231, 1232 (1st Cir.1974), amongst others.

People v. Moore, 50 N.Y. Sup.Ct. 356 (1888), is the leading case on **indirect assault and battery**.  In Com. v. Burno, 18 Mass.App.Ct. 796, 802 n. 8 (1984), the court adopted the reasoning of Moore and affirmed the convictions for assault and battery by holding that an automobile is an extension of a person  and finding it a dangerous weapon based on the "intentional" act theory.

In Lamb v. Maryland, 93 Md. App. 422, 1992.MD.40091 ¶¶73-76 <http://www.versuslaw.com> (1992), the court, citing W. Prosser and P. Keeton, *The Law of Torts* (5th ed. 1984), at 43, wrote that there "[n]o actual contact is necessary" for an assault claim, that is, "a mental, as distinct from a physical, injury" can occur: **"a touching of the mind, if not of the body."**\[15]/

In another Maryland case, Taylor v. State, 52 Md.App. 500, 504-505 (1982), cited in Burno, 18 Mass.App.Ct at 802 n.8, the court concluded, when defining "battery" and "assault": "He who acts through another acts himself."  Taylor at 505 n. 2.

In the case at bar, Stults used the other defendants as instruments for her wrongdoing. Thus she is liable for the false arrest, imprisonment, assault, battery, abuse of process, and

---

[15]    [I]t is not necessary that the victim be actually frightened or placed in fear of an imminent battery at the hands of one with the apparent present ability to commit such a battery. The critical state of mind on the part of the victim is to be placed "in reasonable apprehension" of an impending battery. This distinction preserves the rights of the intrepid crime victim or intrepid plaintiff. As W. LaFave and A. Scott, *Criminal Law* (2d ed. 1986) explained, at 693 n. 18.

Lamb, 1992.MD.40091 ¶¶75-76.  "'Apprehension is not the same thing as fear, and the plaintiff is not deprived of his action merely because he is too courageous to be frightened or intimidated.'"  Id..

malicious prosecution of Meuse.  By Stults acting through another, she acted herself.  <u>Burno</u>, *supra*.

**7.** **Where Meuse was emotionally injured while defendants were committing another tort, summary judgment on the count for intentional infliction of emotional distress is inappropriate.**

"When the injury is emotional, as well as physical, damages compensate for worry, grief, stress, humiliation, anxiety and emotional scarring." <u>Doe v. Clinton</u>, 1996 WL 1185103 at 2 (Mass.Super. 1996) (Kottmyer, J.), citing <u>Wagenmann v. Adams</u>, 829 F.2d 196, 221 (1st Cir. 1987).  "Extreme and outrageous conduct is not required if the emotional distress resulted from the commission of another tort." <u>American Velodur Metal, Inc. v. Schinabek</u>, 20 Mass.App.Ct. 460, 470-471 (1985), *cert. denied*, 396 Mass. 101 (1985), *cert. denied*, 475 U.S. 1018 (1986). Given that Meuse was harmed by many torts and deprived of his fundamental civil rights, even were this court to require Meuse to satisfy the conduct element, he could, under <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140 (1976) and <u>Boyle v. Wenk</u>, 378 Mass. 592, 595-97 (1979), according to <u>Columbus v. Biggio</u>, 76 F.Supp.2d 43, 56-57 (D.Mass. 1999).   For example, in <u>Agis</u>, at 141, the plaintiff was a waitress.  One of the wait staff was stealing from the restaurant.  The manager said until the thief or thieves were identified, he would fire all the waitresses in alphabetical order, starting with the letter **A**, and then fired Agis. The court let her emotional distress claim live.  <u>Id</u>. at 145.   In <u>Boyle</u>, a jury decided that Boyle had an emotional distress claim against a defendant who repeatedly called and harassed her during her recovery from a hospital stay and repeatedly begged the defendant to leave her alone.  <u>Boyle</u>, 378 Mass. at 593-94.

As a direct result of being wrongly accused and defamed and then prosecuted for a non-crime for over one year, Meuse was caused to suffer embarrassment, worry, grief, stress, humili-ation, anxiety, fear, loss of trust, feelings of betrayal, shock, and emotional scarring, all compens-able as emotional distress . . . and all of a much more serious nature than the emotional distress suffered by either <u>Agis</u> or <u>Boyle</u>.

8.    **Where Meuse pled substantive federal questions and where all but the FBI defend-
ants are from Massachusetts, making diversity jurisdiction impossible, the pendent
State claims are properly before this court.**

Stults's request that the pending State claims be dismissed is impractical, for, while Massa-

chusetts is one of the locations of the complained-of events, all but the FBI defendants are Massa-

chusetts entities, which would break the diversity.  Efficiency and conservation of resources de-

mand, therefore, that this court retain jurisdiction over the pending state claims.  There is authority

to do so:  "The exercise of pendent jurisdiction is a matter of discretion, not of right." Landrigan v.

City of Warwick, 628 F.2d 736, 1980.C01.40168  at ¶ 83  <http://www.versuslaw.com> (1st Cir.

1980), citing United Mine Workers v. Gibbs, 383 U.S. 715, 726, (1966).

> . . .  In a federal-question case, the termination of the foundational federal claim does not
> divest the district court of power to exercise supplemental jurisdiction but, rather, sets the
> stage for an exercise of the court's informed discretion. See 28 U.S.C. Section(s) 1367(c)(3)
> (authorizing a district court to decline adjudication of lingering state-law claims after it has
> dismissed "all claims over which it has original jurisdiction"). In deciding whether … to re-
> tain jurisdiction on such an occasion, the trial court must take into account concerns of
> comity, judicial economy, convenience, fairness, and the like…. While dismissal may
> sometimes be appropriate if the federal-question claim is eliminated early in the proceed-
> ings,… each case must be gauged on its own facts. The preferred approach is pragmatic
> and case-specific. Thus, in "an appropriate situation, a federal court may retain jurisdiction
> over state-law claims notwithstanding the early demise of all foundational federal claims."

Roche v. John Hancock Mutual Life Insurance Co., 81 F.3D 249, 1996.C01.0000210 at ¶52

<http://www.versuslaw.com> (1st Cir. 1996) (internal cites omitted).

WHEREFORE, Plaintiff prays this court DENY Stults' motion for summary judgment.

Respectfully submitted,
BRIAN J. MEUSE,
By his attorney,

/s/ Barbara C. Johnson <barbaracjohnson@worldnet.att.net>

8 February 2006                                    Barbara C. Johnson, Esq.
6 Appletree Lane
Andover, MA 01810-4102
978-474-0833
BBO #549972

MEUSE'S MEMORANDUM IN SUPPORT
OF OPPOSITION TO ROSALYN STULTS'
MOTION FOR SUMMARY JUDGMENT

## AFFIDAVIT BY BARBARA C. JOHNSON

I, Barbara C. Johnson, Esq., hereby depose that all statements and observations I attribute to my-self saying or observing are true, and all other statements are true upon information and belief.

Sworn under the pains and penalties of perjury.

8 February 2006                    /s/ Barbara C. Johnson <barbaracjohnson@worldnet.att/net>
                                              Barbara C. Johnson, Esq.