UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-10255-EFH

**Brian J. Meuse**
Plaintiff

v.

**Susan Pane,
Rosalyn Stults,
Lt. Detective Daniel R. Moynihan**, in his official and individual capacities,
**Captain Donald Thompson**, in his official and individual capacities,
**City of Haverhill, Massachusetts,**
**Louis Freeh**, in his official capacity,
**Charles S. Prouty**, in his official and individual capacities,
**Charles P. Kelly,** in his official and individual capacities,
**FOX Television Stations, Inc.,
America's Most Wanted,
National Center for Missing and Exploited Children,
Wal-Mart Stores, Inc.**
Defendants

---

### MEUSE'S OPPOSITIONAL MEMORANDUM
### TO STULTS' SUPPLEMENTAL MEMORANDUM

Now comes Brian J. Meuse ["Meuse] and submits his OPPOSITIONAL MEMORANDUM TO STULTS' SUPPLEMENTAL MEMORANDUM.

This memorandum challenges Stults' assertion that the truth or falsity of a Verified Complaint to the police does "not change the appropriate consideration and application of the state action test" . . . although Stults does not state **which** test and **which** case(s) are the authorities for that unidentified test. That which Stults ignores in her supplemental memorandum, and which she ignored in her original memorandum, is how her false reports shaped the ensuing activities of both the local police department, its Lt. Detective Daniel R. Moynihan ["Moynihan"] and Captain Donald Thompson ["Thompson"], and FBI Agents Charles P. Kelly ["Kelly"] and Charles S. Prouty ["Prouty"], and ultimately the corporate defendants.

That which took shape was a conspiracy. It took shape because Stults (and lest we forget,

1

Pane) was persuasive enough to convince Moynihan and Thompson to insinuate themselves into the conspiracy between Stults and Pane.

> A private party's conduct is attributable to the state if the state "has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity." Barrios-Velazquez v. Asociacion De Empleados Del Estado Libre Asociado, 84 F.3d 487, 494 (1st Cir.l996) (citation and internal quotation marks omitted; alteration in the original).

Camilo-Robles v. Hoyos, 151 F.3d 1, 10 (1st Cir. 1998). And the police and the FBI did, here, insinuate themselves into a position of interdependence with Stults and Pane that the police and the FBI must be recognized as joint participants in the challenged activities. *See* Table 1, *infra*.

> We agree entirely with this appellant's premise that merely initiating a good-faith request for police protection would not attach liability for the subsequent unconstitutional conduct of arresting officers. See, e.g., Burnham v. Collateral Loan Co., 179 Mass. 268, 274, 60 N.E. 617. Such a person does no more than his duty; and to hold him answerable ... for the result of the mistake or misconduct of the officer would be to make the division line of compromise between the right of the individual to his liberty and the right of the public to protection trench too far upon the domain of the latter."); see also 32 Am.Jur.2d False imprisonment §45 "Merely summoning or calling on an officer for protection against a disturbance or trespass or to keep the peace, or to deal with a person accused of crime, is not sufficient participation to impose liability...."). **That tenet, however, does not carry the day, since the evidence presented in this case, albeit largely indirect, adequately supports the conclusion that Anderson was not a "mere complainant," but was implicated in Wagenmann's arrest and imprisonment to a more significant and blameworthy degree.**

Wagenmann v. Adams, 829 F.2d 196, 210 (1st Cir. 1987). According to the pleadings, Stults and Pane were more than "mere complainants" in this scenario. Whether the evidence adduced in discovery will ultimately *further* support the allegations that these two defendants are involved to a more "significant and blameworthy degree" is a question not yet ripe for decision. Meuse contends that there is already more than sufficient evidence to demonstrate that Stults and Pane were not "mere complainants" but were involved to an ***extremely*** "significant and blameworthy degree in a conspiracy to capture Meuse.

In fact, Stults and Pane not only continuously bombarded the defendant police and FBI

agents (as well as the local DA's office) with **false** reports—e.g., **(1)** that when Meuse disappeared, child custody had been awarded to Pane, **(2)** that Meuse was in contempt, **(3)** that the Florida orders were still in effect. Stults and Pane failed to tell them **(4)** that Pane had violated Judge Herlihy's order not to remove the child from Massachusetts, **(5)** that Judge Manzi had held that Pane had wrongfully removed the child from the Commonwealth, **(6)** that Pane had cancelled the therapy appointments that the medical professionals had determined were necessary (following the advice of those medical professionals was at the core of Judge Sahagian's order allowing the child to remain in Florida for the recommended treatment), **(7)** that Pane, by repeatedly disappear-ing with the child, repeatedly violated the stipulation of August 2000 between the parties to let each other know where the child was when she in each other's custody.

With the abundance of sins of commission and omission by Stults and Pane, the police and the FBI agents might not have shunted aside their obvious duty to investigate, which included checking the court records in both Massachusetts and Florida. Had Moynihan or Thompson or Kelly or Prouty done that—whether because of incompetence, plain vanilla negligence, reckless disregard, or intent—Meuse would not have been hunted under false pretenses and captured and maliciously prosecuted. Clearly, by the State warrant being an affidavitless and hearingless warrant and the so-called Federal warrant being Unsigned, the defendants abused process, and in so doing, were ignoring the best interests of the child.

