## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-10255-EFH

**Brian J. Meuse**
Plaintiff

v.

**Susan Pane,**
**Rosalyn Stults,**
**Lt. Detective Daniel R. Moynihan**, in his official and individual capacities,
**Captain Donald Thompson**, in his official and individual capacities,
**City of Haverhill, Massachusetts,**
**Louis Freeh**, in his official capacity,
**Charles S. Prouty**, in his official and individual capacities,
**Charles P. Kelly,** in his official and individual capacities,
**FOX Television Stations, Inc.,**
**STF Productions, Inc.**, a/k/a America's Most Wanted,
**National Center for Missing and Exploited Children,**
**Wal-Mart Stores, Inc.**
Defendants

_____

## MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS IN SUPPORT OF HIS OPPOSI-TION TO DEFENDANTS MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S MOTION FOR SUMMARY JUDGMENT
### (An opposition and a supporting memorandum accompany this Local Rule 56.1 Statement of Facts, and an affidavit appears below the signature on page XX.)

Now comes Brian J. Meuse ["Meuse] and submits his Local Rule 56.1 Statement of Facts

in support of his opposition to the motion for summary judgment by Defendants Lt. Detective

Daniel R. Moynihan ["Moynihan"], Captain Donald Thompson ["Thompson"], and City of Haver-

hill, Massachusetts ["Haverhill"].   Meuse's Statement demonstrates that there are genuine issues

of material fact, making summary judgment inappropriate.

This pleading is divided into seven sections:

- Part I:     A Table of Undisputed and Disputed Facts, which shows
              visually that of the 396 facts in Meuse's Complaint, the
              large majority are disputed                                    landscape p. 3
- Part II:    Summary of Facts Pled in Complaint and Addendum Exhibits       p. 2
- Part III:   Undisputed Facts According to Meuse                            p. 11
- Part IV:    Disputed Facts                                                 p. 19

**1**

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EEH    Document 157    Filed 10/16/2006    Page 2 of 59

- Part V:  Facts Moynihan, Thompson, and Haverhill Pled That They Could Neither Admit Nor Deny and That Meuse Had to Prove at Trial. A Few, They Pled, Contained Legal Conclusions and Required No Answer, or That They Had Insufficient Knowledge or Information to Form a Belief as to the Truth of the Asserted Facts    p. 31
- Part VI:  Meuse's Rebuttal of Moynihan, Thompson, and Haverhill's Spin on the Facts    p. 52
- Part VII:  Significance of Moynihan, Thompson, and Haverhill's Choice of Facts to Be Denied and Facts to Neither Be Denied or Admitted and Be Proven at Trial    p. 57

## Part II:  SUMMARY OF FACTS PLED IN COMPLAINT AND ADDENDUM EXHIBITS

In August 1999, Meuse and Pane had a child out of wedlock [**Am. Ver. Compl. ¶37**].

Meuse was upset by Pane's excessive use of prescription drugs, before, during, and after preg-

nancy [**Am. Ver. Compl. ¶¶28-30, *et seq.*; drug use, *passim***].   Pane made plans to leave for

Florida after she had consulted with Stults [**Am. Ver. Compl. ¶46**].   Meuse filed an action for

custody and paternity [**Am. Ver. Compl. ¶44**] and obtained a temporary restraining order on 4

October 1999 against Pane [**Am. Ver. Compl. ¶¶48, 73**].   The TRO gave custody of the child to

Meuse and ordered Pane not to leave the Commonwealth with the infant.   **Id.**

After Pane told Meuse that she, her mother (visiting from Port Orange, Florida), and the

child were going for a day's outing to Newburyport, MA, all three disappeared [**Am. Ver.

Compl. ¶47**].   Pane caused a pleading to be filed in Florida regarding custody, but did not her-

self resurface physically until the end of October 1999 in Florida.   Meuse made several unsuc-

cessful attempts at service [**Am. Ver. Compl. ¶49**].   Pane testified at the criminal trial of Meuse

that her mother had lied when she told the process servers that Pane did not live with her in Port

Orange [*see* **Am. Ver. Compl. ¶¶51-52, 55**].   Question: Who was lying, her mother or Pane?

The Haverhill District Court ["HDC"] TRO was renewed against Pane several times and

expired on 10 December 1999 [**Am. Ver. Compl. ¶59**].   **Although Pane appeared in HDC**

**during November and December of 1999 and the Meuses sought help from the police and**

Part I:    A Table of Undisputed and Disputed Facts

| UNDISPUTED FACTS | | Table of Contents of Fact Section of Meuse's Complaint | ¶ numbers of Fact section of Meuse's Complaint | DISPUTED FACTS | |
| --- | --- | --- | --- | --- | --- |
| Column 1 | Column 2 | **Headings as Shown on page 4 of Complaint** | | Column 3 | Column 4 |
| M, T, & H Paper #151 are undis-puted ¶¶s | M, T, & H in Answer Admitted ¶¶s | | | M, T, & H in Answer Denied ¶¶s | M, T, & H in Answer state that they neither admit nor deny ¶¶s and that II needs to prove at trial |
| 2 | 6<br>7 in part<br>8<br>17 | | | 7 in part | 16 |
| | | The Beginning<br>Susan Pane's Work as a Prescription Drug Technician<br>The Birth of the Child, Marissa Lyne Meuse, and Pane's Inability to Cope with the Infant<br>Abduction of Child by Susan Pane, 10/1/99 | 19-20<br>21-36<br>37-42<br>43-64 | | |
| | 60 in part<br>62 | | | 60 in part | |
| | | Child's Medical Condition As of June 2000 | 65-68 | | |
| | | Meuse Retains New Counsel and Begins Discovery | 69-72 | | |
| | 74 in part<br>75 in part<br>76-78<br>80 in part<br>81 in part<br>84-85 | Moynihan Ignored Restraining Order Against Pane: Invidious Gender Discrimination | 73-86 | 74 in part<br>75 in part<br>79<br>80 in part<br>86 | |
| | 87-88<br>90-94<br>95 | Moynihan's Non-Investigation Regarding Status of Case in Family Courts of Massachusetts and Florida | 87-94 | | |
| | 96 in part<br>97 in part<br>98<br>101-104<br>106-113 | Information Supplied to and Gathered by the Haverhill Police Department | 95-115 | 96 in part<br>100<br>105<br>114-115 | 99 |
| | 118-125<br>128-129 | Moynihan's Non-Investigation Regarding the Drugs' List | 116-129 | 126-127 | 116-117 |
| | 130<br>134 | Moynihan's Non-Investigation Regarding the Two Susans | 130-139 | 133 | 135-139 |

**Part I:   A Table of Undisputed and Disputed Facts**

| Exh. / Ref. | Fact | | | |
|---|---|---|---|---|
| 172 Exh. ZZ | Child's Medical Condition Between July 2000 and 1 October 2000 | 140-150 | | 173-177 |
| | Meuse's Legal Attempts to Take Marissa out of Harms Way | 151 | | 179-185 |
| | Faced with Court's Failure to Act. Meuse Must Act to Save Child | 152-172 | | 188 |
| 173 | Moynihan's Understanding of the Law | 173-178 | 178 | 190-193 |
| 186 189 | Thompson Orders Moynihan to Stop Investigation and Later Lies to the Chief | 179-184 | | 194-203 |
| 186 Exh. BB (Police Report) | Susan Pane Reports Child Taken from Florida | 185-193 | 187 | 204-214 |
| | Moynihan's Investigation after Pane Reports Child Taken | 194-203 | | 215-223 |
| | What Thompson and Moynihan Knew Before They Sought Arrest Warrant | 204-214 | | |
| 215 Exh. DD 222 Exhs. Y & Z | The Unlawful Warrant for Meuse's Arrest | 215-223 | | 224-232 |
| | What Thompson Knew about the Alleged FBI Unlawful Flight Warrant | 224-232 | | 233-241 |
| | What Thompson Did Not Investigate about the Baby's Health | 233-242 | 242 | 243-246 |
| | What Thompson Knew about Moynihan's Investigation of the Baby's Health | 243-246 | | 247-252 |
| | Moynihan's Non-Investigation Regarding Pane's Care of the Child | 247-252 | | 253-266 |
| | Captain Thompson's General Police Knowledge | 253-267 | | 268-271 |
| | Thompson, Moynihan, the FBI, and FBI Agent Charles Kelly Coordinate Activities | 268-294 | | 273-294 |
| | Pane and Moynihan and the FBI Coordinate Poster Activities | 295-316 | | 296 301 303-304 307-308 320-324 |
| | *The Warrant on America's Most Wanted Website | 317-324 | | 327-334 |
| | FOXNews Televised Broadcast | 325-326 | | |
| | Moynihan's Communication with Pane and Stultz | 327-334 | | 338-341 |
| | Stults' Working with the FBI and Maintaining the "Susan Pane Legal Defense Fund" | 335-337 | 342 | 346-347 349-350 352-360 |
| 348 | Probable Cause | 338-360 | | 369 |
| | Brian Meuse Never Intended to Remove Child Permanently from Mother | 361-376 | | 373 |
| 377 384 387 395 | Meuse's Arrest and the Ensuing Criminal Process | 377-396 | | |
| | **Count 1:** violation of 42 U.S.C. 1983: arrest | 397-409 | **Count I:** 398-399 403-404 407-409 | **Count I:** 400-402 405-406 |

**Part I:   A Table of Undisputed and Disputed Facts**

| Count | | | | |
|---|---|---|---|---|
| **Count II:** violation of 42 U.S.C. 1983: detention and confinement | | 410-411 | **Count II:** 411 | |
| **Count III:** violation of 42 U.S.C. 1983: conspiracy | 413 | 412-433 | **Count III** 423-425 429-433 | **Count III:** 414 416 |
| **Count IV:** violation of 42 U.S.C. 1983: refusing or neglecting to prevent | 435 | 434-440 | **Count IV:** 437-440 | |
| **Count V:** malicious prosecution | 446 455 | 441-456 | **Count V:** 442-443 445 447-453 | **Count V:** 455 |
| **Count VI:** abuse of process | | 457-464 | **Count VI:** 458 461-464 | |
| **Count VII:** violation of Mass. Civil Rights Act (M.G.L. c. 12, sec. 11I) | | 465-470 | **Count VII:** 467-470 | **Count VII:** 466 |
| **Count VIII:** false arrest and imprisonment | | 471-478 | **Count VIII:** 472-473 477-478 | |
| **Count IX:** assault | | 479-483 | **Count IX:** 481-483 | |
| **Count X:** battery | | 484-487 | **Count X:** 485-487 | |
| **Count XI:** conspiracy | | 488-501 | **Count XI:** 489-491 495 | |
| **Count XII:** defamation | | 502-512 | **Count XII:** 504-505 | |
| **Count XIII:** intentional infliction of emotional distress | | 513-521 | **Count XIII:** 514-516 518-521 | |

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EEH     Document 157     Filed 10/16/2006     Page 6 of 59

the mayor, but neither Moynihan nor Thompson nor Haverhill did anything to enforce that TRO [**Am. Ver. Compl. ¶¶60-61**].\[1]/,\[2]/   [**NOTE**: Moynihan, Thompson, and Haverhill denied this at ¶86 and ¶100 of the Verified Complaint.]

Fast-forward to June 2000, when the infant was 10 months old and brought to a Florida Early Intervention team for a medical examination due to her inability to hold a bottle, sit up on her own, crawl [**Am. Ver. Compl. ¶66-67; Compl. Exh.  D**].  The team set up four physical and occupational therapy sessions a week for the child [**Am. Ver. Compl. ¶68; Compl. Exh.  D**]. Pane took the child for therapy two weeks and then cancelled the sessions and left Florida to go on a vacation in another State  [**Am. Ver. Compl. ¶¶69, 140-141, 144-146**].\[3]/  Meuse traveled again from Massachusetts to Florida and saw the child again for a week in August 2000 and observed no improvement in her condition [**Am. Ver. Compl. ¶142;** *see also* **Am. Ver. Compl. ¶150**].

Between June and August, Meuse sought the child's medical records (as the family court had allowed).  He learned about the cancellation of the therapy visits and feared the muscles of the

---

[1]   At the end of Pane's testimony at the criminal trial, Meuse requested that Pane be held and produce the child. Meuse was refused the request.

[2]   In Florida, Pane got a temporary order of custody [**Compl. Exh. QQ**] and Meuse, finding her, got a temporary emergency injunction ordering Pane not to remove the child from Volusia County [**Am. Ver. Compl. ¶¶54, 57; Compl. Exh. OO**].  She repeatedly defied and violated the injunction.  Meuse alerted the courts, resulting in a Massachusetts judge (Manzi, J.) and a Florida judge communicating, in accordance with the Massachusetts Child Custody Jurisdiction Act.  Judge Manzi held a hearing in March 2000 and on 3 May 2000 declared that Massachusetts was the Home State of the child, that Massachusetts would exercise jurisdiction, and that Susan Pane wrongfully removed the child to Florida in October 1999. [**Am. Ver. Compl. ¶64,  Compl. Exh. T**] The Florida court dismissed the Pane's case in two ways: initially by operation of law and later in writing (so that Meuse would have a piece of paper to use in a court as evidence of the Florida dismissal).
    **Stults not only omitted telling the authorities that the Florida temporary order had been dismissed or vacated by operation of law but also misinformed them that the Florida temporary custody order was still in effect.** [*see* **Am. Ver. Compl. ¶¶63, 334-335; Crim. Trial Transcript, 5/22/02, at 169**].
    The defendant FBI agents either did not understand how certain things happen by operation of law, or they were never trained in a very significant facet of the law, or they intentionally ignored the law, for they wrongly declared that the Florida order that had been dismissed in May 2000 was still active on 1 October 2000 [**FBI Mem. Dism/SJ at 2, ¶¶2 and 3**].  If the agents were properly trained and understood how the law operates, then their statement in their memorandum is but an intentional smokescreen to hide the truth of the agents' intentional tortious acts or of their incompetence.

[3]   At trial, Pane admitted that she believed her vacation was more important than the child's therapy **Am. Ver. Compl. ¶¶ 145, 149**.  [NOTE: This was neither admitted not denied by Moynihan, Thompson of Haverhill.]

MEUSE'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EEH    Document 157    Filed 10/16/2006    Page 7 of 59

child's appendages would atrophy [**Compl. Exh. D**].\\[4]/  Around Labor Day 2000, Meuse sought a

*habeas corpus*, but five courts refused to hear it with or without diverse reasons.  **Meuse (with his**

**lawyer by his side) again sought help from the police, but the police department only re-**

**ferred him to the emergency justice (Judge Spencer Kagan) who said he did not have juris-**

**diction** [**Am. Ver. Compl. ¶151**].\\[5]/,\\[6]/

On 1 October 2000, when the child was 14 months old, Meuse again arrived in Florida to

visit with the child [**Am. Ver. Compl. ¶152**].  When he observed that the child still

could not hold a bottle or sit up on her own or crawl, he put himself and the child on a plane to

Massachusetts and brought her to the Children's Hospital Emergency Room and set up appoint-

ments for therapy and examination by a specialist in pediatric neurology associated with Boston

Floating Hospital [**Am. Ver. Compl. ¶¶153-155, 162-164; *see also* ¶¶156-161**, for graphic de-

scription by certified daycare owner—the Commonwealth's witness at the criminal trial—of the

child's physical condition].

Immediately thereafter, in keeping with the August 7th agreement, Meuse's counsel noti-

fied Stults where the child was and the contact information for the doctors and therapists in-

volved [**Am. Ver. Compl. ¶165**].  Stults and Pane immediately phoned the medical profession-

als and cancelled the appointments Meuse had set up for the child [**Am. Ver. Compl. ¶166-167,**

***see also* ¶169, 368-369**].  On 5 October 2000, after learning of the cancellations, Meuse disap-

peared with the child [**Am. Ver. Compl. ¶¶168, 170**].

On 5 October 2000, Stults got a short order of notice and scheduled a hearing for 11 Octo-

---

[4]  On 7 August 2000, Meuse and Pane, via their counsel, entered into an agreement (filed in court) that they would
let each other know where they were with the child [**Am. Ver. Compl. ¶143**].  Pane never abided by that agreement

[5]  At the end of Pane's testimony at the criminal trial, Meuse requested that Pane be held and produce the child.
Meuse was refused the request.

[6]  *See* note 2, *supra.*

Case 1:04-cv-10255-EEH    Document 157    Filed 10/16/2006    Page 8 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

ber 2000 [**Am. Ver. Compl. ¶171**].  At that hearing a judge gave Pane physical custody [**Am. Ver. Compl. ¶344**].  Meuse personally was already out of contact and had no knowledge of either the hearing or the temporary custody order of October 11th [**Am. Ver. Compl. ¶¶172, 345**].

Stults and Pane then began a campaign to find Meuse and the child [**Ver. Compl.,** ***passim***].[7]/  To do so, they said that Meuse was in contempt of court.  That was not true.  No contempt hearing was held.  No judgment of contempt had issued.  They contacted Haverhill Police Department, which appointed HPD Detective Moynihan to the case to find the child.

**Moynihan ignored the restraining order against Pane [Am. Ver. Compl. ¶73-86], failed to investigate the status of the case in the family court in Massachusetts or in Florida [Am. Ver. Compl. ¶87-94 (none of which were denied by Moynihan, Thompson, or Haverhill)], failed to review the information supplied to and gathered by the Haverhill Police Department [Am. Ver. Compl. ¶95-115].**[8]/

Without having conducted a proper investigation, HPD Detective Moynihan obtained an arrest warrant without an affidavit [**Am. Ver. Compl. ¶215**].  A judge did not sign the warrant; a clerk did [**Am. Ver. Compl. ¶222; Compl. Exh. Z**].

 Between October 2000 and March 2001, Defendants HPD Detective Moynihan and Captain Thompson coordinated continuous activities through constant contact with FBI Agent Kelly, Stults, and Pane [**Am. Ver. Compl. ¶¶215**].  The posters (by Pane, the NCMEC, and the FBI) were shown on television (FOX25News, featuring an interview of FBI Agent Prouty, America's Most Wanted, and the Sally Jessy Raphael show), uploaded to the AMW and NCMEC websites,

---

[7]    Susan provided the information for posters [**Am. Ver. Compl. ¶299-300, page 32, Compl. Exhs. FF-GG**].  Stults handled the media and set up and advertised—a Susan Pane Legal Defense Fund—for funds that were to be sent to Stults—although Pane was not being tried for a crime or sued civilly outside family court [**Am. Ver. Compl. ¶337**]. In fact, with Meuse out-of-contact, there was no activity in family court.  At the expense of Meuse's reputation, Stults made money, and so did Pane, if the funds went to pay her legal bills from Stults.

[8]    Moynihan claimed he had brought Pane's drug list to the ADA, but the ADA was generally uninterested in it.

