UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION: 04-10255-EFH

**Brian J. Meuse**
Plaintiff

v.

**Susan Pane,**
**Rosalyn Stults,**
**Lt. Detective Daniel R. Moynihan**, in his official and individual capacities,
**Captain Donald Thompson**, in his official and individual capacities,
**City of Haverhill, Massachusetts,**
**Louis Freeh**, in his official capacity,
**Charles S. Prouty**, in his official and individual capacities,
**Charles P. Kelly,** in his official and individual capacities,
**FOX Television Stations, Inc.,**
**STF Productions, Inc.**, a/k/a America's Most Wanted,
**National Center for Missing and Exploited Children,**
**Wal-Mart Stores, Inc.**
Defendants

---

### MEUSE'S MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANTS MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S MOTION FOR SUMMARY JUDGMENT
(An opposition and a Local Rule 56.1 Statement of Facts accompany this opposition.
An affidavit appears at the bottom of this pleading.)

Now comes Brian J. Meuse ["Meuse] and submits this memorandum in opposition to Motion for Summary Judgment by Defendants Lt. Detective Daniel R. Moynihan ["Moynihan"], Captain Donald Thompson ["Thompson"], and City of Haverhill, Massachusetts ["Haverhill"].

**SUMMARY JUDGMENT STANDARD**

In making its determination, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the non-moving party's case." \[1]/ <u>Celotex Corp. v. Cat-</u>

---

[1]  The movants have done neither: they offered no evidence to disprove Meuse's case and have not demonstrated an absence of evidence to support Meuse's case.

**1**

Case 1:04-cv-10255-EFH    Document 158    Filed 10/16/2006    Page 2 of 19

MEUSE'S MEMORANDUM IN SUPPORT
OF OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

rett, 477 U.S. 317, 325 (1986). Once the movant has met its burden, the non-moving party must "go beyond the pleadings, and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a material issue for trial." Id. at 323 (internal quotation marks omitted). When facts asserted by the moving party go unrebutted, the Court must still search the record on its own for genuine issues of material fact. See Stephanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 930 (1st Cir. 1983).

**ARGUMENTS\\[2]/**

1.  **The defense of qualified immunity must fail where Moynihan and Thompson were objectively UNreasonable or were incompetent.**

    "[G]overnment officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "[O]bjective legal reasonableness ... is the touchstone of Harlow." Anderson v. Creighton, 483 U.S. 635, 639 (1987). By focusing on objective reasonableness, "the Supreme Court's decision in Harlow effectively eliminates from the qualified immunity calculus consideration of a government actor's subjective state of mind." Collins v. Marina-Martinez, 894 F.2d 474, 478 n.6 (1st Cir. 1990).

    In the instant case, Meuse contends that the officers not only acted with objective **_UN_**reasonableness, they also knowingly violated the law and were plainly incompetent. "Qualified immunity protects 'all but the plainly incompetent OR those who knowingly violate the law.'" Anderson v. Creighton, 483 U.S. 635, 638 (1987), quoting Malley v. Briggs, 475 U.S. 335, 341 (1986); McCleary v. Navarro, -- U.S. --, 112 S.Ct. 2324, 2324 (1992), (same); Hunter v. Bryant, 502 U.S. 224, 229 (1991) (same).

---

[2]  See Meuse's Opposition for a list of the issues in the Arguments section in this memorandum.

MEUSE'S MEMORANDUM IN SUPPORT
OF OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH   Document 158   Filed 10/16/2006   Page 3 of 19

"Police officers [were] denied qualified immunity on summary judgment because their conclusion of probable cause could be found objectively unreasonable when the facts are viewed in light most favorable to the plaintiffs." Id., 483 U.S. at 656 n.12 (1987), citing Reardon v. Wroan, 811 F.2d 1025 (7th Cir. 1987). And "police officers [were] denied qualified immunity on summary judgment because of genuine issue of probable cause." Anderson, 483 U.S. at 656 n.12, citing Deary v. Three UnNamed Police Officers, 746 F.2d 185 (3d Cir. 1984).

Where, of course, Meuse's clearly established constitutional rights were violated, Moynihan and Thompson are not entitled to protection from trial by qualified immunity. "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow v. Fitzgerald, 457 U.S. 800, 818-819 (1982).\**3**/

Where there are unresolved factual disputes [*see* Parts IV, V, and VI of Meuse's Statement of Facts], the jury must decide whether the officers' acts were objectively reasonable.\**4**/

> The Court does not consider the possibility that the "objective reasonableness" of the officer's conduct may depend on the resolution of a factual dispute. Such a dispute may preclude the entry of summary judgment but, despite the Court's intimation to the contrary, see ante, at 640, n. 2, should not necessarily prevent a jury from resolving the factual issues in the officer's favor and thereafter concluding that his conduct was objectively reasonable.

Anderson, 483 at 655 n. 10 (Stevens, J. with whom Brennan and Marshall, JJ., joined, dissenting). That means that the jury may, indeed, make the decision as to whether the Moynihan's and Thompson's acts were objectively reasonable. That means, under Anderson, Meuse must be al-

---

**3** "[I]t is not unfair to hold liable the official who knows or should know he is acting outside the law ...." Crawford El v. Britton, 523 U.S. 574, 1998.SCT.42083 at ¶67 <http://www.versuslaw.com> (1998), quoting Butz v. Economou, 438 U. S. 478, 506 (1978).