But for Meuse's zealous protection of the child, and his diligent attention to the care she required, the child's physical well-being would not have improved as remarkably as it did in his custody with the proper care and attention to the child's medical and therapeutic needs.

Before discussing each of the cases Stults' cites in her supplemental memorandum, Meuse provides the factual background in chart form, containing each step of the conspiracy and showing how the conspiracy grow.

| ter | Document containing averment | Date of act or event | Averment | Documentary evidence | Characterization, motive or intent, etc. |
|---|---|---|---|---|---|
|  | TABLE 1. How the Conspiracy Grew ||||||
|  | **THE BACKGROUND** ||||||
| 1 |  | 9/13/99 | Meuse filed paternity and custody action in Probate & Family Court, Essex County Division |  |  |
| 2 | Verified Complaint ¶46 | 9/__/99 | Pane was in communication with Stults prior to leaving Meuse's home | Trial, 5/20/02, at 65 |  |
| 3 | Verified Complaint ¶45 | 9/23/99 | Pane told Dr. Barrie Paster that she wanted to go to Florida for a one-week vacation and that she had contacted an attorney | Trial, 5/17/02, at 109, 116; Complaint Exh. DDD |  |
| 4 | Verified Complaint ¶48 | 10/4/99 | Meuse obtained a restraining order pursuant to M.G.L. c. 209A from Haverhill District Court, which gave Meuse custody of the child and ordered Pane not to leave the Commonwealth with the child | Complaint Exhs M and N. Trial, 5/20/02, at 66 | . |
| 5 | Verified Complaint ¶50 | 10/21/99 | Stults made her appearance as counsel for Pane in Haverhill District Court. | Complaint Exh M, special appearance on page 4 |  |
| 6 | Verified Complaint ¶59 | 11/5/99 | Pane appeared with Stults in Haverhill District Court for a hearing re extension of TRO against her | Trial, 5/20/02 at 73-74 | Court did not order Pane to return child to Massachusetts, but extended TRO |
| 7 | Verified Complaint ¶60 | Nov/99—Dec/99 | Pane was in Haverhill District Court several times in November and December 1999 | Trial, 5/22/02, at 164-165; Trial Exhs. M and P, the latter showing service | Neither the court nor the Haverhill Police Department and/or Captain Thompson enforced the TRO against Pane |
| 8 | Verified Complaint ¶64 | 5/3/00 | Judge Mary McCauley Manzi declared Massachusetts the home state of the child, declared Massachusetts would exercise jurisdiction, and wrote that the mother, Pane, wrongfully removed the child to Florida in October 1999 | Trial, 5/20/02, at 81-82; Trial, 5/21/02, at 17; Complaint Exh. T | Pane did not return the child to Massachusetts |
| 9 | *See* Verified Complaint ¶63 | 5/3/00 | State of Florida dismissed Pane's action against Meuse | Exh. C(4) attached to Meuse's Opposition to FBI's Motion for Summary Judgment |  |
| 10 | *See* Verified Complaint ¶92 | 8/7/00 | Stults and Meuse's counsel signed a stipulation that said that if either Pane or Meuse left Volusia County with the child, they were to tell the other where they were | Trial, 5/20/02, at 212. Complaint Exh. AAA, stipulation of 8/7/00]. | Pane breached this stipulation repeatedly [Trial testimony] |

| | | | | | |
|---|---|---|---|---|---|
| 11 | Verified Complaint ¶165 | 10/5/00 | Meuse's lawyer informed Stults about taking the child to the hospital, therapists, and a local doctor, and making future appointments | Complaint Exh. LL (a page from Meuse's motion, giving Pane and Stults notice of where Meuse had taken the child) | |
| | | | **THE CONSPIRACY** | | |
| 12 | Verified Complaint ¶166 and ¶368 | 10/5/00 | Pane and/or Stults contacted the doctors with whom Meuse had made contact to examine the child, told them that Meuse was in contempt of court, had threatened them with suit were they to continue seeing Marissa, and canceled the Early Intervention Program appointments that Meuse had made. | Trial, 5/21/02, at 125; Verified Complaint Exh. LL | **Step 1 of the conspiracy** |
| 13 | Verified Complaint ¶168 and ¶367 | 10/5/00 | Almost immediately upon his return to his home in Ward Hill, Meuse learned from messages on his answering machine that Pane and Stults had called the doctors, had threatened them with suit were they to continue seeing Marissa, and canceled the Early Intervention Program appointments that Meuse had made. Meuse then disappeared from sight with the child | *See* Verified Complaint Exh. LL | Meuse disappeared from sight this date, 10/5/00. |
| 14 | Verified Complaint ¶171 | 10/6/00 | Stults set up a hearing before Judge Manzi at Probate & Family Court at Lawrence, MA, for Wednesday, 11 October 2000. | | **Step 2 of the conspiracy** Meuse had no personal knowledge of the planned hearing |
| 15 | *See* Complaint ¶252 and ¶369 | | Stults contacted the police re Meuse. Stults gives Exh. LL to Detective Moynihan | Trial, 5/22/02, at 204; Complaint Exh. LL | **Step 3 of the conspiracy** At the top of Exh. LL, Stults wrote "how can the doctors treat Marissa when he is <u>not</u> the custodial parent?" This infers that Stults had told the police *et al* that Meuse did not have custody  Neither had been given custody by P&F court by the time Meuse took the child or by the time he disappeared with the child. *See* Complaint Exh. CCC. |
| 16 | Verified Complaint ¶185 | 10/20/00 | Pane reported that the child had been taken from Florida | Trial Exh. BB, Haverhill PD incident report | **Step 4 of the conspiracy** |
| 17 | Verified Complaint ¶¶194-203 | | Moynihan testified that he did not check records at any court in Mass. or Florida | Trial, 5/21/02, at 5-8, 68-69 | **Step 5 of the conspiracy** |