MEUSE'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 9 of 59

and hung in Wal-Marts across the country  [**Am. Ver. Compl. ¶¶304*ff*, 325-326; Compl. at 32-33; and Compl. Exhs. FF and GG**].  (Wal-Mart is a sponsor of NCMEC.)  In the press and posters and on the airwaves, Meuse was presented as being wanted for Parental Kidnapping and Unlawful Flight to Avoid Prosecution.  **Id.**

In March 2001, Meuse was captured at gunpoint in Oklahoma as a result of a Wal-Mart poster describing him as a fugitive [**Am. Ver. Compl. ¶380**].  The child was turned over to Pane.  Fortunately, in Meuse's care, she had learned finally how to smile, sit up, walk, run, and play [**Am. Ver. Compl. ¶374**].

Back in Massachusetts shortly thereafter, Meuse was arraigned for Parental Kidnapping [**Am. Ver. Compl. ¶387**].  He was never tried for Unlawful Flight to Avoid Prosecution because 18 U.S.C. §1073 (the UFAP statute) requires a State felony warrant and the State warrant obtained by Moynihan was a State misdemeanor warrant,\[9]/ and there never was evidence to support the allegation that Meuse had fled for such a purpose.

In July 2001, a court (Swan, J.) wrote that no custody order had been in effect prior to Meuse taking the child from Florida [**Am. Ver. Compl. ¶343**].

Meuse was tried during May 2002, after which a jury of his peers found Meuse Not Guilty [**Am. Ver. Compl. ¶395**].  It was the testimony by the Commonwealth's own witness of the tragic condition of the child at the time Meuse rescued her [**Am. Ver. Compl. ¶¶156-161**] and the beautiful pictures of the child at play [**Compl. Exh. MM**] close to the time of the Oklahoman siege that clinched the jury verdict.

Notwithstanding the Not Guilty verdict, the posters representing Meuse as a fugitive re-

---

[9]  Meuse contends the federal warrant never existed, the information on the three posters Meuse discovered was false, and given the number of sophisticated corporations and the other defendants who played along with the FBI, there was a conspiracy by the defendants, with diverse ulterior motives, to capture, imprison, and prosecute Meuse and to cause the consequences therefrom to harm him.  To fake the existence of a federal Warrant for Arrest was but one step in the conspiracy, a step with which all the co-conspirators, knowing there was no federal warrant, were in agreement.

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 10 of 59

mained on the AMW and NCMEC websites after the criminal trial. The AMW poster remained on its website until the Complaint in this action was served in 2004 [**Am. Ver. Compl. ¶¶305, 317**].

## Part III: UNDISPUTED FACTS

Moynihan, Thompson, and Haverhill [MTH"] appear to have accepted the following paragraphs of Meuse's Verified Complaint as undisputed: ¶¶ 6, 7 in part, 8, 17, 60 in part, 62, 74 in part, 75 in part, 76-78, 80 in part, 81 in part, 84-85, 87-88, 90-95, 96 in part,, 97 in part, 98, 101-104, 106-113, 118-125, 118-125, 128-130, 134, **186,** 189, 348, 415, 435, 446, 455 [**MTH Answer**].   The following paragraphs were used by MTH in their Rule 56.1 Statement: ¶¶2, 172-173, **186,** 215, 222, 377, 384, 387, 395 [**MTH Local Rule 56.1 Statement of Facts**].   Only ¶186 was admitted to in both their Answer and their Rule 56.1 Statement.

---

**NOTE**
Comprising this category are the facts
that Moynihan, Thompson, and Haverhill admitted in their Answer
and in their Local Rule 56.1 Statement of Facts.

That Moynihan, Thompson, and Haverhill failed to deny so many facts
that Meuse included in his Complaint causes Meuse to contend
that his well-pled facts may be construed as admissions,
for Moynihan, Thompson, and Haverhill failed
to proffer any evidence to prove that the well-pled facts were false.

---

1.    Although Pane was in Haverhill District Court several times in November and December 1999, neither the court nor the Haverhill Police Department and/or Captain Thompson enforced it against her [**Am. Ver. Compl. ¶60, Trial, 5/22/02, at 164-165; Trial Exhs. M and P, the latter showing service**]. **MTH DENIED IN PART, MTH ADMITTED IN PART**

2.    Thompson testified that a violation of the 209A order while the order was in effect may be prosecuted for three years [**Am. Ver. Compl. ¶62. Trial, 5/22/02, at 169**]. **MTH ADMITTED**

**MOYNIHAN IGNORED RESTRAINING ORDER AGAINST SUSAN PANE:
INVIDIOUS GENDER DISCRIMINATION** [**Am. Ver. Compl. ¶¶73-86**]

3.    Moynihan did not alert the District Attorney's Office, Kevin Burke's office, that Marissa was wrongfully removed by Pane from Massachusetts [**Am. Ver. Compl. ¶74,Trial, 5/21/02, at 20-21**]. **MTH DENIED IN PART, MTH ADMITTED IN PART**

**MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS**
**IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS**
**MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S**
**MOTION FOR SUMMARY JUDGMENT**

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 11 of 59

4.  Moynihan did not alert the Attorney General's Office, Thomas Reilly's office, that Marissa was wrongfully removed by Pane from Massachusetts **[Am. Ver. Compl. ¶75, Trial, 5/21/02, at 21].  MTH DENIED IN PART, MTH ADMITTED IN PART**

5.  Moynihan did not ask Carol Beaulieu, Meuse's attorney at the time, why she was doing nothing **[Am. Ver. Compl. ¶76, Trial, 5/21/02, at 21].  MTH ADMITTED**

6.  Moynihan also had a copy of the October 4th chapter 209A RO and the November RO 209A, the Abuse Prevention order, which Brian got from Judge Herlihy against Susan" **[Am. Ver. Compl. ¶77, Trial, 5/20/02, at 186; Compl. Exh. M].  MTH ADMITTED**

7.  Moynihan was familiar with the DV guidelines  **[Am. Ver. Compl. ¶78, Trial, 5/20/02, at 187].  MTH ADMITTED**

8.  When Moynihan sought a warrant for Meuse's arrest, his basis was that the child physically lived with the mother and that Meuse only had visitation with the child **[Am. Ver. Compl. ¶80, Trial, 5/21/02, at 15].**  He did not consider that when the mother abducted the child to Florida, the child had been living with both Meuse and Pane.  **MTH DENIED IN PART, MTH ADMITTED IN PART**

9.  Moynihan admitted that Judge Manzi's order giving Pane custody of the child occurred on 11 October 2000, eleven days **after** Meuse took the child from Florida child **[Am. Ver. Compl. ¶81, Trial, 5/21/02, at 16-17; Exh ZZ].  MTH ADMITTED IN PART**

10.  Moynihan never wrote a complaint against Susan Pane **[Am. Ver. Compl. ¶84, Trial, 5/20/02, at 194].  MTH ADMITTED**

11.  The Haverhill Police Department did not issue a warrant to arrest Pane, of the opposite gender of Meuse **[Am. Ver. Compl. ¶85, Trial, 5/22/02, at 48].   MTH ADMITTED**

## MOYNIHAN NON-INVESTIGATION REGARDING STATUS OF CASE IN FAMILY COURTS OF MASSACHUSETTS AND FLORIDA [Am. Ver. Compl. ¶¶87-94]

12.  Moynihan never made inquiry in Probate and Family Court in Lawrence, Essex County, as to who the lawful custodian of the child was **[Am. Ver. Compl. ¶87, Trial, 5/20/02, at 200].  MTH ADMITTED**

13.  Moynihan admitted that he never looked at the Meuse/Pane file in Probate & Family Court file **[Am. Ver. Compl. ¶88, Trial, 5/20/02, at 212].  MTH ADMITTED**

14.  Moynihan testified that he believed that Susan Pane was the lawful custodian of the child, and admitted that he never went to look at Probate Court.  **[Am. Ver. Compl. ¶90].  MTH ADMITTED**

15.  Moynihan testified that he had no idea what the police department did to get Susan Pane back here with the child during those three months the 209A restraining order was in effect

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 12 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

[**Am. Ver. Compl. ¶91,** Trial, 5/20/02, at 210-211].   **MTH ADMITTED**

16.    Moynihan was not aware that an order was in Probate Court which said that if either one of those people left Volusia County, they were to tell the other where they were [**Am. Ver. Compl. ¶92,** Trial, 5/20/02, at 212. Exh. AAA, stipulation of 8/7/00].   **MTH ADMITTED**

17.    Moynihan admitted that he was unaware that Susan Pane would not reveal where she was all summer and fall of 2000 [**Am. Ver. Compl. ¶93,** Trial, 5/20/02, at 212].   **MTH ADMITTED**

18.    Moynihan testified that he "wasn't aware of anything until Jan Meuse walks in [his] office and was asking help to provide that her, Ms. Pane, was a drug addict and that the child was suffering because of that and there was abuse to the child because of that" [**Am. Ver. Compl. ¶94,** Trial, 5/20/02, at 212; Exh. BBB, letters from Meuse's parents seeking help from the Haverhill Police Department].   **MTH ADMITTED**

## INFORMATION SUPPLIED TO AND GATHERED BY THE HAVERHILL POLICE DE-PARTMENT  [**Am. Ver. Compl. ¶¶95-115**]

19.    Beginning on or around 16 August 2000 through early October 2000, Meuse's mother, Jan Meuse, contacted Defendant Detective Moynihan [**Am. Ver. Compl. ¶95,** Trial, 5/20/02, at 165; Exh. BBB].   **MTH ADMITTED**

20.    In September through early October 2000, according to Moynihan, Jan Meuse, the mother of Meuse, gave him "a list from Merck-Medco of prescription drugs that a Sue Pane was listed as the person who was taking the drugs, and there were several pages and a multiple different variety of drugs" [**Am. Ver. Compl. ¶96,** Trial, 5/20/02, at 165, 174; Trial Exhs. A and KK].  **MTH DENIED IN PART,  MTH ADMITTED IN PART**

21.    When Pane left Meuse's home on Oxford Avenue, she inadvertently left behind the empty pill bottle in Meuse's home.  Jan Meuse, Meuse's mother, took the pill bottle to Detective Moynihan as evidence of Pane's writing falsified prescriptions [**Am. Ver. Compl. ¶97,** Trial Exhs. D and X].    **MTH ADMITTED IN PART**

22.    Thompson testified that he was aware that both of Meuse's parents wrote letters to Thompson, to the chief of police, the mayor, district attorney's office, the city council [**Am. Ver. Compl. ¶98,** Trial, 5/22/02, at 111; Exh. BBB].   **MTH ADMITTED**

23.    Thompson also received the Merck-Medco list of pills [**Am. Ver. Compl. ¶101,** Trial, 5/22/02, at 38; [Trial Exhs. A and KK].   **MTH ADMITTED**

24.    Captain Thompson also gave the list to Detective Moynihan to look into to see if there was something illegal about the obtaining of those drugs [**Am. Ver. Compl. ¶102,** Trial, 5/22/02, at 39].   **MTH ADMITTED**

25. Thompson denied knowing that Susan Pane had at least 140 (Thompson's count) \[10]/ narcotic prescriptions and was left with this young child and she had wrongfully removed her **[Am. Ver. Compl. ¶103, Trial, 5/22/02, at 51;Compl. Exh. T].    MTH ADMITTED**

26. Thompson never ordered Moynihan to check with the Merck-Medco insurance company that provided the claim history of the approximately 140 prescriptions  (Thompson's count) of Defendant Susan Pane's claim history **[Am. Ver. Compl. ¶104, Trial, 5/22/02, at 40]. MTH ADMITTED**

27. Thompson did agree that there's some unique information would have to be supplied by each one of policyholder to his or her insurance company if he or she were making a claim **[Am. Ver. Compl. ¶106, Trial, 5/22/02, at 62].    MTH ADMITTED**

28. Thompson never checked the Probate Court to read Judge Manzi's decisions **[Am. Ver. Compl. ¶107, Trial, 5/22/02, at 46].    MTH ADMITTED**

29. Thompson testified that he has no knowledge of the ongoing, daily Probate Court matters and has not looked  **[Am. Ver. Compl. ¶108, Trial, 5/22/02, at 161].    MTH ADMITTED**

30. Thompson never read Judge Manzi's decision of 3 May 2000 which said that the mother wrongfully removed the child from Massachusetts to Florida in October 1999, over six months prior to the decision **[Am. Ver. Compl. ¶109 Trial, 5/22/02, at 46-47; Compl. Exh. T],** but he was aware of it **[Trial, 5/22/02, at 47].    MTH ADMITTED**

31. Thompson testified that he "asked for guidance from the District Attorney's office      on this and the fact that it was presented before a judge, the judge was aware of this.  The judge had not issued a warrant or any request that we make an attempt to pick up Ms. Pane" **[Am. Ver. Compl. ¶110. Trial, 5/22/02, at 48].    MTH ADMITTED**

32. Thompson admitted that he is Moynihan's supervisor, that he supervised Moynihan **[Am. Ver. Compl. ¶111, Trial, 5/22/02, at 65]**, and that he was responsible for Detective Moynihan's work **[Am. Ver. Compl. ¶111.Trial, 5/22/02, at 67].    MTH ADMITTED**

33. Thompson never contacted Merck-Medco by letter, by phone, or in person; **[Am. Ver. Compl. ¶112, Trial, 5/22/02, at 67-68].    MTH ADMITTED**

34. Thompson never told Detective Moynihan or any one of his other officers to contact Merck-Medco **[Am. Ver. Compl. ¶113, Trial, 5/22/02, at 68].    MTH ADMITTED**

## MOYNIHAN'S NON-INVESTIGATION REGARDING THE DRUGS' LIST [Am. Ver. Compl. ¶¶116-129]

35. Assistant District John DePaolo told Moynihan to check the 360 Ultram pills and then opined that the allegations were unsubstantiated **[Am. Ver. Compl. ¶118, Trial, 5/21/02,**

---

**10**    Compare ¶72, *supra*, where Meuse reports only 80 prescriptions.

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 14 of 59

at 67; Trial Exhs. A and KK].    **MTH ADMITTED**

36. Detective Moynihan reported to Thompson that he had gone so far as to contact the pharmacy on a prescription and they were unable to find any record at all of the prescription he presented to them [**Am. Ver. Compl. ¶119,** Trial, 5/22/02, at 39].   **MTH ADMITTED**

37. Neither Moynihan nor Thompson questioned that a prescription presented to the insurer for payment allegedly by the pharmacy was not in the pharmacy records [**Am. Ver. Compl. ¶120,** Trial, 5/22/02, at 39-40].   **MTH ADMITTED**

38. Moynihan knew that Susan Pane was a pharmaceutical technician and that she dispensed drugs [**Am. Ver. Compl. ¶121,** Trial, 5/20/02, at 174].   **MTH ADMITTED**

39. Moynihan did not inquire at Merck-Medco regarding Pane's position as a pharmaceutical technician [**Am. Ver. Compl. ¶122,** Trial, 5/20/02, at 174].   **MTH ADMITTED**

40. Moynihan did not learn that Pane had the ability to create prescriptions [**Am. Ver. Compl. ¶123**]..   **MTH ADMITTED**

41. Moynihan contacted a Westgate Pharmacy pharmacist, who said he had "no such record [of certain drugs, such s Ultram] being purchased [**Am. Ver. Compl. ¶124,** Trial, 5/20/02, at 175, 177].   **MTH ADMITTED**

42. Moynihan

    a. never contacted Merck-Medco to inquire how come they had it on their list of Pane history [**Am. Ver. Compl. ¶125a,** Trial, 5/20/02, at 176-177; Trial, 5/21/02, at 119**], or Dr. Byrnes, one of Pane's primary doctors [Id.; Trial Exhs. A and KK**],

    b. "never talked to [any of the two dozen] doctors] whatsoever [**Am. Ver. Compl. ¶125b,** Trial, 5/20/02, at 180],

    c. never counted the number of prescriptions [**Am. Ver. Compl. ¶125c,** Trial, 5/20/02, at 179**].

    d. never added up the number of narcotic pills, and checked with only one of the pharmacists [**Am. Ver. Compl. ¶125d,** Trial, 5/20/02, at 181],

    e. never checked "with Merck-Medco as to whether they had a system in place for pilfering" [**Am. Ver. Compl. ¶125e,** Trial, 5/22/02, at 186],

    f. never discussed that Pane's prescription drug use – over five pages of over 80 prescriptions -- with the Haverhill Police Department Drug Unit at all; he "brought it to the District Attorney's office.  That's where I brought it" [**Am. Ver. Compl. ¶125f,** Trial, 5/20/02, at 212-213].   **MTH ADMITTED**

43. Moynihan did **not** agree that it is fair to conclude that all prescriptions listed by Merck-Medco Managed Care on the claims history report for Susan Pane are for Susan Pane unless proven otherwise [**Am. Ver. Compl. ¶128,** Trial, 5/21/02, at 152].    **MTH AD-**

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 15 of 59

MITTED

44.  Moynihan concluded **(a)** that Merck-Medco produced a claims-history report for Susan Pane, **(b)** that the report contained **both** Susan **Pane**'s and Susan **PaIne**'s prescriptions on it, and **(c)** that Merck Medco paid the pharmacists under Susan Pane's policy number for Susan PaIne's prescriptions **[Am. Ver. Compl. ¶129, Trial, 5/21/02, at 152].   MTH ADMITTED**

## MOYNIHAN'S NON-INVESTIGATION REGARDING THE TWO SUSANS [Am. Ver. Compl. ¶¶130-139]

45.  Detective Moynihan reported to Thompson that he was unable to substantiate that the Susan Pane, in this case, was the same Susan Pane that's appearing on all that drug list, that there was another Susan Paine living in town **[Am. Ver. Compl. ¶130, Trial, 5/22/02, at 39].   MTH ADMITTED**

46.  He had "no idea: . . . [how the] "other Sue PaIne would have known what our Sue Pane's Merck-Medco insurance number was" **[Am. Ver. Compl. ¶134, Trial, 5/22/02, at 184]. MTH ADMITTED**

## CHILD'S MEDICAL CONDITION BETWEEN JULY 2000 AND 1 OCTOBER 2000 [Am. Ver. Compl. ¶140-150].

## MEUSE'S LEGAL ATTEMPTS TO TAKE MARISSA OUT OF HARM'S WAY [Am. Ver. Compl. ¶151].

## FACED WITH COURT'S FAILURE TO ACT. MEUSE MUST ACT TO SAVE CHILD [Am. Ver. Compl. ¶152-172].

47.  On 11 October 2000, Judge Manzi, after Meuse had left Florida with the child and in Meuse's absence, at a proceeding[11]/ of which he had no personal notice, gave Pane temporary custody of the child **[Am. Ver. Compl. ¶172, Exh. ZZ].   MTH DECLARE UNDISPUTED**

## MOYNIHAN'S UNDERSTANDING OF THE LAW [Am. Ver. Compl. ¶¶173-178].

48.  Moynihan went to the police academy, studied law at the police academy, and had 19 years of service with the Haverhill Police Department, the last five of which were as a detective **[Am. Ver. Compl. ¶173, Trial, 5/21/02, at 8].   MTH DECLARE UNDISPUTED**

## THOMPSON ORDERS MOYNIHAN TO STOP INVESTIGATING AND LATER LIES TO THE CHIEF  [Am. Ver. Compl. ¶¶179-184].

---

[11]    At that proceeding of 11 October 2000, no evidence was taken.