**4** Another explanation is, of course, that these officers were inadequately or negligently trained and lacked the knowledge to fulfill their assigned positions, making foreseeable the deprivation of Meuse's rights. This is a determination for the jury to make. "[I]nadequate training of subordinates may be a basis for a section 1983 claim against a superior officer." Maldonado-Denis, *et al* v. Castillo-Rodriguez, *et al*, 23 F.3d 576, 582 (1994).

3

lowed to take his case against the officers, as well as against Haverhill, to the jury.

> . . . no such unfairness can be attributed to holding one accountable for actions that she knew, or should have known, violated the constitutional rights of the plaintiff. Harlow itself said as much: "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Id., at 818-819; see also Butz, 438 U. S., at 506 ("[I]t is not unfair to hold liable the official who knows or should know he is acting outside the law ... .").

Crawford-El v. Britton, 523 U.S. 574, 1998.SCT.42083 at ¶67 <http://www.versuslaw.com>.

2. **Where the police officers' conclusion of probable cause was objectively unreasonable when the facts are viewed in light most favorable to Meuse, Lt. Det. Moynihan and Capt. Thompson must be denied qualified immunity on summary judgment.**

Because of the overwhelming number of facts and/or admissions that show that Moynihan and Thompson were either plainly incompetent or their conclusions of probable cause were objectively unreasonable, Meuse makes no attempt to reiterate them here. For the court's convenience, he refers to those facts under the following headings in the Complaint, or under both the fact in Parts III and V of his Local Rule 56.1 Statement of Facts.

| | |
|---|---|
| Moynihan Ignored Restraining Order Against Pane: Invidious Gender Discrimination | 73-86 |
| Moynihan's Non-Investigation Regarding Status of Case in Family Courts of Massachusetts and Florida | 87-94 |
| Information Supplied to and Gathered by the Haverhill Police Department | 95-115 |
| Moynihan's Non-Investigation Regarding the Drugs' List | 116-129 |
| Moynihan's Non-Investigation Regarding the Two Susans | 130-139 |
| Child's Medical Condition Between July 2000 and 1 October 2000 | 140-150 |
| Meuse's Legal Attempts to Take Marissa out of Harms Way | 151 |
| Faced with Court's Failure to Act. Meuse Must Act to Save Child | 152-172 |
| Moynihan's Understanding of the Law | 173-178 |
| Thompson Orders Moynihan to Stop Investigation and Later Lies to the Chief | 179-184 |
| Susan Pane Reports Child Taken from Florida | 185-193 |
| Moynihan's Investigation after Pane Reports Child Taken | 194-203 |
| What Thompson and Moynihan Knew Before They Sought Arrest Warrant | 204-214 |
| The Unlawful Warrant for Meuse's Arrest | 215-223 |
| What Thompson Knew about the Alleged FBI Unlawful Flight Warrant | 224-232 |
| What Thompson Did Not Investigate about the Baby's Health | 233-242 |
| What Thompson Knew about Moynihan's Investigation of the Baby's Health | 243-246 |
| Moynihan's Non-Investigation Regarding Pane's Care of the Child | 247-252 |
| Captain Thompson's General Police Knowledge | 253-267 |
| Thompson, Moynihan, the FBI, and FBI Agent Charles Kelly Coordinate Activities | 268-294 |
| Pane and Moynihan and the FBI Coordinate Poster Activities | 295-316 |
| Moynihan's Communication with Pane and Stults | 327-334 |
| Probable Cause | 338-360 |

Case 1:04-cv-10255-EFH    Document 158    Filed 10/16/2006    Page 5 of 19

MEUSE'S MEMORANDUM IN SUPPORT
OF OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

**Trial facts proving NO probable cause, but neither admitted nor denied by MTH:**
82-83, 89, 131-132, 138-139, 174-175,
176 (Moynihan misstating Massachusetts common law and adding "In the Court. . . . The mother always gets custody of the child until ----" )
177, 179,
182 (Thompson testified that Moynihan misinformed Thompson),
184 (Moynihan accuses Thompson of misrepresenting),
194-203, 204-205,
206 (see footnote 14 on p. 27 of Meuse's Statement of Facts),
208-214, 216-221, 223-225,
226 (Thompson demonstrating that he did not understand the Law),
236-241, 243-246, 247-252, 253, 259-265, 338-350,
351-352 (Thompson admits Pane did not have custody on October 1st, the day Meuse took the child from Florida to Massachusetts),
353
354 (Thompson testified that he was not aware that the 11 October 2000 order was not in effect on 8 October 2000)
355-360

**Trial facts proving NO probable cause, and admitted by MTH:**
60, 62, 74-75, 80-85, **87-88, 90-94, 95-96,** 97-98, 101-104, 106-110, **111**, 112-113
116-129 (more about Pane's drug list),
130-134 (the other Susan . . . Paine)
**172**, 215

**Trial facts proving NO probable cause, and denied by MTH:**
60, 74-75, 79-80, 86, 178, 187, 242

The primary facts that prove no probable cause, despite its low threshold, are Moynihan's and Thompson's failure to conduct a proper and diligent investigation. For instance, they failed to check out the status in the family and district courts. Had they done so, they would have learned that when Meuse took the child from Florida, **(1)** that Meuse was given custody of the child by Haverhill District Court, **(2)** that the Probate & Family Court had never issued a custody order of the child, and **(3)** that there also no judgment of contempt. And MTH knew, of course, that the reason had not actual physical custody of the child was that the police were derelict in their duties by refusing to enforce the restraining order against Susan Pane by Judge Herlihy.