5

| | | | | | |
|---|---|---|---|---|---|
| 18 | Verified Complaint ¶¶186 and 216 | 10/25/00 | Moynihan signed an application for criminal complaint and warrant based only on the information received from Stults and Pane. | Trial, 5/21/02, at 62, 70-71; Complaint Exh. DD | **Step 6 of the conspiracy** Stults and Pane were persuasive and the "state" was insinuated into the position of interdependence with Stults and Pane in the challenged activities |
| 19 | Verified Complaint ¶211; also ¶¶209-210 | | Moynihan kept Captain Thompson informed and Thompson went along because he believed Moynihan | Trial, 5/22/02, at 85-86, 90 | **Step 7 of the conspiracy** |
| 20 | Verified Complaint ¶284 | | Moynihan's domestic violence advocate, Jean Walker, kept a steady correspondence up with Rosalyn Stults and with Charles Kelly of the FBI | Trial, 5/21/02, at 91-92 | **Step 8 of the conspiracy** Moynihan's assignment of Walker to the task of compiling information from Stults worked to give "**significant encouragement**" to Stults to continue doing _police work_, "**traditionally the exclusive prerogative of the State**." Blum v. Yaretsky, 457 U.S. 991, 1003-1005 (1982) and Stults Memo, at 8. Gerena v. P.R. Legal Servs., Inc., 697 F.2d 447, 449 (1st Cir. 1983) |
| 21 | Verified Complaint ¶291. | | Moynihan's DV advocate, Jean Walker, maintained a file on Meuse's defense counsel. The material was supplied to Walker by Pane's lawyer, Stults | Trial, 5/21/02, at 144-145 | **Step 9 of the conspiracy** |
| 22 | Verified Complaint ¶330 | | Moynihan spoke to Stults once every other week | Trial, 5/21/02, at 23; Verified Complaint Exh. II | **Step 10 of the conspiracy** |
| 23 | Verified Complaint ¶331 | | Moynihan never told Stults that her client wrongfully removed the child and that she should get her client back to Massachusetts or otherwise a warrant would issue to bring her back | Trial, 5/21/02, at 23 | |
| 24 | Verified Complaint ¶334. | | Moynihan testified that he kept no notes or records of Stults' calls, but testified that Stults called wanting "to know what was going on in the investigation," telling him "what was going on down in Florida, what they were proceeding to do as far as getting out the posters and that certain people they were getting to help them in trying to recover the kidnapped child" | Trial, 5/21/02, at 61-62 | **Step 11 of the conspiracy** Stults and Pane were performing acts that are "**traditionally the exclusive prerogative of the State,**" and may be deemed state actors. Blum, supra. |
| 25 | Verified Complaint ¶335 | 11/14/00 | Stults communicated with FBI Agent Kelly by FAXed letters on numerous dates, including but not limited to a 29-page letter | FAX cover letter produced by Stults, | **Step 12 of the conspiracy** |