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 16 of 59

MEUSE'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

**SUSAN PANE REPORTS CHILD TAKEN FROM FLORIDA  [Am. Ver. Compl. ¶¶185-193].**

49.    On 25 October 2000, Moynihan signed an Application for Complaint **[Am. Ver. Compl. ¶186,** Trial, 5/21/02, at 70-71; Compl. Exh. DD].   **MTH ADMITTED, MTH DE-CLARE UNDISPUTED**

50.    The Criminal Complaint issued on the same day as that on which the application was made, to wit, 25 October 2000 **[Am. Ver. Compl. ¶189,** Compl. Exh. Y].   **MTH ADMITTED**

**MOYNIHAN'S INVESTIGATION AFTER PANE REPORTS CHILD TAKEN  [Am. Ver. Compl. ¶¶194-203].**

**WHAT THOMPSON AND MOYNIHAN KNEW BEFORE THEY SOUGHT ARREST WARRANT [Am. Ver. Compl. ¶¶204-214].**

**THE UNLAWFUL WARRANT FOR MEUSE'S ARREST [Am. Ver. Compl. ¶¶215-223].**

51.    On 25 October 2000, Moynihan filed an application for a warrant without a supporting affidavit at Haverhill District Court for Meuse's arrest **[Am. Ver. Compl. ¶¶215,** Trial, 5/21/02, at 66].   **MTH DECLARE UNDISPUTED**

52.    On 25 October 2000, Clerk Kim Marotta signed the warrant even though it did not have a supporting affidavit **[Am. Ver. Compl. ¶¶222,** Compl. Exh. Z].   **MTH DECLARE UNDISPUTED**

**WHAT THOMPSON KNEW ABOUT THE ALLEGED FBI UNLAWFUL FLIGHT WAR-RANT [Am. Ver. Compl. ¶¶224-232].**

**WHAT THOMPSON DID NOT INVESTIGATE ABOUT THE BABY'S HEALTH [Am. Ver. Compl. ¶¶233-242].**

**WHAT THOMPSON KNEW ABOUT MOYNIHAN'S INVESTIGATION OF THE BABY'S HEALTH [Am. Ver. Compl. ¶¶243-246].**

**MOYNIHAN NON-INVESTIGATION REGARDING PANE'S CARE OF THE CHILD [Am. Ver. Compl. ¶¶247-252].**

**CAPTAIN THOMPSON'S GENERAL POLICE KNOWLEDGE  [Am. Ver. Compl. ¶¶253-267].**

**THOMPSON,  MOYNIHAN, THE FBI, AND FBI AGENT CHARLES KELLY COORDI-NATE ACTIVITIES  [Am. Ver. Compl. ¶¶266-294].**

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

**PANE AND MOYNIHAN AND THE FBI COORDINATE POSTER ACTIVITIES [Am. Ver. Compl. ¶¶295-316].**

**THE WARRANT ON AMERICA'S MOST WANTED WEBSITE [Am. Ver. Compl. ¶¶317-324].**

**FOXNEWS TELEVISED BROADCAST [Am. Ver. Compl. ¶¶325-326]**

**MOYNIHAN'S COMMUNICATION WITH PANE AND STULTS [Am. Ver. Compl. ¶¶327-334].**

**STULTS' WORKING WITH THE FBI AND MAINTAINING THE "SUSAN PANE LEGAL DEFENSE FUND" [Am. Ver. Compl. ¶¶335-337].**

**PROBABLE CAUSE [Am. Ver. Compl. ¶¶338-360].**

53.      The Criminal Complaint was written on 25 October 2000 **[Am. Ver. Compl. ¶¶348, Trial, 5/22/02, at 148].**      **MTH ADMITTED**

> **NOTE**
> **The only fact upon which**
> **Moynihan, Thompson, and Haverhill**
> **rely for the basis of probable cause is**
> **the fact that Moynihan wrote the criminal complaint.**

**MEUSE NEVER INTENDED TO REMOVE CHILD PERMANENTLY FROM MOTHER [Am. Ver. Compl. ¶¶361-376].**

**MEUSE'S ARREST AND THE ENSUING CRIMINAL PROCESS [Am. Ver. Compl. ¶¶377-396].**

54.      On or around the first week in December 2000, Meuse and the child were living in Ada, Oklahoma [**Am. Ver. Compl. ¶¶377**]..      **MTH DECLARE UNDISPUTED**

55.      On 23 March 2001, Meuse was given his Miranda rights at the request of the court at Ada, Oklahoma and charged with parental kidnapping [**Am. Ver. Compl. ¶¶384**].      **MTH DECLARE UNDISPUTED**

56.      When brought to Haverhill District Court for arraignment, Meuse was able to persuade a court officer into contacting Meuse's attorney for him before he was brought from the holding cell upstairs to the courtroom [**Am. Ver. Compl. ¶¶387**]..      **MTH DECLARE UNDISPUTED**

57.      On Thursday, 23 May 2002, Meuse was found Not Guilty by a jury of his peers [**Am. Ver. Compl. ¶¶395**].      **MTH DECLARE UNDISPUTED**

**COUNT 1: <u>VIOLATIONS OF 42 U.S.C. 1983: ARREST</u>  [<u>Am. Ver. Compl. ¶¶397-409</u>].**

**COUNT 2: <u>VIOLATIONS OF 42 U.S.C. 1983: DETENTION AND CONFINEMENT</u>  [<u>Am. Ver. Compl. ¶¶410-411</u>].**

**COUNT 3: <u>VIOLATIONS OF 42 U.S.C. 1983: CONSPIRACY</u>  [<u>Am. Ver. Compl. ¶¶412-433</u>].**

58.     Moynihan had gathered information from a third-party caregiver (Anne Kalip) who described to Moynihan the serious physical and psychological condition of the child, the condition which Moynihan wrote in his notes [<u>**Am. Ver. Compl. ¶¶413**</u>].    **MTH ADMITTED**

**COUNT 4: <u>VIOLATIONS OF 42 U.S.C. 1983:</u>
<u>REFUSING OR NEGLECTING TO PREVENT</u>  [<u>Am. Ver. Compl. ¶¶434-440</u>].**

59.     At all times relevant to this Complaint, all Defendant police officers of the Haverhill Police Department were acting under the direction and control of Police Chief Barone, and Defendant City of Haverhill [<u>**Am. Ver. Compl. ¶¶435**</u>].    **MTH ADMITTED**

**COUNT 5: <u>MALICIOUS PROSECUTION</u>  [<u>Am. Ver. Compl. ¶¶441-456</u>].**

60.     Moynihan signed the application for criminal complaint against Meuse. [<u>**Am. Ver. Compl. ¶¶446**</u>].  **MTH ADMITTED**

61.     The criminal proceeding terminated in favor of the plaintiff when the assistant district attorney recommended the dismissal of all four charges against Meuse and the court accepted the recommendation and dismissed the charges against Meuse  [<u>**Am. Ver. Compl. ¶¶455**</u>].
**MTH ADMITTED IN PART\12/**

**COUNT 6:  <u>ABUSE OF PROCESS</u>  [<u>Am. Ver. Compl. ¶¶457-464</u>].**

**COUNT 7:  <u>VIOLATION OF MASS. CIVIL RIGHTS ACT, M.G.L. c. 12, sec. 11<i>I</i></u>  [<u>Am. Ver. Compl. ¶¶465-470</u>].**

**COUNT 8: <u>FALSE ARREST AND IMPRISONMENT</u>  [<u>Am. Ver. Compl. ¶¶471-478</u>].**

**COUNT 9: <u>ASSAULT</u>  [<u>Am. Ver. Compl. ¶¶479-483</u>].**

**COUNT 10: <u>BATTERY</u>  [<u>Am. Ver. Compl. ¶¶484-487</u>].**

**COUNT 11: <u>CONSPIRACY</u>  [<u>Am. Ver. Compl. ¶¶488-501</u>].**

---

[12]  Paragraph 455 contains an error.   That portion of the sentence from the word "when" to the period at the end of the sentence should be deleted**.**  Meuse's counsel apologizes.  It remained there from another case that she was using for boilerplate.  Therefore Defendants' admission applies to that portion up until the word "when."

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

COUNT 12: **DEFAMATION**  **[Am. Ver. Compl. ¶¶502-512]**.

COUNT 13: **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**  **[Am. Ver. Compl. ¶¶513-521]**.

**Part IV:    DISPUTED FACTS BY MOYNIHAN, THOMPSON, AND HAVERHILL**

> **NOTE**
> Comprising this category are the facts
> that Moynihan, Thompson, and Haverhill denied in their Answer.
>
> Because  Moynihan, Thompson, and Haverhill stated
> that they could neither admit or deny so many of the facts and
> that those facts Meuse had to prove at trial,
> Meuse makes no attempt to duplicate them in this list.
> Instead, Meuse has included those paragraph numbers in the chart on page 2, supra,
> as well as in a list of their own.

1.    Although Pane was in Haverhill District Court several times in November and December 1999, neither the court nor the Haverhill Police Department and/or Captain Thompson enforced it against her **[Am. Ver. Compl. ¶60, Trial, 5/22/02, at 164-165; Trial Exhs. M and P, the latter showing service]. MTH DENIED IN PART, MTH ADMITTED IN PART**

**MOYNIHAN IGNORED RESTRAINING ORDER AGAINST SUSAN PANE: INVIDIOUS GENDER DISCRIMINATION [Am. Ver. Compl. ¶¶73-86]**

2.    Moynihan did not alert the District Attorney's Office, Kevin Burke's office, that Marissa was wrongfully removed by Pane from Massachusetts **[Am. Ver. Compl. ¶74,Trial, 5/21/02, at 20-21].  MTH DENIED IN PART, MTH ADMITTED IN PART**

3.    Moynihan did not alert the Attorney General's Office, Thomas Reilly's office, that Marissa was wrongfully removed by Pane from Massachusetts **[Am. Ver. Compl. ¶75, Trial, 5/21/02, at 21].  MTH DENIED IN PART, MTH ADMITTED IN PART**

4.    Moynihan made no attempt to enforce the orders that Judge Herlihy had issued and that remained in effect from 4 October 1999 through 10 December 1999, and put out no warrant to bring Pane back with the baby to Massachusetts **[Am. Ver. Compl. ¶79, Trial, 5/20/02, at 189; Compl. Exh. M]. MTH DENIED**

5.    When Moynihan sought a warrant for Meuse's arrest, his basis was that the child physically lived with the mother and that Meuse only had visitation with the child **[Am. Ver. Compl. ¶80. Trial, 5/21/02, at 15].** He did not consider that when the mother abducted the child to Florida, the child had been living with both Meuse and Pane. **MTH DENIED IN PART, MTH ADMITTED IN PART**

6.    Although Thompson was aware that Pane had unlawfully removed the child from Massa-chusetts, Thompson and the Haverhill Police Department did **(a)** nothing to address the criminal action by Susan Pane and **(b)** nothing to bring the child back from Florida and **(c)** nothing to provide Meuse a remedy for the wrong committed by Pane.  [**Am. Ver. Compl. ¶86**]. **MTH DENIED**

### MOYNIHAN NON-INVESTIGATION REGARDING STATUS OF CASE IN FAMILY COURTS OF MASSACHUSETTS AND FLORIDA [Am. Ver. Compl. ¶¶87-94]

### INFORMATION SUPPLIED TO AND GATHERED BY THE HAVERHILL POLICE DE-PARTMENT  [Am. Ver. Compl. ¶¶95-115]

7.    In September through early October 2000, according to Moynihan, Jan Meuse, the mother of Meuse, gave him "a list from Merck-Medco of prescription drugs that a Sue Pane was listed as the person who was taking the drugs, and there were several pages and a multiple different variety of drugs" **[Am. Ver. Compl. ¶96, Trial, 5/20/02, at 165, 174; Trial Exhs. A and KK]**. **MTH DENIED IN PART,    MTH ADMITTED IN PART**

8.    The police did nothing to help the Meuses.  [**Am. Ver. Compl. ¶100**].  **MTH DENIED**

9.    Thompson denied knowing that because there were two Susan Panes but had not proof that his testimony was true [**Am. Ver. Compl. ¶105**]. **MTH DENIED**

10.   The police did not do a proper investigation of the drugs and see whether the mother's drug use when she was taking narcotics going through her breasts when she was breastfeeding, to learn whether the cause of some of the problems the child was having were due to the mother's drug use.  [**Am. Ver. Compl. ¶114**].  **MTH DENIED**

11.   The police made no inquiry as to whether the mother's using drugs while she was pregnant and while she was breastfeeding harmed the child, causing the child to be in such severe bad health.  [**Am. Ver. Compl. ¶115**].  **MTH DENIED**

### MOYNIHAN'S NON-INVESTIGATION REGARDING THE DRUGS' LIST [Am. Ver. Compl. ¶¶116-129]

12.   Moynihan concluded that "whether Ms. Sue Pane was stealing drugs from the company she was working with, number one, it would have been a very difficult thing to prove" **[Am. Ver. Compl. ¶126, Trial, 5/20/02, at 177]**. **MTH DENIED**

13.   Incompetently, Moynihan ignored the Merck-Medco Managed Care claims history list for Susan Pane simply because he did not check the policy or with Merck-Medco **[Am. Ver. Compl. ¶127, Trial, 5/21/02, at 150]**. **MTH DENIED**

### MOYNIHAN'S NON-INVESTIGATION REGARDING THE TWO SUSANS [Am. Ver. Compl. ¶¶130-139]

14. Moynihan used the introduction of a "Susan Paine" as a reason to reject the legitimate claims history list from Merck-Medco [**Am. Ver. Compl. ¶133**]. **MTH DENIED**

## CHILD'S MEDICAL CONDITION BETWEEN JULY 2000 AND 1 OCTOBER 2000 [Am. Ver. Compl. ¶¶140-150].

## MEUSE'S LEGAL ATTEMPTS TO TAKE MARISSA OUT OF HARM'S WAY [Am. Ver. Compl. ¶151].

## FACED WITH COURT'S FAILURE TO ACT. MEUSE MUST ACT TO SAVE CHILD [Am. Ver. Compl. ¶¶152-172].

## MOYNIHAN'S UNDERSTANDING OF THE LAW [Am. Ver. Compl. ¶¶173-178].

15. The police decided it would be easier to convict Meuse of parental kidnapping than it would to prove that Pane had falsified prescriptions, given that Pane had moved to Florida, Merck-Medco claimed to have had no safeguards in its pill dispensing department, and Merck-Medco had moved out of Massachusetts. [**Am. Ver. Compl. ¶178**]. **MTH DE-NIED**

## THOMPSON ORDERS MOYNIHAN TO STOP INVESTIGATING AND LATER LIES TO THE CHIEF [Am. Ver. Compl. ¶¶179-184].

## SUSAN PANE REPORTS CHILD TAKEN FROM FLORIDA [Am. Ver. Compl. ¶¶185-193].

16. Moynihan lied on his Application for Complaint [**Trial, 5/21/02, at 73**]: specifically he lied when he wrote "The defendant, mother, and his lawyer were advised of the warrant to be taken on the defendant. They both said they have not heard from the defendant." [**Am. Ver. Compl. ¶187,** Trial, 5/21/02, at 74]. **MTH DENIED**

## MOYNIHAN'S INVESTIGATION AFTER PANE REPORTS CHILD TAKEN [Am. Ver. Compl. ¶¶194-203].

## WHAT THOMPSON AND MOYNIHAN KNEW BEFORE THEY SOUGHT ARREST WARRANT [Am. Ver. Compl. ¶¶204-214].

## THE UNLAWFUL WARRANT FOR MEUSE'S ARREST [Am. Ver. Compl. ¶¶215-223].

## WHAT THOMPSON KNEW ABOUT THE ALLEGED FBI UNLAWFUL FLIGHT WARRANT [Am. Ver. Compl. ¶¶224-232].

## WHAT THOMPSON DID NOT INVESTIGATE ABOUT THE BABY'S HEALTH [Am.

Ver. Compl. ¶¶233-242].