October 11th, the date MTH and their counsel are treating as if it had some magical power because it was a date an order of custody did issue, it was, in fact, merely a date **AFTER** Meuse

MEUSE'S MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANTS MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH    Document 158    Filed 10/16/2006    Page 6 of 19

had dropped out of sight in order to ensure that the child would get the proper physical and occupational therapy, attention that Pane chose not to provide the child despite the Florida Early Intervention team suggesting that that therapy was mandatory. Without that therapy, the child's muscles were in danger of atrophying. Meuse was not at any hearing on October 11th because he was unaware of it, as he was also unaware of the custody order. Fortunately the jury was able to understand these facts. Unfortunately, Moynihan, Thompson, and Haverhill are still alleging that that date, October 11th, still has some magic significance. It doesn't.

Secondarily, that Florida said that there was no crime there should have raised a red flag alerting the police to see who had custody and whether an order of contempt was in effect on 1 October 2000, when Meuse took the child for medical care.

Thus, where there was no custody order and no finding of contempt in existence on 1 October 2000, the date Meuse took the child from Florida and brought her to Massachusetts for diagnosis and medical and therapeutic care, OR on 8 October 2000, the date that Moynihan's complaint alleged that Meuse had kidnapped the child, his and Pane's daughter, Moynihan and his Captain, Thompson, who approved Moynihan's acts, did not have probable cause to seek a warrant to arrest Meuse or an application to charge him with a crime.

Additionally, MTH argues that probable cause may be found if the police had "reasonably trustworthy information . . . furnished by a credible victim" [MTH Mem. at 5]. Their information was primarily by Susan Pane [**Am. Ver. Compl. ¶¶185-193**] and MTH knew that this was a woman who had willfully ignored Judge Herlihy's restraining orders (extended several times) and who did not care that Judge Manzi found her having unlawfully removed the child to Florida. Moynihan was correct when he testified that the women always get custody in family court. **[Am. Ver. Compl. ¶176, Trial, 5/21/02, at 10-11].** The Mother:Father ratio he quoted was 400:6.

MTH also knew that there was an outstanding violation of a c/ 209A restraining order

MEUSE'S MEMORANDUM IN SUPPORT
OF OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH   Document 158   Filed 10/16/2006   Page 7 of 19

against Pane and that they were derelict in their duty by refusing to prosecute her in both 1999 (when she appeared in the district court confident that she would not be arrested because she was a woman) and 2000 (when she appeared at the Haverhill police to fill out a report against Meuse) [**Am. Ver. Compl. ¶193, Exh. M**]. Moreover, they had been informed by the Meuses on numerous occasions that on 3 May 2000, Judge Mary McCauley Manzi declared Massachusetts the home state of the child, declared Massachusetts would exercise jurisdiction, and wrote that the mother, Susan Pane, wrongfully removed the child to Florida in October 1999 [**Am. Ver. Comply. ¶64; Trial, 5/20/02, at 81-82; Trial, 5/21/02, at 17; Exh. T**]. And, of course, they knew about her drug use. Clearly Pane was not a so-called victim who was sufficiently credible to establish probable cause.

3. **Where Moynihan (a) failed—and admitted he failed— to demonstrate that he could prove probable cause to support his application for an arrest warrant, (b) failed to produce evidence that he took an oath, (c) failed to produce evidence, e.g., such as a tape or transcript, of a hearing on his application, the arrest warrant is invalid.**

> "To be valid, an arrest must be based on probable cause. Art. 14 of the Massachusetts Declaration of Rights. G.L. c. 276, § 22 (1984 ed.). *Cf.* Commonwealth v. Baldassini, 357 Mass. 670, 675, 260 N.E.2d 150 (1970).

Com. v. Bottari, 395 Mass. 777, 783, 482 N.E.2d 321, 325 (1985).

> [T]he Commonwealth lacked a validly issued arrest warrant due to the clerk's failure to administer an oath to the complainant and his failure to sign the arrest warrant. This undoubtably is a substantial violation of law, and raises both State and Federal Constitutional issues. See Payton v. New York, 445 U.S. 573, 603 (1980)...; Commonwealth v. Marquez, 434 Mass. 370, 374-75 (2001)....\[5]/

Com. v. Alves, 2001 WL 1811964 *7, No. 0100156001005 (Mass.Super. Nov. 23, 2001) (Murphy, J.)(holding "that the violation ... warrants the exclusion of evidence and the good-faith ex-

---

[5] In Giordenello v. United States, 357 U.S. 480, 485-486, 78 S.Ct. 1245, 1250, the Court held that

> '(t)he language of the Fourth Amendment (to the Constitution, of the United States), that '* * * no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing * * * the persons or things to be seized * * *,' of course applies to arrest as well as to search warrants.' This requirement is no different from that of art. 14 of the Declaration of Rights.