6

| 26 | Verified Complaint ¶335 | 11/16/00 | Stults communicated with FBI Agent Kelly by FAXed letters on numerous dates, including a 3-page letter | FAX cover letter produced by Stults | **Step 13 of the conspiracy** |
|---|---|---|---|---|---|
| 27 | Verified Complaint ¶295 | 12/31/00 | Pane "quite often" had conversations with FBI Agent Kelly regarding the investigation | Trial, 5/17/02, at 98-99, 100, 104-105 | **Step 14 of the conspiracy** |
| 28 | Verified Complaint ¶296 | | Pane was in continuing communication with Moynihan during the investigation of the case: "I just remember calling him quite often" | Trial, 5/17/02, at 97-98, 100, 104-105; Complaint Exhs. HH and II | **Step 15 of the conspiracy** |
| 29 | Verified Complaint ¶297 | | Because of her "numerous phone conversations with the police and the FBI," Pane was living in New York during the time of the investigation | Trial, 5/17/02, at 99-100]. | **Step 16 of the conspiracy** |
| 30 | Verified Complaint ¶298 | | Between October 2000 and 22 March 2001, Pane had about 50 conversations with different organizations: **(a)** National Center for Missing and Exploited Children, **(b)** Voice for the Children, **(c)** a California-based organization | Trial, 5/17/02, at 102-103 | **Step 17 of the conspiracy** |
| 31 | Verified Complaint ¶299 | | Pane provided the organizations current pictures, height, weight, skin color, sufficient information so that the organizations could put together a package, including a poster, for distribution. Pane also had 500 posters made at a time, provided them to the NCMEC in the very beginning of October 2000, distributed them throughout many states, and locations | Trial, 5/17/02, at 102-104 | **Step 18 of the conspiracy** |
| 32 | Verified Complaint ¶428, ¶494 | | Stults and Pane had the goal to get posters published nationwide to capture Meuse. To reach that goal, Stults and Pane intentionally misrepresented that there had been a custody order prior to Meuse taking the child from Florida | | **Step 19 of the conspiracy** |
| 33 | Verified Complaint ¶418 | | Rosalyn Stults was interviewed by the Eagle-Tribune, publishing in Essex County, Massachusetts, and advertised the then-upcoming Sally Jessy Raphael show | | **Step 20 of the conspiracy** |
| 34 | Verified Complaint ¶429 and ¶¶309-319 | | FOXNews, the Haverhill police department, Thompson, Moynihan, Stults, Prouty, NCMEC, and Pane misrepresented that Meuse was a fleeing felon. So did AMW and Wal-Mart. | Complaint Exhs. FF and GG | **Step 21 of the conspiracy** |

| 35 | FBI Agents' Exhibits attached to their motion to dismiss or for summary judgment | Allegedly 11/6/00 | FBI conducted no independent investigation, took information from Moynihan, who also did not check on the accuracy of the information, took information directly from both Stults and Pane and failed to check whether their information was true or false, told the world, via the corporate defendants—FOX, STF/AMW, NCMEC, and Wal-Mart—that there was a federal warrant for Meuse, when, in fact, there appears not to have been. | FBI Agents' Exhibits and Meuse's Exhibits attached to opposition to FBI's motion | **Step 22 of the conspiracy** |
|---|---|---|---|---|---|
| 36 | Verified Complaint ¶¶420, 443; 309-319 | | AMW, NCMEC, and Wal-Mart continued to display the posters, some even after Meuse's capture | | **Step 23 of the conspiracy** |
| 37 | Verified Complaint ¶443 | | Susan Pane and Rosalyn Stults played an active part in the initiation and continuation of the criminal proceedings. | | **Step 24 of the conspiracy** |
| 38 | Verified Complaint ¶498 | | In concert with Pane's and Stults's representations and misrepresentations, Moynihan, Thompson, HPD Chief Barone, and FBI Agents Kelly and Prouty —as well as the corporate defendants—indirectly caused the detention and confinement of Meuse on the *alleged* grounds **(a)** that he violated a custody order; **(b)** that he was wanted for parental kidnapping, and **(c)** that he was fleeing unlawfully to avoid prosecution | | **Step 25 of the conspiracy** |

## **ARGUMENTS RELATED TO THE "STULTS" FACTS FOR EACH COUNT**

Because Meuse argued state action in his opposition to Stults' motion for summary judgment, he incorporates herein the arguments in his opposition in entirety by reference and argues and distinguishes from the instant case those nine cases which Stults cited in her supplemental memorandum.\[1]/

---

[1]  Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249 (1st Cir. 1996),
Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341 (1st Cir. 1995).
Wagenmann v. Adams, 829 F.2d 196 (1st Cir. 1987),
Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268 (2nd Cir. 1999),
Peng v. Penghu, 335 F.3d 970 (9th Cir. 2003),
Manax v. McNamara, 842 F.2d 808 (5th Cir. 1988),
Moore v. Marketplace Restaurant, Inc., 754 F.2d 1336 (7th Cir. 1985),
Daniel v. Ferguson, 839 F.2d 1124 (5th Cir. 1988),
Munoz Arrill v. Maiz, 992 F. Supp. 112, 116 (D. Puerto Rico 1998).

**1.   Stults was not a "mere complainant"; she was involved to a "significant and blame-worthy degree" and as such was a State actor.**

Stults argued that a complainant "as witness" to the police is not a state actor. Meuse contends that if Stults were a "mere complainant," she would be correct. But Stults was anything but a "mere complainant" and she certainly ***witnessed nothing***. Stults did not even give the police or the FBI the accurate status of the Massachusetts and Florida cases. What Stults *did* do, was to repeatedly passed false information to both the police and the FBI.

For instance, as counsel for Pane in the Probate & Family Court, she knew, amongst other facts, **(1)** Judge Manzi had declared that Massachusetts was the Home State, that it would exercise jurisdiction, and that Pane had wrongfully removed the child from Massachusetts [**Complaint Exh. T**], **(2)** that Florida had dismissed the case upon learning that Massachusetts took jurisdiction [**Exh. C(1), attached to Meuse' Opposition to FBI Motion to Dismiss or for Summary Judgment**], and that the Florida temporary orders were no longer in effect, **(3)** that Pane had repeatedly violated the August 2000 stipulation, **(4)** that Pane had repeatedly cancelled the child's therapy visits, **(5)** that Meuse had not been found in contempt before he took the child from Florida on 1 October 2000, and **(6)** that Meuse had not been found in contempt before he disappeared from sight on 5 October 2000.