17.  Thompson was not concerned that the child received proper medical care or appropriate therapy locally  [**Am. Ver. Compl. ¶242**]..  **MTH DENIED**


**WHAT THOMPSON KNEW ABOUT MOYNIHAN'S INVESTIGATION OF THE BABY'S HEALTH [Am. Ver. Compl. ¶¶243-246].**


**MOYNIHAN NON-INVESTIGATION REGARDING PANE'S CARE OF THE CHILD [Am. Ver. Compl. ¶¶247-252].**


**CAPTAIN THOMPSON'S GENERAL POLICE KNOWLEDGE  [Am. Ver. Compl. ¶¶253-267].**


**THOMPSON,  MOYNIHAN, THE FBI, AND FBI AGENT CHARLES KELLY COORDI-NATE ACTIVITIES  [Am. Ver. Compl. ¶¶266-294].**


**PANE AND MOYNIHAN AND THE FBI COORDINATE POSTER ACTIVITIES [Am. Ver. Compl. ¶¶295-316].**


**THE WARRANT  ON AMERICA'S MOST WANTED WEBSITE [Am. Ver. Compl. ¶¶317-324].**


**FOXNEWS TELEVISED BROADCAST [Am. Ver. Compl. ¶¶325-326]**


**MOYNIHAN'S COMMUNICATION WITH PANE AND STULTS  [Am. Ver. Compl. ¶¶327-334].**


**STULTS' WORKING WITH THE FBI AND MAINTAINING THE "SUSAN PANE LEGAL DEFENSE FUND"  [Am. Ver. Compl. ¶¶335-337].**


**PROBABLE CAUSE  [Am. Ver. Compl. ¶¶338-360].**


**MEUSE NEVER INTENDED TO REMOVE CHILD PERMANENTLY FROM MOTHER [Am. Ver. Compl. ¶¶361-376].**


**MEUSE'S ARREST AND THE ENSUING CRIMINAL PROCESS [Am. Ver. Compl. ¶377-396].**


**COUNT 1: VIOLATIONS OF 42 U.S.C. 1983: ARREST  [Am. Ver. Compl. ¶¶397-409].**

18.  At all times relevant herein, the conduct of all Defendants were subject to 42 U.S.C. §§ 1983, 1985, 1986, and 1988 [**Am. Ver. Compl. ¶398**].   **MTH DENIED**

19.    Acting under the color of law, Defendants worked a denial of Meuse's rights, privileges or immunities secured by the United States Constitution or by Federal law, to wit,

    a.    by depriving Meuse of his liberty without due process of law, by taking him into custody and holding him there against his will,

    b.    by making an unreasonable search and seizure of his property without due process of law,

    c.    by conspiring for the purpose of impeding and hindering the due course of justice, with intent to deny Meuse equal protection of laws,

    d.    by refusing or neglecting to prevent such deprivations and denials to plaintiff,

thereby depriving plaintiff of his rights, privileges, and immunities as guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States. [**Am. Ver. Compl. ¶399**]. **MTH DENIED**

20.    Defendants City of Haverhill and the Haverhill Police Department negligently trained Defendants Thomson and Moriarty [**Am. Ver. Compl. ¶403**]. **MTH DENIED**

21.    Moynihan had an ulterior motive, namely, personal financial benefit, for arresting Meuse and charging him with crimes he had not committed [**Am. Ver. Compl. ¶404**]. **MTH DENIED**

22.    There was no warrant for the arrest of plaintiff on 22 March 2001 by the ADA police. The arrest was without reasonable grounds for said Defendants to believe Meuse had committed an offense and Defendants knew they were without probable cause to arrest Meuse [**Am. Ver. Compl. ¶407**]. **MTH DENIED**

23.    No complaint, information, or indictment was ever sworn against Meuse alleging offenses occurring prior to the moment an Ada, Oklahoma, police officers Casey Northcutt and Fox handcuffed Meuse and told him he was under arrest [**Am. Ver. Compl. ¶408**]. **MTH DENIED**

24.    As a result of the **concerted unlawful and malicious arrest**, all Defendants directly or indirectly deprived Meuse of both his liberty without due process of law and his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. sec. 1983 [**Am. Ver. Compl. ¶409**]. **MTH DENIED**

**COUNT 2: <u>VIOLATIONS OF 42 U.S.C. 1983: DETENTION AND CONFINEMENT</u>  [Am. Ver. Compl. ¶¶410-411].**

25.    Plaintiff repeats and realleges and incorporates by reference the allegations in paragraphs 1 through 409 above with the same force and effect as if herein set forth.

26.    As a result of the **concerted unlawful and malicious detention and confinement** of

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 24 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Meuse, all Defendants directly or indirectly deprived Meuse of both his right to his liberty without due process of law and his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. sec. 1983 [**Am. Ver. Compl. ¶411**]. **MTH DENIED**

## COUNT 3: <u>VIOLATIONS OF 42 U.S.C. 1983: CONSPIRACY</u>  [**Am. Ver. Compl. ¶¶412-433**].

27.    All the Defendants **(a)** had an object to be accomplished; **(b)** had an agreement on the object or course of action; **(c)** performed one or more unlawful overt acts; and **(d)** caused Meuse damages that were a direct result of those acts [**Am. Ver. Compl. ¶423**].   **MTH DENIED**

28.    The object and course of action was to capture Meuse by the following:

    a.    by misrepresenting that a custody order was in place when Meuse took the child from Florida,

    b.    by misrepresenting that Meuse was a felon,

    c.    by misrepresenting that Meuse was a fugitive, that he had taken unlawful flight to avoid prosecution,

    d.    by misrepresenting that Meuse was wanted for parental kidnapping,

    e.    by preparing posters for display in stores, postoffices, other physical locations, and on television and in newspapers,

    f.    by being interviewed by reporters for television and newsprint.  [**Am. Ver. Compl. ¶424**].   **MTH DENIED**

29.    In furtherance of their object, Defendants did two or more overt acts against the plaintiffs. Those unlawful overt acts include, but are not limited to, the following:

    a.    authored and prepared the posters,

    b.    falsely published to local and national audiences that a federal warrant to capture Meuse had issued,

    c.    falsely published to local and national audiences that Meuse was wanted for parental kidnapping,

    d.    falsely published to local and national audiences that Meuse had taken unlawful flight to avoid prosecution,

    e.    arranged for their distribution of the posters,

    f.    distributed the posters across the nation,

    g.    published the posters on television for local and national audiences,

    h.    arranged for being interviewed on local and national television stations, and

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 25 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

     i.    were interviewed on local and national television shows.   [**Am. Ver. Compl. ¶425**].   **MTH DENIED**

30.    FOXNews, the Haverhill police department, Thompson, Moynihan, Stults, Prouty, NCMEC, and Pane misrepresented that Meuse was a fleeing felon [**Am. Ver. Compl. ¶429**].   **MTH DENIED**

31.    In concert with Pane's and Stults's representations and misrepresentations, Moynihan, Thompson, Barone, Kelly, and Prouty indirectly caused the detention and confinement of Meuse on the grounds that Meuse violated a custody order [**Am. Ver. Compl. ¶430**]. **MTH DENIED**

32.    The defendants agreed that the object or course of action was to arrest, detain, and confine Meuse without probable cause, and maliciously charge and prosecute him with crimes [**Am. Ver. Compl. ¶431**].   **MTH DENIED**

33.    Plaintiff suffered harm and damages that are a direct result of those acts [**Am. Ver. Compl. ¶432**].   **MTH DENIED**

34.    As a result of their **concerted unlawful and malicious conspiracy,** all Defendants deprived Meuse of both his liberty without due process of law and his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. sec. 1983 and 1985 [**Am. Ver. Compl. ¶433**].   **MTH DENIED**

**COUNT 4: <u>VIOLATIONS OF 42 U.S.C. 1983:</u>**
**<u>REFUSING OR NEGLECTING TO PREVENT</u>  [Am. Ver. Compl. ¶¶434-440].**

35.    Acting under color of law and pursuant to official policy or custom, the Haverhill Police Department, Chief Barone, the City of Haverhill, the FBI, Director Louis Freeh, and Charles Prouty knowingly, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis Defendant police officers and agents in their duties to refrain from:

    a.    unlawfully and maliciously harassing a citizen who was acting in accordance with his constitutional and statutory rights, privileges, and immunities,

    b.    unlawfully and maliciously arresting, imprisoning and prosecuting a citizen who was acting in accordance with his constitutional and statutory rights, privileges, and immunities,

    c.    conspiring to violate the rights, privileges, and immunities guaranteed to Plaintiff by the Constitution and laws of the United States and the laws of the Commonwealth of Massachusetts; and

    d.    otherwise depriving Plaintiff of his constitutional and statutory rights, privileges, and immunities  [**Am. Ver. Compl. ¶437**].   **MTH DENIED**

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 26 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

36.    Defendants Thompson, the City of Haverhill, the FBI, Director Louis Freeh, and Charles Prouty had knowledge or, had they diligently exercised that duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed.  The afore-named defendants had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with gross negligence failed or refused to do so [**Am. Ver. Compl. ¶438**].    **MTH DENIED**

37.    Defendants Thompson, the City of Haverhill, the FBI, Director Louis Freeh, and Charles Prouty directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of Defendant police officers and agents heretofore described [**Am. Ver. Compl. ¶439**].    **MTH DENIED**

38.    As a direct and proximate cause of the negligent and intentional acts of the Defendants Haverhill Police Department, Chief Barone, the City of Haverhill, the FBI, Director Louis Freeh, and Charles Prouty, Plaintiff suffered physical injury, loss of income, and severe mental anguish in connection with the deprivation of his constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. sec. 1983 [**Am. Ver. Compl. ¶440**].    **MTH DENIED**

**COUNT 5: MALICIOUS PROSECUTION**   [**Am. Ver. Compl. ¶¶441-456**].

39.    Defendants instituted criminal process against the plaintiff with malice [**Am. Ver. Compl. ¶442**].    **MTH DENIED**

40.    Susan Pane and Rosalyn Stults played an active part in the initiation and continuation of the criminal proceedings [**Am. Ver. Compl. ¶443**]. .   **MTH DENIED**

41.    Moynihan played an active part in the initiation of the criminal proceedings by causing the false arrest and imprisonment of Meuse [**Am. Ver. Compl. ¶445**].    **MTH DENIED**

42.    The charges were not based upon probable cause, that is the state of the facts in the mind of the prosecutor would not lead a man of ordinary caution and prudence to believe, or entertain an honest or strong suspicion that Meuse was guilty [**Am. Ver. Compl. ¶447**]. .   **MTH DENIED**

43.    Defendants Moynihan and Thompson had a duty to ascertain whether there was reasonable and probable cause for a prosecution, to wit, knowing that Meuse had been given emergency custody of the child by Judge Herlihy, Defendants Moynihan and Thompson had a duty to arrest Pane when she showed up at the station on 20 October 2000, while the violation of Judge Herlihy's 209A order was still effective [**Am. Ver. Compl. ¶44**].    **MTH DENIED**

44.    Defendants Moynihan and Thompson breached their duties [**Am. Ver. Compl. ¶449**].    **MTH DENIED**

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 27 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

45.    Defendants Moynihan and Thompson knew or should have known that the 209A order against Pane was in effect, that Pane was evading service; they had a duty to ascertain the status of that 209A and failed that duty [**Am. Ver. Compl. ¶450**].    **MTH DENIED**

46.    Defendants Moynihan and Thompson and the FBI agents knew or should have known that Pane had intentionally misrepresented facts about the non-existent custody order when Meuse took the child from Florida and about the medical condition of the child, Marissa [**Am. Ver. Compl. ¶451**].    **MTH DENIED**

47.    Pane recklessly made categorical statements to Officer Moynihan accusing the plaintiff of violating a court order by taking the child, statements that resulted in Meuse's arrest [**Am. Ver. Compl. ¶452**].    **MTH DENIED**

48.    Pane instigated or participated in the prosecution by pressing police to arrest and apply for a complaint for an improper purpose  [**Am. Ver. Compl. ¶453**].    **MTH DENIED**

**COUNT 6:  ABUSE OF PROCESS    [Am. Ver. Compl. ¶¶457-464].**

49.    Defendants maliciously used a "legal process `to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the par-ticular process employed'" [**Am. Ver. Compl. ¶458**]    **MTH DENIED**

50.    Defendants Moynihan and Thompson knew or should have known that the complaint initi-ated was groundless [**Am. Ver. Compl. ¶461**].    **MTH DENIED**

51.    Defendant Moynihan applied for a warrant without an affidavit and was granted an unlaw-ful warrant for Meuse  [**Am. Ver. Compl. ¶462**].    **MTH DENIED**

52.    Defendants Moynihan and Thompson used the legal process with the ulterior purpose, to wit, for personal financial benefit [**Am. Ver. Compl. ¶463**].    **MTH DENIED**

53.    Defendants City of Haverhill is liable under the doctrine of *respondeat* superior  [**Am. Ver. Compl. ¶464**].    **MTH DENIED**

**COUNT 7:  VIOLATION OF MASS. CIVIL RIGHTS ACT, M.G.L. c. 12, sec. 11*I*  [Am. Ver. Compl. ¶¶465-470].**

54.    Defendants Susan Pane, Stults, Moynihan, Thompson, Barone, Kelly, and Prouty interfered with or attempted to interfere by threats, intimidation, or coercion with Plaintiff's exercise and enjoyment of his rights -- e.g., his rights to his liberty, and his right to due process -- secured by the state and federal constitutions or laws of the United States and/or the Com-monwealth of Massachusetts [**Am. Ver. Compl. ¶467**]. **MTH DENIED**

55.    Thus, under color of state, Meuse's liberty was threatened, and he was intimidated and co-erced into not enforcing his right to living in his home [**Am. Ver. Compl. ¶468**].    **MTH DENIED**

56.  Defendants City of Haverhill and the FBI are liable under the doctrine of respondeat superior [**Am. Ver. Compl. ¶469**].  **MTH DENIED**

57.  As a direct and proximate result of the conduct of the Defendants, Meuse was intimidated and put in continuing anxiety and has suffered damages including but not limited to the aforesaid damages [**Am. Ver. Compl. ¶470**].  **MTH DENIED**

## COUNT 8: <u>FALSE ARREST AND IMPRISONMENT</u>  [**Am. Ver. Compl. ¶¶471-478**].

58.  At all times relevant herein, **(a)** the Defendants acted with the intention of confining Meuse within fixed boundaries, **(b)** the act directly or indirectly resulted in confinement, and **(c)** Meuse was conscious of the confinement [**Am. Ver. Compl. ¶472**].  **MTH DENIED**

59.  All the Defendants indirectly caused to be imposed on Meuse by force or threats an unlawful restraint upon his freedom of movement, to wit by arresting and handcuffing and shackled together with several others [**Am. Ver. Compl. ¶473**].  **MTH DENIED**

60.  As a direct and proximate result of the conduct of the defendants, Meuse suffered harm and damages including but not limited to the aforesaid damages [**Am. Ver. Compl. ¶477**].  **MTH DENIED**

61.  Defendants City of Haverhill and the FBI are liable under the doctrine of *respondeat* superior [**Am. Ver. Compl. ¶478**].  **MTH DENIED**

## COUNT 9: <u>ASSAULT</u>  [**Am. Ver. Compl. ¶¶479-483**].

62.  All Defendants indirectly but intentionally created an apprehension of immediate physical harm by means of an overt gesture, for no known purpose other than to create in Meuse an apprehension of immediate physical harm.  Those overt gestures included the following:

   a.  an overly hyperkinetic policeman, literally shaking, held a shotgun two inches from Meuse's face

   b.  a policeman with a 9-millimeter handgun aimed at Meuse  [**Am. Ver. Compl. ¶481**] **MTH DENIED**

63.  Any reasonable person would also become apprehensive in the face of defendants' threatening conduct [**Am. Ver. Compl. ¶482**].  **MTH DENIED**

64.  Defendants City of Haverhill and the FBI are liable under the doctrine of *respondeat* superior [**Am. Ver. Compl. ¶483**].  **MTH DENIED**

## COUNT 10: <u>BATTERY</u>  [**Am. Ver. Compl. ¶¶484-487**].

65.  Without the consent of Meuse, Defendants intentionally, harmfully, and offensively touched Meuse by handcuffing and shackling him [**Am. Ver. Compl. ¶485**].  **MTH DENIED**

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 29 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

66.    Without the consent of Meuse, all Defendants indirectly caused the intentional, harmful, and offensive touching of Meuse when chaining and shackling Meuse in the police station [**Am. Ver. Compl. ¶486**].    **MTH DENIED**

67.    Defendants City of Haverhill and FBI are liable under the doctrine of *respondeat* superior [**Am. Ver. Compl. ¶487**].    **MTH DENIED**

## COUNT 11: <u>CONSPIRACY</u>   [**Am. Ver. Compl. ¶¶488-501**].

68.    All the Defendants **(a)** had an object to be accomplished; **(b)** had an agreement on the object or course of action; **(c)** performed one or more unlawful overt acts; and **(d)** caused Meuse damages that were a direct result of those acts [**Am. Ver. Compl. ¶489**].    **MTH DENIED**

69.    The object and course of action was to capture Meuse by the following:

    a.    by misrepresenting that a custody order was in place when Meuse took the child from Florida,

    b.    by misrepresenting that Meuse was a felon,

    c.    by misrepresenting that Meuse was a fugitive, that he had taken unlawful flight to avoid prosecution,

    d.    by misrepresenting that Meuse was wanted for parental kidnapping,

    e.    by preparing posters for display in stores, postoffices, other physical locations, and on television and n newspapers,

    f.    by being interviewed by reporters for television and newsprint [**Am. Ver. Compl. ¶490**].    **MTH DENIED**

72.    In furtherance of their object, defendants did two or more overt acts against the plaintiffs. Those unlawful overt acts include, but are not limited to, the following:

    a.    authored and prepared the posters,

    b.    falsely published to local and national audiences that a federal warrant to capture Meuse had issued,

    c.    falsely published to local and national audiences that Meuse was wanted for parental kidnapping,

    d.    falsely published to local and national audiences that Meuse had taken unlawful flight to avoid prosecution,

    e.    arranged for their distribution of the posters,

    f.    distributed the posters across the nation,

    g.    sponsored the posters across the nation

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 30 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

    h.     published the posters on television for local and national audiences,

    i.     arranged for being interviewed on local and national television stations, and

    j.     were interviewed on local and national television shows [**Am. Ver. Compl. ¶492**].  **MTH DENIED**

73.    FOXNews, Prouty, Wal-Mart, NCMEC, AMW, Moynihan, and Susan misrepresented that Meuse was a fleeing felon [**Am. Ver. Compl. ¶495**].  **MTH DENIED**

## COUNT 12: <u>DEFAMATION</u>   [**Am. Ver. Compl. ¶¶502-512**]..

74.    By false statements both orally and pictorially on 10 February 2001, Defendants intended to impeach Plaintiff Meuse's honesty, integrity, virtue, or reputation [**Am. Ver. Compl. ¶504**].  .  **MTH DENIED**

75.    The defamatory statements were, including, but not limited to, the following:

76.    that there was a custody agreement,

77.    that Meuse was Wanted for parental kidnapping,

78.    that Meuse was unlawfully fleeing to avoid prosecution [**Am. Ver. Compl. ¶505**].  **MTH DENIED**

79.    On Friday, 16 February 2001, ABC televised on the Sally Show, hosted by Sally Jesse Raphael, an episode entitled "My Child Has Been Stolen."

## COUNT 13: <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>   [**Am. Ver. Compl. ¶¶513-521**].

80.    Defendants intentionally and deliberately inflicted emotional distress on Meuse by maliciously prosecuting Meuse, or by abusing the lawful process by unlawful purpose, or by violating Meuse's constitutional rights, or by falsely arresting and imprisoning the plaintiff, by conspiring against Meuse, or by interfering with Meuse's state civil rights by threats, coercion, or intimidation, or knew or should have known that emotional distress was the likely result of their conduct [**Am. Ver. Compl. ¶514**].  **MTH DENIED**

81.    Defendants' conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community [**Am. Ver. Compl. ¶515**].  **MTH DENIED**

82.    The actions of the Defendants were the cause of Meuse's distress [**Am. Ver. Compl. ¶516**].  **MTH DENIED**

83.    The emotional distress sustained by Meuse was severe and of a nature that no reasonable man could be expected to endure [**Am. Ver. Compl. ¶518**].  **MTH DENIED**

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 31 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

84.    As a result of the Defendants' extreme and outrageous conduct, Plaintiff was, is, and, with a high degree of likelihood, will continue to be emotionally distressed due to the intentional exclusion [**Am. Ver. Compl. ¶519**].    **MTH DENIED**

85.    Defendant City of Haverhill is liable under the doctrine of *respondeat* superior [**Am. Ver. Compl. ¶520**].    **MTH DENIED**

86.    As a result of the Defendants' extreme and outrageous conduct, Meuse has suffered and will continue to suffer mental pain and anguish, severe emotional trauma, embarrassment, and humiliation [**Am. Ver. Compl. ¶521**].    **MTH DENIED**

**Part V:    Facts Moynihan, Thompson, and Haverhill Pled That They Could Neither Admit Nor Deny and That Meuse Had to Prove at Trial.  A Few, They Pled, Contained Legal Conclusions and Required No Answer, or That They Had Insufficient Knowledge or Information to Form a Belief as to the Truth of the Asserted Facts**

1.    Paragraphs 1-58 are summarized in the background section.

2.    Pane was in Haverhill District Court for a hearing on the c. 209A restraining order and that order was continued several times until 10 December 1999 [**Am. Ver. Compl. ¶59, Trial, 5/20/02, at 73-74**].