Baldassini, 357 Mass. at 675, 260 N.E.2d at 154.

ception is inapplicable to the facts presented").

Although in a case cited Moynihan, Thompson, and Haverhill, Commonwealth v. Pellegrini, 405 Mass. 86, 88, *cert. denied*, 497 U.S. 975 (1989), the Court held that the judge's failure to sign the search warrant was a ministerial defect that does not invalidate the warrant, in Pellegrini, there was evidence of a hearing and many details demonstrating that there was interaction between the judge and the clerk and the officer.

In Massachusetts, there is "a statute and corresponding Rule of Criminal Procedure which require an arrest warrant to be signed in order to be issued. See G.L. c. 276, § 22 (justice shall issue arrest warrant in compliance with the provisions of Massachusetts Rules of Criminal Procedure)." Alves, at 4. "Article 14 requires justices issuing warrants both to administer an oath to the applicant and to sign the arrest warrant they issue pursuant to the laws of the Commonwealth." Id. at 5. Otherwise, the warrant is invalid. Id.

Further, without an existing order giving custody to Pane prior to his taking the child and without a judgment of contempt, there was no evidence that Meuse had committed a crime. Where such evidence did not exist, there was insufficient information to have produced to a clerk or a magistrate or a judge. Thus, under G.L. c. 276, § 22, Mass.R.Crim.P. 14, or Article 14 of the Massachusetts Declaration of Rights, the State arrest warrant was invalid.

4. **Where there is evidence of an unlawful custom or practice by the City and an unconstitutional policy can be inferred from a single decision by the responsible City officials, summary judgment on Meuse's civil rights claims is inappropriate.**

In Monell v. New York City Dep't of Social Services, 436 U.S. 658, (1978), the Court found:

> Local governing bodies ... can be sued directly under s 1983 ... where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers. Moreover, ... local governments ... by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

8

Case 1:04-cv-10255-EFH    Document 158    Filed 10/16/2006    Page 9 of 19

MEUSE'S MEMORANDUM IN SUPPORT
OF OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

Monell, 436 U.S. at 690-91.  "[T]he Court  [also] assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." Broderick v. Roache, 803 F.Supp. 480, 484 (D.Mass. 1992), quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (citing Owen v. City of Independence,  445 U.S. 622 (1980) and City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981)). [FN3]

"Defin[ing] more specifically the circumstances in which a single decision might appropriately be considered to establish an unconstitutional policy," [Broderick, at 484 ], Justice Brennan wrote in Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986):

> First, a municipality may be held liable only for acts "which the municipality has officially sanctioned or ordered."   Second, a municipality may be held liable only when the decisionmaker "possesses final authority to establish municipal policy with respect to the action ordered."   Third, "whether an official ha[s] final policymaking authority is a question of state law."   Fourth, in order for municipal liability to attach, the decisionmaker must be the official "responsible for establishing final policy with respect to the subject matter in question."

Broderick, at 484-485 (cites omitted), noting that the four elements were identified and approved in Praprotnik.   Meuse notes, in passing, that the facts in his case satisfy all four elements.

5. **Where (1) there was an affirmative link between the street-level misconduct and Chief Barone and Haverhill, directly through the then-mayor, (2) there was notice to Barone and Haverhill, (3) Barone and Haverhill, were deliberately indifferent, and (4) they failed to take easily available measures to address the risk, summary judgment of Meuse's §1983 claims against Haverhill is inappropriate.**

> A crucial difference exists between liability as master (*Respondeat* superior) and direct liability. *Respondeat* superior is a doctrine of vicarious liability based upon public policy the notion that the person who benefits by the acts of the servant must pay for wrongs committed by the servant; the one held liable as master need not be at fault in any way. See Holmes, The History of Agency, 4 Harv.L.Rev. 345 (1882). Under direct liability, plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury. The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right.

McClelland v. Facteau, 610 F.2d 693, 695 (10th Cir.1979).

Case 1:04-cv-10255-EFH   Document 158   Filed 10/16/2006   Page 10 of 19

MEUSE'S MEMORANDUM IN SUPPORT
OF OPPOSITION TO DEFENDANTS
MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S
MOTION FOR SUMMARY JUDGMENT

**A. Affirmative Link:** To find Moynihan's supervisor, who was Thompson, and Thompson's superviser, who was Chief Barone, "there must be 'an "affirmative link" between the street-level misconduct and the action, or inaction, of supervisory officials.'" Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989), quoting Woodley v. Town of Nantucket, 645 F.Supp. 1369, 1372 (D.Mass. 1986), quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976).

The "affirmative link [must be] through direct participation or through conduct that amounts to condonation or tacit authorization." [Camilo-Robles v. Zapata, 175 F.3d 41, 44, 1999 WL 223051 at *2 (1st Cir. April 20, 1999)] or "supervisory, encouragement, condonation or acquiescence, or gross negligence amounting to deliberate indifference" [Aponte Matos v. Toledo Davila, 135 F.3d 182, 192 (1st Cir. 1998) (cite omitted)], or the purposeful disregard of the conduct. Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 48 (1st Cir. 1999). Essentially, "the plaintiff must show that the supervisor 'possessed either the state of mind [6/] for the particular constitutional violation or deliberate indifference, and . . . played a causal role in plaintiff's constitutional deprivation.'" O'Neill v. Baker *et al*, 210 F.3d 41, 47 (1st Cir. 2000), quoting 1 Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983, sec. 3:91, at 3-241 (4th ed. 1999).