**Roche v. John Hancock Mutual Life Ins. Co.**, 81 F.3d 249, 1996.C01.0000210 <http://www.versuslaw.com> (1st Cir. 1996). The distinction between the scenario underlying the instant case and Roche, is that in Roche the police and prosecutors exercised their own independent judgment in making the arrest. Here Meuse has demonstrated that police and prosecutors and the FBI agents used the information solely from Stults and Pane **[Verified Complaint, ¶216; Trial, 5/21/02, at 62]** and performed no independent investigation and used no independent judgment.

9

> . . . To be sure, the rule is not absolute: private actors may align themselves so closely with either state action or state actors that the undertow pulls them inexorably into the grasp of Section(s) **1983**. See, e.g., Adickes [v. S.H. Kress & Co., 398 U.S. [144,] 152 [(1970)]; Burton v. Wilmington Parking Auth., 365 U.S. 715, 724 (1961). But the case at hand exemplifies the general rule, not the exception to it.

Roche, 1996.C01.0000210 at ¶33 <http://www.versuslaw.com>. The instant case, of course, exemplifies the exception to the general rule.

Further, in Roche, "[a]n independent magistrate [] examined the collected evidence and found it sufficient to justify issuance of the warrant. There is not the smallest hint that the magistrate was a Hancock pawn, or, for that matter, that Hancock solicited the magistrate to act." Id., at ¶ 34. In the instant case, Defendant Detective Moynihan admitted that he performed **no** investigation [**Verified Complaint, passim**] and that he wrote **no** affidavit [**Verified Complaint, ¶215; Trial, 5/21/02, at 66**], in support of the State warrant, which was signed by a clerk, **not** a Clerk-Magistrate [**Verified Complaint ¶222; Trial Exh. Z**].

**Alexis v. McDonald's Restaurants of Massachusetts, Inc.**, 67 F.3d 341, 1995.C01.0000-655 <http://www.versuslaw.com> (1st Cir. 1995). The opinion of the court in **Alexis** was no different than the opinion in Roche: "Clearly something more than a report to the police or even false report to the police which leads to an arrest is required to establish state action for the pur-poses of § 1983 liability." Meuse asserted his agreement with that rule, but he argued that here there *is something more*! By failing to conduct any investigation whatsoever, the police and the FBI did allow their professional and individual judgment to be substituted by that of Stults and Pane, and thereby allow Stults and Pane to exercise state power. *See* Alexis, 67 F.3d at 351-352. For this, Stults and Pane may be deemed state actors.

Further, together, Stults and Pane, the police, the FBI and its agents, and the corporate defendants jointly deprived Meuse of his civil rights. Id., at 352, citing Wagenmann v. Adams, 829 F.2d 196, 209 (1st Cir. 1987); Casa Marie, Inc. v. Superior Court of P.R., 988 F.2d 252,

10

258-259 (1st Cir. 1993); and <u>Dennis v. Sparks</u>, 449 U.S. 24, 27-28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting `under color' of law for purposes of Section(s) 1983 actions."). For this, Stults and Pane may be deemed State actors and co-conspirators with the police, the FBI and its agents, and the corporate defendants. *See* <u>Alexis</u>, at 352, describing <u>Wagenmann v. Adams</u>, 829 F.2d 196, 209-211 (1st Cir. 1987):

> (close relationship between private citizen and deputy police chief, together with evidence that private actor and police collectively determined to arrest plaintiff, raised inference that private actor was more than "mere complainant" and that a "meeting of the minds" occurred between police and private defendant sufficient to warrant finding that defendant was state actor)

<u>Alexis</u>, at 352.

Given the frequent and regular communication between Stults and the police and the FBI agents, it is inescapable that there is sufficient evidence that Stults was more than a "mere complainant" and that a "meeting of the minds" occurred between the police and the FBI and Stults sufficient to warrant the finding that Stults was a state actor.

In Senior Circuit Judge Bownes' dissent in <u>Alexis</u>, the justice wrote:

> "The Supreme Court has found a section 1983 violation where there was no formal plan to discriminate. In <u>Adickes v. Kress & Co.</u>, 398 U.S. 144 (1970), the Court held that a policeman's presence in a segregated lunch counter might be enough to infer a conspiracy between the police officer and the establishment, where the plaintiff had both been refused service and arrested. segregated lunch counter might be enough to infer a conspiracy between the police officer and the establishment, where the plaintiff had both been refused service and arrested. In a notable decision the Seventh Circuit found a conspiracy where the state agents with whom the private actor conspired were not actively involved in the deprivation of rights. See <u>Soldal v. County of Cook</u>, 942 F.2d 1073 (7th Cir. 1991), rev'd on other grounds by 113 S.Ct. 538 (1992)(finding that private owner and deputy sheriffs conspired to "get rid of a pesky tenant" when sheriffs passively watched an unlawful eviction). **It was not necessary that there be evidence of an express plan between Domina and Leporati to implicate section 1983**.