3.    By keeping the child in Florida, Pane was in violation of the chapter 209A order [**61, Trial, 5/22/02, at 167**].

4.    The Florida action against Meuse was declared "null and void" in March 2000 [**Am. Ver. Compl. ¶63, Trial, 5/20/02, at 84**].

5.    On 3 May 2000, Judge Mary McCauley Manzi declared Massachusetts the home state of the child, declared Massachusetts would exercise jurisdiction, and wrote that the mother, Susan Pane, wrongfully removed the child to Florida in October 1999 [**Am. Ver. Compl. ¶64, Trial, 5/20/02, at 81-82; Trial, 5/21/02, at 17; Compl. Exh. T**].

**MOYNIHAN IGNORED RESTRAINING ORDER AGAINST SUSAN PANE:
INVIDIOUS GENDER DISCRIMINATION [Am. Ver. Compl. ¶¶73-86]**

6.    In the Haverhill District Court, however, in the Fall of 1999, Meuse had been given custody by Judge Herlihy [**Am. Ver. Compl. ¶73, Compl. Exh. M**]

7.    Moynihan admitted that he had never seen Judge Manzi's order of 3 May 2000.  In that order, Judge Manzi wrote that Pane had wrongfully removed the child to Florida in October 1999, over six months prior to Meuse taking the child from Florida and prior to giving Pane custody on 11 October 2000 [**Am. Ver. Compl. ¶82, Trial, 5/21/02, at 17; Compl. Exh. T**].

8.    Moynihan did not read the file in the Probate & Family Court **(a)** because there was never a warrant for Ms. Pane and **(b)** because both Florida and Massachusetts allowed the child

Marissa to stay in Florida **[Am. Ver. Compl. ¶83, Trial, 5/21/02, at 19]**.

## MOYNIHAN NON-INVESTIGATION REGARDING STATUS OF CASE IN FAMILY COURTS OF MASSACHUSETTS AND FLORIDA  **[Am. Ver. Compl. ¶¶87-94]**

9.    Moynihan testified that the courts did nothing to get the child returned to Meuse **[Am. Ver. Compl. ¶89, Trial, 5/20/02, at 94, 200-201, and 213-214]**. .

## INFORMATION SUPPLIED TO AND GATHERED BY THE HAVERHILL POLICE DEPARTMENT  **[Am. Ver. Compl. ¶¶95-115]**

10.    In all the letters, Meuse's parents were worried about the child: the mother is a drug addict. In words, for all intents and purposes, they wrote: "The poor baby has not developed: she can't walk, she can't put her feet together, she can't hold a bottle, she can't hold a cracker. Would you please help us?  We want Brian to have the child.  We haven't heard from him, but we want you to look into the drugs, look into this drug situation." **[Am. Ver. Compl. ¶99 ]**.

## MOYNIHAN'S NON-INVESTIGATION REGARDING THE DRUGS' LIST  **[Am. Ver. Compl. ¶¶116-129]**

11.    Moynihan "brought the documentation over to the D.A. over here to see if he thought there was anything, you know, that could be anything unusual about it" " **[Am. Ver. Compl. ¶116, Trial, 5/20/02, at 167]**.

12.    Of the list of drugs\\[13]/ he showed to the DA, the only prescription in which the assistant DA was interested was "the Ultram and that was only because of the large count, which was 360" **[Am. Ver. Compl. ¶117, Trial, 5/21/02, at 118]**.   The ADA was not concerned with the abundance here of codeine and other narcotic drugs **[Am. Ver. Compl. ¶117, Trial, 5/21/02, at 118]**.   *See also* Trial Exhs. A, C, D, E, F, G, I, X, and KK, SS.

## MOYNIHAN'S NON-INVESTIGATION REGARDING THE TWO SUSANS  **[Am. Ver. Compl. ¶¶130-139]**

13.    **In actual fact,** a Susan "Paine" lived on Mercury Terrace and Susan "Pane" had signed her handwriting on a script from Dr. Byrne that was for a narcotic and filled the fake prescription at a CVS pharmacy  **[Am. Ver. Compl. ¶131, Trial, 5/22/02, at 182; Trial Exhs. C, X, KK, and JJ]**.

14.    **In actual fact,** Susan Paine and her husband's pornography and sexual paraphernalia shop was still in existence a few blocks from the courthouse at time of trial **[Am. Ver. Compl. ¶132]**.

15.    Moynihan did not consider that the second Susan "Paine" did not know Susan Pane's

---

[13]   The list included Ultram, hydrocodone with Apap, Vicodin, codeine, propoxiphene, Napsalet with Apap, propoxiphene, oxycodone (Oxycontin with acetaminophen), amongst other drugs.

driver's license number, date of birth, social security number, in addition to the insurance policy number [**Am. Ver. Compl. ¶135**]..

16.     Moynihan did not consider that Pane had access to that information for everyone who went through **any** prescription system.  That was an integral part of Pane's job [**Am. Ver. Compl. ¶136**]..

17.     Moynihan defense was that there was another Sue Pane in Haverhill. [**Am. Ver. Compl. ¶137, Trial, 5/22/02, at 186**].

18.     Captain Thompson testified that Detective Moynihan ran into trouble when he found two Susan Panes; one that had lived on Oxford and one who had lived on Orchard.  Thompson testified that Moynihan unsuccessfully attempted to find the other Susan PaIne and was unable to do so [**Am. Ver. Compl. ¶138, Trial, 5/22/02, at 40**].

19.     Thompson claimed that the other Susan PaIne's forwarding address led to a dead end [**Am. Ver. Compl. ¶139, Trial, 5/22/02, at 40; Compl. Exh. JJ**].

## CHILD'S MEDICAL CONDITION BETWEEN JULY 2000 AND 1 OCTOBER 2000 [Am. Ver. Compl. ¶140-150]

## MEUSE'S LEGAL ATTEMPTS TO TAKE MARISSA OUT OF HARM'S WAY [Am. Ver. Compl. ¶151]

## FACED WITH COURT'S FAILURE TO ACT. MEUSE MUST ACT TO SAVE CHILD [Am. Ver. Compl. ¶152-172]

## MOYNIHAN'S UNDERSTANDING OF THE LAW  [Am. Ver. Compl. ¶¶173-178]

20.     Moynihan testified that he knew that Massachusetts does not have jurisdiction over any crime committed in any other state [**Am. Ver. Compl. ¶174, Trial, 5/21/02, at 8**].

21.     But Moynihan insisted at trial that Meuse did commit a crime in Massachusetts [**Am. Ver. Compl. ¶175, Trial, 5/21/02, at 9**].

22.     To reach the conclusion that Meuse committed a crime in Massachusetts, Moynihan testified: "I'm referring to the common law that the Massachusetts. . . .  If there's no judge's decision, a mother automatically has custody of the child" [**Trial, 5/21/02, at 9**].  "I've seen it a hundred times. . . .  Right in the court.  In the Court. . . .  The mother always gets custody of the child until ----  . . .  Until the court overturns it, the mother always has custody of the child. . . . I can bring in 400 women that have custody of their kids compared to your half a dozen [men]" [**Trial, 5/21/02, at 10**].  I think the basis [of concluding that Meuse committed a crime is that] Massachusetts had determined that they would be responsible for the custody.  When it came down between who was given custody, either Florida or Massachusetts, Massachusetts took over that role.  Florida would not accept -- have anything to do with the role of who had custody of the baby between Mr. Meuse and Ms. Pane" [**Am. Ver. Compl. ¶176, Trial, 5/21/02, at 10-11**].

23.    Moynihan believed that "Florida really didn't care who had that child" **[Trial, 5/21/02, at 11]** and that Judge Mary McCauley Manzi had declared Massachusetts the "home state of the child" and that Massachusetts would exercise jurisdiction over the child  **[Am. Ver. Compl. ¶177, Trial, 5/21/02, at 11-12].**

## THOMPSON ORDERS MOYNIHAN TO STOP INVESTIGATING AND LATER LIES TO THE CHIEF  [Am. Ver. Compl. ¶¶179-184]

24.    When Moynihan learned that Meuse had taken the child, Captain Thompson told Moynihan to do no further investigation work in the matter **[Am. Ver. Compl. ¶179, Trial, 5/20/02, at 176].**

25.    Thompson swore on the witness stand that everything in his letter of 17 January 2001 to Chief Barone was the truth **[Am. Ver. Compl. ¶180, Trial, 5/22/02, at 94; Compl. Exh. CC].**

26.    Thompson testified, "The chief believed me when I told him that there was a [FBI] warrant **[Am. Ver. Compl. ¶181, Trial, 5/22/02, at 96].**

27.    When faced with his letter of 17 January 2001 to his Chief, Leonard Barone, Thompson testified that Detective Moynihan had told him that "when Mr. Meuse did not show up with the child before Judge Manzi, she found him in contempt" **[Am. Ver. Compl. ¶182, Trial, 5/22/02, at 88-89].**

28.    According to Captain Thompson's letter to Chief Barone, the paperwork that Jan Meuse gave Moynihan accused Susan Pane of abusing prescription drugs **[Am. Ver. Compl. ¶183, Trial, 5/21/02, at 66; Compl. Exh. CC, dated 17 January 2001]**.  The captain also wrote that "Detective Moynihan looked into this paperwork and was unable to substantiate any illegal activity."  **[Id.]**

29.    Moynihan denied that the information that Thompson wrote to Chief Barone was, in fact, information that Thompson had received from Moynihan **[Am. Ver. Compl. ¶184, Trial, 5/21/02, at 69].**

## SUSAN PANE REPORTS CHILD TAKEN FROM FLORIDA  [Am. Ver. Compl. ¶¶185-193]

30.    According to the Haverhill Police Department incident report, Susan Pane reported on 20 October 2000 that the child had been taken from Florida **[Am. Ver. Compl. ¶185, Compl. Exh. BB, Haverhill Police Department incident report signed by Steven Iannialfo for Clerk of the Court].**

31.    On the Application for Complaint, the Place of Offense is alleged to have been "Port Orange, Florida" **[Am. Ver. Compl. ¶188, Compl. Exh. DD].**

32.    On the Criminal Complaint, the Place of Offense is alleged to have been "Haverhill" **[Am. Ver. Compl. ¶190, Compl. Exh. Y].**

33.    Moynihan admitted that he did not advise Meuse's counsel that there was a warrant against Meuse **[Am. Ver. Compl. ¶191, Trial, 5/21/02, at 73]**.

34.    Also on the Application for Complaint, Moynihan testified that he wrote, in words for all intents and purposes, **"**Litigant came to Haverhill station and filed a missing person report on October 20th**" [Am. Ver. Compl. ¶192, Trial, 5/21/02, at 74; Compl. Exh. DD]**.

35.    Moynihan knew or should have known that there was an outstanding violation of the chapter 209A restraining order against Susan Pane, and should have begun prosecution of her on 20 October 2000 for the violation that occurred in the Fall of 1999 **[Am. Ver. Compl. ¶193, Compl. Exh. M]**.

## MOYNIHAN'S INVESTIGATION AFTER PANE REPORTS CHILD TAKEN  [Am. Ver. Compl. ¶¶194-203]

36.    Moynihan testified that he did not contact or check with the Florida court to learn whether there was any outstanding order that Meuse was supposed to comply with **[Am. Ver. Compl. ¶194, Trial, 5/21/02, at 5]**.

37.    Moynihan did not know if there was an order in Florida that Meuse broke **[Am. Ver. Compl. ¶195, Trial, 5/21/02, at 5]**.

38.    Moynihan did not check in Massachusetts, with the Probate and Family Court, whether there was any outstanding order that the court had found him in contempt of **[Am. Ver. Compl. ¶196, Trial, 5/21/02, at 6]**.

39.    Moynihan at first testified did not believe there was an order that Meuse was in contempt of **[Am. Ver. Compl. ¶197, Trial, 5/21/02, at 6]**; then Moynihan testified that he believed there "could be a contempt order,: but "who ordered it [he did not] know" and he did not believe he had seen such a document **[Am. Ver. Compl. ¶197, Trial, 5/21/02, at 68]**.

40.    Moynihan testified that "if [he] had such a document or if [he] had seen such a document, [he] would have given it to . . . the office of District Attorney. **[Trial, 5/21/02, at 68-69]**. By the end of his testimony, Moynihan believed that Meuse had not been found in contempt in Lawrence **[Am. Ver. Compl. ¶198, Trial, 5/21/02, at 69]**.

41.    Moynihan did not believe there were any charges brought up against Meuse in Haverhill District Court **[Am. Ver. Compl. ¶199, Trial, 5/21/02, at 7]**.

42.    Moynihan did not believe there was any Haverhill Court order of which Meuse was in contempt or had broken **[Am. Ver. Compl. ¶200, Trial, 5/21/02, at 6]**.

43.    Moynihan testified that Meuse did not take any child from anyone in Massachusetts **[Am. Ver. Compl. ¶201, Trial, 5/21/02, at 7, 8]**.

44.    Moynihan testified that there was nothing in Florida that said Meuse could not take the child in Florida **[Am. Ver. Compl. ¶202, Trial, 5/21/02, at 7-8]**.

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 36 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

45.  Moynihan testified that "[a]s far as [he was] concerned, there was no crime in Florida" **[Am. Ver. Compl. ¶203, Trial, 5/21/02, at 8].**

### WHAT THOMPSON AND MOYNIHAN KNEW BEFORE THEY SOUGHT ARREST WARRANT **[Am. Ver. Compl. ¶¶204-214]**

46.  Although Thompson knew **(a)** that the probate and family court had found neither Pane nor Meuse in contempt, **(b)** that Meuse had been awarded custody by Judge Herlihy of District Court, **(c)** that Judge Manzi had found that Pane had wrongfully removed the child from Massachusetts, Thompson allowed his subordinate Detective Moynihan to seek a warrant to arrest Meuse **[Am. Ver. Compl. ¶204, Trial, 5/22/02, at 48; Trial Exhs. M and T].**

47.  Thompson testified that he believes that "a man has all the same rights as a woman" " **[Am. Ver. Compl. ¶205, Trial, 5/22/02, at 50].**

48.  Thompson testified that he was not ready to convict and get a warrant because it was known that "the baby, in the beginning, was in Florida with the mother, it was known where the baby was. The courts were aware of the situation. The District Attorney's office was aware of the situation. The judge was aware of the situation. When the baby left with the father, we did not know where the baby was. We didn't -- the judge did not know where the baby was, the District Attorney's office did not know where the baby was, and that's why at that point we proceeded with a warrant" **[Am. Ver. Compl. ¶206, Trial, 5/22/02, at 50-51].** \[14]/

49.  Thompson denied feeling that because he knew that everyone else wasn't doing their job, he felt comfortable in not having to do his job either **[Am. Ver. Compl. ¶207, Trial, 5/22/02, at 51].**

50.  Thompson testified that the basis for the warrant was "that the child remained away from the mother **[Am. Ver. Compl. ¶208, Trial, 5/22/02, at 84].**

51.  Thompson knew that the probate court did not issue a warrant for either Pane or Meuse **[Am. Ver. Compl. ¶209, Trial, 5/22/02, at 85-86].**

52.  Thompson could not or would not provide on the witness stand a reason for the Probate Court not issuing a warrant either for female Susan Pane or for male Brian Meuse, but the police went after Meuse and not Pane **[Am. Ver. Compl. ¶210, Trial, 5/22/02, at 86].**

53.  Thompson admitted that he never saw a contempt order out of Lawrence **[Am. Ver. Compl. ¶211, Trial, 5/22/02, at 90].** He believed, however, that there was a contempt order against Meuse solely because Moynihan had been on the department for 25 years **[Id.].**

---

[14]  What Thompson was ignoring was that both he and Moynihan had **WRITTEN** notice (in Moynihan's file produced in court) from Stults that she and Pane had threatened with suit the doctors to whom Meuse brought the child and scared Meuse off to wherever he could attend to the medical care for the child without interference by Stults and Pane. .

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 37 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

54.    When he had written to the Chief on 17 January 2001, Thompson had never checked whether there was a contempt of court out of Lawrence, and did not know whether or where the court kept its records **[Am. Ver. Compl. ¶212, Trial, 5/22/02, at 108-109]**.

55.    Thompson never saw an affidavit written by Detective Moynihan or by anyone else to support the warrant sought **[Am. Ver. Compl. ¶213, Trial, 5/22/02, at 83]**.

56.    Thompson never heard Detective Moynihan swear to any facts before the Court for that warrant **[Am. Ver. Compl. ¶214, Trial, 5/22/02, at 83]**.

## THE UNLAWFUL WARRANT FOR MEUSE'S ARREST  **[Am. Ver. Compl. ¶¶215-223]**

57.    Before Moynihan brought an application for criminal complaint and warrant, the only people he used as a resource of information beside Susan Pane and her lawyer, Rosalyn Stults, was his captain, Captain Thompson  **[Am. Ver. Compl. ¶216, Trial, 5/21/02, at 62]**.

58.    Moynihan testified that he never had conversation with Chief Barone **[Am. Ver. Compl. ¶217, Trial, 5/21/02, at 62]**.

59.    Moynihan admitted that neither the copy nor the original arrest warrant had a signature by anyone, that he was the complainant, but did not sign it **[Am. Ver. Compl. ¶218, Trial, 5/21/02, at 29-30; Trial Exhs. Y]**.   The court copy of the warrant is in red and black and was signed by Kim Marotta and is dated 25 October 2000 **[Am. Ver. Compl. ¶218, Compl. Exh. Z]**.

60.    Moynihan never saw the correspondence between Captain Thompson and Chief Barone **[Am. Ver. Compl. ¶219, Trial, 5/21/02, at 62-63; Compl. Exh. CC, letter dated 17 January 2001 from Thompson to Barone]** and never saw the federal or FBI warrant out for Meuse's arrest **[Am. Ver. Compl. ¶219, Trial, 5/21/02, at 63]**.