**B. Notice:** Actual knowledge by a supervisor of the unconstitutional conduct is not required. Shabazz v. Cole, 69 F.Supp.2d 177, 203 (D.Mass. 1999). "A supervisor 'may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or wilful blindness.'" Shabazz, at 203-204, quoting Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir.1998), *cert. denied*, 525 U.S. 1105 (1999).

**C. Deliberate Indifference:** "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his ac-

---

[6] In the context of an arrest, a probable cause analysis does not entail an assessment of an officer's state of mind but of the facts and circumstances confronting him at the time of the act. Maryland v. Macon, 472 U.S. 463, 470-471 (1985). "[P]robable cause is the appropriate standard to apply to strip and visual body cavity searches." Ford (Memo, Class), slip op. at 8, quoting Com. v. Thomas, 429 Mass. 403, 408, 708 N.E.2d 669, 673 (Mass. 1999).

tion." Board of the County Com'rs of Bryan County, Oklahoma v. Brown, *et al*, 520 U.S. 397, 410 (1997), citing City of Canton v. Harris, 489 U.S. 378 (1989).[7]

"Deliberate indifference, ..., requires the plaintiff to `show **(1)** a grave risk of harm, **(2)** the defendant's actual or constructive knowledge of that risk, and **(3)** his failure to take easily available measures to address the risk.'" Shabazz, at 204, quoting Camilo-Robles v. Hoyos, 151 F.3d at 7 (noting that this formulation implies the necessary showing of causation as well as deliberate indifference).

> [T]he causal link may be established where "here exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994); *see also* Braddy v. Florida Department of Labor and Employment Security, 133 F.3d 797, 802 (11th Cir. 1998) (widespread abuse sufficient to alert supervisor exists where deprivations are "'obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences'").

Shabazz, at 204.

> [In the supervisory liability context], liability attaches if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation. [Cites omitted]; *cf.* City of Canton v. Harris, 489 U.S. 378, 388-89 (1989) (explicating deliberate indifference standard in a municipal liability setting). Under such a theory, a supervisor may be brought to book even though his actions have not directly abridged someone's rights; it is enough that he has created or overlooked a clear risk of future unlawful action by a lower-echelon actor over whom he had some degree of control.

Camilo-Robles v. Zapata, 175 F.3d at 44.

Where a supervisor can be held liable if **(1)** the behavior of his subordinates results in a constitutional violation, and **(2)** the supervisor's action or inaction is affirmatively linked to that

---

[7] Our earlier cases on supervisory liability have stated that a plaintiff must establish that the supervisor's conduct constituted "gross negligence *amounting* to deliberate indifference." [Cite omitted.] We believe there is no difference of moment between that standard and one of reckless or callous indifference. [Cites omitted] . . . (discussing different definitions of deliberate indifference); . . . (using standards of reckless disregard and deliberate indifference interchangeably); . . . (equating the two standards); . . . (using both standards as one); . . . (noting distinction between gross negligence -- standing alone -- and recklessness). We see no reason to differentiate in this context between these standards. We hold that indifference that rises to the level of being deliberate, reckless or callous, suffices to establish liability under sec. 1983. Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989).

behavior in that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference, the indifference that is required to support supervisory liability under 42 U.S.C. §1983 must be deliberate, reckless or callous. It should lead "inexorably to the constitutional violation." Seekamp v. Michaud, 109 F.3d 802, 809 (1st Cir. 1997).

One supervisor named in the within suit is Captain Thomas. As his testimony makes clear, Thompson had to know and almost always did know that his orders to Moynihan and what Moynihan did on his own would deprive Meuse of his fundamental right to make decisions concerning the care, custody, and control of his child. Troxel v. Granville, 530 U.S. 57, 66 (2000) (citing Stanley v. Illinois, 405 U.S. 645, 651 (1972)) (other citations omitted).

Other supervisors of the Haverhill Police Department are now-former-Chief Leonard Barone and the Mayor of Haverhill. The mayor and Barone were contacted by the Meuses and informed during the Fall of 1999 of the problem with Pane's drug use and the failure of the police department to enforce Judge Herlihy's restraining order against Pane [**Am. Ver. Compl. ¶¶98, 180-184, 219, 391, 430, 435, 437, 440, 467, 498, Exh. CC**]. Had the mayor not been deliberately indifferent to the welfare of his constituents, in this case Meuse and his child (over whom Massachusetts had declared it was exercising jurisdiction) and acted properly to control and supervise and train his police department, Meuse's civil rights claims would never have arisen.

> d. **Failure to take easily available measures to address the risk.**
>
> Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of that action -- the "deliberate indifference" -- necessary to trigger municipal liability.

Board of the County Com'rs v. Brown, 520 U.S. 397, 407, 117 S.Ct. 1382, 1390 (1997), citing and discussing Canton v. Harris, 489 U.S. 378, 390 n. 10 (1989).

> It could be .... that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers.

Board of the County Com'rs, 520 U.S. at 407, citing Canton, at 397. This, Meuse contends, is what was happening in his case.