<u>Alexis</u>, 1995.C01.0000655 at ¶87 <http://www.versuslaw.com> (emphasis supplied). In short, the failure to act affirmatively, that is, to watch passively, while an individual is being deprived of his or her constitutional rights is sufficient to find a conspiracy for purposes of §1983.

11

**Wagenmann v. Adams**, 829 F.2d 196, 210 (1st Cir. 1987). *See supra*: the court held that a private actor was more than "mere complainant" and that a "meeting of the minds" between the police and a private defendant was sufficient to warrant a finding that the defendant was a state actor.

**Ginsberg v. Healey Car & Truck Leasing, Inc.**, 189 F.3d 268, 271-272, 1999.C02.42359 <http://www.versuslaw.com> (2nd Cir. 1999). In Ginsberg, the level of activity between the truck rental store and the plaintiff does not rise to that level of interaction between Stults and the police and the FBI Agent Kelly, the alleged com-plainant in the alleged USA v. Meuse case and the author of both the affidavit and the UNsigned warrant produced by the FBI defendants.

Further, while the court in Ginsberg held that "[i]n the absence of any plan or arrangement between the police officer and store manager, the grant of summary judgment was appropriate" [id. at 272], the United States Supreme Court, in Adickes, *supra*, that it was not necessary that there be evidence of an express plan a private party and an officer to implicate §1983.

Significant to this issue is that in **no** pleading has Stults denied her continuous communication with the police and the FBI; in **no** pleading has Stults denied that she passed false information to the police or the FBI or the local DA's office; in **no** pleading has Stults denied that she withheld relevant and material facts from the police or the FBI; in **no** pleading has Stults denied that she withheld exculpatory information about Meuse to the police or the FBI; in **no** pleading has Stults denied that her goal was to deprive Meuse of his constitutional rights to liberty and to be free of false criminal charges; and—even more egregious—in **no** pleading has Stults shown that was at any time concerned for the physical well-being of the child.

In fact, as **Complaint Exhibit LL**, Stults cancelled the appointments Meuse had set up with doctors, a specialist in pediatric neurology, and physical and occupational therapists . . . all on the false basis that Meuse was not a custodial parent (see item #15 in Table 1, *supra)*, when, in

fact, as Judge Alan Swann found [**Complaint Exhibit CCC**], there had been no determination of child custody at the time Meuse took the child to Boston Children's Hospital and to other local area doctors and specialists and therapists.

**2.      Where Stults not only provided false information to the police but also was encouraged by the police to perform *police work*, "traditionally the exclusive prerogative of the State," Stults was a State actor. <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1003-1005 (1982). <u>Gerena v. P.R. Legal Servs., Inc.</u>, 697 F.2d 447, 449 (1st Cir. 1983).**

**<u>Peng v. Penghu</u>**, 335 F.3d 970, 980 (9th Cir. 2003), *cert. denied sub nom*, <u>Peng v. Hu</u>, 124 S.Ct. 1506 (2004).

> [A] factual dispute regarding a victim's complaint at the scene of an alleged domestic disturbance does not defeat probable cause if: 1) the victim's statements are sufficiently definite to establish that a crime has been committed; and 2) the victim's complaint is corroborated by either the surrounding circumstances or other witnesses.

<u>Peng</u>, 335 F.3d at 979.  <u>Peng</u> and the instant case are distinguishable inasmuch as there were in <u>Peng</u> no court records, as there were in the cases underlying the instant case, which the police could check to determine the accuracy of the mother's and son's statements.

Further, in <u>Peng</u>, the police considered the statements of the many witnesses at the subject event.\[2]/ In the scenario underlying the instant case, the police and FBI agents ignored any and all of Meuse's witnesses prior to their obtaining the warrants—notwithstanding that both were invalid or nullities, one for not having an affidavit or hearing and the other for being UN-signed.

> The court held that Mei Hu and Jonathan Hu were not state actors for purposes of § 1983 because there was no concerted action between them and Gage to have Peng arrested. Although generally inapplicable to private parties, a § 1983 claim can lie against a private party when, as relevant here, " 'he is a willful participant in joint action with the State or

---

[2]     "[T]he disturbance arose out of a family meeting held to resolve a dispute over land title documents that Mei Hu possessed, but which her father, Chieh Tsai Peng ("C. Peng"), asserted the right to possess. Mei Hu's brother Peng was present at the meeting to mediate, and the meeting took place at the house of Mei Hu and Peng's sister. At some point, Peng obtained the documents from Mei Hu. Whether he used force to obtain them is disputed."

<u>Peng</u>, 2003.C09.0000447 at ¶21 <http://www.versuslaw.com>.

13

its agents.' " Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003) (quoting Dennis v. Sparks, 449 U.S. 24, 27 (1980)).

Peng, 2003.C09.0000447 at ¶64 <http://www.versuslaw.com>.