61.    Moynihan testified that "Agent Kelly" told the captain there was one **[Am. Ver. Compl. ¶220, Trial, 5/21/02, at 63]**.

62.    Moynihan does not recall telling Captain Thompson that Brian was a fugitive in flight **[Am. Ver. Compl. ¶221, Trial, 5/21/02, at 63]**.

63.     Moynihan admitted that he had "never physically and visually seen" the alleged FBI warrant for the Unlawful Flight to Avoid Prosecution **[Am. Ver. Compl. ¶223, Trial, 5/21/02, at 69]**.

## WHAT THOMPSON KNEW ABOUT THE ALLEGED FBI UNLAWFUL FLIGHT WARRANT  **[Am. Ver. Compl. ¶¶224-232]**

64.    Thompson testified that he had not seen the alleged federal unlawful flight warrant **[Am. Ver. Compl. ¶224, Trial, 5/22/02, at 93]**.

65.    Thompson told the Chief that there was an Unlawful Flight to Avoid Prosecution warrant by the FBI **[Am. Ver. Compl. ¶225, Trial, 5/22/02, at 93]**.

66.    Thompson testified that "an unlawful flight is how the FBI enters a case.  That gives them the jurisdiction, the authority to enter the case and to conduct a search.  Charles Kelly, the FBI agent, obtained the unlawful flight warrant" **[Am. Ver. Compl. ¶226, Trial, 5/22/02, at 93].**

67.    On 18 January 2001, Captain Thompson, detective commander, wrote something that appears to be an interview with Tim Allen.   He gave that letter to Detective Moynihan and FBI Agent Kelly.   Tim Allen is the brother of a police officer who stated that he knows the Meuse family and is friendly with them **[Am. Ver. Compl. ¶227, Trial, 5/22/02, at 114; Compl. Exh. EE].**

68.    Thompson wrote that Tim Allen had stated the day before on January 17th that he was at the home of Jan and Owen Meuse, and he was there from 6:00 to 8:00 and at around 7:20 he was told that Brian Meuse was on  line with his family. **[Am. Ver. Compl. ¶228, Trial, 5/22/02, at 116; Compl. Exh. EE].**  And, according to Thompson, Allen told Thompson that Brian said "Tell  Tim I said hi" and that the family told Tim Allen that Brian was in New Zealand.

69.    Thompson testified that the FBI did contact somebody in New Zealand **[Am. Ver. Compl. ¶229, Trial, 5/22/02, at 116].**

70.     Thompson testified that the FBI did check whether Meuse had a passport **[Am. Ver. Compl. ¶230, Trial, 5/22/02, at 116-117].**

71.    Thompson testified that although Allen also told him that he believed that the baby's mother, Sue Pane, had some type of drug problem and that the courts have been unfair to Meuse, he, Allen, wants to help in this situation: He would do what he can to convince Brian Meuse to turn himself in.  And Mr. Allen asked you several questions regarding what Brian would be facing if he returned **[Am. Ver. Compl. ¶231, Trial, 5/22/02, at 117].**

72.    Thompson testified that he and Detective Moynihan told Allen that if Meuse turned himself into the police Thompson would attempt to drop the federal charge of Unlawful Flight **[Am. Ver. Compl. ¶232, Trial, 5/22/02, at 118].**

## WHAT THOMPSON DID NOT INVESTIGATE ABOUT THE BABY'S HEALTH  [Am. Ver. Compl. ¶¶233-242]

73.    Thompson knew that Marissa was supposed to have therapy **[Am. Ver. Compl. ¶233, Trial, 5/22/03, at 69].**

74.    Thompson was made aware of problems with the child's health, with the child's deficits, physical deficits **[Am. Ver. Compl. ¶234, Trial, 5/22/03, at 71; Compl. Exh. D and Exh. BBB].**

75.    Thompson was aware that Marissa had only been brought to therapy for two weeks between the period from June 22nd, when she was examined and diagnosed as needing therapy, and mid-September **[Am. Ver. Compl. ¶235, Trial, 5/22/03, at 70].**

76.    Thompson was aware that Detective Moynihan had the therapy records in his file, but neither attempted to see them nor saw them **[Am. Ver. Compl. ¶236, Trial, 5/22/03, at 69]**.

77.    Thompson never had his detective speak to some medical people, for instance, the child's doctors, as to the child's health **[Am. Ver. Compl. ¶237, Trial, 5/22/03, at 73]**.

78.    Thompson testified, "During the investigation, Detective Moynihan talked to Ms. Pane regarding the child's health.  He reported back to me that …that there had been missed appointments, that the child was not in the best of health.  He also had made contact with the doctor's office and actually, in an attempt to provide, if there would be any other information that we could gather to find the whereabouts of the child" **[Am. Ver. Compl. ¶238, Trial, 5/22/03, at 74]**.

79.    Thompson did not recall whether Susan Pane contacted Children's Hospital regarding Brian and the child **[Am. Ver. Compl. ¶239, Trial, 5/22/03, at 76]**.

80.    Thompson himself did not contact Children's Hospital or any other doctors regarding Brian and the child **[Am. Ver. Compl. ¶240. Trial, 5/22/03, at 76-77]**.

81.    Thompson knew that Brian brought the child to Children's Hospital, to a local doctor, and to a local therapy company **[Am. Ver. Compl. ¶241, Trial, 5/22/03, at 78]**.

## WHAT THOMPSON KNEW ABOUT MOYNIHAN'S INVESTIGATION OF THE BABY'S HEALTH  [Am. Ver. Compl. ¶¶243-246]

82.    Thompson knew that Moynihan's purpose in making several phone calls to Boston Children's Hospital, Dr. Tanguay at the Wilmington Pediatrics Group, and the West Newbury Pentucket Early Intervention Program was to alert the doctors and therapists to call Moynihan if Brian showed up again with the child so that Moynihan could arrest him and grab the child **[Am. Ver. Compl. ¶243, Trial, 5/22/03, at 79-81]**.

83.    Thompson testified that Detective Moynihan made inquiries into the child's medical history, but did not know which doctor's office Moynihan contacted **[Am. Ver. Compl. ¶244, Trial, 5/22/03, at 74, 77]**.

84.    Thompson asked Moynihan about the Florida therapy records **[Am. Ver. Compl. ¶245, Trial, 5/22/03, at 69]**.

85.    Thompson did not know whether Detective Moynihan called Dr. Tanguay at Wilmington Pediatrics regarding the baby **[Am. Ver. Compl. ¶246, Trial, 5/22/03, at 77]**.

## MOYNIHAN NON-INVESTIGATION REGARDING PANE'S CARE OF THE CHILD [Am. Ver. Compl. ¶¶247-252]

86.    Moynihan investigated " [t]o a certain point" **[Am. Ver. Compl. ¶247, Trial, 5/20/02, at 166]**.

87.    Moynihan handwrote in **Compl. Exh. II** that Annie Kalip provided day care for 15 years

and Brian brought Marissa to her, that the baby had "symptoms, locked jaw effect. Baby grit her teeth so badly that the top right teeth were worn down. The child could not crawl or put legs together. Ann tried to work with child to try to get her to be able to put her legs together. Child has six-month skills, could not talk or crawl. She thought baby was kept in a confined area port-a-crib long periods of time" **[Am. Ver. Compl. ¶248, Trial, 5/21/02, at 99-100; Trial Exhs. HH and II].**

88.    Moynihan testified that he asked Kalip "if she noticed any unusual symptoms with the child. She said the child would lock its jaw and grind its teeth. From doing so, the child's top right teeth were worn down. She also said the child could only drag itself. Her right foot was pointed out and the left foot was pointed behind her. The child's legs could not be put together. Her opinion was that the child was in a confined area (a port-a-crib) for long periods of time. She also said the child could not talk. She said the child's skills were that of a six month old and told Brian she needed Marissa's medical records and also his custody papers" **[Am. Ver. Compl. ¶249, Trial, 5/21/02, at 100-102].**

89.    Moynihan testified that he asked Susan Pane what kind of care she gave to the child, that he asked her whether she had kept the child confined in the port-a-crib, but Pane denied it " **[Am. Ver. Compl. ¶250, Trial, 5/21/02, at 101-102].**

90.    Moynihan told Thompson that Marissa, the child, had missed some appointments with the therapist down in Florida **[Am. Ver. Compl. ¶251, Trial, 5/22/03, at 69-70].**

91.    Moynihan had knowledge that Pane and/or Stults contacted the doctors with whom Meuse had made contact to examine the child **[Am. Ver. Compl. ¶252, Trial, 5/21/02, at 124; Compl. Exh. LL].**

## CAPTAIN THOMPSON'S GENERAL POLICE KNOWLEDGE [Am. Ver. Compl. ¶¶253-267]

92.    Thompson knew nothing of the Parental Kidnapping Act, federal or state **[Am. Ver. Compl. ¶253, Trial, 5/22/02, at 41-46].**

93.    Thompson denied receiving a bonus incentive for the department from the federal government **[Am. Ver. Compl. ¶254, Trial, 5/22/02, at 105].**

94.    Thompson denied receiving a bonus incentive for the department from the federal government based on the number of people that are arrested for domestic violence or parental kidnapping cases **[Am. Ver. Compl. ¶255, Trial, 5/22/02, at 105-106].**

95.    Thompson admitted that he, as a detective commander, has a responsibility to use due diligence **[Am. Ver. Compl. ¶256, Trial, 5/22/02, at 119].**

96.    Thompson explained to the jury what due diligence means in his position: "That I have the obligation to investigate -- I believe that this is the area that we're headed -- that I have the obligation to conduct these investigations in a  reasonable, proper, use the same word, diligent manner.   To carry on, as we're talking about an Unlawful Flight warrant, I believe that it certainly is due diligence when you receive a call from the FBI stating, we have obtained

an Unlawful Flight warrant. That's what enables the posters to go out. That's when they tell you that they are entering the case and going to conduct a search. I feel that my obligations towards that issue; due diligence with the Unlawful Flight warrant were certainly covered. There was a warrant then. The warrant has been dismissed. I have absolutely zero doubts that there was never not an Unlawful Flight warrant" **[Am. Ver. Compl. ¶257, Trial, 5/22/02, at 121-122.**

97.     Thompson believed without question whatever the FBI told him regarding a warrant "
**[Am. Ver. Compl. ¶258, Trial, 5/22/02, at 122]: "**I was told by the FBI that there was
warrant, Unlawful Flight warrant for Mr. Meuse. The knowledge of one officer is considered to be the knowledge of all officers. . . . That is a rule in police investigations" **[Am. Ver. Compl. ¶258, Trial, 5/22/02, at 123-124].**

98.     Thompson knew that there was no crime in Florida, i.e., that Florida was not handling the
case, but he did not learn that on his own. He never communicated with anyone in Florida
about the Meuse case **[Trial, 5/22/02, at 126];** Melissa Alleruzo and Eileen Forman in the
DA's office spoke to someone in Florida about the Meuse case **[Am. Ver. Compl. ¶259, Trial, 5/22/02, at 127; Compl. Exh. CC].**

99.     Thompson testified that Florida felt that the case belonged in the Massachusetts courts because there were court orders in effect in Massachusetts and they referred it to us for investigation and/or prosecution **[Am. Ver. Compl. ¶260, Trial, 5/22/02, at 129].**

100.    Thompson admitted, in words for all intents and purposes that he does not have the authority to prosecute someone who commits a crime in another jurisdiction, for instance, in another State **[Am. Ver. Compl. ¶261, Trial, 5/22/02, at 133-134].**

101.    If Meuse had committed a crime in Florida, Thompson would not have had a right to try
him for that crime here in Haverhill District Court **[Am. Ver. Compl. ¶262, Trial, 5/22/02, at 134].**

102.    Thompson testified that Meuse was not charged with a crime in Florida **[Am. Ver. Compl. ¶263, Trial, 5/22/02, at 137].** Meuse did not take the baby from Pane in Massachusetts
**[Id.].** "The baby was taken in Florida, **[Id.].**

103.    Thompson testified that before he can bring a criminal complaint, he must first determine
that a crime has been committed before he tries to charge someone with the crime **[Am. Ver. Compl. ¶264, Trial, 5/22/02, at 142].**

104.    Thompson denied, however, that one of the first things that he has to determine in a parental kidnapping case, in Massachusetts is whether a parent took the child in Massachusetts
**[Am. Ver. Compl. ¶265, Trial, 5/22/02, at 142].**

105.    Ada, Oklahoma, police contacted Moynihan's captain,, Captain Thompson" **[Am. Ver. Compl. ¶266, Trial, 5/20/02, at 173]**.

106.    On 5 April 2001, the day Meuse was arraigned, Judge Herlihy wanted to see the FBI warrant and requested Assistant District Attorney DePaolo to produce it **[Am. Ver. Compl.**

**¶267**].

## THOMPSON,  MOYNIHAN, THE FBI, AND FBI AGENT CHARLES KELLY COORDI-NATE ACTIVITIES  [Am. Ver. Compl. ¶¶268-294]

107.    Moynihan was involved with Charles Kelly of the FBI Boston unit in the investigation of this case **[Am. Ver. Compl. ¶268, Trial, 5/20/02, at 168-169**].

108.    Moynihan and the FBI, including Kelly, performed stakeouts, went to the homes of different people' whose names were provided by Pane, performed "follow-ups" **[Trial, 5/20/02, at 170-172**].  He, Agent Kelly, and others spent "close to a couple of hundred hours" **[Trial, 5/20/02, at 173**]: "two hundred hours" **[Am. Ver. Compl. ¶269, Trial, 5/20/02, at 188**].

109.    Thompson testified that the police made **(a)** note that Meuse was assisted by a fathers' group, the Fatherhood Coalition, **(b)** note of articles that were in the newspaper, **(c)** note of articles that were on the internet, **(d)** note of signs that were in front of the Meuses' home, **(e)** note of picketing of the courthouse **[Am. Ver. Compl. ¶270, Trial, 5/22/02, at 99-100].**

110.    Thompson testified that Detective Moynihan worked with Agent Kelly of the FBI, but he, Thompson, was not aware of any direct contact that Agent Kelly had with the Fatherhood. He was aware, however, that Detective Moynihan had such contact **[Am. Ver. Compl. ¶271, Trial, 5/22/02, at 100].**

111.    The FBI chased Meuse's friends, knocked on their doors in the middle of the night, tapped people's phones **[Am. Ver. Compl. ¶272**]..

112.    Thompson testified that he knew Meuse had been interviewed by local TV and newspaper reporters **[Am. Ver. Compl. ¶273, Trial, 5/22/02, at 100].**

113.    Thompson testified that he knew Pane had been interviewed by local newspaper reporters **[Am. Ver. Compl. ¶274, Trial, 5/22/02, at 104].**

114.    Moynihan spoke to Captain Thompson a couple of times a week anywhere from 5 to 20 minutes about the Meuse/Pane case **[Am. Ver. Compl. ¶275, Trial, 5/21/02, at 76]:**

115.    It was always ongoing, whether it was once or twice a week.  Whenever something was discovered or if I had to go someplace, a surveillance or something like that, I always advised the captain as to what was going on.  I just couldn't like go off on my own and do things.  He had to have knowledge of like what I was doing and where I was going.

116.    A lot of times it would have to do with Agent Kelly.  The FBI was the one that did a lot of the extensive investigation on this part.  They have the resources.  The city police department has nowhere near the resources.  So, Agent Kelly called me, I have this bit of information, you want to come with me, I'd like to go here and check this location, or I'd like to go here and do this surveillance, and that's what would happen.

117.  And I'd relay that information to my captain that I'd be with Agent Kelly, I'd be going out of town, and that's about what it boiled down to.

118.  Moynihan took guidance from the FBI: "Whenever they came up with something they wanted to investigate with me, we went and did it" **[Am. Ver. Compl. ¶276, Trial, 5/21/02, at 79]**.

119.  According to Moynihan, Captain Thompson, to a certain extent, gave him guidance or guidelines to follow in this case **[Am. Ver. Compl. ¶277, Trial, 5/21/02, at 78-79]**; for instance, "[o]nce Mr. Meuse became a defendant, he told me . . . that I was no longer to deal with Jan Meuse; that he had become the defendant and that we were no longer to provide her with any information or try to do any investigation on the part of Mr. Meuse" **[Am. Ver. Compl. ¶277, Trial, 5/21/02, at 79]**.

120.  Moynihan testified that he received that instruction from Thompson when Meuse allegedly became a fugitive from justice **[Am. Ver. Compl. ¶278, Trial, 5/21/02, at 78]**.

121.  Moynihan defined fugitive as being "a person [who] has a warrant on him and he's running from the law, he was hiding from the law, he is concealing himself from justice, not coming forth to the court system, as ordered" **[Am. Ver. Compl. ¶279, Trial, 5/21/02, at 78]**.

122.  Moynihan equated the alleged knowledge that Meuse's family had with Meuse's knowledge **[Am. Ver. Compl. ¶280, Trial, 5/21/02, at 78]**.

123.  Moynihan admitted that he had no "proof that his family even knew where [Meuse] was on October 25th or after October 25th" **[Am. Ver. Compl. ¶281, Trial, 5/21/02, at 79]**.

124.  Moynihan admitted that Meuse "was just running because he had no knowledge of it, whatsoever. That's why they found him in Oklahoma. He had no idea that anybody was looking for him" **[Am. Ver. Compl. ¶282, Trial, 5/21/02, at 80]**.

125.  Moynihan admitted that he told Timothy Allen that if Brian turned himself in, Moynihan would attempt to drop the federal charge of Unlawful Flight, which didn't exist, and to keep the Parental Kidnapping charge a misdemeanor, but the Parental Kidnapping charge was always just a misdemeanor **[Am. Ver. Compl. ¶283, Trial, 5/21/02, at 84; Compl. Exh. EE]**.

126.  The domestic violence advocate Jean Walker, kept a steady correspondence up with Rosalyn Stults, Pane's lawyer, and with Charles Kelly of the FBI **[Am. Ver. Compl. ¶284, Trial, 5/21/02, at 91-92]**.

127.  Kelly got in touch with the HPD "[p]robably to set up a time and date for us to get together to go on a surveillance or, you know, to interview people **[Am. Ver. Compl. ¶285, Trial, 5/21/02, at 92]**.

128.  Moynihan and the FBI were working off a list of names supplied to the FBI **[Am. Ver. Compl. ¶286, Trial, 5/21/02, at 92]**.