> The policymaker's toleration of the subordinates' behavior establishes a policy-in-practice just as readily attributable to the municipality as the one-act-policy-in-practice. Such a policy choice may be inferred even without a pattern of acts by subordinate officers, so long as the need for action by the policymaker is so obvious that the failure to act rises to deliberate indifference.

Board of the County Com'rs, 520 U.S. at 418, citing Canton, at 390.

> [W]here a municipality's failure to train its employees ... evidences a `deliberate indifference' to the rights of its inhabitants can ... a shortcoming be ... city `policy or custom' ... actionable under sec. 1983.

Board of the County Com'rs, 520 U.S. at 419, citing Canton, at 389.

> "[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations ..."

Board of the County Com'rs, 520 U.S. at 407, citing Canton, at 397.

> ... A municipality may be liable under sec. 1983, see Monell v. Dept. of Soc. Servs. of New York, 436 U.S. 658, 688, 694 (1978), but only if the injury is caused by "officials whose acts may fairly be said to be those of the municipality," or if there is a municipal policy or custom that caused the injury. County Commrs. of Bryan County v. Brown, 520 U.S. 397, 403-404 (1997).

Howcroft v. City of Peabody, 51 Mass.App.Ct. 573, 583 n. 15, 2001 WL 521382 *6 (2001).

This condition is satisfied here

6. **Where MTH not only were willing participants in the conspiracy, which included state actors, but also aided Pane in creating a situation out of which the potential prosecution of Meuse could and would likely grow and lead to possible conviction, summary judgment of Meuse's claims for conspiracy against MTH under §1985(3) is inappropriate.**

> "The heart of a conspiracy is the formulation of the unlawful agreement or combination." Com. v. Cantres, 405 Mass. 238, 244 (1989). . . . But a conspiracy rarely wears its heart on its sleeve. Thus we have no explicit proof of the defendant's "agreeing" in so many words with Curtis to join in the scheme, although we have much about transactions with M & S, the defendant's company. Agreement, however, may be instinct in the situation as a whole, and proved by circumstantial means. . . . It is enough if the parties come even tacitly to an understanding, and this may be inferred from a course of conduct having a common design.

13

*See* Direct Sales Co. v. United States, 319 U.S. 703, 714 (1943). Finally, "[t]he step from knowledge to intent and agreement may be taken. There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. There is informed and interested cooperation, stimulation, instigation. And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy." Id. at 713 (Rutledge, J.).

Com. v. Melanson, 53 Mass.App.Ct. 576, 580-581 (2002) (some internal cites omitted).

> a. **Invidious discriminatory animus is, under Bray, *infra*, not an element of conspiracy pursuant to the SECOND clause of §1985(3). Invidious discriminatory animus was created by judicial fiat as an element for conspiracy pursuant to the FIRST clause of §1985(3) in Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).**

Section 1985(3) of Title 42 of the United States Code has three clauses. Only the first two have any relevance to this discussion. Those clauses of the subsection of the statute read:

> **(3) Depriving persons of rights or privileges**
>
> [**Clause 1**] If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;
>
> [**Clause 2**] or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . .

The first clause of §1985(3) is broad in scope. Because "the [first clause] [ ] was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others." Griffin v. Breckenridge, 403 U.S. (Miss.) 88, 1971.SCT.42106 at ¶42 <http://www.versuslaw.com> (1971). So, to guard against §1985(3) becoming a "general federal tort law," the Court in Griffin imposed a fifth element— invidious discriminatory animus—to make out a *prima facie* case for conspiracy pursuant to Clause 1.[8]

A decade later, the Court in Kush v. Rutledge, 460 U.S. 719 (1983), declined to impose

---

[8] None of the defendants argued in their motions for summary judgment that discrimination is an element of a conspiracy claim under the first clause of §1985(3). Because Meuse's counsel has argued, in another case in this District Court, this issue—of the judicially imposed fifth element of a §1985(3) conspiracy claim—Meuse would like the opportunity to brief the issue more fully if the court is inclined to act *sua sponte* and base its decision on Meuse's §1985(3) conspiracy claim on discrimination grounds.

14

the judicially created *animus* requirement onto the list of elements needed to make out a claim for a conspiracy pursuant to the **second** clause of §1985(3).

Commenting upon Kush still another decade later, Justice Stevens in Bray v. Alexandria Women's Health Clinic, 113 S.Ct, 753, 1993.SCT.40439 <http://www.versuslaw.com> (1993), wrote, "Kush suggests that Griffin 's strictly construed class-based animus requirement, developed for the first clause of § 1985(3), should not limit the very different second clause." Bray at ¶128 (Stevens, J., with whom Justice Blackmun, joins, dissenting). ""There is no suggestion in the opinion that its reasoning applies to any other portion of §1985." Bray, at ¶129, citing Kush, 460 U.S., at 726. "[O]f greatest importance, the statutory language that provides the textual basis for the 'class-based, invidiously discriminatory animus' requirement simply does not appear in the portion of the statute that applies to this case." 460 U.S., at 726.