Soldal v. Cook County, 56 U.S. 56, 60 n.6 (1992), if the police condone activities by private parties that they know to be illegal, there exists "sufficient evidence of conspiracy between the private parties and the officer to foreclose summary judgment" for the private parties.

Peng, 2003.C09.0000447 at ¶65 <http://www.versuslaw.com>.

And as the court in Peng wrote, in citing Howerton v. Gabica, 708 F.2d 380, 385 (9th Cir. 1983): : ". . . a single request that the police perform their peace-keeping responsibilities may be insufficient to create a joint undertaking. Clearly in the instant case, Stults and Pane were not satisfied with a "single request." They worked "side-by-side" with the police and the FBI for almost six months, and even had a special advocate assigned to gather the information sent to the police department by Stults.

**Manax v. McNamara**, 842 F.2d 808, 1988.C05.41542 <http://www.versuslaw.com> (5th Cir. 1988).

> First, [Manax] alleges that defendant McNamara, as mayor of Waco, employed the power of her office against him. Second, he alleges that the defendants' scheme included an attempt, in part through the office of a state senator, to cause the state Board of Medical Examiners to revoke his license to practice medicine.

Manax, 1988.C05.41542 at ¶36 <http://www.versuslaw.com>. The court stated: "[I]n reviewing a Rule 12(b) dismissal, we do not take account of allegations that are wholly conclusory and that do not set forth facts that, if provide, would warrant the relief sought." Manax, at ¶37. Meuse does **not** state purely conclusory facts, as did Manax. Meuse has relied upon an abundance of documents and upon testimony by police officers given under the pains and penalties of perjury.

In dismissing the §1983 claims against the mayor, the court found that "Manax failed to allege any incident in which McNamara employed the slightest shred of the power of the mayor's

14

office." Id. As Stults wrote in her memorandum at page 5: "[T]he state is not the source of the wrongdoing when private entities seek to misinform or mislead the state into employing its power improperly." Manax, 842 F.2d at 813. Likewise, although Stults is an officer of the Massachusetts court, the state is not the source of Attorney Stults' wrongdoing when she sought to misinform or mislead the Haverhill police and the FBI into employing their powers improperly.

**Moore v. Marketplace Restaurant, Inc.**, 754 F.2d 1336, 1985.C07.41100 <http://www.versuslaw.com> (7th Cir. 1985) (while the three-judge panel agreed to reverse and remand for trial, each of the judges differed on other points of law). One judge wrote the opinion. A second wrote:

> I part company with Judge Coffey in just two respects. Although I agree that summary judgment for the defendants on the plaintiffs' claims of unlawful arrest, and of unlawful detention following arrest, was improper, my analysis is different from his. And I disagree that the plaintiffs' state-law claims against the restaurant owner are outside the federal courts' "pendent parties" jurisdiction.

1985.C07.41100 at ¶72. The third judge, concurring in part and dissenting in part, wrote:

> I concur specifically in Judge Coffey's probable cause determination, see *supra* at 18-19, and, also agree with both Judge Coffey and Judge Posner that if the arrest was unlawful then the defendants are liable for all the foreseeable consequences stemming from the arrests. Although I agree that this case should be remanded for a jury trial, I feel strongly that the officers in this case had neither probable cause nor the right to arrest these plaintiffs under the factual circumstances of this case. An arrest, without a warrant and without the benefit of a filed complaint, seems to me to violate an individual's right under the Fourth Amendment to be free from unreasonable seizures and the right under the Fourteenth Amendment to due process of law. In all other respects, I concur in Judge Coffey's opinion except as follows.

1985.C07.41100 at ¶87.

The dispute in Moore was over the amount owned on a restaurant bill. The court wrote:

> One party is dissatisfied with the service after not being served for two hours, while the other party insists upon performance for the services and the food ordered. **One party insists that payment was offered for the consumed food, while the other insists that no offer of payment was made.** . . . This entire episode may have avoided if the officer who received the original complaint and the arresting officers had used reasonable judgment and conducted a proper investigation, inquiring both as to the plaintiffs' presence in the restau-

15

> rant and the dispute over the bill. Once explanations were provided, a further investigation could have been commenced in an attempt to resolve the dispute in a reasonable manner.

Moore, 1985.C07.41100 at ¶35 (emphasis supplied). Whether one party was telling a falsity and one was not, or whether there was simply a misunderstanding or miscommunication, the nature of the dispute was one that the appellate court wanted a jury to decide. Clearly, if there was a falsity, it was not nearly of the magnitude of the falsities told by Stults to the police officers or to FBI agents.

> In Roschen v. Ward, 279 U.S. 337 (1929), a case construing a criminal statute, Mr. Justice Holmes stated, in language equally applicable to this situation, that "we agree to all the generalities about not supplying criminal laws with what they omit, but there is no canon against using common sense in construing laws as saying what they obviously mean." Id. at 339. If we may be so bold as to paraphrase Justice Holmes' thought, "there is no law against using common sense"; indeed, the use of common sense is a prerequisite for police officers in developing their investigation in order to effectuate a valid arrest. In this land of freedom and liberty, with all of its concomitant constitutional rights and protections, **if we wish to have our citizen population continue to respect the authority of police personnel performing their duties in a lawful manner, it is incumbent upon law enforcement officials to make a thorough investigation and exercise reasonable judgment before invoking the awesome power of arrest and detention.**

Moore, 1985.C07.41100 at ¶35 (emphasis supplied).