129.  According to Moynihan, the FBI got telephone bills from Mr. and Mrs. Meuse's phone

**[Am. Ver. Compl. ¶287, Trial, 5/21/02, at 134].**  He, Moynihan, "had nothing to do with the phone bills or the -- anything, any type of contacts that came out of their house" **[Am. Ver. Compl. ¶287, Trial, 5/21/02, at 134].**

130.    The bills the FBI obtained were the Meuses' phone bills from August 2000 through October 2000 **[Am. Ver. Compl. ¶288, Trial, 5/21/02, at 135].**

131.    According to Moynihan, Agent Kelly "conveyed to [him] certain phone calls to certain locations and the FBI conducted investigations into those locations, but he did confide in to me where the locations were, and which I don't have recall.  Some, I believe were in New Hampshire.  Some were in Maine" **[Am. Ver. Compl. ¶289, Trial, 5/21/02, at 136].**

132.    Moynihan described photographs he was shown of the child after Meuse had been caring for her: he observed that Marissa was walking, running, smiling, picking up a toidy potty **[Am. Ver. Compl. ¶290, Trial, 5/21/02, at 139-140, 142].**  The photos were date stamped by the camera on 8 January 2001 and 12 January 2001 **[Am. Ver. Compl. ¶290, Trial, 5/21/02, at 140],** three and a half months after he took the child from Florida **[Am. Ver. Compl. ¶290, Trial, 5/21/02, at 142].**

133.    Moynihan's domestic violence advocate, Jean Walker, maintained a file on Meuse's defense counsel.  The material was supplied to Walker by Pane's lawyer, Stults **[Am. Ver. Compl. ¶291, Trial, 5/21/02, at 144-145].**

134.    Jean Walker is the department's Domestic Violence civilian professional partially she's paid under the Violence Against Women Act **[Am. Ver. Compl. ¶292, Trial, 5/22/02, at 115].**  She maintains the office.

135.    In response to Meuse's counsel's question, **"She kept an eye on me?"** Moynihan responded. "Yes, she did.  I believe so.  The eye in the sky" **[Am. Ver. Compl. ¶293, Trial, 5/21/02, at 145].**

136.    Moynihan testified that all of the material provided to Moynihan's victim witness advocate was provided to the FBI **[Am. Ver. Compl. ¶294, Trial, 5/21/02, at 145].**

## PANE AND MOYNIHAN AND THE FBI COORDINATE POSTER ACTIVITIES [Am. Ver. Compl. ¶¶295-316].

## THE WARRANT  ON AMERICA'S MOST WANTED WEBSITE [Am. Ver. Compl. ¶¶317-324].

137.    In his 19-year career, Moynihan had arrested a dozen or so women and around a hundred men, around 10 percent women, 90 percent men.   "That's the national rate, ten to one." **[Am. Ver. Compl. ¶321, Trial, 5/20/02, at 192-193].**

138.    Moynihan wrote the complaint against Meuse for Kidnapping of a Minor by a Relative, to wit; her father, pursuant to chapter 265 section 26A **[Am. Ver. Compl. ¶322, Trial, 5/20/02, at 198].**

139. The complaint read, "On 10/8/2000, being a relative of Marissa Meuse, a child less than 18 years old, did without lawful authority hold or intend to hold such child permanently for a period, protracted period did take or entice such child from such child's lawful custodian" 26A **[Am. Ver. Compl. ¶323, Trial, 5/20/02, at 199]**.

140. On page two of His Honor's memorandum dated 30 July 2001, Judge Alan Swan wrote, "[T]here is still no order or judgment of custody" in the Probate & Family Court case entitled <u>Meuse v. Pane</u> **[Am. Ver. Compl. ¶324, Trial, 5/21/02, at 15, and Compl. Exh. CCC]. Moynihan agreed that there had been neither a judgment nor order of custody [Am. Ver. Compl. ¶324, Trial, 5/21/02, at 15].**

## <u>FOXNEWS TELEVISED BROADCAST</u> [Am. Ver. Compl. ¶¶325-326]

## <u>MOYNIHAN'S COMMUNICATION WITH PANE AND STULTS</u>  [Am. Ver. Compl. ¶¶327-334]

141. Pane had written several letters to Detective Moynihan **[Am. Ver. Compl. ¶325, Trial, 5/21/02, at 42; Compl. Exh. HH].**

142. Moynihan spoke to Susan Pane when she called maybe once or twice a week  **[Am. Ver. Compl. ¶326, Trial, 5/21/02, at 22-23].**

143. Moynihan never told Pane to get back to Massachusetts with the child **[Am. Ver. Compl. ¶327, Trial, 5/21/02, at 22].**

144. Moynihan spoke to Rosalyn Stults, her attorney, once every other week **[Am. Ver. Compl. ¶328, Trial, 5/21/02, at 23; Compl. Exh. II].**

145. Moynihan never told Stults that her client wrongfully removed the child and that she should get her client back to Massachusetts or otherwise a warrant would issue to bring her back **[Am. Ver. Compl. ¶329, Trial, 5/21/02, at 23].**

146. Moynihan never considered issuing a warrant to get Susan to bring back the child **[Am. Ver. Compl. ¶330, Trial, 5/21/02, at 23].**

147. Moynihan testified that he did not consider issuing a warrant to arrest Susan because Meuse and Pane were "in court on a custody battle at the time and it was the court's decision at the time that a decision had never been made" **[Am. Ver. Compl. ¶331, Trial, 5/21/02, at 23].**

148. Moynihan testified that he kept no notes or records of Stults' calls, but testified that Stults called wanting "to know what was going on in the investigation," telling him "what was going on down in Florida, what they were proceeding to do as far as getting out the posters and that certain people they were getting to help them in trying to recover the kidnapped child" **[Am. Ver. Compl. ¶332, Trial, 5/21/02, at 61-62].**

## <u>STULTS' WORKING WITH THE FBI AND MAINTAINING THE</u>

**"SUSAN PANE LEGAL DEFENSE FUND"  [Am. Ver. Compl. ¶¶335-337].**

**PROBABLE CAUSE  [Am. Ver. Compl. ¶¶338-360]**

149.  The complaint alleged that Meuse took the child on 8 October 2000.  Thompson testified that he did not know in which of the 50 States Meuse and the child were on October 8th **[Am. Ver. Compl. ¶338, Trial, 5/22/02, at 146].**

150.  Thompson testified that he did not know whether Meuse and the child were together on 8 October 2000 **[Am. Ver. Compl. ¶339, Trial, 5/22/02, at 146].**

151.  Thompson testified that he knew from Judge Manzi's order of 3 May 2000 that Susan Pane had the child wrongfully because she had wrongfully removed the child **[Am. Ver. Compl. ¶340, Trial, 5/22/02, at 146].**

152.  It is undisputed that Judge Manzi's order of 3 May 2000 was never vacated or modified **[Am. Ver. Compl. ¶341, Compl. Exh. T].**

153.  Judge Alan Swan on 30 July 2001 ruled that there had been even by that date no judgment or order of custody in the <u>Meuse v. Pane</u> case in the probate and family court **[Am. Ver. Compl. ¶343, Trial, 5/21/02, at 12-15; Exh. CCC, Judge Swan's Memorandum and Decision, p. 2].**

154.  Judge Manzi gave Pane custody of the child on 11 October 2000, eleven days after Meuse had taken the child **[Am. Ver. Compl. ¶344].**

155.  Meuse was not present in court on 11 October 2000 and had no personal notice of the proceeding **[Am. Ver. Compl. ¶345, Trial, 5/23/02, at 14-15].**

156.  Moynihan admitted knowing that Meuse took the child from Florida before Judge Manzi issued the order of custody to Pane **[Am. Ver. Compl. ¶346, Trial, 5/21/02, at 168].**

157.  Thompson was relying on Judge Manzi's order of 11 October 2000 **[Am. Ver. Compl. ¶347, Trial, 5/22/02, at 149].**

158.  Thompson never saw Judge Swan's memorandum and decision of 30 July 2001 in this case **[Am. Ver. Compl. ¶349, Trial, 5/22/02, at 149; Exh. CCC].**

159.  Thompson agreed at trial that Judge Manzi's order of May 3d, in which she said Susan had wrongfully removed, was valid and lawful **[Am. Ver. Compl. ¶350, Trial, 5/22/02, at 150; Trial Exh T].**

160.  Therefore Susan Pane had not been given custody of that child by the court on 1 October 2000 **[Am. Ver. Compl. ¶351, Trial, 5/22/02, at 153],** and did not have lawful authority to have the child at the very least until 11 October 2000.

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 47 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

161.    Thompson admitted that he was aware that Pane did not have custody on 1 October 2000,
on 2 October 2000, on 3 October 2000, on 4 October 2000, on 5 October 2000, on 6 Octo-
ber 2000, and on 7 October 2000 **[Am. Ver. Compl. ¶352, Trial, 5/22/02, at 154-155]**.

162.    Thompson did not admit that he was aware that Pane did not have custody on 8 October
2000 **[Am. Ver. Compl. ¶353, Trial, 5/22/02, at 155]**: Thompson testified: "I did not read
the order and I would have to say that there must be something in the order which gave her
custody" **[Am. Ver. Compl. ¶354, Trial, 5/22/02, at 155]**.

163.    **Thompson testified that he was not aware that the 11 October 2000 order was not in
effect on 8 October 2000 [Am. Ver. Compl. ¶354, Trial, 5/22/02, at 156].**

164.    Thompson ultimately testified that Pane had not yet been awarded custody on October 8th
**[Am. Ver. Compl. ¶355, Trial, 5/22/02, at 157]**.

165.    Thompson admitted that he was aware that Pane did not have custody on 9 October 2000
and on 10 October 2000 **[Am. Ver. Compl. ¶356, Trial, 5/22/02, at 157]**.

166.    Thompson testified that on October 11th then Susan got custody **[Am. Ver. Compl. ¶357,
Trial, 5/22/02, at 157]**.

167.    Thompson was aware that she never had a hearing on October 11th and that Meuse was not
in court on that date **[Am. Ver. Compl. ¶358, Trial, 5/22/02, at 158]**.

168.    Thompson testified that he was not aware that Meuse never knew about that order by
Judge Manzi on October 11th **[Am. Ver. Compl. ¶359, Trial, 5/22/02, at 158]**: "I don't
know whether he knows it or not, no" **[Trial, 5/22/02, at 158]**.

169.    Thompson testified that he believed that Meuse intended to hold Marissa permanently or
for a protracted period **[Am. Ver. Compl. ¶360, Trial, 5/22/02, at 159]**.  Thompson's be-
lief was based on Meuse not having returned the child for six months **[Trial, 5/22/02, at
160]**.

## MEUSE NEVER INTENDED TO REMOVE CHILD PERMANENTLY FROM MOTHER [Am. Ver. Compl. ¶¶361-376].

## MEUSE'S ARREST AND THE ENSUING CRIMINAL PROCESS [Am. Ver. Compl. ¶377-396].

170.    Meuse spent 11 days in the Pontococ Jail.   He was kept in a 10-man jail cell with as many
as 15 or 20 men in it at any given time.  The conditions were inhuman.  Where there once
was a light socket in the ceiling, there were just live wires hanging from the ceiling.  The
floor was half-covered with puddles from the walls leaking in water from outside rains.
Meuse had to sleep on a damp or even wet cement floor with only a thin, little mat and a
small, thin blanket.  The food was despicable and in very small portions.  Sometimes
someone didn't get any, because the jailers would run out of it.   Meuse was then trans-
ported to Massachusetts in a van.  The van was designed for 8 passengers but was filled at
times with up to 12 men.  Meuse and the other men were all shackled at the wrists and feet

and together.  It took several days of driving around the country before Meuse was deliv-
ered to the Essex County House of Correction ["Middleton"] in Middleton, Massachusetts.

171.  Meuse spent three days housed in Middleton.  Meuse was denied the right to counsel and
the right to make a phone call to his counsel.  Meuse was also confined to a 4-by-10-foot
room with another man every minute of his stay there.

172.  Meuse's bail was set for $15,000.00.  Meuse said that he was not going anywhere because
he had no reason to do so; he said, "The only reason I ever went anywhere was to get my
daughter the care that she needed."

173.  Meuse went to court several times in the 14 months before he had a jury trial.

174.  To Meuse, those in the legal system appeared unconcerned about Marissa's health and wel-
fare.

175.  Prior to 6 October 2000, when he went away with the child, Meuse had asked for help from
as many as 26 judges, prior to Judge Swan for the criminal trial.  "Between my parents and
me, we had contacted and asked for help from the newspapers, the Haverhill police, Haver-
hill Detective Daniel Moynihan, Haverhill Police Chief Leonard Barone, Haverhill's Judge
Herlihy in his personal capacity, the FBI, DSS, the Haverhill District Court, the Family
Probate Court in Lawrence, the Family Probate Court in Salem, the City of Haverhill's
Mayor, the City of Haverhill's Attorney, each member of the City of Haverhill's City
Council, and various televisions stations" [**Am. Ver. Compl. ¶391**].

176.  After being arrested, Meuse continued to ask for all of them to look at the evidence that
Marissa was being put back in Harm's way, and asked them to help her **[Compl. Exh.
BBB].**

177.  While waiting for trial, Meuse was not able to find a job.  Possible employers denied him a
job because of his CORI record.  Meuse applied for food stamps at Welfare's Department
of Human Resources.  DHR said that Meuse could not do the mandatory, prerequisite vol-
unteer work for receiving food stamps.  He was excluded because of his CORI.

178.  The criminal proceedings continued for 14 months. On the first day of trial in May 2002,
Judge Alan Swan said that Meuse was precluded from using the necessity defense, a de-
fense he and his counsel had been led to believe they could use.

179.  Since trial to this day, Meuse has been unable to find employment.  Meuse is known as the
"kidnapper" almost everywhere he goes.

## COUNT 1: VIOLATIONS OF 42 U.S.C. 1983: ARREST  [Am. Ver. Compl. ¶¶397-409]

180.  Around 3:30 P.M., plaintiff, handcuffed to two other detainees, was transported from the
Haverhill Municipal Court to a Essex County jail, put into a holding area with other detain-
ees, strip-searched, given prison garb, and remained in jail until he was bailed out by his
parents around 10 A.M. on Tuesday, 10 April 2001.

181.  Meuse had to appear in Haverhill Municipal Court three more times.

182.  On 23 May 2002, the jury found Meuse not guilty as charged.

183.  Pane had the improper purpose of trying to gain an advantage in the custody action and to unlawfully deprive Meuse of his property and liberty.

184.  Stults's purpose was to aid and abet Pane, her client, in the custody action, to benefit Stults herself financially and reputationally from depriving Meuse of his property and liberty.

**COUNT 2: <u>VIOLATIONS OF 42 U.S.C. 1983: DETENTION AND CONFINEMENT</u>  [Am. Ver. Compl. ¶¶41-411]**

**COUNT 3: <u>VIOLATIONS OF 42 U.S.C. 1983: CONSPIRACY</u>  [Am. Ver. Compl. ¶¶412-433]**

185.  Moynihan one affidavitless warrant that was unlawful, having no basis for it, whatsoever [**Am. Ver. Compl. ¶414**].

186.  The FBI alleged to the world that there was an outstanding warrant for Meuse.[**Am. Ver. Compl. ¶415**].

187.  Moynihan was not sure whether he or the HPD had supplied the information to the FBI for the warrant poster.  [**Am. Ver. Compl. ¶416**].

188.  Susan Pane secured an interview with NBC-TV's Sally Jessy Raphael show and they tele-vised the FBI's Wanted Poster two times during the broadcast across the nation.

189.  Rosalyn Stults was interviewed by the Eagle-Tribune, publishing in Essex County, Massa-chusetts, and advertised the then-upcoming  Sally Jessy Raphael show.

190.  The FBI coordinated activities with the National Center for Missing and Exploited Chil-dren with the intent to broadcast nationwide the poster of Meuse and Marissa.

191.  On 10 February 2001, FOXNews broadcast the FBI/NCMEC Missing/Abductor poster.

192.  On Friday. 16 February 2001, American Broadcasting Company's ["ABC's"] Sally Jessy Raphael's show broadcast a different version of the FBI/NCMEC Missing/Abductor poster. It read "FAMILY ABDUCTION" rather than "MISSING/ABDUCTOR."

193.  Beginning on or around 10 February 2001, FOX TV's America's Most Wanted  show dis-played the FBI/NCMEC Missing/Abductor poster on its website [see above] and that poster exists on the website to date.

194.  Rosalyn Stults advised and strategized with Susan about how to evade service of process of the 209A order and to keep the child from him before and after the original 209A tempo-rary restraining orders had expired;

195.  Susan Pane intentionally told her mother to lie to a deputy sheriff and a process server that

Susan was living in an unknown location.  **[Compl. Exh. K, attempt at service; Compl. Exh. NN, affidavit]**

196.    Stults and Pane had the goal to get posters published nationwide to capture Meuse and with the an agreement Susan intentionally misrepresented that there had been a custody order prior to Meuse taking the child from Florida.

## COUNT 4: <u>VIOLATIONS OF 42 U.S.C. 1983: REFUSING OR NEGLECTING TO PREVENT</u>  [**Am. Ver. Compl. ¶¶434-440**]

197.    At all times relevant to this Complaint, all Defendant agents of the FBI were acting under the direction and control of FBI, Director Louis Freeh, and Charles Prouty.

## COUNT 5: <u>MALICIOUS PROSECUTION</u>  [**Am. Ver. Compl. ¶¶441-456**]

198.    Stults played an indirect role by advising Susan how to evade service of process of the original 209A temporary restraining order.

199.    Stults instigated or participated in the prosecution by pressing police to apply for a complaint for an improper purpose.

200.    Defendants City of Haverhill is liable under the doctrine of *respondeat* superior  [**Am. Ver. Compl. ¶456**].

## COUNT 6: <u>ABUSE OF PROCESS</u>  [**Am. Ver. Compl. ¶¶457-464**]

201.    Pane knew that the complaint initiated was groundless and made misrepresentations to the officers to gain advantage in the custody action.

202.    Stults knew or should have known that the complaint was groundless and she sought to use the process for an ulterior purpose, including, but not limited to, the purpose of aiding her client to gain advantage in her divorce.

## COUNT 7: <u>VIOLATION OF MASS. CIVIL RIGHTS ACT</u>, M.G.L. c. 12, sec. 11*I*  [**Am. Ver. Compl. ¶¶465-470**]

203.    At all times relevant herein, the conduct of all Defendants was subject to the Massachusetts Civil Rights Act.

## COUNT 8: <u>FALSE ARREST AND IMPRISONMENT</u>  [**Am. Ver. Compl. ¶¶471-478**]

204.    Meuse was shackled in such a way that his hands were in front, but the leg shackles were worse, they restricted all movement, and the hand shackles and feet shackles were tightly connected together.

205.    Shackled with his hands behind his back, Meuse was transported for 5 or 6 days and nights to numerous cities between Oklahoma and Massachusetts, at each of which he was de-

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 51 of 59

tained in a cell.