In Bray, the alleged conspiracy was of a different type than that in Griffin. Similarly, so is the conspiracy in the case at bar. According to Bray, **a clause-2 conspiracy** is one that "seeks by force of numbers to prevent local officials from protecting the victims' constitutional rights." Bray, at ¶12 (Stevens, J., with whom Justice Blackmun, joins, dissenting). Such a conspiracy

> presents exactly the kind of pernicious combination that the second clause of § 1985(3) was designed to counteract. As we recognized in Griffin, the second clause of § 1985(3) explicitly concerns such interference with state officials and for that reason does not duplicate the coverage of the first clause. Griffin, 403 U.S., at 99.

Bray, at ¶12. Stults and Pane and the FBI directly—and the corporations indirectly—did just that, i.e., they interfered with the proper performance of the defendant police officers by building the Meuse case so that they all could enhance their own careers by enhancing, in turn, the City of Haverhill's and the police department's domestic violence statistics, which those entities use when applying for an award of grant money from the State and the federal governments.

Without out some ulterior motive and hidden benefit, there was no reason for the defendant

15

police officers to circumvent proper investigating techniques, to forego checking with the courts to learn **(1)** whether there was a custody order, **(2)** whether there was a custody agreement, **(3)** whether Meuse was in contempt of court, **(4)** whether there was in effect at the time Meuse took the child to Massachusetts a custody order issued by a Florida court giving Pane custody of the child. The police failed to check into any of these items. [**Ver. Compl. ¶¶82-83, 87-88, 194-203**]\9/ Meuse contends that the failure of MTH to investigate properly is the reason Moynihan failed to file an affidavit supporting his application for a warrant. *See* Alves, *supra* at 7.

> Limited to conspiracies that are sufficiently massive to supplant local law enforcement authorities, the second clause requires no further restriction to honor the congressional purpose of creating an effective civil rights remedy without federalizing all tort law.

Id., at ¶130. In sum, a clause-2 conspiracy differs from a clause-1 conspiracy in that it "entails both a violation of the victims' constitutional rights and state involvement." Id.

Had the Moynihan and Thompson and the FBI agents working the case not been either incompetent or have their own ulterior motives for not properly investigating the case, they would have conducted a diligent investigation. A proper investigation required that the Haverhill officers or the FBI check with the courts to learn whether Meuse was in contempt and whether there had been an order awarding the child's custody to Pane—as Pane and Stults had repeatedly, wrongly informed them.

7. **Moynihan, Thompson, and Haverhill are liable for civil rights deprivations committed by others where their acts were done with the intent to commit those acts**

Moynihan, Thompson, and Haverhill are responsible:

---

[9] Was the failure to check intentional or was the failure caused by incompetence? According to Moynihan [**Ver. Comp. ¶203**], "as far as [he was] concerned, there was no crime in Florida."

The lack of a State felony warrant to support an application for a federal warrant under §1073 is likely the reason the federal warrant [**FBI Exh. 3**] was not signed by Magistrate-Judge Bowler and the reason even Defendants Det. Moynihan and Capt. Thomson never saw the FBI's warrant [**As to Moynihan: Ver, Compl. ¶219, 223;Trial Trans., 5/21/02, at 63, 69. As to Thompson: Ver. Compl. ¶224, Trial Trans., 5/22/02, at 93; Ver. Compl. ¶225, Trial Trans., 5/22/02, at 93]. Thompson even told his Chief. Id. at ¶225**]. Thompson clearly did not know that 18 U.S.C. §1073 requires a State felony warrant to support the issuance of a federal warrant for Unlawful Flight to Avoid Prosecution [**Ver. Compl. ¶257, Trial Trans., 5/22/02, at 121-122**].

- under §1983 and common law for Meuse's false arrest and imprisonment,
- for conspiracy under §1983 and common-law conspiracy,
- violating the Mass. Civil Rights Act (M.G.L. c. 12, sec. 11*I*),
- for common-law malicious prosecution, abuse of process, assault, battery, defamation, and the intentional infliction of emotional distress

Most cases hold a position contrary to that of MTH: i.e., it is immaterial whether the complained-of act directly or indirectly caused, for example, confinement or some other tort.

> A person may be liable for false imprisonment not only when the person's own acts directly impose a restraint upon the liberty of another but also when that person, by providing false information, causes such restraint to be imposed. Karjavainen v. Buswell, 289 Mass. 419, 427 (1935) (questioned on other grounds by Mezullo v. Maletz, 331 Mass. 233, 239-240 [1954]). Restatement (Second) of Torts s 37 (1965) ("If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement").

Sarvis v. Boston Safe Deposit and Trust Co., 47 Mass.App.Ct. 86, 97-98 (1999).

> Cf. Restatement (Second) of Torts §158(a) comment j (1965) ("If, by any act of his, the actor intentionally causes a third person ... to enter land in the possession of another, the actor is responsible for the third person's entry if it be a trespass") ... and Restatement (Second) of Agency §212 comment b (1958) ("If a person directs a particular act which is performed as directed, he is subject to liability if the act directed constitutes a tort."…)

Com. v. Santos, 58 Mass.App.Ct. 701, 705-706 (2003) (trespass and torts in general).

> A cause of action under Section(s) 1985(3) has four elements: (1) two or more persons must conspire, (2) to deprive, **either directly or indirectly**, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) one or more of the conspirators must have done or caused to be done an act in furtherance of the object of the conspiracy, and (4) the plaintiff must have suffered either an injury to person or property or a deprivation of a constitutionally protected right or privilege as a result of the conspiracy.