> Therefore, under the circumstances of this case it is proper for the jury to consider all the evidence, including questions regarding the sufficiency of the deputies' investigation at the scene, in determining whether there was enough evidence to establish probable cause to arrest for the crime of theft of services

Moore, 1985.C07.41100 at ¶38.

As to the plaintiffs' conspiracy claim: In their interrogatories, the plaintiffs admitted that they had no evidence in support of their conspiracy claim, and in their affidavits, the defendants stated that they have had no previous contact with one another.

> A conspiracy may be demonstrated by circumstantial evidence, Hampton v. Hanrahan, 600 F.2d 600 (7th Cir. 1979); however, mere allegations of a conspiracy are insufficient to withstand a motion to dismiss.

Moore, 754 F.2d at 1352, 1985.C07.41100 at ¶54. "In order to sustain a § 1983 action against a

16

private individual, there must be some evidence of some concerted effort or plan between the private party (i.e. Schneiter) and the state officials (i.e. the Sheriff's department)." Id.

Moore is another case in which a single. limited event—the alleged nonpayment of food (or a truck rental, as in Ginsberg)—is insufficient to state a claim of conspiracy against a private party under §1983. Moore, 754 F.2d at 1352.   It was not at all similar to the events in Meuse, the abundance of events and proof of collaboration and communication in the instant case.

**Daniel v. Ferguson**, 839 F.2d 1124, 1988.C05.41746 <http://www.versuslaw.com> (5th Cir. 1988).   Daniel lived on a farm that was foreclosed, he remained a "rent-free tenant at will" on the farm for a few months after it was foreclosed, and after a temporary restraining order to prevent Plaintiff from entering the Farm had been granted the Lender who foreclosed, Daniel returned to the farm to fetch some personal property he had left on the farm.

Daniel later sued for deprivation of property rights, but the court found no deprivation of property rights.  After a jury trial on his claims, including his §1983 claims and his state-law claims involving the legality of the Lender's foreclosure, his defenses to the Lender's note, and trespass, the court granted the defendants' motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). The district court concluded that it had no subject matter jurisdiction because Plaintiff failed to prove a claim under §1983.

> The alleged entries and destruction, however, occurred well after the Lender became the owner of the Farm. As a result, unless the Lender's foreclosure was somehow invalid, the defendants could not have deprived Plaintiff of any property right.

Daniel, 1988.C05.41746 at ¶44.  Where "Plaintiff did not present any evidence that the Lender's foreclosure was invalid . . . [he] cannot state a claim under § 1983 for deprivation of rights that he does not have in property that he no longer owns, a directed verdict on this § 1983 claim is proper." Daniel, 1988.C05.41746 at ¶45.

In this case the district court found that the evidence, particularly Jim Judge's testimony

17

about the falsity of his own affidavit, established a jury question on the issue of the existence of probable cause. We agree. For purposes of determining whether the defendants were entitled to a directed verdict on this §1983 claim we therefore assume that Plaintiff was arrested without probable cause.

Daniel, 1988.C05.41746 at ¶47. "The Court therefore provided for exclusion of evidence seized on the basis of probable cause established by a false affidavit." Id., at ¶79 n. 12.

Therefore, under Daniel, the UNsigned federal warrant, allegedly based upon FBI Agent Kelly's affidavit, would be excluded and Meuse would be deemed to have been falsely arrested and detained. Why Stults argued in her memorandum about false affidavits as a defense to the claims against her remains a mystery. Stults wrote no affidavit in the underlying case, i.e., Com. v. Meuse.

**Munoz Arrill v. Maiz**, 992 F. Supp. 112, 116 (D. Puerto Rico 1998). Stults is correct: "Bare, conclusory allegations of conspiracy are not enough, and the complaint must plead in some detail the nature of the cooperation or relationship between the state actors and the private individuals to survive dismissal." This is exactly what Meuse did: he plead in some detail the nature of the cooperation or relationship between Stults and Pane and the police and the FBI.

WHEREFORE, Meuse prays this court **(1)** DENY both Stults' motion for leave to file a supplemental memorandum and her motion for summary judgment and **(2)** AWARD Meuse attorney's fees for having to oppose a frivolous motion. If the award of fees to Meuse is made, Plaintiff's counsel prays that she be given 10 days to prepare the accounting and supporting affidavit.

|  |  |
|---|---|
| | Respectfully submitted, |
| | BRIAN J. MEUSE, |
| | By his attorney, |
| | /s/ Barbara C. Johnson <barbaracjohnson@worldnet.att.net> |
| 13 March 2006 | Barbara C. Johnson, Esq., BBO #549972 |
| | 6 Appletree Lane |
| | Andover, MA 01810-4102 |
| | 978-474-0833 |