206. It was all Defendants who, under the color of state law, indirectly caused the unlawful imprisonment of Meuse in diverse jails from Oklahoma to Massachusetts.

## COUNT 9: <u>ASSAULT</u>  [**Am. Ver. Compl. ¶¶479-483**]

207. Meuse is a reasonable person.

## COUNT 10: <u>BATTERY</u>  [**Am. Ver. Compl. ¶¶484-487**]

## COUNT 11: <u>CONSPIRACY</u>  [**Am. Ver. Compl. ¶¶488-501**]

208. Rosalyn Stults advised and strategized with Susan about how to evade service of process of the 209A order and to keep the child from him before and after the original 209A temporary restraining orders had expired;

209. Susan Pane intentionally told her mother to lie to the deputy sheriff that Susan was living in an unknown location.

210. Stults and Pane had the goal to get posters published nationwide to capture Meuse and with the an agreement Susan intentionally misrepresented that there had been a custody order prior to Meuse taking the child from Florida.

211. Wal-Mart sponsored NCMEC and the America's Most Wanted segments in which the poster against Meuse was used.

212. FBI Agent Charles Prouty helped further the conspiracy when he was interviewed by the agents, servants, or employees of the television broadcasters.

213. In concert with Pane's and Stults's representations and misrepresentations, Moynihan, Thompson, Barone, Kelly, and Prouty indirectly caused the detention and confinement of Meuse on the grounds  (a) that he violated a custody order; (b) that he was wanted for parental kidnapping, and (c) that he was fleeing unlawfully to avoid prosecution [**Am. Ver. Compl. ¶498**].

214. The defendants agreed that the object or course of action was to arrest, detain, and confine Meuse without probable cause, and maliciously charge and prosecute him with crimes.

215. Defendants City of Haverhill and the FBI are liable under the doctrine of *respondeat* superior.

216. Plaintiff suffered harm and damages that are a direct result of those acts.

## COUNT 12: <u>DEFAMATION</u>  [**Am. Ver. Compl. ¶¶501-512**]

217. On Saturday, 10 February 2001, by televising on FOX stations the Wanted poster and an interview of FBI Agent Prouty, Defendants published that Meuse was wanted for parental

kidnapping and was unlawfully fleeing to avoid prosecution.

218. On Friday, 16 February 2001, ABC televised on the Sally Show, hosted by Sally Jesse Raphael, an episode entitled "My Child Has Been Stolen."

219. On that show, Defendants caused a Wanted poster of Meuse and the child to be televised.

220. The "My Child Has Been Stolen" episode was sponsored by NCMEC and America's Most Wanted.

221. The Wanted poster was displayed two times and read, ""Family Abduction." portrayed Meuse and the child, and instructed viewers to call 1-800-The-Lost upon seeing Meuse and/or the child.

222. Defendants published the statements with knowledge of their falsity or with reckless disregard as to whether they were false.

223. By false statements both orally and pictorially on 10 February 2001 and on 16 February 2001, Defendants intended to impeach Plaintiff Meuse's honesty, integrity, virtue, or reputation.

224. Meuse has been harmed and damaged by Defendants' publications.

## COUNT 13: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS [Am. Ver. Compl. ¶¶513-521]

225. Meuse is a reasonable man.

### Part VI:   Meuse's Rebuttal of Moynihan, Thompson, and Haverhill's Spin on the Facts

**MTH ¶1:** The plaintiff, Brian J. Meuse (hereinafter "Meuse") had a relationship with the defendant, Susan Paine [*sic*] (hereinafter "Paine") and was the father of their child, Marissa Lynn Meuse, who was born on August 4, 1999. (See, plaintiff's verified complaint, ¶ 3.)

**Meuse's Rebuttal to MTH ¶1:** Susan's surname is "P-a-n-e," not "P-a-i-n-e." This same error was ignored by counsel's clients during the so-called investigation stage.  During the criminal trial, this all came out and admissions were made.  The Meuses had hard evidence – fraudulent drug prescriptions, etc. — that they produced to MTH, but MTH were incompetent or were so in favor of women, that MTH did not follow the evidence and failed to help Brian Meuse from the gitgo.  See **Am. Ver. Compl. ¶129 (Trial, 5/21/02, at 152).**  *See also* **MOYNIHAN'S NON-**

## INVESTIGATION REGARDING THE TWO SUSANS [**Am. Ver. Compl. ¶¶130-139**]

Detective Moynihan reported to Thompson that he was unable to substantiate that the Susan Pane, in this case, was the same Susan Pane that's appearing on all that drug list, that there was another Susan Paine living in town [**Am. Ver. Compl. ¶130, Trial, 5/22/02, at 39**].    Moynihan He had "no idea: . . . [how the] "other Susan PaIne would have known what our Sue Pane's Merck-Medco insurance number was" [**Am. Ver. Compl. ¶134, Trial, 5/22/02, at 184**].    Bozo! The Susan Pa*I*ne did ___***not***___ know what Susan PANE's insurance number was.  Susan Pane was fraudulently using Susan Pa*I*ne's name for prescriptions.  Susan Pane worked as a drug distributor for Merck-Medco; i.e., she filled out prescriptions for Merck-Medco in their facility and had at her disposal all the data for all the insureds under Merck-Medco's prescription drug insurance.  There is no doubt that Moynihan's intelligence level was certainly not what it should have been to fill competently the position of detective for the police force.

Apparently the difference between the two Susans went over counsel's head, too.  A seemingly intelligent, young woman, it is likely her gaff was caused by her receiving erroneous information from her clients, who apparently still have not figured out what they did not understand from the outset.

**MTH ¶2:**  The defendant Paine [*sic*] and the plaintiff Meuse lived together in the City of Haverhill, Massachusetts.

**Meuse's Rebuttal to MTH ¶2:**  This fact has no relevance to the issues before the court for determination of MTH's motion for summary judgment on Meuse's civil rights claims.

**MTH ¶3:**  On September 13, 1999, Meuse filed an action for custody and paternity and motion seeking the Court to order Paine [*sic*] to remain in Massachusetts.

**Meuse's Rebuttal to MTH ¶3:**  This is true [**Am. Ver. Compl. ¶43, Compl. Exh. I**].

**MTH ¶4:**  On October 11, 2000, Justice Mansi [*sic*] gave Paine [*sic*] temporary custody of the child. (Id, ¶172 and Exhibit ZZ.)

**Meuse's Rebuttal to MTH ¶4:** This is also true, but Meuse had already taken the child from

Florida to Massachusetts for medical care, had already dropped out of sight, knew nothing of the

short order of notice of a hearing on 11 October 2000, was not at the hearing of October 11th,

and had no notice of Judge Manzi's order.    Had MTH paid attention to all the relevant informa-

tion provided them—to Moynihan, Thompson, and to the then-mayor of Haverhill—MTH would

have known that the date of 11 October 2000 had absolutely no relevance to the charge that was

eventually brought against Meuse *in absentia* at the end of October 2000.  **[Am. Ver. Compl.**

**¶¶83-90, 94, 96, 98-99, 107-109, 391**].

That Moynihan based his charge on the date of 11 October 2000 was the major flaw in

his case.  It is also a major flaw in MTH's request for summary judgment now in the instant case.

**MTH ¶5:** . On October 20, 2000, Paine [*sic*] reported to the Haverhill Police that the child
had not been returned after a visitation with her father. (Exhibit BB Police Report.) The
failure of Meuse to return his daughter was in violation of Justice Mansi's Court Order.
(See Exhibit ZZ). Justice Manzi's order stated "mother shall have sole legal and sole physi-
cal custody of Marissa Lyne Meuse until such time as both litigants appear before the court
upon appropriate pleading and proper notice. At the time of the warrant Moynihan and
Thompson were both veteran police officers with the Haverhill Police Department. (Plain-
tiff's Complaint, ¶173)

**Meuse's Rebuttal to MTH ¶5:** Judge Manzi's order came after the horse was out of the barn.  It

did not have retroactive effect.   On 30 July 2001, Judge Alan Swan found that there had been no

custody order prior to Meuse taking the child [**Am. Ver. Compl. ¶456, Exh. CCC**]:  Even Moyni-

han agreed that there had been neither a judgment nor order of custody [**Id., Trial, 5/21/02, at 15**].

**MTH ¶6:** On October 25, 2000, Det. Moynihan of the Haverhill Police Department filed
an application for a warrant and criminal complaint at the Haverhill District Court. (Id, ¶
215; Exhibit DD attached to plaintiff's complaint.)

**Meuse's Rebuttal to MTH ¶6:** Where there had been neither a judgment nor order of cus-

tody even nine months **after** Moynihan filed an application for a warrant and criminal complaint.

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 55 of 59

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Moynihan had absolutely no basis either in fact or at law to support his applications  [**Id., Trial, 5/21/02, at 15**].   The moment Moynihan filed those applications, he was depriving Meuse of his constitutional rights, he had taken a first step in depriving Meuse of his liberty and in depriving Meuse his parental relationship with his and Pane's daughter.\[15]/    And Thompson acted with reckless disregard or with intentional disregard of the true underlying facts when he allowed Moynihan to seek an arrest warrant for Meuse.

Where Moynihan failed to file an affidavit in support of his application for a warrant, the warrant was not valid.

**MTH ¶7:**   On or about October 25, 2000, Clerk Kim Arada of the Haverhill District Court signed the warrant. (Id, ¶ 222.)

**Meuse's Rebuttal to MTH ¶7:**  This is not accurate.  Moynihan admitted that neither the copy nor the original arrest warrant had a signature by anyone, that he was the complainant, but did not sign it [**Am. Ver. Compl. ¶218, Trial, 5/21/02, at 29-30; Trial Exhs. Y**].   The court copy of the warrant is in red and black and was signed by Kim Marotta, not Kim Arada, and is dated 25 October 2000 [**Am. Ver. Compl. ¶222, Compl. Exh. Z**].   *See also* Meuse's Rebuttal to MTH ¶6 and note

---

[15]      Since 1923, if not before, the Supreme Court of the United States has recognized that parents possess a fundamental liberty interest to be free from unnecessary governmental intrusion in the rearing of their children. See Quilloin v. Walcott, 434 U.S. 246, 255 (1978); Wisconsin v. Yoder, 406 U.S. 205, 232-33 (1972); Prince v. Massachusetts, 321 U.S. 158, 16667 (1944); Pierce v. Society of Sisters, 268 U.S. 510, 534-35 (1925); Meyer v. Nebraska, 262 U.S. 390, 399, 401 (1923). **The Fourteenth Amendment protects this fundamental interest against unnecessary state intrusion.** Curtis v. Sch. Comm. of Falmouth, 420 Mass. 749, 755 (1995).  Historical analysis of "parental rights" begins with Meyer v. Nebraska and Pierce v. Society of Sisters.

In the year 2000, the Supreme Court reiterated the importance of this right. "[W]e have recognized the fundamental right of parents to make decisions concerning the **care, custody, and control** of their children." Troxel, 530 U.S. at 66 (citing Stanley v. Illinois, 405 U.S. 645, 651 (1972)) (emphasis supplied) (other citations omitted). Accord, Pelletier v. Maine Principals' Ass'n, 261 F. Supp. 2d 10 n.8 (D. Me. 2003).

Troxel is the Supreme Court's most recent "parental rights" decision. Therein, the Court reiterated that parents have a **fundamental liberty interest** to "direct the upbringing and education of children under their control." Id. at 65 (emphasis supplied) (quoting Pierce, 268 U.S. at 534-35). Moreover, because this right is vested in the Due Process Clause of the Fourteenth Amendment, it "provides heightened protection against government interference." Id. at 65 (emphasis supplied) (quoting Washington v. Glucksberg, 521 U.S. 702, 720 (1997). **In Troxel, eight justices recognized the parental right to be "fundamental."**

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 56 of 59

14, *supra*.  Meuse also incorporates herein by reference Meuse's Opposition to Motion for Summary Judgment by Rosalyn Stults.

**MTH ¶8:**  Moynihan signed the application for the criminal complaint. (Id, ¶ 186.)

**Meuse's Rebuttal to MTH ¶8:**  This is true, but he failed to write a supporting affidavit [**Am. Ver. Compl. ¶213**].  *See also* Meuse's Rebuttal to MTH ¶6 and note 14, *supra*.

**MTH ¶9:**  The criminal complaint and warrant also issued on October 25, 2000. (See Exhibits Y and Z)

**Meuse's Rebuttal to MTH ¶9:**  This is true, but legal bases for issuing these court documents are non-existent.

**MTH ¶10:**  On or around the first week in December, 2000, Meuse and his daughter were living in Ada, Oklahoma. (Id, ¶ 377.)

**Meuse's Rebuttal to MTH ¶10:**  This is true, but neither the State nor the Federal warrants, which form the bases for the arrest, were valid.  There was no State felony warrant, which is requisite for a Federal arrest warrant for the unlawful flight to avoid prosecution (UFAP), and the so-called Federal warrant was UNsigned.\[16]∧[17]/  That FBI Agent Charles Kelly wrote an affida-

---

Further, within the realm or zone of privacy is the notion that parents have a "fundamental right to make decisions concerning the care, custody and control of their children."  Troxel, 530 U.S. at 66.

[16]    [T]he Commonwealth lacked a validly issued arrest warrant due to the clerk's failure to administer an oath to the complainant and his failure to sign the arrest warrant.  This undoubtably is a substantial violation of law, and raises both State and Federal Constitutional issues.  See Payton v. New York, 445 U.S. 573, 603 (1980)...; Commonwealth v. Marquez, 434 Mass. 370, 374-75 (2001)….

Com. v. Alves, 2001 WL 1811964 *7, No. 0100156001005 (Mass.Super. Nov. 23, 2001) (Murphy, J.)(holding "that the violation ... warrants the exclusion of evidence and the good-faith exception is inapplicable to the facts presented").

[17]    Although in Commonwealth v. Pellegrini, 405 Mass. 86, 88, *cert. denied*, 497 U.S. 975 (1989), the Court held that the judge's failure to sign search warrant was a ministerial defect that does not invalidate the warrant, in Pellegrini, there was evidence of a hearing and many details demonstrating that there was interaction between the judge and the clerk and the officer.  In the instant case, there is nothing but an affidavit with the false representation that the mandatory State felony warrant existed when, in fact, it did not.  Com. v. Alves, 2001 WL 1811964 *4 (Mass.Super. 2001).  In Massachusetts, there is "a statute and corresponding Rule of Criminal Procedure which require an arrest warrant to be signed in order to be issued.  See  G.L.c. 276, § 22 (justice shall issue arrest warrant in

MEUSE 'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 57 of 59

vit is insufficient to support that warrant.  It is insufficient because in the affidavit Agent Kelly

swore that certain things, such as there being a State felony warrant, were true, when, indeed,

they were absolutely untrue.  Both Moynihan and Thompson testified at the criminal trial that

they had never seen the alleged Federal warrant [**Am. Ver. Compl. ¶¶223 and 225**].


**MTH ¶11:**  On or about March 23, 2001, Meuse was charged with parental kidnaping [*sic*] while in court in Ada, Oklahoma. (Id, ¶ 384.)

**Meuse's Rebuttal to MTH ¶11:**  True.


**MTH ¶12:**  Meuse was ultimately brought back to Haverhill District Court for his arraignment. (Id, ¶387.)

**Meuse's Rebuttal to MTH ¶12:**  True.


**MTH ¶13:**  On May 23, 2002, Meuse was found not guilty of parental kidnaping [*sic*] . (Id, ¶ 395.)

**Meuse's Rebuttal to MTH ¶13:**  True.


**Part VII:  Significance of Moynihan, Thompson, and Haverhill's Choice (1) of Facts to Be Denied and Facts to Neither Be Denied or Admitted and Be Proven at Trial and (2) of Facts to Be Denied.**

There are 225 paragraphs in this category, i.e., the category of those facts that MTH neither

admit nor deny.  Of those 225 paragraphs, 179 (give or take one or two, in case Meuse's counsel

miscounted) were taken specifically from **testimony** memorialized in the transcripts of Meuse's

criminal trial.  Had MTH admitted that the facts in those 179 paragraphs were true representations

of the trial testimony, Meuse would have filed a motion for summary judgment on liability.  Given

that MTH failed to produce any evidence during discovery to demonstrate that the facts in the 179

paragraphs were untrue, this court may infer that all the facts in those 179 paragraphs are true.

---

compliance with the provisions of Massachusetts Rules of Criminal Procedure)." *Alves*, at 4. "     Article 14 requires justices issuing warrants both to administer an oath to the applicant and to sign the arrest warrant they issue

Similarly, of the 86 paragraphs MTH chose to deny in entirety or in part 82 paragraphs (give or take one or two, in case Meuse's counsel miscounted), which were taken specifically from **testimony** memorialized in the transcripts of Meuse's criminal trial.    Given that MTH failed to produce any evidence during discovery to demonstrate that the facts in the 86 paragraphs were untrue, this court may infer that all the facts in those 86 paragraphs are true.

This court may infer further that MTH's Answer was filed in bad faith and that MTH's Motion for Partial Summary Judgment is frivolous.  Consequentially, Meuse seeks sanctions in the form of attorney's fees for having to write the entire oppositional package.

And primarily, while summary judgment on Meuse's civil rights is possible, it may, under the totality of these circumstances, may be **only** in Meuse's favor.  Given, however, that in federal court, there is no rule equivalent to that in Massachusetts, which allows summary judgment to be awarded to the NONmovant, Meuse will have to move for partial summary judgment.  His counsel would have already done so had her Bar-status debacle taken an enormous amount of unanticipated time from her obligations to Meuse in this case.

On November 6th, there will be a hearing in federal court.  Not having received as yet the paper sent to counsel by certified mail, Meuse's counsel knows not whether she shall be continuing to represent Meuse or whether successor counsel will be necessary.  If she remains, she will write such a motion.  If there is successor counsel, he or she will likely do so.

Respectfully submitted,
BRIAN J. MEUSE,
By his attorney,


/s/ Barbara C. Johnson <barbaracjohnson@worldnet.att.net>
16 October 2006                        Barbara C. Johnson, Esq.
                                       6 Appletree Lane
                                       Andover, MA 01810-4102

---

pursuant to the laws of the Commonwealth." Id. at 5.

MEUSE'S LOCAL RULE 56.1 STATEMENT OF FACTS
IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH    Document 157    Filed 10/16/2006    Page 59 of 59

978-474-0833
BBO #549972

### AFFIDAVIT BY BARBARA C. JOHNSON

I, Barbara C. Johnson, Esq., hereby depose that all statements and observations I attribute to myself saying or observing are true, and all other statements are true upon information and belief.

Sworn under the pains and penalties of perjury.

16 October 2006                    /s/ Barbara C. Johnson <barbaracjohnson@worldnet.att/net>
                                   Barbara C. Johnson, Esq.