Andrade v. Jamestown Housing Authority, 82 F.3D 1179, 1192 (1st Cir. 1996) (emphasis supplied). That is, if an act is done with the intent to commit a tort or to deprive another of his or her constitutional rights, and such act is the legal cause of the harm to or deprivation of the rights of another, liability attaches. It is immaterial whether one acts directly or indirectly if it caused the harm or civil rights deprivation; liability attaches. Cf. Karjavainen v. Buswell, 289 Mass. at 427.

> A person may be liable for false imprisonment **not only** when the person's own acts di-

MEUSE'S MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANTS MOYNIHAN, THOMPSON, AND CITY OF HAVERHILL'S MOTION FOR SUMMARY JUDGMENT

Case 1:04-cv-10255-EFH    Document 158    Filed 10/16/2006    Page 18 of 19

rectly impose a restraint upon the liberty of another **but also** when that person, by providing false information, causes such restraint to be imposed. Karjavainen v. Buswell, 289 Mass. 419, 427 (1935) (questioned on other grounds by Mezullo v. Maletz, 331 Mass. 233, 239-240 [1954]). Restatement (Second) of Torts s 37 (1965) ("If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement").

Sarvis v. Boston Safe Deposit and Trust Co., 47 Mass.App.Ct. 86, 97-98 (1999) (emphasis supplied). *See also* Restatement (Second) of Torts § 35 (1965).

An assault and battery is the intentional, unprivileged, unjustified touching of another with such violence that bodily harm is likely to result. See Com. v. Burke, 390 Mass. 480, 482-483, 457 N.E.2d 622 (1983). **The offensive touching may be** direct, as by striking another, or it may **be indirect, as by setting in motion some force or instrumentality with the intent to cause injury**. See Com. v. Stratton, 114 Mass. 303 (1873); Perkins & Boyce, *Criminal Law* 153-154 (3d ed. 1982).

Com. v. Dixon, 34 Mass.App.Ct. 653, 654-655 (1993) (emphasis supplied); Com. v. Cohen, 55 Mass.App.Ct. 358, 359-360 (2002) (holding indirect touching constitutes criminal battery), quoting Dixon, at 654, and citing U. S. v. Frizzi, 491 F.2d 1231, 1232 (1st Cir.1974), amongst others.

People v. Moore, 50 N.Y. Sup.Ct. 356 (1888), is the leading case on **indirect assault and battery**. In Com. v. Burno, 18 Mass.App.Ct. 796, 802 n. 8 (1984), the court adopted the reasoning of Moore and affirmed the convictions for assault and battery by holding that an automobile is an extension of a person and finding it a dangerous weapon based on the "intentional" act theory.

In Lamb v. Maryland, 93 Md. App. 422, 1992.MD.40091 ¶¶73-76 <http://www.versuslaw.com> (1992), the court, citing W. Prosser and P. Keeton, *The Law of Torts* (5th ed. 1984), at 43, wrote that there "[n]o actual contact is necessary" for an assault claim, that is, "a mental, as distinct from a physical, injury" can occur: **"a touching of the mind, if not of the body."**\[10]/

---

[10] [I]t is not necessary that the victim be actually frightened or placed in fear of an imminent battery at the hands of one with the apparent present ability to commit such a battery. The critical state of mind on the part of the victim is to be placed "in reasonable apprehension" of an impending battery. This distinction preserves the rights of the intrepid crime victim or intrepid plaintiff. As W. LaFave and A. Scott, *Criminal Law* (2d ed. 1986) explained, at 693 n. 18.

Lamb, 1992.MD.40091 ¶¶75-76. "'Apprehension is not the same thing as fear, and the plaintiff is not deprived of his action merely because he is too courageous to be frightened or intimidated.'" Id..

In another Maryland case, Taylor v. State, 52 Md.App. 500, 504-505 (1982), cited in Burno, 18 Mass.App.Ct at 802 n.8, the court concluded, when defining "battery" and "assault": "He who acts through another acts himself." Taylor at 505 n. 2.

In the case at bar, MTH used the other defendants as instruments for their wrongdoing. Thus they are liable for the false arrest, imprisonment, assault, battery, abuse of process, and malicious prosecution of Meuse. By acting through another, they acted themselves. Burno, *supra*.

WHEREFORE, Plaintiff prays this court DENY Moynihan, Thompson, and Haverhill's motion for partial summary judgment, to wit, on the civil rights claims.

Respectfully submitted,
BRIAN J. MEUSE,
By his attorney,

16 October 2006

/s/ Barbara C. Johnson <barbaracjohnson@worldnet.att.net>
Barbara C. Johnson, Esq.
6 Appletree Lane
Andover, MA 01810-4102
978-474-0833
BBO #549972

## AFFIDAVIT BY BARBARA C. JOHNSON

I, Barbara C. Johnson, Esq., hereby depose that all statements and observations I attribute to myself saying or observing are true, and all other statements are true upon information and belief.

Sworn under the pains and penalties of perjury.

16 October 2006

/s/ Barbara C. Johnson <barbaracjohnson@worldnet.att/net>
Barbara C. Johnson, Esq.